[No. F006225. Fifth Dist. Sept. 5, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKY LYNN PITTS et al., Defendants and Appellants.

610

618

628

COUNSEL

Michael Snedeker, Richard Phillips, Richard Power, Kyle Gee, Cynthia A. Thomas, Laurance S. Smith and Robert Fiedler, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Arnold O. Overoye, Chief Assistant Attorney General, Jane N. Kirkland, Assistant Attorney General, Roger E. Venturi and Thomas F. Gede, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

BEST, J.—

## STATEMENT OF THE CASE

On July 25, 1984, a 53-count information (No. 27641) was filed in Kern County Superior Court, charging Ricky Lynn Pitts (hereinafter Rick), Marcella Pitts (hereinafter Marcella or Tutti), and Colleen Forsythe (hereinafter Colleen)[1] with conspiracy (Pen. Code,[2] § 182), forcible lewd and lascivious acts on children under the age of 14 (§ 288, subd. (b)), use of children for purposes of pornography (§ 311.4, subd. (c)), child endangerment (§ 273a), and assault (§ 245, subd. (a)).

On August 16, 1984, a 58-count information (No. 27774) was filed in Kern County Superior Court, charging Grace Dill (hereinafter Grace), Wayne Dill, Jr. (hereinafter Dill), and Gina Miller (hereinafter Gina) with the same basic offenses, involving the same children. On September 17, 1984, the two cases were consolidated upon the People's motion.

On November 13, 1984, a 44-count information (No. 28244) was filed in Kern County Superior Court, charging Wayne Forsythe (hereinafter Forsythe) with the same basic offenses, involving the same children. His case was consolidated with the other two on November 15, 1984.

---

[1] To avoid confusion, appellants are referred to by their first names, except for the two Waynes. Tutti, Marcella's nickname, was frequently used by the children, friends, and family members.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

Trial began December 13, 1984. On December 17, the People were granted leave to file amended informations in Nos. 27641 and 27774.[3] Jury selection commenced January 14, 1985; a jury was sworn to try the case on February 14. Presentation of evidence began February 27.

On May 20, 1985, prior to resting their case, the People moved to amend the informations to conform to proof. The motion was granted. On June 10, second amended informations were filed in Nos. 27641 and 27774, and a first amended information was filed in No. 28244.

Following an extremely contentious trial filled with motions for dismissal, mistrial, sanctions, severance, and the like, the jurors began deliberations on July 22, 1985. On August 2, they returned guilty verdicts against all defendants on all counts.

Rick, Tutti, and Colleen were each convicted of one count of violating section 182, forty-five counts of violating section 288, subdivision (b), two counts of violating section 311.4, subdivision (c), three counts of violating section 273a, and two counts of violating section 245.

Grace, Dill, and Gina were each convicted of one count of violating section 182, forty-nine counts of violating section 288, subdivision (b), two counts of violating section 311.4, subdivision (c), three counts of violating section 273a, and two counts of violating section 245.

Forsythe was convicted of one count of violating section 182, thirty-four counts of violating section 288, subdivision (b), six counts of violating section 311.4, subdivision (c), and three counts of violating section 273a.

All defendants subsequently moved for new trials; the motions were denied.

Sentencing took place on August 30, September 3, and September 4, 1985. Forsythe was sentenced to 285 years in prison. Rick, Tutti, and Colleen each received 373 years in prison. Grace, Dill, and Gina each received terms of 405 years in prison.

Timely notices of appeal were filed.

---

[3] The December 17, 1984, minute order erroneously reflects amended informations filed in Nos. 27641 and 28244.

## STATEMENT OF FACTS

### I. *Family Tree*

Grace has six children. Four of them were accused in the instant case: Colleen, Dill, Tutti, and Clovette. Clifford and Norma Pitts have two sons who were accused: Clifford Pitts, Jr. (Cliffy), and Rick.

Cliffy and Clovette are married. They were not prosecuted because they fled the state. Clovette has three children: Christine H., born August 10, 1973; James O. (Bobo), born in 1977; and Brandy O., who was born in 1978. At the time of trial, Bobo and Brandy were believed to be with Cliffy and Clovette.

Rick and Tutti are also married. Prior to his arrest, Rick had custody of his daughters by a previous marriage to Linda Pitts Cardoso: Carol P., born February 3, 1973; and Lisa P., born April 3, 1977. Both girls are alleged to have been victims.

Tutti was previously married to John M., Sr. (hereinafter John), who at the time of trial was married to Janice M. John had custody of his and Tutti's three sons: Johnny M., born August 24, 1973; Tommy M., born February 12, 1975, and Brian M., born May 9, 1977. All are alleged victims.

Colleen and Forsythe are married. Colleen has two daughters by prior marriages: Windy B., born April 29, 1975; and Amanda B., born April 25, 1979. Both are alleged victims.

Gina is an acquaintance of Colleen and Tutti. Although there was some testimony regarding her children, none were alleged as victims.

### II. *Development of the Case*

Sometime after Brian's birth, Tutti and John separated. Tutti and the boys moved to Oklahoma and she and John divorced in 1980. John and Janice were married March 28, 1981.

After the marriage, Tutti and her sons returned to Bakersfield. Eventually, Tutti got a job at the Knotty Pine Cafe, which was owned by Clifford and Norma Pitts. It was there that Tutti met Rick; they began dating steadily in April 1982. At that time, Rick was living at 316 Sycamore,

Oildale,[4] with another woman and his daughters, Carol and Lisa. The woman moved out in August 1982, and Tutti moved in at the end of August or beginning of September.

In March 1982, John instituted proceedings to obtain custody of the boys, Johnny, Tommy and Brian. He was successful, and Tutti turned them over to him on April 5, 1982. Beginning that month, Tutti received visitation on alternate weekends. She was also to receive visitation the entire month of July. During the latter half of 1982 and all of 1983, visitation took place at the green house. Tutti had the boys every other weekend until the end of June 1983.

Rick and his father traveled to Oklahoma at the beginning of May 1983. Rick returned to Oildale a couple of weeks later but moved to Boswell, Oklahoma, on July 2, 1983. His parents, daughters, and brother Mike moved with him. Tutti did not go with him at the time.

Tutti got the boys for visitation on July 1, 1983. By then she had moved out of the green house and was living with Cliffy, Clovette, Bobo, and Brandy. The first day Tutti had the July extended visitation, she hired a baby-sitter while she ran an errand. As a result of the baby-sitter smoking marijuana, the boys were taken to shelter care. Unable to get them out until July 5, John and Janice took legal action which resulted in Tutti losing her extended July visitation and resuming alternate weekend visitation the last week of July.

Rick returned to Bakersfield around the middle of August to help Cliffy move to Boswell. When Rick returned to Oklahoma a few days later with Cliffy, Tutti went with them. Tutti came back to Bakersfield in September but returned with Rick to Oklahoma where they were married on November 26, 1983.

In January 1984, Donald Silvius was working as a counselor at Brian's school. Brian and a group of children were found playing in an unauthorized area. A child claimed she had been forced to the ground by the children, who were "humping" her and trying to "kiss her booty." Silvius talked to the children involved; of them, Brian, then not yet seven, stood out in terms of his sexual sophistication and terminology.

When asked about the incident, Brian said he was accused of humping the girl and kissing her booty, but denied doing so. When Silvius asked how

---

[4] Consistent with the children's testimony, this residence will be referred to as the green house.

Brian knew about such things, Brian replied, "Oh, it happened." Silvius assumed Brian was talking about a long time ago and said so, but Brian said, "No, no, just the other day." Silvius asked Brian where and with whom, and Brian mentioned Tutti. As a result, Silvius made a report to child protective services. He also told Janice, Brian's stepmother, what Brian had said and encouraged her to tell the police; when she appeared hesitant, he said he would report it if she did not.

Deputy Jesse Sneed contacted Janice on February 8, 1984, after which he interviewed Brian. Brian said he was in the bedroom when Rick entered. Rick approached from the rear, removed Brian's pants and rubbed Brian's "pee pee," then rubbed it with his own pee pee. Rick then put his penis in contact with Brian's bottom. Sneed asked if anything else happened; Brian said no. Asked if Rick had molested him any other times, Brian stated that was the only time. When asked why he had not told anyone, Brian said Rick spanked him with a belt and said that if he told anyone, Rick would spank him again.

Sneed also interviewed Tommy who stated that while he was taking a nap in one of the bedrooms in the Pitts residence, Rick reached inside Tommy's shorts and played with Tommy's pee pee. When Sneed asked if Rick had committed any other acts of molestation on him, Tommy said no. Tommy's response as to why he did not report this earlier was basically the same as Brian's.

Sneed spoke with Johnny on the same date. Johnny denied ever being molested while staying at Rick's.

Sheriff's Sergeant Bobby Fields (Fields) talked to Janice and interviewed the boys on February 15, 1984. During his interview with Brian, Fields told Brian that he had heard that things had been happening to him. Brian said he had a problem. Fields replied that he had heard about the problem and it would be all right. Brian then said his mom sucked his "pee wee." Brian said this happened one time.

When asked about Rick, Brian said that Rick did not do anything to him. When asked if Rick had ever taken his pants off or touched Brian or put his pee wee in Brian, Brian said no, never. When Fields asked about Rick later in the conversation, however, Brian said Rick made Brian hump him at the green house in the summer time. Brian said he and his brothers had been playing, and that he was humped in the backyard. Brian said Rick also humped Tommy.

During the interview with Tommy, Tommy said that Rick had put his hands inside Tommy's shorts and rubbed his privates. He did not mention

Rick doing anything else, or any other adults. Tommy did not indicate that there had been any type of sexual activity between himself and Tutti. Fields also interviewed Johnny; Johnny did not mention being sexually molested by Rick or Tutti. None of the boys mentioned Colleen or her boyfriend being involved.

Fields next interviewed the boys on March 7. Brian said that Tutti and Rick had done things to him. He said that a bunch of times during visitations at the green house Tutti put her privates on his privates. He said that Tutti would take his clothes off, but that she would have hers on. She would lie on top of him, with her stomach on his back. When asked if anything else happened, Brian made a motion with his hand indicating possible masturbation of him by Tutti. Brian also said that Rick had sucked his pee wee a bunch of times. Fields did not ask Brian any questions concerning possible molestation of other children by anyone.

Tommy said that Rick would make him lie on the bed with his clothes off and Rick would lie on top of him. Rick just lay there without moving. This lasted about 15 minutes. Tommy also said that Rick put his hands on Tommy's "ding dong" several times. Tommy described it as Rick putting his hands inside his pants or shorts. Tommy also said Rick had humped him and put his ding dong in Tommy's butt. Tommy said he could not do anything because Rick was bigger and had threatened to stab Tommy with a knife if Tommy told anyone or did not do it. Tommy did not say anything about anyone else at this time.

On the same day, Johnny told Fields that Tutti humped him in a bedroom. Johnny said Tutti called him into the bedroom while his brothers were outside playing. Johnny also said that he had to hump Tutti and put his privates in her privates. He made a masturbating motion with his hands and said she would do that to him. He said she would lie on her back and spread her legs and he would lie on her stomach and be between her legs. Johnny said this happened during the visitation. He also indicated that she orally copulated him. In addition, Johnny said that Rick stuck his ding dong in Johnny's butt.

Throughout the March interviews, none of the boys mentioned anything like boards, chains, or shots.

In the middle of May 1984, Tutti was served with legal documents having to do with custody and visitation of the boys. The documents contained allegations that she and Rick had molested the boys. Rick and Tutti returned to California and brought Carol, Lisa, Windy, and Christine with them. Windy had been living with Clovette for awhile.

During an interview on May 31, Johnny told Fields the names of various people who were present during a group sexual orgy. Johnny named his Aunt Sissy, whom he identified as Colleen. He also said that her boyfriend was there, and that there were a lot of people present and he could not name them all. He said he had to "do it" with Clovette, and he also talked about Cliffy taking pictures. Johnny told Fields he had a lot more to tell but he was too tired to talk anymore that day.

In an interview on June 1, Tommy described a group sexual orgy and named Colleen as being one of the people present. He also said Clovette was there, as well as her and Colleen's boyfriends. Tommy said the boyfriends took pictures during the orgies. Tommy said he did not have to have sex with his aunt, referring to Colleen.

On June 4, 1984, Fields arrested Rick, Tutti and Colleen.

On June 5, Fields interviewed Colleen's daughter, Windy. He questioned her regarding specific molestations involving Tutti's boys. Windy responded that she did not know what they were talking about. Fields also interviewed Clovette's daughter, Christine. She denied any knowledge of any sexual activity.

Windy and Christine were hostile toward Fields, and he subsequently contacted Carol Darling and asked her to interview the girls. At the time of trial, Carol Darling was the Sex Abuse Program Coordinator of the Kern County District Attorney's office. Her husband, Sheriff's Sergeant Brad Darling, supervised the juvenile sex crimes detail.

Ms. Darling first met with Christine about a week after Rick and Tutti were arrested. Christine angrily denied that anything had happened.

Fields reinterviewed Brian on June 7. Brian said he had to get on top of Tutti, and he mentioned Colleen being involved in sexual touchings. Brian also said that Windy and Amanda were there. Using anatomically correct dolls, Brian indicated that he performed acts of sexual intercourse and sodomy with Colleen.

Fields reinterviewed Johnny on June 13 and Tommy on June 14. Both told him that Colleen had touched a child. Johnny said he would have to lie on a board and there would be chains or straps on it which would be placed over his ankles and wrists, and a chain would be placed across his stomach.

Johnny told Fields about being molested at a public swimming pool. The incident involved Doug, Steve, and "Carla." The boys said nothing about Carla being pregnant. Tommy and Johnny said Carla, a friend of Tutti's, had been present at the green house, but they did not say if she had taken part in anything.

Right around this time, Janice gave Fields a vehicle license number that might have been involved in the incident. A registration check indicated the car was registered to Gina[5] at 622 Edwin.

Sheriff's Sergeant Jack Rutledge (Rutledge) and Carol Darling jointly interviewed Windy on or about June 22. Windy indicated that molestations occurred in Rick's living room at the green house, and said that Tutti, Rick, Linda Pitts Cardoso, Clovette, and Cliffy were there. She said she was molested, and named Johnny, Tommy, Brian, Carol, Lisa, and Amanda as being present, along with other children. She did not mention anyone named Carla or Gina. Windy did not name Grace or Dill as being involved. She said that pictures were taken by Linda Pitts Cardoso, Tutti, and Clovette.

Rutledge interviewed Colleen's daughter, Amanda, then not yet five, on June 25. She also did not name Carla or Gina. She did, however, name Colleen and her husband Wayne, Rick, Tutti, Grace, someone named Timothy, Cliffy, and a big mean man. Amanda said there were other adults there as well, but she did not say who they were.

On June 26, Johnny directed Rutledge to a certain residence. Gina was outside in the yard. Johnny identified her as the Carla who had molested him. Gina and Grace were both arrested the following day and their residences were searched. No pornography or sophisticated video or photographic equipment was found.

Gina participated in a live lineup on June 28. Brian was unable to make any identification, but Johnny chose Gina and said she was the woman he knew as Carla, who had molested him. Tommy also chose Gina, but said she looked like someone named Yvonne who had molested him. Johnny and Tommy both said there were two female molesters who looked a lot alike.

Also on June 28, Rutledge searched Dill's residence, which was where Colleen had been living at the time of her arrest. No pornography, drug

---

[5] Gina's defense was that the boys, especially Johnny, had mistaken Carla Joyce for her. At the time of the swimming pool incident, which allegedly occurred sometime around June 10, 1984, Gina would have been approximately five months pregnant, as she was due to give birth in October.

paraphernalia, cameras, or video equipment were found. Dill was arrested on June 29.

On June 29, Rutledge again interviewed Windy. She still did not name Carla, Gina, or Grace. However, she named Clovette, Colleen, Linda Pitts, Tutti, Cliffy, Dill, Rick, and a mean man as being present. Prior to this interview, she had also named Forsythe.

Also on June 29, Sergeant Darling traveled to Boswell, Oklahoma, for the purpose of arresting Cliffy and Clovette and taking Brandy and Bobo into protective custody. On June 30, he and Oklahoma state police officers searched Cliffy and Clovette's residence. It appeared that no one had lived there recently, but in the kitchen was a newspaper article from the Bakersfield Californian concerning the instant case. No video equipment, lights on stands, or televisions were found either in Cliffy's or Rick's residences, which were approximately one and one-half miles apart. No videotapes or pornographic photographs were found, although sexual pedophiles generally regard such items as prized possessions and rarely dispose of them.[6]

Eventually, warrants were sworn out for the arrest of Cliffy and Clovette, and the Federal Bureau of Investigation was contacted. As of the date of trial, Cliffy and Clovette had not been apprehended, nor had Brandy and Bobo been found.

On July 3, Lisa's foster mother took Lisa and Carol to Ms. Darling's office. Lisa, then seven, said some bad things happened at the green house, that the children did things to each other when they had their clothes off. Lisa said she was not supposed to talk about these things and did not want to, so Ms. Darling did not pursue the subject.

On July 17, Fields showed a photographic lineup to Johnny, Tommy, and Brian. All three identified Forsythe. A warrant was issued for Forsythe around July 23.

---

[6] Richard "Toby" Tyler, an expert on child pornography, later testified that whether a pornographic videotape is quickly disseminated to a prospective buyer depends on the producer's primary motivation. If he or she is a pedophile or child molester, the tape will not be distributed quickly. If he or she primarily has a profit motive, however, distribution will usually be fast. It has always been Tyler's experience in the case of videotapes that the seller keeps the original tape as a master. For the same reason, a film producer almost always keeps the negatives from the still pictures; copies made from them are better than copies made from other copies. If someone over the course of a year had two- or three-hour pornographic sessions, both with videotaping equipment and still cameras, every other weekend, Tyler would expect to find some of the master material in his or her physical possession. However, at the first indication of any investigation, the person would immediately remove the master from his or her premises and put it in a safe place. Rarely would the master be destroyed.

On July 24, Janice and Johnny were on the third floor of the courthouse for a preliminary hearing. A child molestation trial was in progress, and a blond woman was sitting outside waiting to testify. Johnny pointed her out as having been involved. Fields was called to the courthouse, where he arrested Vicki Raye Pearce. Tommy and Brian both picked her photograph out of a photographic lineup. Fields never showed her photograph to any of the other children and no charges were ever filed against her.

On August 1, Johnny identified a photograph of Carla Joyce and said she was a friend of his mother's who was not involved. Nevertheless, Carla Joyce was ultimately arrested in the case and given immunity in return for her testimony. The immunity agreement was later rescinded by the district attorney's office and prosecution reinstated.

When discussing the molestations with Janice sometime after June 4, Johnny used the names "Doug" and "Steve" when referring to "mean guys" he said were involved. During the summer of 1984, Janice attended a gymnastics meet with Brian and Tommy. There, the boys showed her individuals they identified as Doug and Steve. As a result, Janice called the police and the men, Gary Mazzarelli and Brian Lee Butler, were arrested. They appeared in two different live lineups. Butler's was first, and Johnny was the first child to view it. He identified Butler but simply marked the position on his identification card and did not give Fields the name "Doug" or "Steve." Christine viewed the lineup next, but did not identify anyone. Tommy and Brian both identified Butler. Amanda was next; she identified someone else who was apparently merely someone from the jail used in the lineup, and as to whom Fields never conducted any investigation. Windy made no identification.

Johnny was first to view the live lineup which included Mazzarelli; he identified someone else. Windy picked Timothy Paloma, a suspect in another molestation case, as being someone she thought looked familiar. Amanda identified a man who, as far as Fields knew, was merely someone selected at random for the lineup. Fields never investigated any of these men with regard to possible involvement in the instant case. Neither Christine nor Brian identified anyone, despite the fact that Butler and Mazzarelli were arrested three days before the lineup and Brian identified Mazzarelli at the gymnastics meet. Tommy viewed the lineup last; he identified Mazzarelli. Butler and Mazzarelli were released from custody shortly after the lineup following further investigation.

Janice was also present on one occasion, after Rick's and Tutti's arrest, when one of the boys identified a woman in a bank as one of the molesters. The woman did not become a defendant.

Forsythe was arrested on October 11, 1984. He waived his rights and told Fields that he had been sort of lying low. He denied having any cameras or video recording equipment.

According to Ms. Darling's recollection, she and Christine saw each other 20 to 25 times, but only talked about sexual matters on 4 occasions. A few days before November 30, Christine came into Ms. Darling's office and at the end of their time together, Christine, then 11, said she did not want to lie in court, that she was molested and wanted to tell Ms. Darling about it. They set up another appointment for November 30 and during that interview and another one on December 3, Ms. Darling asked Christine general questions about what happened at the green house. Christine said Rick was not going to control her anymore and that her stomach no longer hurt. Christine indicated she was afraid of defendants, especially Rick and Forsythe.

Christine listed the following adults as being present when the sexual things happened: Rick, Forsythe, Clovette, Cliffy, Colleen, Dill, Tutti, Grace, Carla—a friend of Colleen's whose last name she did not know, a large white male who acted like Rick, and other adults she was unable to name. She did not name Gina. The children she named were herself, Carol, Lisa, Johnny, Tommy, Brian, Bobo, Brandy, Windy, Amanda, and two unknown girls, aged approximately six and nine years. Christine said she had to touch Johnny, Brian, Tommy, and Bobo. She also said she had to touch Clovette, Colleen, Tutti, Grace, Carla, Carol, and Lisa. Christine told Ms. Darling about being at the green house every other weekend that she was not with her father. She talked for a long time about seeing other children go behind closed doors but not going in herself, then being called in. Once she was called in and became aware of what was going on, she was pretty much involved when the sexual things would happen at the house, which was approximately every other weekend. Christine said the nasty things started a year and a half before the Oklahoma move.

On December 5, 1984, Dimas Cardoso, Carol and Lisa's stepfather, brought the girls in to get reacquainted with Ms. Darling. Ms. Darling told at least Lisa, and possibly both girls, that Christine had experienced some things and was happy she had told Ms. Darling. When Ms. Darling was alone with Lisa and Dimas, she asked Lisa if she remembered telling Ms. Darling some things before. Lisa, not yet eight, said she remembered; Ms. Darling asked if she wanted to talk about them again. Lisa said it was hard and embarrassing. Ms. Darling talked about the definition of "nasty things," then asked Lisa when the nasty things occurred. Lisa said it was before they went to Oklahoma. Ms. Darling asked if it would be easier to tell the names of the people who were there when the nasty things hap-

pened, and Lisa said it would. Lisa said Tutti and Rick and someone "I bet you just don't know" were present. This person was a lady named Yvonne, who had a daughter named Angela. Lisa also said Carol, Johnny, Tommy, and Brian were present. When Ms. Darling asked if Lisa had seen a weapon at her home, Lisa said it was hard to tell about it. Lisa did not identify any weapon.

## III. The Children's Trial Testimony

*Christine H.*, date of birth August 10, 1973, daughter of Clovette.

Before the move to Boswell, Clovette took Christine to the green house almost every other weekend. Sometimes Johnny, Tommy, and Brian were there.

Christine was able to remember a time when she went to the green house and saw lots of children and adults there. On many occasions, there were adults and children there without clothes on. On the time Christine remembered best in 1983, Rick, Tutti, Colleen, and Forsythe were there. Carla was not there. Although sometimes Dill was also there, neither Dill nor Grace was there on the time Christine remembered best. A big, mean-looking man was there, as were two younger children whose names Christine did not know. The other children present were Brandy, Bobo, Carol, Lisa, Johnny, Tommy, Brian, Windy, and Amanda.

On this occasion everyone was in a bedroom and Rick ordered the children, in a mean voice, to take their clothes off. Forsythe also gave orders. Rick had a knife, the kind that does not fold. He also had a black gun, which he pointed at Johnny's penis. He said that Johnny better do what he told him, or Rick would "blow it off." Rick also threatened to tie the children to a board which was up against the wall. A rope and pair of handcuffs were on the board. Christine never saw the board or handcuffs used in any way.

All of the children and adults removed their clothes. The children then did what Rick told them. They touched each other on their private parts. Johnny touched Carol, Windy, Christine, Bobo, and Amanda. Johnny also lay on top of Carol. Bobo lay on top of Lisa and Windy. During this time, the adults were in the room, nude, and Rick was telling the children what to do. Tommy touched Amanda on her private parts. Brian touched Carol and Christine. He touched Christine on her private. Christine had to touch Johnny's and Bobo's penises. Tommy touched her private. She had to get on top of Tommy. In addition, Christine had to touch Amanda, Carol, and

Brandy on their privates. Bobo had to lie on top of Christine. While the children were touching each other, the adults were watching.

On this time that Christine remembered best, Rick, Colleen, and Tutti touched some of the children. Rick touched Christine on her private with his hand. Johnny touched his mouth to Colleen's breasts. Bobo touched Tutti's breasts with his mouth. Everybody was watching. In addition, Rick put his penis in Johnny's butt. Rick did the same thing to Tommy. Forsythe touched all of the children where they go to the bathroom. Tutti touched Brian on his penis. When Windy needed to go to the bathroom, Rick made her go on the floor.

On this occasion, Forsythe took pictures of what was going on. Christine did not see any of the pictures or movies later. This episode happened in the daytime, around Christmas of the year Christine was in fourth grade. The next summer she moved to Oklahoma.

Christine was also able to remember another time when she went to the green house and there were a lot of adults and children without their clothes. It was sometime between January and June 1983, after the time she remembered best. On that occasion, Christine put her mouth on Rick's penis. She did the same thing to Forsythe's penis. Bobo touched Grace's breasts; Windy touched Dill's penis with her mouth. Colleen was present and had her clothes off, but Christine could not recall any child touching her or vice versa. Additionally, Christine's privates touched Johnny's privates. Her body also touched Brian's body but not Tommy's, although her body touched Tommy's on at least one of the occasions. On neither of the occasions did Rick's privates touch Christine's body, nor did her body touch Bobo's body. Although Christine was able to identify Gina at trial, she did not think Gina was present. Dill was present without clothes on, but Christine could not recall whether he touched anyone. However, many times on many different days, Christine saw Dill in the green house touching children in their private places.

Christine remembered that she also had to touch Forsythe's penis with her mouth during the time she remembered best. Those were the only times she had to do that. Although Christine described numerous tattoos on Forsythe's body, she did not think he had any below his belt line.[7]

On occasion at the green house, Christine saw Rick use a movie camera. Both times she remembered, all of the adults and children touched each

---

[7] Forsythe subsequently described his tattoos, pictures of which were admitted into evidence. According to his testimony, he had a tattoo on his penis prior to 1982. The tattoo said "Fuck this" with an arrow pointing toward his abdomen.

other's private parts. Rick had a gun and knife on more than one occasion. No one ever gave Christine shots. No one ever put anything up her rear end, and she never saw anyone put a gun up Johnny's rear end.

On one or more of the occasions Christine remembered, every adult except Grace shared a skinny, tightly rolled, funny-smelling cigarette. Christine also saw a white powder substance in a straight line on a table. Rick put it there. All of the adults, except Grace, sniffed the powder up their noses with a straw. One of the adults called the powder cocaine.

The sexual things happened many times. Rick was always there. The first time Christine remembered them happening, they happened in Carol and Lisa's room. Christine first testified these things always happened in Carol and Lisa's bedroom. Later she stated they occurred twice in Rick and Tutti's room.

Christine did not tell anyone about these things because she was terrified of Rick. When she was first questioned, she said nothing happened because she was scared. She told Fields that Johnny was making all this crud up and that everything was Johnny's fault, but this was not the truth. Ms. Darling was the first person she told about these things.

*Tommy M.*, date of birth February 12, 1975, son of Tutti and John.

Tommy remembered a time when he lived with his father and Janice and went to visit Rick and Tutti every other weekend at a green house. A lot of times, nasty things happened there.

Tommy could remember the last time nasty things happened at the green house and another time they happened around the time of his track meet.[8] He was also able to remember a third time, the time he remembered best other than those two times.

On the third time, the adults present were Tutti, Rick, Colleen, Forsythe, Dill, Grace, Clovette, Cliffy, Gina, Doug, and Steve. Tommy testified that although he did not know Gina's name, he knew her and she was present, clothes off, on this occasion. Doug had long blond hair and tattoos down his arm. Steve had brown hair and a mustache. Both were skinny. The children present were Windy, Amanda, Bobo, Christine, Brian, Johnny, Carol, Lisa, and Bobo's sister.

---

[8] According to Janice, the track meet took place on a Saturday in May 1983. Rick placed the date as being May 21, 1983.

On this occasion, the nasty things happened in Carol and Lisa's room. All of the adults and children were in the room. There were lights and cameras; sometimes the cameras were operated by Rick and Dill. A camera was in use while the nasty things happened.

During this episode, Rick "peed" in a bottle and stuck it up Tutti's vagina. He then gave it to Tommy, Johnny, and Brian, and Forsythe told them to drink it. All the adults, who were naked, were taking pictures and laughing. Tommy also had to drink "pee" on other occasions at the green house. The act was always filmed. Additionally, Rick played with Tommy's private. Forsythe took pictures. Rick also put his private in Tommy's butt. Although Rick put baby oil and baby powder on his penis first, it hurt. Dill was taking pictures and the other adults were laughing. Sometimes more than one person took pictures at the same time.

Tommy also had to put his mouth on Rick's penis because Rick told him to do this. Rick's penis was hard, and he told Tommy to suck it. This happened a bunch of times. On one occasion, Rick told Tommy to swallow something that came from his penis. Colleen also told him to swallow it. This happened on a bunch of days.

On this third occasion that Tommy could remember, Rick had a little bottle of white powder that he poured on a table that had pennies embedded in the top and was referred to by the children as the penny table. Rick poured the powder in lines that were about three-fourths of an inch wide and fifteen inches long. Rick made Tommy, Johnny, and Brian sniff it. It made Tommy feel dizzy. Forsythe told him to sniff the powder. Christine, Bobo, Amanda, and Windy also had to sniff it.

On this occasion, Rick stuck his tongue in Tommy's, Johnny's, and Brian's mouths. At this time, Rick had his clothes on. Later, he removed his clothes and the other nasty things happened. During this episode, Rick took some of the white powder from the bottle and put it on his privates. Tommy had to put Rick's private in his mouth and swallow the powder. It made Tommy's mouth feel salty. Tommy also had to get on top of Tutti and stick his privates in hers. The lights were facing him and Rick was using the camera. Tommy and his brothers also had to suck on Tutti's breasts. In addition, Tommy had to put his head between Tutti's legs and lick her private. Tommy never saw anyone put white powder on Tutti's privates.

Tommy also had to suck on Colleen's breasts. Forsythe took pictures. Tommy had to get on top of Colleen, put his privates in her vagina, and go up and down. Forsythe told him to do this while Dill took pictures. Tommy

also had to lick Colleen's vagina. Colleen had letters tattooed above the hair by her vagina.[9]

On this occasion, Tommy did not have to do anything nasty with Grace. However, he had to put his penis in Dill's rear end. Forsythe told him to do this. Rick was taking pictures. During this time, Grace's clothes were off, but she was just watching. Grace has cherries tattooed on her bottom.[10]

Tommy also had to suck Dill's penis. Dill told him to do that. Forsythe was holding a camera.

During this episode, Doug had a gun which he said was a .22. Doug stuck it up Tommy's rear end. The pistol had a raised sight on the barrel, right at the part that went in Tommy. It did not hurt when Doug put the gun inside his bottom. The gun did not actually go inside Tommy's butt, but just touched his cheeks. On this and other occasions, Doug stuck a gun on the butts of Tommy, Brian, Johnny, and Bobo. Doug stuck the gun on the rear ends of all the kids, every time. Doug threatened to kill all the children if they told what had happened. Doug had the gun when he said this. Steve had a knife. They also threatened to shoot or cut the boys' penises off. This all happened on the third occasion. Doug and Steve were both strangers, not relatives.

Colleen and Forsythe told Tommy to do nasty things with some of the other children. Tommy had to lie on top of Windy. Forsythe and Dill filmed this. Tommy had to do the same thing to Amanda. Forsythe and Dill were smoking dope. Forsythe made Tommy smoke one of the funny cigarettes. It made Tommy feel dizzy. Tommy also had to get on top of Christine, put his privates on her private, and go up and down. Clovette told him to do that. Forsythe was filming. Tommy also had to put his mouth to Christine's privates. Cliffy told him to do that. Dill was filming. The other adults were watching Tommy. Tommy subsequently said he did not have to put his mouth on any part of Christine's body.

All of the defendants except Tutti were there watching; they were all naked. Tommy saw everyone's penis. No one had a tattoo there. Tutti was at the store. It was a different time when Tommy had to do things with Tutti.

On this third time, someone gave Tommy beer to drink. Tommy drank about half of the bottle. It did not make him feel funny. Someone also gave

---

[9] Colleen testified she sometimes lived with Tutti and the boys and, on occasion, one or more of the boys walked in on her when she was in the process of dressing.

[10] According to Grace, she never lived with Tutti's boys. However, she talked to many people about her cherries tattoo, because it was a joke.

him about one-half to three-fourths of an inch of whiskey in a glass. Tommy drank it all. It did not make him feel funny. Tommy also smoked half of a pot cigarette, which likewise did not make him feel funny. In addition, he sniffed a line of white powder off the penny table. The line was about 15 inches long. It made him feel funny. Tommy ingested all of the substances on the same day, before anyone did nasty things to him.

Tommy also was given shots with a needle attached to a little gun. The shots, which were in two different spots, hurt and bled a little. They left a small mark and there was swelling. They left black spots between the size of a dime and a quarter. Tommy got sick and threw up after the shots. Forsythe, Rick, and Dill gave him the shots.

On this occasion, all of the other children also got shots, sniffed white powder, smoked pot, and had beer and whiskey. Everyone cried when they got their shots. The needle was never changed; the children were given the shots right in a row. When Tommy went home, he did not show Janice the black mark or hole from the shot because the marks were gone. Tommy was scared to show anyone. On the other two times (the last time Tommy remembered and the track meet time), Tommy also had whiskey, beer, pot, white powder, and shots. So did Johnny and Brian and all the other kids there.

The nasty things happened about 20 times when Tommy was at the green house. It was mostly the same adults and same children involved, and mostly the same things happened. Tutti was there on all but one occasion. Grace was there three times that nasty things occurred. Colleen, Forsythe, Rick, Dill, Steve, Doug, Cliffy, and Clovette were there all of the times.

On the last time Tommy could remember things happening, they happened in Rick's room. The room had a water bed and a dresser in it. A camera and lights were present. Tutti, Grace, Colleen, Forsythe, Rick, Dill, Gina, Cliffy, Clovette, Doug, and Steve were there. The children present were Tommy, Christine, Windy, Amanda, Bobo, Brandy, Carol, Lisa, Johnny, and Brian.

On this occasion, Tommy had to touch Tutti's, but not Grace's, body. Rick stuck his penis in Brian's rear end. Cliffy was using the camera. Brian put his mouth on Rick's privates. Forsythe took a picture. In addition, Rick put powder on his private and made Tommy suck it. Rick also put powder on his penis, then stuck his penis in Tommy's rear end. Tommy did not see Rick do anything with Christine, Carol, or Lisa. However, Rick put his privates in Bobo's butt and stuck his tongue in Bobo's mouth. Rick also stuck his tongue in Tommy's mouth. Rick put his privates in Windy's

vagina. Additionally, Rick again got a cup and peed in it. He made Tommy, Bobo, Brandy, and Windy drink pee from the cup. Someone filmed the incident.

Also on this occasion, Tommy had to kiss Tutti's breasts and suck her nipple and get on top of her while she was naked. He had to put his tongue in her vagina. Rick told him to do this. Besides Tommy, Johnny, Brian, Brandy, Bobo, Christine, and Windy all had to put their mouths on Tutti's vagina. Someone was filming this as it went on. In addition, Tutti sucked Tommy's penis. Additionally, Tommy, Johnny, Brian, Bobo, Brandy, Christine, Windy, and Amanda had to suck Colleen's breasts and all but Brandy also had to put their mouths on Colleen's privates. Forsythe put his privates in Tommy's butt and Tommy had to suck Forsythe's privates. Tommy, his brothers, and his cousins had to suck Dill's privates. Dill stuck his privates in their butts.

Tommy initially testified that none of the men had tattoos on their penises that he saw but, later, stated he could not remember.

Tommy, Johnny, and Brian had to get on top of Christine and go up and down. Forsythe was using the still camera at the time. Tommy, Johnny, and Bobo had to get on top of Windy. Dill was holding a camera over them. Tommy, Johnny, Brian, and Bobo also had to get on top of Carol and go up and down.

On this occasion, Doug had a gun and Steve had a knife. Doug held the gun to Tommy's neck and told him not to tell. Doug also pointed the gun at Tommy's privates and said not to tell or he would blow off Tommy's "dick." Steve held the knife to Tommy's privates and said he would cut it off if Tommy told.

Grace was there about 12 times that nasty things happened. Each time, she did something to Tommy's body. On these occasions, the other adults were also present. On the time Tommy remembered best that Grace did something, the things happened in Carol and Lisa's room. Tommy had to lie on top of Grace and suck her breasts. He also had to put his mouth on Grace's private. Tommy testified that Grace's privates smelled like the other women's. However, he admitted telling coprosecutor Gindes that he did not like to put his mouth on Grace's privates because she had a real bad smell down there. There were times when the adults made Tommy watch while Grace was on the toilet. Grace did not wipe her rear end. When Tommy put his mouth on her privates, he could smell "poop." Tommy's brothers also had to do this. Tommy's brothers and Bobo had to lie on top

of Grace. His brothers, Bobo, and Amanda had to put their mouths between her legs.

On an unspecified occasion, Tommy saw Bobo forced to pee in front of the adults. Also, Forsythe told Windy to pee in a cup. This was at the green house.

On various occasions, a board was used. Tommy was strapped on it about 12 times. People then sucked his privates. Tommy's brothers and cousins were also strapped to the board and had things done to their bodies. Tommy saw the board in Carol and Lisa's room and in the very back room of the green house. Tommy saw Christine on the board a whole bunch of times.

Tommy also saw handcuffs on the wall of the green house, in Carol and Lisa's room. Forsythe and Dill were the only ones who used them. If the children got too wild, their hands and feet would be cuffed.

Sometimes Forsythe showed movies on the television. They were films of Tommy and the others doing nasty things. A bunch of people were talking on the film. Tommy could not remember if anyone was saying what was happening.

At a different time, around the time of a track meet at North High, things happened in the green house in the girls' bedroom. The adults present were Tutti, Rick, Colleen, Forsythe, Dill, Grace, Doug, Steve, Cliffy, and Clovette. The children present were Tommy, Windy, Bobo, Christine, Johnny, Brian, Brandy, and Amanda. There were cameras and lights. Everyone was naked. Forsythe, who always brought the white powder, had a jar of it in his pocket. The powder was put on Rick's penis, then Tommy, Johnny, Brian, Bobo, and Tommy's cousins had to put their mouths on Rick's privates. Rick did not sodomize any of the children this time, nor did Tommy have to do anything else with Rick. Tommy did not have to do anything nasty with Forsythe, either. The only other adult Tommy had to do anything with was Dill. Tommy, Johnny, and all his cousins had to suck Dill's privates. In addition, Tommy had to stick his privates in the vaginas of his girl cousins and go up and down. His brothers did this, too. Forsythe filmed it. Tommy also had to put his penis in the rear ends of Johnny, Brian, Windy, Amanda, and Christine.

Although the police had been talking to Tommy since he was in a different grade, he first told them that someone named Gina molested him about a week before he testified. Tutti's friend Yvonne never molested him. Someone named Carla was also involved in molesting Tommy and the

others. Carla had some little kids and drove an old white car. She was not Gina. Carla was present most of the 20 times nasty things happened at the green house. Sometimes she brought her kids. Sometimes her son would be molested.

One day, Tommy and his brothers went swimming at the North High swimming pool. Although there were no doors on the toilets, Doug and Steve brought Tommy and his brothers into the rest room, leaned them up against the wall and put their privates in the boys' rear ends. No one walked by while this was happening. Carla stood outside of the door. After this incident, Carla and the men drove the boys around in the parking lot. Carla, not Gina, drove the car, which was old and white. Doug and Steve put their privates in the boys' mouths. Carla sucked Tommy's penis. They then dropped the boys off and Janice picked them up.

There was a time in August 1984, when Janice, Tommy, and his brothers were at a gymnastics meet at school. Tommy saw Doug and Steve, and Janice called the police. After school started the year of trial, Tommy and his brothers and Janice were driving by an apartment and Tommy identified one Vicki as being involved in the molestations. Vicki, who was a friend of Tutti's, had children. The children were not present on the 20 times the nasty things happened, although Vicki was sometimes there.

During the time nasty things were happening at the green house, they were also happening at Clovette's house. One weekend they would happen at the green house, then the next weekend they would happen at Clovette's house. The same adults and children were present. Tommy could not recall if he was molested at Carla's house, but bad things also happened to him at the Knotty Pine.

Tommy told Janice and his father what had happened two or three weeks after Rick and Tutti went to Oklahoma. He only mentioned Tutti, Rick, and Colleen as being involved because he was too scared to tell about everybody.

*Amanda B.*, date of birth April 25, 1979, daughter of Colleen.

Amanda was not quite six years old at the time she testified. She had stayed in the green house about two years before trial and could remember being there when kids and older people all took off their clothes. Rick would threaten to kill the people if they did not do it. The people would leave their clothes outside on the front porch. The children present were Amanda, Windy, Christine, Brandy, Bobo, Johnny, Brian, Tommy, Carol, and Carol's sister.

When the kids had their clothes off in the green house, they would have to lie on somebody and touch the other kids in the private place. Brian lay on Amanda and touched her with his finger in her front private place. Dill took pictures; there was only one camera. There were three lights, not on stands, which were close to the camera. One was in Colleen's room, one in "our" room, and one in Rick and Tutti's room. The light in the room where things happened was bright.

A lot of the kids had to touch each other in their private places. The nasty stuff happened in the room in which Carol and Lisa slept. Rick put powder on the private parts of all the children. Rick pointed the knife at their stomachs and the gun at their brains. Rick made "all the nice people" do it to the children. The nice people did not want to, but Rick made them.

Sometimes the kids would touch older people, too. They would not have to touch Grace. They would have to touch Tutti, Colleen, Grace (some of the kids did), all of the grownups that were there and Rick, and the other people that Rick made do it. The boys had to touch the ladies with their privates. Rick told them not to tell or he would kill them.

Rick would make the kids get on a board and hang them up if the kids did not do what he said. There were handcuffs on the board. Windy got hung up.

Amanda saw someone put a "poison thing" on the penny table in the girls' room. It was a piece of candy, but she could tell it was poison because there were sprinkles on it. The piece of poisoned candy remained on the table for two years before Colleen threw it out.

In the kids' room, she saw someone put a straw in the powder and make the kids smell the powder. All the kids had to do that. The kids would have to touch men's penises. She never saw a child use his or her mouth on the older people. The children had to touch the women's breasts. Brian was the only one of the kids who touched Amanda.

Amanda saw Rick put a screwdriver in the bottoms of the kids. Amanda also testified that Rick did not put a screwdriver in anyone's bottom, but he made another man do this. The man was only at the green house one time, and he only used the screwdriver on Brandy. Rick gave Amanda shots in the upper, outer portion of her left hand, midway between the knuckles and the wrist. Everyone had to smoke dope. It made Amanda throw up. Amanda subsequently testified that Colleen smoked pot and let Amanda smoke some in her bedroom. Amanda did not get sick from the pot, but she threw up one time in the living room.

Grace was nice to Amanda. Grace never did anything mean to Amanda, nor did Amanda see her do mean things to anyone else. Rick only put handcuffs on Windy and Amanda. Grace never cuffed Amanda, but she was there when it happened, with Rick in Amanda's room. It happened lots of times and Grace was there every time. Grace never took pictures of Amanda, but Grace and Colleen were at the green house when Amanda had her clothes off. Grace never touched Amanda's body.

Most of the things Rick made Amanda do were in the living room of the green house. When Amanda was cuffed, her hands were behind her back. She saw Windy, Grace, Colleen, and Forsythe all handcuffed. They were cuffed by "one of those other guys that Rick made do it." Amanda saw her Uncle Wayne (Dill) at the green house taking pictures. She did not know his last name. She was locked up at the time. She did not see him taking pictures because she could not turn around, but she knew he was. Christine was looking out the window and saw Uncle Wayne and whispered to Amanda. Amanda did not see Uncle Wayne at the green house at this time because she was hung up. Rick made Brian do nasty things to Amanda. Rick did not do anything to her, nor did Tommy. When Brian did these things, it was in the room shared by Carol, Lisa, Amanda, and Windy. Amanda and Brian were alone. Then Brian could not do it to her anymore because Rick made another guy lock Amanda up.

Every time the nasty things happened, Rick and Tutti kept their clothes on. Everyone else took theirs off. Amanda left her clothes on the front porch of the green house every time she went there and took off her clothes. Everyone, together, took off their clothes on the front porch. Sometimes this happened in the daytime. Amanda subsequently testified the people never undressed on the front porch in the daytime.

When the police came to the front door to make arrests, Amanda was hung up on the handcuffs. She was not there when Rick was arrested because Joe the bailiff took the handcuffs off Amanda and let all of the kids out of the house. Joe then called some other cops to take Rick in, and they took the kids to Shalimar (a child care shelter). Rick did not put cuffs on Amanda or Windy or Colleen or Grace.

When Amanda was led from the witness stand to identify the defendants, she stated she did not know Gina. At one point, she also said she did not see Uncle Wayne in the courtroom.

*Windy B.*, date of birth April 29, 1975, daughter of Colleen.

About 2 years before trial, Windy went to the green house 10 to 20 times when nasty things happened. On two different occasions, a group of adults

was present. It was not the same group both times. This all happened before Rick left for Oklahoma in August 1983.

One of the two episodes took place during the morning in the living room. The adults present were Rick, Tutti, Grace, Colleen, Forsythe, Clovette, Cliffy, Gina, Vicki Raye, Carla Joyce, and Linda Pitts Cardoso. Linda was present during the nasty things just a few times. There was also an adult man whose name Windy did not know. He was fat, mean, over six feet tall, wore his long black hair in a pony tail, and had lots of scars and tattoos. This was the only adult whose name Windy did not know. As far as she knew, there was no Doug or Steve present. The children present were Windy, Amanda, Bobo, Brandy, Christine, Tommy, Johnny, Brian, Carol, Lisa, Kenny, Joshua, and Angela. The latter three were Vicki's children.[11]

When the nasty things happened in the living room, it was daytime on a Saturday. Colleen and Gina took Windy and Amanda to the green house. Some of the adults were already there; some arrived later. At some point in time, all the adults and children had their clothes off. Rick had a knife that folded. The fat man had a black gun. He told Windy, Amanda, and some of the other children that he would hurt them if they told. Rick told the boys he would cut off their dicks if they said anything.

Before the nasty things happened, Colleen took Johnny, Tommy, and Brian to the back of the house. When they returned about 15 minutes later, they were giggly and acted like they were having trouble standing up. The boys said they had gotten a shot. Windy did not see them get the shots. She thought this happened only once.

Rick and the fat man ordered Windy to touch Johnny on his private spot, where he goes pee. The adults did not make her put her mouth on any part of Johnny's body, but they made Johnny touch her on her private spot. The big fat man and Rick ordered her to touch Tommy, Brian and Bobo on their privates, and them to touch her on her privates.

Rick and the fat man also ordered Amanda to touch Brian's privates. Brian also touched Amanda's and Brandy's private spots. Christine and Carol touched Johnny's private spot. Johnny touched Carol on her private spot. Lisa and Tommy touched each other's privates. Rick and the fat man made Windy and Christine pee on the floor. The group of adults was watching and some were taking pictures when all of this occurred.

---

[11] Vicki Raye Pearce testified that her children's names are Andrea, Kenneth, Rebecca, and Joshua. Joshua was only two years old at the time of trial. However, Carla Joyce has two children, one of whom is named Joshua. The other is Danny. Yvonne Mailloux has a daughter named Angela.

Rick made Windy, Christine, Brandy, Amanda, Carol, and Lisa touch his private. Windy had to put Rick's penis in her mouth. Rick also put his penis in her bottom. Rick also stuck his penis in the mouths and bottoms of Christine, Brandy, Amanda, Carol, and Lisa. The other adults were watching and more than one was taking pictures.

Forsythe touched Windy's private spot. He also put his private in her front private. The other adults were watching and people were taking pictures. Forsythe also put his penis between the legs of Carol, Lisa, Amanda, Christine, and Brandy. The other adults were watching and taking pictures.

Dill was present on this occasion. He was present about 10 of the times that nasty things happened. On this occasion, he was just watching and taking pictures. Windy subsequently testified she could not remember if Dill was present this time.

Windy did not have to do anything nasty with the women. However, she saw Johnny, Tommy, Brian and Bobo touch the front privates of Grace, Colleen, Tutti, and Clovette. Windy did not see any of the boys lie on top of the women. Bobo, Tommy, Johnny, and Brian all put their mouths on the privates of Clovette, Tutti, Colleen, and Grace. Vicki's children were also taking part in what was going on.

While all the adults and children were there, Forsythe, Dill, Rick, Cliffy, Colleen, Tutti, Clovette, and the big fat man were smoking pot. Windy did not see anyone drinking liquor or beer.

On this occasion in the living room, Windy saw three cameras. There were also three bright lights on tables. After the nasty things occurred, someone poured white powder all over a table. The adults sniffed it through their noses. Sometimes they used a straw. The men had the cameras, although Windy could not recall who. Rick and the fat man acted like they were bosses. They told everyone what to do.

On some occasion, Forsythe made Windy put her mouth on his penis. She did not see what his penis looked like. She had seen him in shorts, barefoot, and shirtless when they lived in the same house. To her knowledge, he had no tattoos around his privates. Windy never saw any adult man's private at the green house.

Windy could remember another time things happened in Rick and Tutti's room. It was perhaps two weeks after the time in the living room. The adults present were Rick, Tutti, Clovette, Cliffy, Colleen, Grace, Dill, Vicki, Carla Joyce, Gina, Forsythe, and the big fat man. Windy testified later that

neither Grace nor Vicki was present during the incident in Rick and Tutti's room. The children present were Windy, Amanda, Christine, Bobo, Brandy, Carol, Lisa, Johnny, Tommy, Brian, Kenny, Joshua, and Angela. All of the adults and children were present in the room. Furniture in the room consisted of two dressers, a water bed, and two night stands. This happened during the daytime on a Saturday.

On this occasion, Colleen brought Windy and Amanda to the green house. The adults and children had their clothes off. The big man had a gun; Rick had a knife. They looked like the same weapons as before. One camera was there; Windy could not recall who had it. The big fat man told Windy that if she said anything, she would be hurt bad. He had the gun pointed behind him. Rick told Bobo that if he said anything, Rick would get him. Windy did not see Rick or the fat man touch a weapon to any part of the boys' bodies.

On this occasion, Rick put white powder on the night stand. Rick, Colleen, Forsythe, Dill, Tutti, Clovette, and Cliffy put it up their noses by putting their noses to the table. Windy did not see anyone smoking pot.

Windy and Christine peed in Rick and Tutti's room. If they had to go, they had to go on the floor. Rick told them that rule. The other adults were watching.

Windy was one of the children who had to do nasty things to other children's bodies. Rick told Johnny and Windy to touch each other's private spots; he did the same with Amanda and Brian, Carol and Johnny, and Lisa and Tommy, and also had Christine touch Johnny's private. The adults were watching.

During this episode, Windy saw Johnny, Tommy, Brian, and Bobo lie on top of a girl. Johnny lay on top of Windy, Christine, and Carol. His private was on Windy's private. Rick told him to do this. Johnny lay on the other girls the same way. The adults were watching. Tommy and Bobo lay on top of Lisa. Brian lay on Amanda and Brandy. Windy also saw some of the girls put their mouths on the boys' privates and vice versa. Johnny put his mouth on Windy's private. Rick told him to. Tommy and Bobo put their mouths on Lisa's privates. Brian put his mouth on Amanda and Brandy. Carol, Christine, Windy, Brandy, Lisa, and Amanda had to put their mouths on the privates of Tommy, Johnny, Brian, and Bobo. Rick told them to. The adults had their clothes on and were watching.

The adults also did nasty things to the kids. Rick put his mouth on Windy's private spot. He was undressed at the time. He touched Amanda's

private spot with his hands. He also touched the private spots of Christine, Carol, and Brandy. Also on this occasion, Rick put his penis in the bottoms of Windy, Christine, Brandy, and Amanda. Forsythe put his penis in the bottoms of Windy, Christine, Carol, Lisa, Brandy, and Amanda. Windy, Christine, Carol, Lisa, Brandy, and Amanda put their mouths on his private spot. No one ever put a private in Windy's front part.

Although Dill was present when this was going on, Windy did not see him do nasty things with any of the kids. However, Bobo, Brian, Johnny, and Tommy all lay on top of Tutti and put their mouths on her privates. In addition, Johnny, Tommy, and Bobo lay on top of Grace and put their mouths on Grace's privates. Johnny, Tommy, Brian, and Bobo put their mouths on Colleen's privates. They also lay on top of her. Windy never saw any of the adults put white powder on their privates.

These same things happened a bunch of times in Lisa and Carol's room and involved the same group of children and adults. The girls' room was furnished with two bunk beds which were sometimes unstacked, a desk, two dressers, and an end table.

Windy never watched television at the green house on the 10 to 20 times nasty things happened there. She never saw one of the adults with a screwdriver. Windy never saw any handcuffs at the green house nor did she see kids cuffed or tied up. Any time she was there, Amanda was there. She was with Amanda every weekend. During the time the nasty things were happening, Windy never stayed overnight at the green house or lived there. Amanda lived with Colleen and Windy the entire time.

On occasion when nasty things would happen, Windy, Amanda, and Colleen would undress on the front porch of the green house and leave their clothes on the porch. Windy never had to smoke pot at the green house, although the adults smoked it. She saw only adults sniffing the white powder. She never saw anyone put white powder on an adult's privates, nor did she see Rick urinate in a bottle, anyone drink urine, or anyone stick a gun in anyone's butt.

Before Windy was taken to Shalimar or ever talked to the police, Colleen and Rick threatened to kill her if she ever told. When she first talked to the police, she was scared that Rick and Colleen would carry out their threats. Also, she wanted to protect Grace and not get her into trouble. Neither Ms. Darling nor anyone else ever told her to do anything other than tell the truth. Windy admitted that she did not want her mother to get out of jail. She wanted to live with her father. Ms. Darling and coprosecutors Vendras-

co and Gindes all told her that if she did not tell the court what Colleen did, Colleen would get out and it would happen again.

*Brian M.*, also known as "B. J.," date of birth May 9, 1977, son of Tutti and John.

Brian was almost eight at the time he testified. He could remember Rick and Tutti going to Oklahoma in the summer of 1983. Before then, Brian went to their house every other weekend. He recalled going over to the green house lots of times when there were a lot of older people and kids in the house without clothes on. Nasty things happened every time Brian visited the green house. They happened in the living room, Rick and Tutti's room, and the kids' room.

On the time Brian remembered best in Rick and Tutti's room, the adults present were Rick, Tutti, Colleen, Clovette, Forsythe, Dill, and Cliffy. They had their clothes off. There were also two men whose names Brian did not know. One had red hair to his waist and was fat. He had a gun and knife. The other had brown hair and was short. He had a mustache. Carol, Lisa, Bobo, Windy, Amanda, Brandy, Christine, Johnny, and Tommy were also there with their clothes off. There were also boys and girls there whose names Brian could not remember. The kids all took off their clothes because Rick told them to. Then the kids touched the other kids' privates. Sometimes they touched the adults' privates. Sometimes older people touched the kids' privates. Sometimes kids lay on top of other kids.

On this occasion, Rick had a knife eight or nine inches long. Rick pointed it at all of the kids. He pointed it at Johnny's privates and said, "If you tell anybody, I will cut you." The red-haired man also had a knife. In addition, all of the men had guns. There were six guns altogether: two in Rick and Tutti's room, two in the girls' room, and two in the living room. Doug and Steve picked up the guns in the girls' room, but no one picked up the guns on the sofa in the living room. They were real guns, .22 pistols. When Cliffy caught Johnny and Bobo trying to pick up and throw those guns, he picked the kids up and threw them in the bedroom. The guns were black and brown and they were pointed at all the kids, even the girls.

On this occasion, Forsythe put a gun up Brian's butt. He did it twice that same day. The gun went inside Brian's butt hole; it hurt a little bit. Forsythe did it to Brian two times a day every time nasty things happened at the green house. On the day in Rick and Tutti's room, all of the people with guns stuck the guns in Brian's butt. Brian did not tell the police about that because he did not want to. He did tell Janice. All of the children had a gun

put in their butts by all the men. This happened to all the children every time.

On this time Brian remembered best, in Rick and Tutti's room, Johnny touched Christine, and Johnny and Windy touched each other. Johnny touched Windy's privates with his privates. Johnny also lay on top of Windy and went up and down. Tommy also touched Christine and Windy. He touched Lisa's privates and lay on top of her. Tommy did the same with Christine and Windy; each got on top of the other and their privates touched.

In Rick and Tutti's room, all the children touched the privates of every other child. Amanda touched Brian with her hand on his privates. He did not see her touch any other boy. Each got on top of the other. When Brian was on top of Amanda, his privates touched hers. Rick told him to move up and down on her. Brian had to do this because Rick said he would beat Brian with a belt buckle and Tutti would burn him with a knife. In addition, Bobo got on top of Windy and went up and down. Every time, Rick told the boys to get on top. Also giving orders were the man who had the knife and the gun, and both Waynes. Additionally, all the boys put their mouths on the girls' privates, i.e., between their legs. The girls also put their mouths on the boys' privates, i.e., on their penises.

Brian saw someone taking pictures of the nasty things happening. There were two cameras and two lights. Cliffy and Dill used one of the cameras. Rick used another one.

In Rick and Tutti's room, all the adults and children sat in a circle and passed around a cigarette that Rick said contained pot. The children all had to smoke it. On this occasion, Rick touched all the children on their privates. Rick put his privates in all of the children's rear ends. Cliffy took pictures of this. Rick put his penis in the girls' front privates and went up and down. Rick touched Brian's penis and put his privates in Brian's rear end. He went up and down. It hurt. His private went inside Brian's rear end. Rick put powder on his private first. He also put oil on his penis and made Brian suck it. Rick did this a lot in his and Tutti's room. Sometimes he made Brian suck his penis. Powder would be on Rick's penis. His penis would be big and get bigger. Then white stuff came out of Rick's penis and Rick told Brian to drink it.

Rick put baby powder on his (Rick's) privates. Brian never saw any powder in a little bottle. On the time he remembered best in Rick's room, Brian did not have to lick anything on Rick's body. Brian did have to put

his mouth on Rick's penis when the penis had powder on it. Rick told him to do this.

Rick told Brian to put his mouth on Rick's lips and kiss him. Rick told him he would beat Brian otherwise. Brian's tongue went into Rick's mouth and Rick put his tongue in Brian's mouth. Someone took a picture. This happened once in Rick and Tutti's room.

Someone always filmed the acts. Brian saw pictures of the nasty things on television the next morning. He did not see what happened to the photographs taken with the smaller camera, although he did see Tutti hide those pictures up on the closet shelf where nobody would see them.

Brian had to drink beer out of a bottle, but no whiskey. In Rick and Tutti's room, he saw Rick pee in a cup on one occasion only. After that, Brian had to drink the pee or Rick said he would beat him. Brian also saw Amanda, Christine, Lisa, Carol, Johnny, Tommy, and Bobo drink pee. Both Rick and Tutti peed in the same cup and the boys had to drink it. This happened in Rick and Tutti's bedroom when everyone was there, but no one took pictures of it and Brian had his clothes on. In addition, Brian saw Windy and Christine pee on the floor of Rick and Tutti's room. Rick told them to.

Also in Rick and Tutti's room, Brian had to put his mouth on Forsythe's private. Forsythe put his private inside Brian's rear end. Forsythe put his private in the rear ends of all the children. He also put his private on the front private of the girls, i.e., the part between their legs. He did this to all the girls.

When Forsythe put his penis in Brian's bottom in Rick and Tutti's room, it hurt, but not bad enough to make Brian cry. Brian could feel Forsythe inside him, but he did not bleed. When Forsythe put his penis in Carol's bottom, she "screamed to death." Brian did not see her bleed. Lisa also screamed, and she also bled a lot. Lisa got mad at Forsythe and went in her bedroom and slammed the door. Amanda screamed loudly and cried. She also bled, but not very much. Brandy also screamed for two minutes straight. Christine screamed but did not bleed. Tommy also screamed when Forsythe did it to him. When Forsythe did it to Johnny, Johnny said, "You better stop it." Forsythe told him to shut up. Forsythe did this to the children one right after the other. Everyone else was watching.

Rick did the same thing to all the children, one right after the other, after Forsythe did it. All of the children were lying lined up on the bed. Every child screamed. All the girls bled. Brandy bled the most. Afterward, Rick

put his penis in the front private of all the girls. They were lined up on the bed. Christine "[s]creamed bloody murder." She bled a little bit. Carol, Lisa, Amanda, and Windy also screamed and bled. When Rick gave orders, he screamed them louder than the children screamed. There was also real loud music going when the events were happening.[12]

Dill was present in Rick and Tutti's room. He had his clothes on. Brian did not see Dill touch a child; Dill just watched and took pictures of the nasty things. Grace was also present. Her clothes were off. Brian did not see a child put his or her mouth anywhere on Grace. Grace did nasties to the boys. She went up and down on Johnny.

Tutti was in the room without her clothes. She did nasty things with all the girls and boys. All the women did it to the girls. Brian did not see any of the children put their mouths on Tutti. Tutti did the same things to the girls that the men did to the boys. She went up and down on all the girls. Brian did not have to do anything with Tutti. Tutti never put her privates on him.

In Rick and Tutti's room, Brian saw Johnny put his mouth on Grace's breast. Brian did not see him do this with any of the other women. Brian did not put his mouth on any of the women's breasts. Brian did not see any of the girls put their mouths on the women's privates. None of the women put their mouths on Brian's privates, nor did he have to lie on top of any of the women in Rick and Tutti's room.

Colleen was also present with her clothes off in Rick and Tutti's room. She got on top of the girls and touched her privates to theirs. Brian did not see anyone put his or her mouth on Colleen's breasts. Brian did not have to touch any part of Colleen's body with his mouth or anything. He did not see any of the boys put their mouths on her.

Someone named Carla was present in the green house when these nasty things were going on. Brian did not know Carla's last name. Brian knew a person by the name of Gina, but she was not there. At trial, he identified Gina as Carla. He did not remember her being in the green house, at least

---

[12] Prosecution witness Homer Horton lived across the street from the green house. During the latter part of 1982 and 1983, he noted an extensive amount of traffic in the area, which is semirural. People in new, flashy cars would park in front of Horton's residence late in the evening, go to the green house, enter, then leave a few minutes later. Horton suspected narcotics activity. However, although he occasionally saw little girls playing naked on the front lawn, he never saw a child nude on the front porch, nor did he see nude women anywhere about the green house. Although Horton was generally home in the daytime on weekends during 1982 and 1983, he heard no yelling or screaming coming from the green house, nor did he recall seeing anyone carrying photographic equipment.

not when they were smoking pot. However, when the other stuff happened to the children, she was there.

All of the children got on top of Tutti in Rick and Tutti's room. Brian had to put his private on her private and move. Rick told him to. This happened more than once. He did not have to put his mouth on Tutti. Grace, Rick, Clovette, and Cliffy touched Brian's private with their hands. Clovette had her clothes off. Clovette also touched the privates of Johnny, Tommy, Bobo, Christine, Windy, and Amanda. Clovette put her privates on the privates of Brian and the other children. In Rick and Tutti's room, all the other people touched Brian's privates. He had to put his mouth on all the men's penises. All the kids had to put their mouths on all the men's penises and on the women's private parts.

On a different occasion, nasty things happened in the girls' room. This was before Rick and Tutti went to Oklahoma. Nasty things happened in the girls' room all the time. Colleen did nasty things with the children there. So did Grace, all the times. She did nasty things to all the kids. She went up and down on them and sucked all the boys' penises. This happened in Rick and Tutti's room, and in Carol and Lisa's room. All of the boys sucked Grace's breasts in the girls' room. The boys did this to all the women. All the boys, including Brian, put their mouths on Colleen's breasts. Brian put his mouth on Tutti's breasts a couple of times. All of the boys put their mouths between the legs of Grace, Colleen, Clovette, and Carla. The boys did not suck Carla's breasts, nor did Brian see any of the boys do it to Tutti.

Brian saw handcuffs inside the green house. They were up on a wall in Carol and Lisa's room. Rick put cuffs on all the kids, then tied them on the board, got a needle gun, and shot them in the leg. The children were then molested. Rick, Cliffy, and both Waynes molested the children while they were on the board.

The board was on the floor. Rick put Brian on the board and tied him on with ropes. Brian also had handcuffs on. Rick, Cliffy, both Waynes, and an old man with a red Porsche then shot him with the needle gun. Then nasty things happened. Brian and Amanda went up and down. Cliffy took a picture of it.

Rick put powder on his own penis in the girls' room. There was also powder on a little table in that room. Rick set the powder on the table in a small jar. All the kids had to smell the powder out of a straw.

On this time Brian remembered best in the girls' room, the children present with their clothes off were Brian, Johnny, Tommy, Bobo, Amanda,

Christine, "and that is all." It was the same children who took their clothes off in Rick and Tutti's room, including Lisa, Carol, Windy, Brandy, and the other kids that Brian mentioned. The older people touched the kids and the kids touched the older people, and the kids touched other kids. All of the kids had to touch the other kids' privates. Brian had to touch the privates of Amanda and Brandy. Tommy had to touch Windy and Lisa. All the boys touched the girls' privates with their mouths. Amanda touched Brian's penis. Windy, Amanda, and Christine touched the penises of all the boys. Carol touched Johnny and Bobo with her mouth. Lisa touched Brian and Bobo with her mouth. Brandy touched Brian with her mouth.

All the kids put their mouths on the adults' privates. Brian saw kids put their mouths between Grace's, Colleen's, and Tutti's legs. Brian saw kids put their mouths on the breasts of Colleen, Tutti, and "especially Grace." Brian put his mouth on the breasts of Clovette, Carla, and Grace. He also put his mouth between Grace's legs. He did not put his mouth on Tutti's breasts or between her legs. He put his mouth on Colleen's breasts a couple of times. He did not lie on top of Tutti in the girls' room. Rick threatened to kill Brian if he did not lick Tutti's privates, so Brian put his tongue between her legs. He did this one time. He also had to stick his tongue up Clovette and lick between Colleen's legs.

Rick did not put anything in Brian's mouth in the girls' room, but he touched Brian's behind with his penis. Rick put his penis inside Brian's rear end one time. He only did it in one room, on one day.

In the girls' room, all the boys lay on top of all the girls. Cliffy took a picture of this. There were two cameras, one big and one little.

On one occasion in Lisa and Carol's room, Brian had to suck Rick's penis. Brian had to do this in the two bedrooms, but not at all in the living room. Rick gave Brian what he said was whiskey and made Brian drink it. In addition, Rick urinated in a white cup and made Brian, Johnny, Bobo, and Tommy drink it.

In the girls' room, Forsythe put his penis in the behinds of Brian, Tommy, Johnny, and Bobo. Forsythe had some words tattooed on his penis. Dill put his penis in the behinds of the same boys. When Rick put his penis in Brian's behind in the girls' room, it only hurt a little. Rick used greasy stuff, but he did not put it on Brian's behind before inserting his penis. Rick used powder on his private. When Rick put his penis in Brian's mouth, Brian had to swallow white stuff one time.

Every time Brian got shots at the green house, he was given shots by Rick, both Waynes, Cliffy, and the old man in the red Porsche. On the day

Brian remembered in Rick and Tutti's room, this old man took off his clothes and put his penis in all the kids' behinds. All the kids had to put their mouths on the man's penis. When the man took his clothes off, he had his gun with him. Brian saw the man bring the needle gun into the house in a plastic bag that closed with a black zipper. The needle gun looked like a handgun.

Brian first testified he was given five or six shots in the upper left leg every other weekend. He never noticed any needle marks on his leg. The shots were always in the same spot on his inner thigh, about four to five inches above his knee. All the kids got five or six shots. The shots left a three- to four-inch black and blue spot, but Brian never showed Janice. Brian and his brothers could not walk for a day after the shots. They had trouble walking and just sat around for a day every weekend that they returned from visiting. Janice never asked what was wrong.

Brian later retracted his testimony that he was given five or six shots every other weekend and stated that he only got one shot. He changed his testimony because Vendrasco told him he answered the question wrong and made a mistake, although Vendrasco did not tell him he should say one shot.

The time Brian remembered best in Rick and Tutti's room happened when Brian was five. The time in Carol and Lisa's room was before the time in Rick and Tutti's room. The nasty things went on for two years. They always happened on a Sunday, usually around noon time. Brian could not remember any time that he was at the green house when something nasty did not happen to him. Every time it happened, Grace was there.

Brian did not tell Janice about the nasty things right away because he was afraid of Rick. He told Mr. Silvius and his kindergarten teacher before he told Janice. However, he told his father every Sunday evening right after he got home from the green house. Brian subsequently testified that he waited "a long time" to tell his father. When Brian first talked to a police officer, he did not tell about everything because he was afraid of being beaten by Rick, even though Rick was in Oklahoma. Brian admitted telling some lies to the officer just because he wanted to.

Brian had not heard of a lady named Linda Pitts. However, a lady named Linda was present when nasty things happened. She was there almost all the time. She was there the time Brian remembered best in Rick and Tutti's room. She was not there the time in Carol and Lisa's room. Someone named Yvonne was there lots of times. So was someone named Vicki. Both were there the two times Brian testified about. Vicki had her clothes off; Brian

could not remember about Yvonne or Linda. Doug and Steve were also there. Sometimes their clothes were on, sometimes off. Doug and Steve were in Rick and Tutti's bedroom with their clothes off. They were also in Carol and Lisa's bedroom, but their clothes were on. Brian did not recall children named Kenny, Joshua, or Angela being present during the nasty things. There was a child named Jed present, though, both in Rick's and the girls' rooms. (Gina's son, Jeremy, was nicknamed "Jed.")

*Lisa P.*, date of birth April 3, 1977, daughter of Rick.

At the time of trial, Lisa lived with her mother, Linda Pitts Cardoso, Linda's husband, Dimas Cardoso, and Lisa's sister, Carol.

Lisa testified that nasty things did not happen at the green house, but admitted she may have told Gindes that Linda told her to say that. Linda did not, however, tell her what to say. Similarly, Lisa testified she never lied to Carol Darling, but denied telling Ms. Darling that bad things happened to her. According to Lisa, if Ms. Darling testified to that effect, she would be lying.

The second time Lisa talked with Ms. Darling, she told the truth. Lisa told Ms. Darling that it was hard and embarrassing to talk about things that happened at Rick and Tutti's house. Lisa admitted that Ms. Darling asked when the nasty things happened and Lisa said before they went to Oklahoma; however, nothing nasty happened before they went to Oklahoma and Lisa did not tell Ms. Darling that they did. Lisa also admitted that Ms. Darling asked who was at Rick and Tutti's house when the nasty things happened. Lisa told her Johnny, Tommy, Brian, Lisa, Carol, Yvonne, Tutti, Rick, and Angela. However, nothing nasty happened and Lisa did not tell Ms. Darling those people were there. Lisa told Ms. Darling Tutti was there when nasty things happened. That was the truth. Nothing happened:

"BY MR. GINDES:

"Q WAS TUTTI THERE WHEN NASTY THINGS HAPPENED?

"A [by Lisa] YES.

"Q WHAT NASTY THINGS HAPPENED WHEN TUTTI WAS THERE?

"A YES.

"Q WHAT HAPPENED?

"A Nothing.

". . . . . . . . . . . . . . . . . . .

"Q Now, I Think That You—Did You Just Tell Us That Tutti Was There When Nasty Thing Happened?

"A Yes, There Was No Nasty Things at All."

According to Lisa, Ms. Darling asked Lisa to name the people that were there when nasty things happened. Lisa told her Tutti was there. She also said Rick. That was the truth. She also said Yvonne was there. Yvonne was not there when one child had to touch another child, because that never happened. Lisa told Ms. Darling that Yvonne had a daughter named Angela. That was the truth. Lisa did not tell Ms. Darling that Angela also had to do it. If Ms. Darling said Lisa said that, she would be lying. Lisa told Ms. Darling Angela did not like doing it. That was the truth. Lisa said she did not know what Angela did not like doing. Lisa told Ms. Darling that Angela did not like doing it because Angela did not. What did she not like doing? Nothing. Lisa also told Ms. Darling that nobody liked doing it. That was the truth. Lisa did not know what she meant when she told Ms. Darling that. Lisa told Ms. Darling that when nasty things happened, Johnny, Tommy, and Brian were also there. Lisa was telling Ms. Darling the truth; however, nasty things did not happen at the green house when they were there. Yet Lisa testified that she told Ms. Darling the truth when she said nasty things happened at the house. A short time later, she testified she was not telling the truth when she told Ms. Darling that.

If given her choice, Lisa would like to live with Rick and Tutti again.

*Johnny M.*, date of birth August 24, 1973, son of Tutti and John.

In the summer of 1983, Tutti and Rick went to Oklahoma. Prior to that time, Johnny visited them every other weekend in the green house. He started visiting them in the green house in 1982. He was in fourth grade at the time.

Nasty things happened on lots of visits at the green house. The group of people present would change, but there were a number of people who were there lots of times the nasty things happened. Those who were there a lot of the times were Rick, Tutti, Clovette, Colleen, Cliffy, Grace, Gina (Carla), Doug, Steve, a lot of strangers Johnny did not know, Dill, Forsythe, and another Carla who was not present in court.

At trial, Johnny stated that the name "Gina" was not familiar to him and identified Gina as "Carla." For the sake of clarity, unless otherwise noted we will refer to Gina as Gina, regardless of the name Johnny used. Johnny identified a picture of Colleen and the Carla who was not present in court. The picture was of Carla Joyce. Carla Joyce was subsequently brought into court, where Johnny identified her as being one of the people at the green house who molested him. He called her "Carla."

Doug had blond hair worn a little past his shoulders and was medium height. He looked strong. He was a slob and had tattoos up and down his arms. Steve was short with blackish or dark brown hair. He was a little fat and had a mustache. He was Doug's friend. There was also a lady in the group named Vicki.

When the nasty things happened, there would be a group of children there. Occasionally one or two children would be missing. The children who were there a lot of times were Johnny, Tommy, Brian, Bobo, Christine, Windy, Amanda, Carol, Lisa, Brandy, and four children Johnny did not know—these were four boys who left with a man and lady, neither of whom Johnny knew. The man and lady did not do nasty things, they just stayed in another room.

One time nasty things happened at the green house was on the Saturday of Tommy's track meet, following the meet. The adults present were Rick, Tutti, Clovette, Colleen, Cliffy, Grace, Gina, Doug, Steve, Forsythe, and about seven or eight strangers. The other Carla (Joyce) was not there. The children present were Tommy, Brian, Bobo, Christine, Windy, Amanda, Carol, Lisa, Brandy, and Johnny. The unknown children were not there that time, nor was Vicki.

On this occasion, the nasty things happened in Rick and Tutti's room. It was around lunch time. The children were told to go into the bathroom and take off their clothes. Doug, Forsythe, and Rick were acting like bosses and telling people what to do. Tutti and Rick told the children to remove their clothes. All of the children and all of the adults took off their clothes before they went into Rick and Tutti's room.

There were two cameras in the room. Cliffy used one and Forsythe the other. Doug and Steve also used them occasionally. The cameras were used when the nasty things were happening. There were two or three lights that were different from ordinary lights. They would be on the place where the nasty things were happening, and the cameras would be pointed toward that place.

Johnny later testified that on this occasion, 13 adults and 14 children were in Rick and Tutti's room at the same time. There were also the lights on stands, and there were three stands. The three lights were on all the time when Johnny was in the room. They did not change the room's temperature. Also in the room were a big water bed, one dresser, and the penny table.

We note that, according to prosecution witness Toby Tyler, lights used in semiprofessional pornography are usually quartz lights which give off a substantial amount of light and heat. People closer than six feet would be made uncomfortable by the heat. Within two feet, sustained exposure would cause a second degree burn.

We also note that Roger Ruby, a private investigator, measured Rick and Tutti's bedroom. The depth of the room from the door from the kitchen to the wall was 10 feet 8 inches. The length of the room was 11 feet 2 inches. In the lower right hand part of the room was an inset where the refrigerator sat in the kitchen. From the north end going south for about three feet eight inches, the room was only nine feet, one inch wide. The length of the room at that spot was cut down to seven feet six inches. When the water bed was placed in the room, the measurement from the bed to the outside wall with the window was one foot nine inches. The measurement from the foot of the bed to the wall where the bathroom door was located was two feet seven inches. Ruby did not measure the other bedroom; however, to him it appeared about the same length-wise, and probably one-half times as big otherwise as the room he measured.

Johnny testified that on this occasion, Doug had a black handgun. Steve had a knife seven or eight inches long that did not fold. Doug and Steve said that if the children did not do something, they would hurt the children. Steve placed the knife to Johnny's penis and said he would cut it off if Johnny did not do the nasty stuff. He also put the knife to Johnny's throat and said he was going to slice Johnny's throat. This scared Johnny. Steve said that if Johnny told, he would hurt Johnny. Doug pointed the gun at Johnny's head and clicked it. Doug said he would kill Johnny if Johnny told what was happening. Doug also put the gun to Johnny's rear end. Tutti was around when these threats were made, but neither she nor anyone else tried to protect Johnny.

Both the adults and children used drugs, during and after the nasty things. On this occasion in Rick and Tutti's room, the nasty things went on for four or five hours. During this time, Johnny was given two shots, one in his rear and one in his arm. The shots were given by Doug, about five

minutes apart, and made Johnny feel drowsy. Johnny saw Doug give shots to all of the other children.

Rick and Tutti smoked pot a lot and taught Johnny what pot was. On the day nasty things happened in their room, during the time the things were happening, all of the children had to smoke their own pot cigarette and just about all of the adults also smoked some. It made Johnny feel like he was drunk. Johnny also drank whiskey on this occasion. Rick told him to. It made him feel a little drunk. Rick also made him drink half a can of beer. Rick also put some white powder in a line on the penny table and made all of the kids sniff it. Rick, both Waynes, and "all of the guys" also sniffed it. It made Johnny feel dizzier than any other thing. Rick called it angel dust.

More than one child was molested at the same time. Forsythe, Doug, and Steve gave the orders as to which child would be molested. No one else gave orders. Rick did not give orders, but he participated in the sex acts. All the kids tried to get away from him. Rick and some of the others disciplined the children to make them stop trying to get away. Rick was especially mean to Amanda.

On this occasion, Rick put lotion on his penis, then stuck his penis in Johnny's rear and moved up and down. Rick also put his penis in the butts of all the other children. One of the cameras was pointed at the child as Rick was doing this. Rick also put white powder on his penis and made Johnny and all the other kids suck it. Rick forced Johnny's head down to his penis and told Johnny to suck on his dick. Rick also made Johnny suck his penis a lot of other times. Sometimes stuff like "snot" came out of his penis. Rick told Johnny to swallow it.

On this occasion in Rick and Tutti's room, Johnny saw Rick urinate in a bottle. Rick then made Johnny drink the urine. Everyone watched and Cliffy took pictures. Rick also made Bobo, Windy, Brandy, Tommy, and Brian drink it. When kids had to go to the bathroom, Rick would tell them to pee on the floor. Rick wanted them to stay in the room. Windy is the only one Johnny saw pee on the floor at any time.

Johnny later testified that in addition to himself, Carol, Lisa, Tommy, Brian, Bobo, Christine, Windy, Amanda, Brandy, and the four unknown boys drank urine from a bottle. It is unclear, however, whether this testimony related to the track-meet time.

On this occasion following the track meet, Doug stuck the gun up Johnny's rear end. He did it to all the boys. In addition, Johnny saw Rick get on top of Lisa and Windy while they were lying on their backs. Rick put his

penis in their vaginas and went up and down. Johnny did not see any blood, but both girls screamed. Rick also put white powder on Tutti's vagina. Rick and Doug made Johnny and some of the other kids put their face down in it. Johnny had to put his tongue inside Tutti. Rick told him to do that. Doug and Cliffy had the cameras and the lights were shining on the private spots. Johnny saw Bobo, Tommy, Brian, Christine, and Windy put their mouths on Tutti's privates. Someone was filming this. Johnny also had to suck on Tutti's breasts. Someone was filming this. Johnny saw all the boys suck on Tutti's breasts at that time. Johnny also had to lie on Tutti. She told him to. His penis touched her vagina. Rick told him to move up and down. Rick called it humping. All the other boys also had to lie on top of Tutti, and Rick told them to move up and down.

Also on this occasion, Johnny had to suck Colleen's breasts. She told him to. Doug took pictures. Bobo, Christine, Amanda, Windy, Tommy, and Brian also had to do this. Johnny also had to lie on top of Colleen. She told him to. She also told him to go up and down. All the boys had to lie on top of her. Johnny, Tommy, Brian, Bobo, Amanda, and Christine also had to suck on Grace's breasts. All of them had to lie on her and move.

Johnny testified that Grace had tattoos of cherries on either side of her buttocks. He also testified that Colleen has "Bob" tattooed above her pubic hair line; Forsythe has tattoos up and down his arms, on his chest and back and one not on his penis, but on the left side of it between his legs; and Rick has a tattoo on his back.

During this episode, Dill stuck his penis in Johnny's rear. Dill used grease on his penis. Johnny also saw him stick his penis in all the kids' butts. Johnny also had to suck Dill's penis. All the children did it that day. In addition, Johnny had to do nasty things with Gina. Johnny had to lie on top of her. She told him to. She also told him to go up and down. Forsythe took pictures of this. Bobo, Tommy, Brian, and the four unknown boys also had to do it. Additionally, Johnny, Tommy, Brian, Bobo, Brandy, Windy, and Amanda had to suck her breasts. Johnny also had to suck Forsythe's penis and Forsythe put his penis in Johnny's butt.

There came a time that day when Forsythe started ordering children to do things with other children. This went on for about two hours. Someone would always be filming. On this occasion, Johnny did not have to do nasty things with Christine, but he had to stick his penis in Lisa's vagina while he was on top of her. Forsythe ordered him to do that. It was being filmed. Forsythe told Johnny to go up and down. Johnny had to do the same thing with Carol. Forsythe ordered him to. Tommy and Brian did the same thing with Lisa and Carol. Christine sucked all the boys' penises. Forsythe or-

dered her to. Christine did not do any other nasty things with the boys. Windy also played with and sucked the boys' penises. Forsythe ordered her to do that. Cliffy filmed these acts. Windy did not do anything else nasty with the boys. Amanda played with and sucked the penises of Johnny, Tommy, Brian, and Bobo.

When the children squirmed around a lot, they were strapped to the board and given shots. Cliffy, Forsythe, Dill, Doug, Steve, and "all the other guys" did this. Only one child was strapped to the board at a time. Sometimes the child would be facing the ceiling, and sometimes face down on the board.

Johnny was on the board on the track-meet time. Forsythe, Doug, and Steve gave him shots and spanked him with a belt. Someone filmed Johnny being tied to the board and whipped. All the kids took turns on the board. During the track-meet time, however, no nasty things were done to the kids while they were on the board.

On some occasions, the children were shown films of the nasty things on television. Johnny was shown such movies more than once. Doug would do the narration on the film. He would name the children and tell what they were doing. All the people would be in the room when the tape was shown. Rick would run the tape machine.

Johnny could remember another time when nasty things happened in Rick and Tutti's room. The same things happened on both Saturday and Sunday. The time Johnny could remember the most things about happened in the afternoon. It was after Johnny's birthday in 1982, but before Rick and Tutti went to Oklahoma in 1983. Carol and Lisa lived in the green house at the time and were present when the nasty things happened. Johnny and his brothers were spending the weekend. Cliffy and Clovette brought Christine and Bobo to the house. Brandy was also there. Colleen brought Amanda and Windy. Forsythe was with them. Also present were the four unknown boys, Dill, Doug, Steve, Gina, Grace, Rick, Tutti, and five or six strangers. Some of the strangers were driving a fancy green car. Johnny did not see any other fancy cars.

When the various people arrived, Johnny was watching television. Rick and Doug got there early and brought in and set up the video equipment. Rick and Doug did this all the time. Forsythe never helped set it up.

Eventually, Tutti, Rick, Doug, Steve, Forsythe, "and everybody" told the children to take their clothes off. All the adults and children ended up nude in Rick and Tutti's room. Rick, Doug, and Forsythe gave the orders to all

of the kids that were there. Forsythe and Cliffy did the filming. A bunch of people did nasty things at the same time. They made the children suck their penises and stuck their penises in the children's rears. The ladies made the children suck their breasts and get on top of them. Someone also made the children lie on top of the girls. The girls had to play with the boys' penises. The boys had to put their mouths down by the girls' vaginas and the girls had to put their mouths on the boys' penises. Forsythe ordered them to do these things. While this went on, Doug and Steve had a gun and knife.

On this occasion, Rick put lotion on his penis, then sodomized Johnny. Rick did the same thing to Tommy, Brian, and Windy. Johnny later testified that Rick did this to all the other boys, but not to any of the girls on this occasion. Rick also made Johnny suck on his penis. Rick stuck his penis in Bobo's rear, and Bobo had to suck on Rick's penis. Christine had to suck on Rick's penis. Johnny did not see Rick touch the children's privates with his hand, nor did he see Rick do anything with Christine's privates on this occasion.

During this episode, Rick urinated in a bottle, then put the bottle in Tutti's vagina and she urinated in it. Rick then made Johnny and his brothers drink it. Cliffy filmed it. Johnny subsequently saw this part on television with a voice telling what was happening.

Also on this occasion, Johnny had to put his face in Tutti's vagina and lick it. Rick told him to do this. Cliffy filmed it. Tommy and Brian also licked her vagina. Johnny also had to suck on Tutti's breasts. Rick told him to. Cliffy filmed it. Everyone was standing around watching. Rick also made Brian do this. Bobo also had to do that, as did "a whole bunch of other kids." Johnny and the other kids also had to lie on Tutti. Rick told him to go up and down. Johnny's penis was touching Tutti's vagina. Johnny saw this happen with all the boys. Cliffy was filming. The rest of the adults were molesting other kids at the time.

Also on this occasion, Forsythe molested a bunch of kids. Johnny had to suck his penis, and Forsythe stuck his penis in Johnny's rear. Tommy and Brian sucked Forsythe's penis, and Forsythe stuck his penis in Brian's rear. Amanda also had to suck Forsythe's penis and Forsythe stuck his penis in her rear. In addition, Johnny had to suck on Colleen's breasts. The adults were all present, nude, when this was occurring. Forsythe was filming. Johnny also had to lie on Colleen with his penis touching her vagina while someone was filming it. Tommy and Brian also sucked her breasts. Bobo, Brian, and Johnny had to put their mouths on Colleen's vagina. Forsythe was filming. Additionally, Johnny, Tommy, and Brian had to suck Dill's penis. Forsythe filmed this. Grace was involved in the nasty things on this

occasion, too, as was Gina. Dill, Doug, Forsythe, and Steve put their penises in the children's rears.

During this incident, Windy played with Johnny's penis. Johnny had to lie on top of Christine. His penis touched her vagina. He went up and down on her. Christine touched and played with his penis. Forsythe filmed this. Johnny also had to lie on top of Carol. His privates touched her vagina. He also had to lie on top of Lisa. His penis touched her. Johnny did not see his brothers lie on top of Christine on this occasion. However, Brian had to lie on top of Amanda. Brian's penis touched her privates. Amanda played with Brian's penis. Forsythe was filming this. Johnny saw Windy playing with Bobo's penis.

The board was used on this occasion for shots. Johnny received two shots, beer, whiskey, and marijuana. The shots, which were administered about five minutes apart with something that looked like a needle for shots at a hospital, made him a little sleepy. Everybody got shots this time.

In addition to Rick and Tutti's room, nasty things happened more than once in Carol and Lisa's room. The time Johnny remembered best in the girls' room was a Saturday. On this occasion, the nasty things started about lunch time. Carol, Lisa, Johnny, Tommy, and Brian spent Friday night at the house, but the other children did not. The children who showed up were Bobo, Christine, Brandy, Windy, and the four unknown kids. Amanda was also there. Rick and Tutti were there. Of the adults, Doug and Steve showed up the earliest. Grace was there, as were Dill, Forsythe, Clovette, Gina, Cliffy, and some strangers.

At some point, everyone had their clothes off. The white powder, pot, and liquor were all used while the nasty things were going on. Rick put the white powder on a little table, not the penny table. All the kids sniffed it. Johnny did not see any of the adults sniff it. None of the adults put it on parts of their body. Some of the men put lotion on their privates. The adults did not molest the children on the floor, only on the beds. During the incident, Forsythe was using a camera.

On this occasion, Steve had a knife and Doug had a gun. Both threatened the children if the children would not do something. Amanda got yanked around and all the kids got yelled at.

At some point, Forsythe put down the camera and began molesting children himself. He stuck his penis in Johnny's rear and made Johnny suck his penis. Johnny saw Forsythe make the other children, including Amanda, suck on his penis. Forsythe also put his penis in Amanda's butt. Johnny

had to suck on Rick's penis, and Rick stuck his penis in Johnny's rear. Grace molested children, too. Johnny lay on top of her. He also sucked her breasts. Johnny also had to lie on top of Tutti. His penis touched her vagina. He had to lie on top of Gina and suck her breasts. All the boys did that. Tommy, Brian, and Bobo also had to lie on top of Grace. Forsythe ordered Bobo to lie on top of Christine. Bobo's penis was in her vagina. In addition, Tommy sucked Rick's penis and Rick put his penis in Brian's behind. Besides Rick and Forsythe, Doug, Dill, and Cliffy put their penises in Johnny's rear.

No adult named Yvonne was involved in the molestations. A child named Angela P. was involved and her mother was there, but her mother's name was not Yvonne. (In fact, Yvonne Mailloux, also known as Yvonne P., was Angela P.'s mother.) A woman named Vicki was involved. All the people in the green house called Gina "Carla." Gina had three children, Jed, age eleven, and two girls younger than Brian. Gina's children were never present when molestations were occurring. Both Carlas were present the last time nasty things happened.

Johnny never saw any handcuffs in the green house. He never saw any pistol except the one Doug had. It was a revolver and had a sight at the end. Doug, Steve, Cliffy, Dill, and Forsythe all put the gun up Johnny's butt. More than one man would do it on a single day.

Johnny saw a red Porsche at the green house when bad things happened. A man would come to the green house alone in the red Porsche. He would touch Johnny sexually. The man had long hair and was about 50. His hair was grayish brown, down to his shoulders.

Johnny did not tell the police initially because he was scared. If he had told, "mean guys" would have found out and he would have been hurt. Johnny did not tell the police about the red Porsche because they did not ask him.

During cross-examination, Johnny testified that on one occasion he saw Doug and Steve at the swimming pool with a person he named as Carla. That was when they had him suck their penises in the rest room. Johnny and his brothers all basically had sex with Doug and Steve in the rest room at the North High swimming pool. There were no doors on the toilets in the rest room. There were lots of other kids and people at the swimming pool, and there were four or five kids coming in and going out of the rest room while these things were going on. No adults ever came in to put a stop to these things.

Gindes's relevancy objections regarding this incident were sustained as to all defendants except Gina. Subsequently, the prosecution's objections to the introduction of various photographs of the pool and buildings, as well as to the testimony from the lifeguard who was on duty at the pool June 9, 1984, were sustained.

*Carol P.*, date of birth February 3, 1973, daughter of Rick and his former wife Linda Pitts Cardoso.

Carol was called to testify by the defense. A straight "A" sixth-grader at the time of trial, she was able to identify all of the defendants except Forsythe and Gina. She had seen Gina before and knew her to be a friend of Colleen's. She did not know who Forsythe was, although she had seen him before but did not know where.

Prior to the move to Oklahoma, Tutti lived with Carol, Lisa, and Rick. During that time, Johnny, Tommy, and Brian would visit on weekends, every two weeks. They would arrive on Friday, sometime after school. Everyone would have supper together, which Tutti would fix. Afterward, Carol, Lisa, and the boys would play outside for about an hour. They would then watch television in the living room until about 10 p.m., at which time they would go to bed. Carol and Lisa would sleep each in her own bed in their room. The boys would sleep on the floor of the girls' room in sleeping bags.

On a typical Saturday, they would watch television when they got up. They would then have breakfast, play outside all morning, then eat lunch. In the afternoons, they would play and watch television. They would go to the park on Saturday evenings. They would eat supper at the green house, then play for a while and watch television after. On Sundays, they would eat breakfast, then play. The boys returned home on Sunday mornings.

There was never a time at the green house when Carol, Lisa, and the boys were there when any kind of nasty things happened between adults and children or between children and each other. There was no time when the children were nude and nude adults were also present. Rick had rifles and shotguns at the house, but Carol never saw any handguns. She never saw a board in the house or any child strapped to a board. She never saw a syringe at the house or any child get a shot.

No one, including a doctor, ever put anything up Carol's butt. She never had anything put inside her vagina. Carol never saw Rick stick his penis in children's butts at the green house, nor did she see him and Tutti molest children or give children shots. She never saw them snort white powder,

although she saw them smoke pot. It happened when children were present, although not when Johnny, Tommy or Brian was there.

Carol did not know how many times she saw Grace at the green house. She saw Cliffy and Clovette there lots of times. She saw Colleen there a few times. Carol never saw Forsythe at the green house; when Colleen visited, she did not bring her boyfriend with her. Carol did not know anyone named Carla Joyce, but she did know Vicki Pearce. She saw Vicki at the green house a couple of times. She knew Yvonne and had seen her at the green house a lot of times. She saw Amanda at the green house between five and ten times.

During the time in question, Carol never saw any of the children pee on the floor of the green house. She did not remember going to see Tommy participate in a track meet. She never saw the M. boys drink beer or whiskey. Carol never saw Gina naked, talked to her about sexual matters, or had Gina try to do anything sexual to her. Carol never saw Dill on the weekends the M. boys were visiting the green house. Carol never saw a VCR at the green house, nor did she see a movie camera or one that works with a VCR there. She never saw a camera sitting on a tripod there, or any photographer's lights.

When Rick was arrested, Carol talked to a lady from the sheriff's department. She told the lady that Rick and Tutti had not molested her and that she had never been molested when the M. boys were there. Carol told the lady that she had not been molested by Rick, Tutti, Colleen, Forsythe, Dill, or Grace. The people at the sheriff's department kept asking her questions over and over again, although they did not tell her what to say. They did not tell her it would be good if she said something, nor did they say they wanted her to tell lies. They put pressure on her, although she did not know how. They did not yell at her. Somebody, perhaps the lady, called her a liar. No one was mean to her. Ms. Darling was nice to Carol and very gentle. She did not yell, threaten Carol, or call her a liar. Carol felt comfortable with her.

*Angela P.*, eight years of age, daughter of Yvonne Mailloux, who was not charged as a victim but whose presence during the molestations was testified to by some of the children, was also called by the defense. She denied ever seeing any of the defendants naked at the green house or doing nasty things with children there. However, she had seen Rick, Tutti, and her mother Yvonne smoke pot.

## IV. *The Defenses*

### *Dill*

Defendant Dill testified that he only visited the green house a few times in 1982. One time was when his father came from Arkansas. Other than that, he only dropped by occasionally to tell Tutti that Grace wanted her. Dill did not even meet Rick until the latter part of 1982. In 1983, he only visited the green house on Easter, except for the times he stopped by to give Tutti messages from Grace or to look for Grace.

Dill denied ever molesting any of the children. He had no idea why the children would say such things, as he was never present when anyone did anything like that. The children were lying.

Dill worked at D & D Auto Sales on about half of the Saturdays during the time in question. He never left before noon.[13]

During the same time, Howze Auto Sales was located on the same lot. Dill occasionally worked for Don Howze, and the business was open Saturdays. Normally, however, only salespeople worked that day, and Dill was not a salesperson. Dill came in very seldom on Saturdays and did not regularly work Saturday mornings. The lot was usually open until around 3 p.m. on Saturday. Howze was not at the lot every Saturday.[14]

On the weekends he was not working, Dill would spend time with Carol Forsythe, Wayne Forsythe's sister (hereinafter Ms. Forsythe) or his wife, Linda Dill (hereinafter Ms. Dill). He spent one or two weekends a month with Ms. Dill during November 1982 to June 1983. On some of the weekends he spent with Ms. Forsythe, he would still go to the pizza parlor where Ms. Dill worked and spend a couple of hours with her.[15]

---

[13] According to Roy Fizer, owner of D & D Auto Sales between September 1982 and July 1983, Dill was never a regular employee, although he helped out once in a while. Dill only worked there very occasionally. Fizer did not personally work Saturdays, although the lot was open. Once in a while he stopped by for a few minutes; sometimes Dill was there.

[14] Tanya Howze was the sales manager at Howze Auto Sales, and she worked every other Saturday during the time in question. According to her, it was rare for Dill to work there on a Saturday.

[15] Prosecution rebuttal witness Elvira England, the owner of the pizza parlor, could not recall seeing Dill there on a Saturday afternoon during 1982 or 1983. The restaurant's policy, which was explained to employees, was that they were not to have relatives or friends there while they were on duty. A friend or relative could come in and buy pizza, but they were not to disturb the employee. Glenn England, who worked at the pizza parlor every Saturday beginning at 4 p.m., never saw Dill there on a Saturday during the time in question. Both witnesses admitted they could not always see the entire pizza parlor, especially if they were in the office.

According to Laura Dobbs, a neighbor of Ms. Forsythe's from January to April 1983, Dill was home most of the time on Saturdays. Although Dobbs did not consider Forsythe her boyfriend, she admitted she was in love with him. In letters written to her from jail, Forsythe promised to move in with her and her children if he were acquitted.

According to Ms. Dill, Forsythe visited her about every other weekend during 1982 and 1983.

Mike Warren, one of Dill's coworkers at D & D Auto Sales, testified to seeing Dill on many Sundays during 1982. He saw Dill almost every single Saturday and Sunday in 1983.

Milton Lee Spaulding, Ms. Forsythe's father, testified to seeing Dill and Ms. Forsythe part of almost every Saturday and Sunday from February to approximately May 1983. There were some Sundays when Dill and Ms. Forsythe spent the entire day with Spaulding and his wife. A couple of times they did this on successive Sundays.

### Tutti

Tutti described a typical weekend when the boys visited at the green house. She usually picked the boys up between 5 and 6 p.m. on Friday, then the boys would return to Janice and their father between 6 and 7 p.m. on Sunday. On a typical weekend, Rick would work Friday nights and would not get home until 9 or 10. On Saturday, Tutti would fix breakfast and everyone, including Rick, would watch cartoons. Sometimes the kids would then go outside, or everyone would visit Rick's parents at the Knotty Pine where they lived. Sometimes they would eat lunch at the Knotty Pine; sometimes they would be home. Some of the weekends, everyone would go hunting. If they stayed home, they would sit around the house. The children would play outside a lot, or come in and watch television. Typically, they would have supper at the green house. They would then watch television or the children would play outside some more. Occasionally, the children would go to a nearby recreation hall and park to play. Bedtime would be between 9 and 10 p.m.

On Sunday, Tutti would again fix breakfast and they would watch cartoons. Usually they would sit home and watch television, and the children would play outside. They went to the recreation hall a few times, although Tutti did not let them go too often. She would fix lunch at noon. There was no particular type of activity that took place on a typical Sunday afternoon, other than all of them being together and enjoying each other's company.

The children had rules of conduct and knew not to enter Rick and Tutti's room without knocking. Once Carol and Lisa knocked and Tutti, who was in her panties and bra, told them to come in. The girls "liked to fell over themselves trying to get out," because they did not think they were supposed to be in the bedroom while she was dressing. Rick and Tutti had cable television, but the girls knew they were not supposed to watch anything with an R rating. Rick was strict about the boys not running around in underwear in front of the girls on the weekends that the boys would visit. The boys would have to put on their pajamas following their baths.

During September 1982 through June 1983, Grace did not visit the green house very often. At no time did Grace come over and get undressed. During this time, Colleen visited frequently, especially on her way to work on weekdays. Sometimes Gina was with her. Gina was a friend of the family and visited the green house occasionally; her little girls may have visited, but her son never did. Gina never stayed more than an hour or took off her clothes.

Tutti first met Forsythe on Halloween 1982 at Colleen's. During the time in question, he came to the green house less than five times. He never stayed long, nor did he take his clothes off. Tutti could recall Dill and his family coming over on Easter and when Wayne Dill, Sr., was visiting. Other than that, sometimes he would come by and give Tutti a message from Grace. Easter and during their father's visit were the only times Tutti remembered him staying any length of time. Cliffy and Clovette would visit occasionally on weekends Rick was not working, and would bring their children to play. Sometimes they would come when Johnny, Tommy, and Brian were there, because it was the only time Bobo got to see the boys. Brandy also came. Christine rarely visited, because she spent weekends with her father. At no time was Cliffy or Clovette nude inside the green house.

Yvonne Mailloux was Tutti's friend. She would visit frequently and bring Angela with her. However, she never removed her clothes. (According to Angela, the only time she saw any of the children without their clothes was when she, Carol, and Lisa took baths. There was never a time in the girls' room when any of the children had their clothes off. Angela never saw any nude adults at the green house, or a board or handcuffs. She never saw a pistol or anyone sniff white powder.)

Vicki Pearce was another of Tutti's friends. She also visited frequently and brought her children, but they did not stay long.

Carla Joyce was a friend of Colleen and the family. During the time in question, she and Colleen had a conflict for a while and Joyce was not

around very often. Tutti could recall her being at the green house one time for approximately 20 minutes, when she and Colleen came over. Neither of them took their clothes off during this visit.

Between September 1982 and June 1983, Tutti had the boys every other weekend. On no occasion did Tutti have them two weekends in a row. One time Janice called her and said she wanted to keep Tommy at home because he was sick. Neither of the other boys visited that weekend. That did not change the alternate weekend schedule, so the boys were not with her the next weekend, either.

During the time in question, deer hunting season was in September or October, and the family went hunting every weekend during the season. This involved them camping overnight. One weekend, they all went to the beach and stayed overnight. Another weekend, they took an all-day trip on a Saturday to the Los Angeles zoo.

Tutti denied that the children's testimony was true, and averred that she and Rick had a good relationship with all of them.

*Rick*

Rick also testified about hunting deer every weekend during the season. In addition, he testified to hunting other game during the various hunting seasons, and to Carol's, Lisa's, and Tutti's boys being along on many of the trips.

According to Rick's testimony, he met Forsythe only once prior to his arrest. It was around the first week of August 1983, when Rick helped Cliffy move to Oklahoma. Before that, he had seen Forsythe a couple of times at the Knotty Pine. They said hello, since Rick knew Colleen, but Rick never saw Forsythe at the green house.

Rick saw Dill inside the green house probably three or four times. The only time Dill spent any considerable time there was on Easter Sunday. Most of the other times, he stayed less than half an hour. Grace was never in the green house when Rick was there, even on Easter. Tutti did not visit with her that much.

Rick denied participating in, or being present during, any molestations. He also denied having special lamps or photographic or video equipment. He never saw any of the defendants naked or having sex with children, nor did he do such things himself. He denied participating in the making of any

child pornography, or threatening any of the children with his pistol. There was never a sexual orgy at his house. The children's allegations were false.

Rick admitted smoking marijuana in front of Carol and Lisa, maybe a couple of times a week. He may have also smoked it in front of Angela P. a few times. He never smoked it in front of Tutti's boys, because they would tell Janice and their father. Tutti also smoked marijuana, but not in front of her boys. Rick and Tutti did not snort cocaine, nor did Rick ever see Tutti or Colleen snort white powder. He never saw anyone snort crank (methamphetamine).

*Forsythe*

According to John Ebert, owner of The Appliance Doctor, Forsythe generally worked Monday through Friday, and more than 50 percent of the Saturdays, in 1982 and 1983. Most of the time, the shop closed at noon on Saturdays. Sometimes Forsythe would go to Ebert's residence on weekends and they would work on cars. Forsythe and Colleen were there quite a bit on weekends, sometimes even on Sundays. On May 21, 1983, which Rick testified was the date of Tommy's track meet, Forsythe was at the shop from between 8:30 and 9 a.m. until they closed that night between 5 and 6. There were periods during the day when Ebert was not at the shop—he was gone at least three hours during the day—but Forsythe was there when they closed.

Forsythe first met Colleen in August 1982, when he fixed her family's dryer in the course of his employment at The Appliance Doctor. Prior to that time, he knew Dill, but had not met Grace, Tutti, or Rick.

Shortly after meeting, Forsythe and Colleen began dating. They split up on Halloween night 1982 and did not see each other again until February 1983. In February, Forsythe moved into Colleen's apartment and lived there about two weeks. Also living there were Colleen, Clovette, Grace, Amanda, Windy, Christine, Bobo, and Brandy.

After two weeks, Forsythe, together with his sister Hazel and Mike Warren, rented a place. Colleen moved in with them a few days later. Forsythe and Colleen remained there until July or August of 1983, when they moved into Clovette and Cliffy's residence as the two of them moved to Oklahoma. This was when Forsythe helped Rick load the truck. Forsythe frequently moved back to the shop (The Appliance Doctor) where he sometimes lived. There were about three or four times between February and August when he lived at the shop, because he and Colleen fought a lot. He would move out and live at the shop for about a week, then move back with

her. In August 1983, he moved to Harbor City to work. Colleen did not move with him. Once he established a place to live, she visited occasionally, then moved in with him around October. They were married in Long Beach in November 1983.

Prior to the time he began going with Colleen in 1982, Forsythe had never met Rick or Tutti, although he knew Dill and had met Gina and Grace. Nor had he visited the green house or met Tutti's boys or any of the other children who testified. After he began going with Colleen, he visited the green house maybe two times but did not stay more than an hour. The only time he remembered with any certainty, Rick was not home. The first time he remembered meeting the boys was when Tutti visited at his and Colleen's residence and had the boys with her. Most of the time, he and Colleen visited Cliffy and Clovette and the boys would be there playing. This was in August 1983.

Forsythe denied that any of the alleged child abuse or molestation occurred. He denied ever touching a child in his life, or entering into any kind of conspiracy with the other defendants. He never committed, aided or encouraged, or saw the acts to which the children testified. He denied having any experience with the use of videotape equipment or a video cassette recorder. He operated a video camera once in high school.[16]

Forsythe admitted using crank occasionally during the latter part of 1982 and beginning of 1983. Sometimes he would use a straw to snort it. During this period of time, he saw Colleen snort crank perhaps one time. At no time were any of the children, even Windy or Amanda, around. Forsythe never used drugs at the green house.

Forsythe admitted prior felony convictions for second degree robbery and receiving or possessing stolen property.

*Colleen*

By using her diaries, Colleen attempted to reconstruct her whereabouts during the period of time in question. During September 1982, she had no

---

[16] According to Allen B., Amanda's father, Forsythe was living with Carla Joyce in June 1984. Allen was present when Joyce said something about pictures. Forsythe responded that everything had been taken care of. Joyce and Allen discussed pictures which were supposed to have been taken at the green house. Allen heard about them from newspapers and television and wanted to get them so he could get custody of Amanda away from child protective services. Forsythe stated he was afraid of being arrested himself. Allen later amended his testimony and stated that he and Joyce were the ones discussing photographs, with Joyce wanting to know where the pictures were he had taken of her and Colleen long before when they were both pregnant. When Forsythe said everything had been taken care of, Allen did not know what he meant.

weekend dates with Forsythe. Nor was Amanda living with her, because Allen B. had run off with the child. During this time, Windy was almost always with Grace. Colleen got Amanda back October 8, 1982.

During October and November 1982, Colleen was involved with Allen B., although she and Forsythe were together most of the time during the last two weeks of October. Colleen and Allen remained together until Wednesday, December 8, when Allen went to jail. On December 14, Colleen began spending time with Randy Robertson. Colleen ran into Forsythe on December 28, which was the first time she had seen him in a couple of months. She wrote in her diary that she was not giving up Randy.

Colleen continued to be involved with Randy during January 1983, but on January 23, she spent the night with Forsythe. In early February, Colleen was seeing Randy. Her diary entry for Saturday, February 12, indicated that Allen was in jail and she could not find Amanda. Colleen was with Forsythe from February 10 through at least February 13. During the rest of the month, she vacillated between Forsythe and Randy.

On Saturday, February 19, Colleen moved in with Forsythe. She did not have Amanda back yet, and Windy stayed with Grace. Colleen finally got Amanda back, after which the child alternated between staying with her and Grace. On February 28, Colleen took the children to the pediatric clinic at Kern Medical Center, as Amanda had a severe ear infection and Windy had fever blisters. Colleen asked that they both be given complete physicals, which she expected would entail an examination of the girls' whole bodies.

On March 21, Colleen moved out of Forsythe's residence but continued to see him. During the latter part of March, she was also seeing Randy at times. The situation continued through most of April, and on April 18, Forsythe started moving his stuff into Colleen's residence. He moved out again on June 20, but he and Colleen continued to see each other. Colleen spent the night of Saturday, June 25, with Randy, and the next night with Forsythe.

On August 9, 1983, Tutti, Cliffy, and Clovette moved to Oklahoma, and Colleen moved into the house Cliffy and Clovette vacated. Grace, Windy, Amanda, and Forsythe moved in with her. On September 5, Forsythe moved to Los Angeles. Colleen visited him on many weekends and moved in with him on October 1. Windy and Amanda were not with her.

Colleen spent about 30 days with Forsythe in Los Angeles, over different time spans. She would move in and move out. In the latter part of October, she returned to Bakersfield. Her October 12 diary entry indicated that she

and Forsythe broke up but she was going to remain in Los Angeles until Friday. On November 4, 1983, they got married. On November 12, Colleen moved back to Grace's in Bakersfield. On November 15, Windy went to Oklahoma with Tutti and Rick. Windy was going to live with Cliffy and Clovette because Colleen could not control her. Windy hated Forsythe and did not like Colleen.

During 1984, Colleen lived with Forsythe off and on. She lived most of the time prior to her arrest with Grace and Amanda. Windy phoned and said she wanted to come home, so Rick and Tutti brought her when they came to California for the custody hearing. Windy then stayed with Colleen until Colleen's June 4 arrest.

Between September 1982 and June 1983, Colleen frequently visited the green house. She tried not to visit when Rick was home because she did not like being around him. Sometimes she would have coffee with Tutti before work; sometimes Tutti would ask for a ride to get the boys or take them home; sometimes Colleen would just go to visit. A couple of times a week, Colleen would go over there to smoke a joint. Colleen also admitted using cocaine, angel dust, crank, and acid during the time period in question. She denied being a heavy user and testified that every time she used crank, her diary contained a reference to it.[17]

When Colleen first began living with Forsythe, Forsythe and Rick did not know each other, nor did Colleen and Forsythe go to the green house during that time. Even after the two men met, they did not became friends or start doing things together. Grace did not have a good relationship with Forsythe; they spoke only if they had to.

Colleen, Forsythe, Windy, and Amanda lived together on various weekends when Colleen could not recall if they went to the green house. She denied any knowledge of there being pornographic pictures involving her children, Tutti's boys, or Clovette's children; however, she admitted she did not know what went on at the green house when she was not there. She never snorted white powder in front of Amanda, Windy, Johnny, Brian, Tommy, or Christine. She never saw Forsythe or anyone else do it in front of Amanda. Colleen never saw Tutti use crank. At no time did Colleen go to the green house and engage in sexual activity with children, nor did she see anyone engage in such activity with them.

Bonnie B., Allen's wife, confirmed that during 1982 and 1983, there were times when she and Allen had both Amanda and Windy, as well as other

---

[17]According to Allen B., in late 1982 Colleen said she had once injected crank.

times when they had Amanda by herself. At one point, Bonnie had Amanda from December 28, 1982, until the weekend after January 15, 1983. During this time, Bonnie and Allen left Amanda with Jerry and Jenise Stevenson in Bakersfield. Bonnie had Amanda and Windy both every weekend during December 1982 and until about January 23, 1983. According to Jenise Stevenson, she kept Amanda the last week of January 1983 and the first couple weeks of February.

In February 1985, Dr. Jess Diamond, a physician at Kern Medical Center, performed a complete physical on Windy, who was brought in complaining of painful urination. Dr. Diamond viewed the rectal area, but made no note as to whether he actually placed a finger within the rectum. Other than noting that Windy had poor hygiene of the rectal area, he did not take note of anything else. He did not note any injuries, scars, or tears. He did not check the sphincter tone or elasticity. He noted nothing abnormal. There was no irritation in the area of the clitoris. Windy's urinary opening showed a small amount of discharge. The hymen was intact and it covered most of the introitus, which is the opening into the vaginal area. However, it seemed to have a double (bifid) appearance. It raised a question as to whether this was a congenital bifid vagina, or a septal hymen. Diamond could not tell from looking, although the hymen appeared intact and he did not see any tears in it. The labia minora was normal; there was no evidence of any problem, and Diamond saw nothing unusual about the fourchette. He saw no scars, transections, or tags. Diamond diagnosed a urinary tract infection and recommended a referral to the genito urinary clinic to resolve the question about the bifid vagina and whether there were any congenital defects in the kidney system. He did not perform a vaginal examination because he did not have written approval from Windy's parents. Lab tests had been previously performed. There was a positive test report for gardnarella. Gardnarella vaginalis is an organism that is found in sexually active individuals. It is sexually transmitted. There was no way to tell how long Windy had had it.

Dr. Diamond did not see Windy in order to determine if she had been sexually assaulted. In examining her, he did not use the normal methodology he would have used to make such a determination. In his examination, however, which included an examination of the fourchette, he found no signs of molestation.

Dr. Diamond has examined thousands of children who have complained of being vaginally molested. A lay person has the concept that in such cases, a torn vagina will be present. This is not true. In fact, a torn hymen is found in only about 1 percent of children who have a history of vaginal molestation. This is because, in order to tear the hymen, the penis has to be inserted

through the hymen into the vagina. If a child has a penis shoved between her legs, the pubococcygeous muscle will subconsciously contract, making penetration difficult. In such instances, penetration would take an extreme amount of force.

In children, vaginal penetration means in the genital area, not, as in the adult, insertion of a penis through the hymen into the vagina. Most children who describe a penis being placed in them mean the penis was placed in the area of the vulva. This is the area before the hymen that is called the vulvar vestibule. A child's statement of penetration usually means the penis was up against or in the area of the vulvar vestibule on the outside of the hymen. There may be no signs whatsoever, or there may be some irritation or scarring on the fourchette. Nor can a child determine the depth of penetration.

### Grace

Between September 1982 and June 1983, Grace saw Tutti's boys only a very few times. Occasionally, Tutti would bring them by the house to say hello, but they never stayed long. She did not see the boys at the green house at any time. During this time, Grace had no relationship with Rick. She spoke to him, but did not know him.

Grace was at the green house two or three times prior to her arrest. The first time she could recall going there was in December 1982, when Wayne Dill, Sr., was visiting. She stayed a few minutes, then they all went out to eat. The next time, she went to see Tutti for some reason. She did not stay very long. She may have also gone there on another occasion, although she could not recall with any certainty if or when that was. During this time she saw Rick's girls two or three times. Grace did not see Tutti very often and saw Rick only a few times. Grace never liked Forsythe and had no real relationship with him. Dill did not live with Grace during the time in question, nor did she see him often. He did not visit her every other weekend, although he might have been there two weekends in a row. Dill never took her to the green house, although she sometimes gave him messages to deliver, such as asking Tutti to call or come by.

During the time in question, Grace played bingo frequently. Different people gave her rides. She played on weekends sometimes, although she could not remember any specific dates or how many weekends. During this time, she also went to Las Vegas twice on weekends. Both times were 24-hour turn-around trips, where a group of people left Saturday morning at 7 a.m. and returned on Sunday. Grace also went to Galt, probably in March 1983. She stayed five or six days and returned Sunday afternoon. She also

went to the coast sometime during warm weather in 1983. Grace could not remember if she was gone on this trip over a weekend.

During this period, Grace saw Milan Maloney several times. They would go fishing and camping and have barbecues. During the first part of 1983, they did not see each other as often as usual. This was not unusual in their relationship; they would have a big fight over the kids, then go their separate ways for a couple of weeks. They would talk on the phone, but Maloney would stay away because he did not get along with Grace's children. He would want to go out of town or somewhere and Grace would not be able to go because she was baby-sitting. On one weekend during the time in question, Grace and Maloney went camping to Lake Isabella. They also went fishing together several times.[18]

Grace never touched children in a sexual way, nor was she present when others touched children sexually. No child ever touched her in a sexual way, nor was she ever present when children touched adults sexually. She never saw anyone film nasty pictures of children. The children's allegations about her involvement were not true.

Grace worked on Easter 1983, and on May 21, 1983. Grace's personnel records from San Joaquin Hospital showed that she was off work many weekends during the time in question. However, in April 1983, she worked every Saturday and Sunday from 7 a.m. to 3:30 p.m. Yvonne Schneider, a cardiovascular technician at the hospital, transported Grace to and from work whenever they both worked the shift that got off at 3:30 p.m. On those days, Schneider dropped Grace off at home between 3:45 and 4 p.m. She never took Grace to the green house.

*Gina*

Gina did not testify at trial.

Gina lived at 622 Edmond, Oildale, with her father, John H. Miller, off and on for 14 years. During the summer of 1983, Carla Joyce, who is around Gina's age, lived across the street in front of Miller. Gina never went by the name of Carla, nor had Miller ever heard anyone call her that. People told Miller they saw Joyce driving Gina's car.

At some point, Gina moved out of the Miller house for six to eight months, although Miller could not say when this occurred. Even when she

---

[18] According to Maloney, they saw each other often on weekends. The Lake Isabella trip, which occurred in June or July 1983, covered a weekend. Maloney spent time with Grace when she was not working and it was convenient for her to get away. Even when she worked weekends, he saw her before or after work.

was living at the family residence, Gina would sometimes leave on the weekend and Miller would not know where she was. She would not be gone the entire weekend, but might be gone all day Saturday.

Miller never saw any pornography around his house, nor, to his knowledge, were any such items seized during the search of his house. During that search, the sheriff's department tore the house "all to pieces."

Additional facts will be presented in this opinion where pertinent to the discussion of specific issues.

## I.

### PROSECUTORIAL AND TRIAL COURT MISCONDUCT

Defendants allege numerous instances of prosecutorial misconduct, which they contend denied them the right to a fair trial. Related to this point are claims of trial court misconduct and allegedly biased evidentiary rulings. We conclude that because of gross prosecutorial misconduct, defendants did not receive a fair trial. Accordingly, their convictions must be reversed.[19]

We first discuss the general law regarding prosecutorial misconduct. We then discuss the various types of misconduct which occurred in this case and give illustrative examples of each.[20] Except for the section titled "Misconduct Outside Jury's Presence," all examples occurred in the jury's presence unless otherwise stated. Trial court inaction/misconduct is presented in a separate category.[21]

---

[19] Business and Professions Code section 6086.7 provides in part: "Whenever a reversal of a judgment in a judicial proceeding is based in whole or in part upon gross misconduct . . . , the court that ordered reversal of the judgment shall cause the matter to be reported to the State Bar of California for investigation with regard to the appropriateness of initiating disciplinary action against the attorney. The court shall also notify the attorney involved that the matter has been referred to the State Bar for investigation."

Andrew Gindes and Michael Vendrasco were coprosecutors in the instant case. While Vendrasco was guilty of misconduct, most instances were fairly isolated. Gindes's behavior, however, can only be termed gross misconduct. Accordingly, we hereby notify Andrew Gindes that we are reporting this matter to the State Bar in accordance with the foregoing provisions. (See *People* v. *Ryner* (1985) 164 Cal.App.3d 1075, 1087, fn. 5 [211 Cal.Rptr. 140].)

[20] Where necessary for purposes of clarity, the examples are numbered.

[21] Defense counsel were: Ronald S. Sims (Grace), Richard Fusilier (Dill), Eugene R. Lorenz (Gina), Andrew Rubin (Rick), George Van Meter (Tutti), Dominic Eyherabide (Colleen), and Robert Gardiner (Forsythe).

## A. *General Law*

■ " 'Prosecutorial misconduct implies the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citation.]' " (*People v. Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d 776].) A prosecutor has a duty to prosecute vigorously. "But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." (*Berger v. United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629].) Misconduct need not be intentional in order to constitute reversible error. (*People v. Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].)

In viewing what occurred at the instant trial, the admonition given by the court in *People v. Lee Chuck* (1889) 78 Cal. 317, 329 [20 P. 719], and repeated in *People v. McCracken* (1952) 39 Cal.2d 336, 349 [246 P.2d 913], is especially apt: " '[Prosecuting officers] seem to forget that it is their sworn duty to see that the defendant has a fair and impartial trial, and that he be not convicted except by competent and legitimate evidence. Equally with the court, the district attorney, as the representative of law and justice, should be fair and impartial. He should remember that it is not his sole duty to convict, and that to use his official position to obtain a verdict by illegitimate and unfair means is to bring his office and courts into distrust. We make due allowance for the zeal which is the natural result of such a legal battle as this, and for the desire of every lawyer to win his case, but these should be overcome by the conscientious desire of a sworn officer of the court to do his duty, and not go beyond it.' "

■ Respondent first argues that much of the alleged misconduct is not cognizable on appeal for want of objection in the trial court. ■ "[T]he initial question to be decided in all cases in which a defendant complains of prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected [citation]; if it would not, the court must then and only then reach the issue whether on the whole record the harm resulted in a miscarriage of justice within the meaning of the Constitution." (*People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

■ Generally, in order to raise the alleged misconduct on appeal, the objection must be both timely and specific. (*People v. Simon* (1989) 208 Cal.App.3d 841, 849 [256 Cal.Rptr. 373].) Moreover, where defense counsel objects during trial but does not request an appropriate instruction or admonition in order to lessen the possible prejudicial effect on the jury, the

asserted objection is waived for purposes of appeal. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 762 [239 Cal.Rptr. 82, 739 P.2d 1250], cert. den. 485 U.S. 929 [99 L.Ed.2d 261, 108 S.Ct. 1099].) "Simply to object or make an assignment of misconduct without seeking a curative admonition is generally not enough. [Citation.] 'The reason for this rule, of course, is that "the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury." ' [Citation.]" (*People* v. *Bonin* (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217], cert. den. 489 U.S. 1091 [103 L.Ed.2d 864, 109 S.Ct. 1561].)[22]

The rule that a defendant must object and request an admonition at trial in order to preserve the issue for appeal, however, "applies only if a timely objection or request for admonition would have cured the harm." ▪ Accordingly, the rule is not applicable where any objection by defense counsel would almost certainly have been overruled. (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1184, fn. 27 [259 Cal.Rptr. 701, 774 P.2d 730].) Likewise, where such an objection is overruled, failure to request an admonition is excused because there is no opportunity to do so. (*People* v. *Green, supra*, 27 Cal.3d at p. 35, fn. 19.) ▪ Such was the situation in the instant case: early on in trial, it became abundantly clear that any objections by defense counsel on the grounds of prosecutorial misconduct would be overruled and requests for admonitions denied or ignored.

▪ A jury will generally be presumed to have followed an admonition to disregard improper evidence or comments, as "[i]t is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' [Citation.]" (*People* v. *Allen* (1978) 77 Cal.App.3d 924, 934-935 [144 Cal.Rptr. 6].) However, in some situations an admonition will actually exacerbate the prejudice to the defendant. (*People* v. *Bolton, supra*, 23 Cal.3d at pp. 215-216, fn. 5.) Thus, where improper comments and assertions are interspersed throughout trial and/or closing argument, repeated objections might well serve to impress upon the jury the damaging force of the misconduct. (*People* v. *Kirkes* (1952) 39 Cal.2d 719, 726 [249 P.2d 1].) In such a situation, a series of admonitions will not generally cure the harmful effect of such misconduct. (*Ibid.*)

▪ Additionally, a lack of contemporaneous objection is excused where the prosecutor asks questions and defense counsel assumes that he is

---

[22] In *Bonin*, defense counsel failed to strictly comply with the requirements of the rule. However, the court found she achieved substantial compliance therewith by making motions for mistrial and to strike the challenged portions of testimony. Accordingly, the court reached the merits of the issue, since counsel "gave the court more than ample opportunity to 'correct the abuse.' " (*Ibid.*)

prepared to present evidence on the issue. (*People* v. *Lo Cigno* (1961) 193 Cal.App.2d 360, 371 [14 Cal.Rptr. 354].) Lack of objection is also excused, as being futile, where the district attorney's conduct has been sanctioned by the trial court's erroneous evidentiary ruling. (*People* v. *Rios* (1985) 163 Cal.App.3d 852, 868 [210 Cal.Rptr. 271].)

Both of these situations occurred frequently in the instant case. Furthermore, defendants urge that we consider an objection made by one as an objection made by all. This is reasonable, since once one defendant's objection was overruled, it was futile for any other defendant to raise the same objection. Moreover, we may consider the issue on its merits despite a lack of objection, in order to forestall a possible claim of ineffectiveness of counsel based on failure to object. (See *People* v. *Lewis* (1990) 50 Cal.3d 262, 282-283 [266 Cal.Rptr. 834, 786 P.2d 892].)

Respondent also notes that numerous instances raised by defendants occurred outside the presence of the jury. Respondent correctly points out that "[r]eversal of judgment is designed not so much to punish prosecutors as to protect the fair trial rights of defendants" (*People* v. *Bolton, supra*, 23 Cal.3d at p. 214), and concludes that therefore no sanctions should be imposed for anything that did not occur in the presence of the jury.

The foregoing principle does not grant a prosecutor carte blanche just because the jury is not present. (See *People* v. *Kelley* (1977) 75 Cal.App.3d 672 [142 Cal.Rptr. 457] [reviewing court considered misconduct occurring in and out of jury's presence and assessed prejudicial effect thereof].) Accordingly, in the instant case this court will not turn a blind eye to misconduct which occurred outside the jury's presence, although that aspect affects the prejudice analysis.

Respondent asserts that in any event, very little misconduct occurred, and what little there was did not prejudice defendants. ▮ Generally, "[p]rosecutorial misconduct is cause for reversal only when it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant.' [Citation.]" (*People* v. *Milner* (1988) 45 Cal.3d 227, 245 [246 Cal.Rptr. 713, 753 P.2d 669]; *People* v. *Bolton, supra*, 23 Cal.3d at p. 214; *People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913], cert. den. 406 U.S. 971 [32 L.Ed.2d 671, 92 S.Ct. 2415], overruled on other grounds in *People* v. *Green, supra*, 27 Cal.3d 1, 33-34.) "Short of misconduct of that nature which infringes on a specific guaranty of the Bill of Rights, . . . prosecutorial misconduct implicates the defendant's federal constitutional rights only if it is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." (*People*

v. *Harris* (1989) 47 Cal.3d 1047, 1083-1084 [255 Cal.Rptr. 352, 767 P.2d 619].)

 Respondent contends that the evidence of guilt was overwhelming and the jury must have discounted the bickering by counsel as inconsequential to the case before it. Occasional bickering, especially in a short trial, might be discounted and ignored. Here, however, it was constant, over the course of a lengthy trial. Given the nature of the exchanges among the attorneys, and between defense counsel and the bench, it is unlikely that it had little effect on the jurors. Moreover, there are other types of misconduct with which to contend. Additionally, the sheer volume of questionable evidentiary rulings, most of which benefited the prosecution, casts substantial doubt on the validity of the argument that the strength of the People's evidence overcame the effect of any misconduct. For reasons which will appear, we conclude the misconduct was prejudicial under any standard.

### B. *Misconduct During Closing Argument*[23]

 A prosecutor's closing argument is an especially critical period of trial. (*People* v. *Alverson* (1964) 60 Cal.2d 803, 805 [36 Cal.Rptr. 479, 388 P.2d 711].) Since it comes from an official representative of the People, it carries great weight and must therefore be reasonably objective. (*People* v. *Talle* (1952) 111 Cal.App.2d 650, 677 [245 P.2d 633].) An argument by the prosecution that appeals to the passion or prejudice of the jury is improper. (*People* v. *Haskett, supra*, 30 Cal.3d at p. 863; *People* v. *Talle, supra*, 111 Cal.App.2d at p. 676.)

 Perhaps the most egregious single act of misconduct occurred following Gindes's argument that, although it would be an atrocity to convict an innocent person, the People had proven their case as required by law and to set the defendants free would be a similar travesty. He then stated:[24]

"ANOTHER THING. I WANT YOU TO UNDERSTAND THIS, AND I WANT YOU TO CONSIDER IT VERY CAREFULLY. THIS IS IMPORTANT. AFTER THE JUDGE INSTRUCTS YOU AND YOU GO INTO THE JURY ROOM AND YOU START YOUR DELIBERATIONS, YOU MIGHT BE THINKING WHEN YOU HEAR AN ARGUMENT YOU MIGHT BE THINKING IN YOUR MIND, WHY IS HE ARGUING THIS? I KNOW THIS. WHY IS HE TALKING ABOUT THIS POINT? I KNOW IT. I KNOW ABOUT IT.

---

[23] Vendrasco presented the People's opening argument; Gindes handled closing argument.

[24] Two court reporters recorded the proceedings. One's transcript is entirely in upper case.

"BUT YOU 12 ARE GOING TO GO BACK INTO A JURY ROOM AND DECIDE THE ISSUES OF THIS CASE. AND THERE IS GOING TO BE A LITTLE DIFFERENCE BETWEEN THE WAY YOU DECIDE THESE ISSUES AS FAR AS THE PROSECUTION IS CONCERNED AND AS FAR AS THE DEFENSE IS CONCERNED. AND I WANT TO TELL YOU THAT DIFFERENCE. THEY NEED ONE VOTE. ONE. THAT IS IT. THEY NEED ONE VOTE TO BLOCK A CONVICTION. IF WE FAIL TO PERSUADE ALL 12 OF YOU BEYOND A REASONABLE DOUBT, WE PERSUADE 11 OF YOU IT WIPES OUT SIX MONTHS, FOLKS. IT'S AS THOUGH IT NEVER EXISTED.

"MR. EYHERABIDE: I WILL OBJECT. IMPROPER ARGUMENT.

"THE COURT: OVERRULED.

"MR. GINDES: ONE VOTE FOR THEM AND WE GO BACK TO SQUARE ONE. IT TAKES 12 VOTES FOR THE PROSECUTION. YOU MUST UNANIMOUSLY AGREE ON ANY VERDICT. SO I WANT YOU TO THINK ABOUT THAT . . . ."

The trial court overruled objections, stating, "All you need [is] unanimity for a verdict either way. That's the impression I got." It subsequently denied a motion for mistrial based on this and other portions of closing argument.

Defendants analogize these remarks to situations in which deadlocked juries were told the case would be retried if they could not reach a verdict. In *People* v. *Barraza* (1979) 23 Cal.3d 675 [153 Cal.Rptr. 459, 591 P.2d 947], such an instruction was held to be error under the principles laid down in *People* v. *Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73]. The *Barraza* court stated: "The pervasive influence of such misinformation [that the case must be decided sooner or later] is further compounded when, as here, the jury charge refers to the expense involved in trying a case . . . . [R]eference to the expense and inconvenience of a retrial is irrelevant to the issue of a defendant's guilt or innocence and is thus impermissible. [Citation.] That the reference here did not link the notion of expense to a prospective retrial is immaterial, for the link is obvious and will naturally be inferred by the jurors once the subject is introduced. It is not so much the irrelevance of such a reference that is troubling, however, as the additional pressure to decide thus created. Consideration of expense 'may have an incalculably coercive effect on jurors reasonably concerned about the spiraling costs of government.' [Citation.] The improper reference to expense herein thus augments the substantial, if subtle, pressure created by the improper instructions concerning the need for retrial. Although these erroneous instructions may not constitute a

direct admonition to the minority, they have for all practical purposes much the same effect . . . ." (*People* v. *Barraza, supra,* 23 Cal.3d at p. 685.)

Respondent distinguishes the instant situation from that confronted in *Barraza* and *Gainer* and contends that the remark was not prejudicial because it came during argument, and the jury was instructed that statements made by attorneys are not evidence. (See CALJIC No. 1.02 (4th ed. 1979).)

It is proper for a prosecutor to urge jurors to do their best to reach a verdict, even though such urging may contain a passing reference to retrial. (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1241-1242 [255 Cal.Rptr. 569, 767 P.2d 1047].) However, it is improper to appeal to the self-interest of jurors or to urge them to view the case from a personal point of view. (*People* ex rel. *Dept. of Public Works* v. *Graziadio* (1964) 231 Cal.App.2d 525, 533-534 [42 Cal.Rptr. 29].)

Considered in context of the instant case, we view Gindes's remarks as going far beyond proper bounds and as being worse than the instruction condemned in *Barraza*. These jurors had given half a year out of their lives to try this case. Gindes essentially told them not merely that a verdict had to be unanimous, as the trial court interpreted the remarks, but that if a single one of them did not vote with the others for convictions, all of their time and effort over those six months would be completely wasted. Although these remarks came before the start of deliberations, they still exerted a powerful pressure to decide the case—to convict—that was much more personal and therefore potentially more coercive than any reference to the cost to taxpayers or the like. Because of the personal aspect of the pressure, respondent's distinction between argument and instruction is unpersuasive. It is true the court did not tell the jurors anything along these lines, and it instructed that counsel's statements were not evidence. But in this situation, counsel's statements did not have to be evidence to be incalculably damaging to defendants, nor did they have to come from the court. The idea was planted in the jurors' minds that anyone not voting for conviction would be nullifying a great deal of hard work and rendering vain the personal sacrifice of all.

 Defendants also vigorously contend that portions of Gindes's closing argument were pure appeals to the passions of the jurors. One instance occurred during Gindes's response to Sims's argument about whether Grace, a grandmother, would reasonably be expected to do the acts of which she was accused:

"You know, I don't think that the defendants' actions are as historically unique and atrocious as they might seem before you. You know, we tend

to isolate ourselves in a jury trial and look at history like sort of tunnel vision. But, you know, I appeal to you to think back over the history of civilization. It's been replete with atrocities. Some of you are old enough to remember what happened during World War II and Korean [War] before [sic] then. The world, you know, unfortunately has always had things happen that shock [the] conscience of people. And we can look way, way back, I think, in history and maybe get a grasp of something you saw in this case.

"And what I want to refer to is a message that was given many, many years ago shortly after Christ was crucified to the people of Gallatia [sic] by Paul. And it's found in the New Testament in the Book of Gallatians [sic] and put in more modern language in the form of the Jerusalem [B]ible. The message was this: He said to the people of Gallatia [sic], 'Let me put it like this, if you are guided by the spirit, you will be in no danger of self-indulgence. Since self-indulgence is the opposite of the spirit, the spirit is totally against such a thing, and it's precisely because the two are so opposed that you do not always carry out your good intentions.' He continued, Paul did, 'If you are led by the spirit, no law can touch you. When self-indulgence is at work, the results are obvious. Fornication, gross indecency, sexual irresponsibility, feuds, rankling, jealousy, bad temper, quarrels, disagreements, factions, envy, drunkenness, orgies and similar things.' And Paul said, 'I warn you now as I warned you before those who behave like this will not inherit the kingdom of God.'

"MR. FUSILIER: I'm going to object to this kind of argument.

"THE COURT: Grounds?

"MR. FUSILIER: Grounds interjecting, I think, it's interjecting religion into a law case.

"THE COURT: Overruled.

"MR. FUSILIER: It's not proper.

"THE COURT: Overruled.

"MR. GINDES: This [sic] people are, as Paul say [sic] them many years ago, gluttons. Gluttons for self-indulgence. They have shown that by all of their conduct. They have abandoned the spirit and have gluttonized their body. Lies, liquors, 'getting shit-faced', cranking up, taking Coca-cola, taking drugs, taking crank, taking dust,[25] the orgies, the arguments, the feuds

---

[25] All are references to terms used by Colleen in her diaries to indicate drug use.

between them. This is no new unique thing. It might seem strange to you because we're before a tribunal of justice, but this gluttony, this appetite of these defendants is what charges through, and that's what answers Mr. Rubin's question, did these people do this to arouse themselves as Grace Dill said in the jail, 'You betcha.' "[26]

Another instance occurred at the very end of closing argument:

"I SUBMIT THAT IT'S NOW TIME TO DO SOMETHING. THAT IS THIS: I WANT YOU TO LOOK AT ALL THE EVIDENCE PRESENTED IN THIS CASE AND I WANT YOU TO WEIGH IT, ALL THE EVIDENCE, AND CONSIDER IT ALL AS A WHOLE AND CONSIDER IT IN LIGHT OF THE INSTRUCTIONS THAT THE COURT IS GOING TO GIVE YOU, AND DETERMINE WHICH OF THESE TWO PICTURES THAT MR. VENDRASCO TALKED ABOUT WAS THE TRUTH. THOSE OF SIX CHILDREN, CHRISTINE, B.J., WINDY, JOHNNY, TOMMY, AMANDA. ARE THEY ALL LYING? OR ARE THEY TELLING THE TRUTH? ARE THOSE KIDS SITTING BEFORE YOU CREATING THE BIGGEST FANTASY, A WITCH HUNT, AS MR. FUSILIER DESCRIBED IT, OR WAS THERE SOMETHING ELSE? A CHILD HUNT WITH THESE DEFENDANTS, HUNTED OUT, BETRAYED AND MASSACRED THE TRUSTED INNOCENCE OF THOSE CHILDREN? WHICH IS IT? BECAUSE THAT IS YOUR DECISION.

"TEN [sic] YEARS AGO CHRIST WAS IN JUDEA AND HE WAS PREACHING BEYOND THE JORDON [sic] AND CROWDS OF PEOPLE GATHERED AROUND CHRIST—

"MR. FUSILIER: I WILL OBJECT TO THIS, YOUR HONOR, READING OUT OF THE BIBLE IN THIS TRIAL.

"THE COURT: WE HAVEN'T REJECTED THE BIBLE FROM THE COURTROOM YET.

"MR. FUSILIER: IT'S NOT PROPER ARGUMENT, I SUBMIT.

"THE COURT: OVERRULED.

"MR. GINDES: CHRIST WAS PREACHING AND CROWDS WERE GATHERING AROUND HIM, AND AS MARK STATES, THEY WERE BRINGING CHILDREN TO HIM SO HE MIGHT TOUCH THEM AND THE DICIPLES [sic] REBUT [sic] THEM. THEY REBUT [sic] THE PEOPLE THAT WERE PUSHING THE CHILDREN TOWARD CHRIST, THAT CHRIST COULD

---

[26] This remark was made by Grace during a conversation with Colleen after Colleen's arrest but prior to Grace's. Colleen asked Grace if Clovette, who was still at large as of the time of trial, was hiding. Grace replied, "You betcha."

Bless Them. and It, as Stated in Mark, But When Jesus Saw This He Was Indignant and Said to Them, Permit the Children to Come to Me. Do Not Hinder Them. For the Kingdom of God Belongs to Such as These. And Then Christ Told Everybody, Truly as I Say to You, Whoever Does Not Receive the Kingdom of God, Like a Child, Shall Not Enter It at All.

"He Talked About the Innocence of Children. He Talked About Kids. And They Have Come Forward Before You, Ladies and Gentlemen. And Not [*sic*] It's Time to Take Roll. Lisa [P.], Victim. Carol [P.], Victim. Tommy [M.], Victim. Windy [B.], Victim.

"Mr. Rubin: Objection. I'm Going to Object.

"The Court: Overruled.

"Mr. Gindes: B.J. [M.], Victim. Amanda [B.], Victim. Christine [H.], Victim.

"Mr. Fusilier: Objection, Your Honor, He Is Making an Impassioned Plea and That's All He's Doing.

"Mr. Rubin: Join.

"Mr. Eyherabide: Join.

"Mr. Van Meter: Join.

"The Court: Overruled.

"Mr. Gindes: Colleen Forsythe, Child Molester. Wayne Forsythe, Child Molester. Rick Pitts, Child Molester. Marcella Pitts, Child Molester. Wayne Dill, Child Molester. Grace Dill, Child Molester. Gina Miller, Child Molester.

"Defendant Ms. Forsythe: You're a Lawyer [*sic*].

"The Court: One More Word and We'll Remedy That Situation, Ma'am.

"Mr. Gindes: They All Must Be Brought to Justice. They Deserve Not One Iota of Your Sympathy. They Deserve Not One Iota of Mercy. They Deserve the Justice. They Had Every Single Chance in the World to Stop What They Were Doing and

EVERY SINGLE TIME THAT THEY HAD A CHANCE THEY SATISFIED THEIR PERVERTED SEXUAL DESIRES INSTEAD OF PROTECTING THEIR CHILDREN. THEY BETRAYED THEIR CHILDREN AT EVERY CHANCE. AND NOW WHEN THE ONLY CHOICE THAT CAN BE MADE IS YOU [*sic*], THEY HAVE THE NERVE TO COME TO YOU AND SAY, FORGIVE US FOR WHAT WE HAVE DONE. MAKE THE CHOICE, FIND US NOT GUILTY.

"MR. RUBIN: OBJECTION, IMPROPER ARGUMENT.

"THE COURT: OVERRULED.

"MR. FUSILIER: THAT IS NOT IN EVIDENCE, YOUR HONOR. HE IS MAKING IMPASSIONS [*sic*] TO THE JURY, PLAYING TO THE PASSIONS OF THE JURY.

"MR. GINDES: NO, PLAYING TO YOUR INTELLIGENCE, AND I REJECT THAT.

"SO I HOPE YOU WILL DELIBERATE AND I HOPE YOU WILL CONSIDER THAT.

". . . . . . . . . . . . . . . . . . . . .

"LADIES AND GENTLEMEN, THE DESTINY OF THESE CHILDREN HAS BEEN A HEAVY MANTEL [*sic*] OF RESPONSIBILITY OF [*sic*] MY SHOULDERS. IT'S NOW APPROXIMATELY 3:30. THE BURDEN HAS GONE OFF MY SHOULDERS. TONIGHT I CAN GO HOME FOR THE FIRST TIME IN SEVEN MONTHS AND SAY TO MYSELF, I'M NOT RESPONSIBLE NOW FOR THOSE SIX LIVES. YOU ARE.

"MR. RUBIN: OBJECTION, IMPROPER ARGUMENT.

"ALL DEFENSE COUNSEL: JOIN.

"THE COURT: OVERRULED.

"MR. LORENZ: I DO HAVE TO OBJECT. IT'S AN IMPROPER, EMOTIONAL ARGUMENT.

"MR. FUSILIER: HE IS PLEADING TO THE PASSIONS.

"MR. LORENZ: EVEN THOUGH I HATE TO INTERRUPT.

"MR. GINDES: DO THEM JUSTICE. THANK YOU VERY MUCH FOR YOUR PATIENCE.

"THE COURT: THANK YOU, MR. GINDES."

The trial court denied a subsequent motion for mistrial on the ground that there was "no undue emotional appeal in the argument of any counsel."

Respondent contends that there was nothing improper about the foregoing argument, since Gindes was merely arguing the evidence presented at trial and showing the jury that these atrocious crimes were not so unique as to be unbelievable. We agree that Gindes's reference to the crimes as atrocities did not constitute misconduct. The use of epithets is proper where warranted by the evidence. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 237 [253 Cal.Rptr. 55, 763 P.2d 906].) Moreover, Gindes was entitled to argue that such crimes were not so unique historically as to be unbelievable. Although his linking of "atrocities" with World War II may call to mind Hitler's "Final Solution," the reference was mild and only arguably misconduct.

The real problem arises with Gindes's choice of biblical passages. There is nothing wrong, per se, with quoting from the Bible in final argument, or with arguing that such conduct occurred even in biblical times. (See *People* v. *Williams* (1988) 45 Cal.3d 1268, 1325 [248 Cal.Rptr. 834, 756 P.2d 221], cert. den. __ U.S. __ [102 L.Ed.2d 1006, 109 S.Ct. 883].) But Gindes took matters a step further and noted Paul's statement that people who behave like this will not inherit the kingdom of God. Such argument is inappropriate. (Cf. *People* v. *Poggi* (1988) 45 Cal.3d 306, 340 [246 Cal.Rptr. 886, 753 P.2d 1082] [prosecutor's references to trial in which higher authority would judge, victim would testify as she was before the killing, and defendant would be sentenced to eternal damnation and hell inappropriate but not prejudicial; remarks came at the very close of argument and were recognizable as hyperbole and therefore discounted].)

The problem was compounded when Gindes basically turned Christ into an unsworn witness for the children's credibility. Gindes essentially told the jurors, Christ took the side of children over adults, Christ said they were innocent, therefore you the jurors should think so, too, and should believe the children in this case.

This is not to say the entire argument was impermissible. For example, calling each child a victim and each defendant a child molester was proper since Gindes was merely arguing his interpretation of what the evidence showed. ▪ As the California Supreme Court stated in *People* v. *Beivel-*

*man, supra,* 70 Cal.2d at pages 76-77: " ' "It is the province of a district attorney to state to a jury the various conclusions that he draws from the evidence, and to make it clear to the jury what conclusions in his opinion should be drawn from the evidence introduced, so long as he keeps within the scope of conclusions which may properly be drawn." [Citation.] "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury." [Citation.] In the argument before the jury, any reasonable inference may be drawn from the evidence . . . .' [Citation.]"

 The overall tone of the argument, however, was purely an attempt to play upon the passions and prejudices of the jurors. For instance, Gindes equated a not guilty verdict with forgiving defendants for their crimes. The two are simply not the same legally. Moreover, coming close on the heels of Gindes's references to Christ and who will or will not inherit the kingdom of God, the remarks presented a subtle argument that jurors voting not guilty would be at odds with Christ and would be condoning the type of behavior the Bible condemns. This is not proper argument. Nor is placing upon the jurors the responsibility for the children's lives. █ █ Whether or not this portion of the argument can be construed as a subtle statement by Gindes of his belief in defendants' guilt,[27] it clearly is an appeal to the passions of the jurors.

Unlike the situation in *People* v. *Poggi, supra,* 45 Cal.3d at page 340, such appeals to the passions and prejudices of the jurors were not brief, but were interspersed throughout the prosecutor's closing argument. As such, we cannot conclude that they were recognizable as mere hyperbole and so were probably discounted by the jurors.

 References were also made during closing argument to facts not in evidence. Argument is improper when it is neither based on the evidence nor related to a matter of common knowledge. (*People* v. *Bell* (1989) 49 Cal.3d 502, 539 [262 Cal.Rptr. 1, 778 P.2d 129]; *People* v. *Heishman* (1988) 45 Cal.3d 147, 195-196 [246 Cal.Rptr. 673, 753 P.2d 629]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 579-581 [189 Cal.Rptr. 855, 659 P.2d 1144];

---

[27] Such a statement constitutes improper argument if there is substantial danger that jurors will interpret the statement of opinion or belief as being based on information other than evidence adduced at trial, but not if it is merely the prosecutor's view of deductions and inferences warranted by the evidence. (*People* v. *Adcox, supra,* 47 Cal.3d at pp. 236-237; *People* v. *Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564]; *People* v. *Kirkes, supra,* 39 Cal.2d at pp. 723-724; *People* v. *Prysock* (1982) 127 Cal.App.3d 972, 997 [180 Cal.Rptr. 15].)

*People* v. *Kirkes, supra,* 39 Cal.2d at p. 724; *People* v. *Evans* (1952) 39 Cal.2d 242, 251 [246 P.2d 636].)

A clear example occurred during Gindes's argument about why the children waited so long before they told anyone what was happening. Gindes stated:

"So That Is Something That Maybe Is Not Common Experience, It's a Myth. It's Another Myth. You Hear About It All the Time in the News as Matters of Historical Facts, Folks. There Is a Whole History of That. And When They Do Tell, Remember That Little Girl, She Was Molested Over and Over Again by Her Uncle and She Did Tell and She Went to Court and the Judge Said, You Should Have Told About This a Long Time Ago. How Can I Believe You? It Took You a Year to Tell. If This Really Would Have Happened, Why Didn't You Tell?

"She Is a United States Senator From Florida Right Now. She Didn't Tell for a Long Time. When She Told She Was Disbelieved. It's Just Another Atrocity, Another Example of False Expectations of People. So What Do We Do, We Say to Ourselves? What Do We Say to Ourselves When We Look at These Children Who Testified in Front of You? They Should Have Told Right Away? They Should Have Told a Teacher? How Many Teachers Do We Have on This Jury Panel? How Many Teachers Did I Ask, Did You Hear Me Ask, Have You Ever Had a Kid Complain About Being, a Child, Being Molested to You? I Think of All the Teachers, of All the Students, of the Thousands of Students, I Think, You Know, We Heard Jurors Talk About One or Two Incidences. It's Not Something That You Tell Your Teacher. It's Not Something You Volunteer to a Teacher. My Mom's Making Me Lick Her Vagina. That Is Not Something You Tell a Teacher."

A short time later, he continued in the same vein:

"Well, Another Thing Mr. Eyherabide Talked About or His Questions Seemed to Imply Is That Teachers, If Molestation Is Occurring, Should Find Out About It. Should Know About It. Should Be Told About It by Their Students. Right. And I Think That the Question That We Have Here Is Basically, First of All, You Saw a Lot of Teachers Testify Before You. I Mean— Excuse Me, a Lot of Teachers During Jury Selection, You Heard

HOW MANY OF THEM HAD ACTUALLY HAD KIDS COME UP AND
DISCUSS WITH THEM THAT THEY WERE VICTIMS OF CHILD ABUSE."

Counsel may argue to the jury matters which are not in evidence, but which are common knowledge or illustrations drawn from common experience, history, or literature. (*People* v. *Sassounian* (1986) 182 Cal.App.3d 361, 396 [226 Cal.Rptr. 880], cert. den. 481 U.S. 1039 [95 L.Ed.2d 817, 107 S.Ct. 1977].) We question whether the story about the senator from Florida, albeit factually based, falls within the foregoing principle. Additionally, Gindes's questioning of teachers about molestations reported by students, occurred during voir dire, not the evidentiary portion of trial. Some of the jurors may not have been privy to it, depending on what panel was being questioned. Regardless, the prospective jurors' answers were not "evidence" as that term is defined by statute,[28] such as could properly be argued against defendants.

Defendants also complain of the denigration of defense counsel. While a prosecutor may properly sympathetically portray a victim, he may not include defense counsel as a villain who was attacking the victim. (*People* v. *Turner* (1983) 145 Cal.App.3d 658, 673-674 [193 Cal.Rptr. 614].) By so doing, he casts aspersions on the defendant's right to defend himself and to be represented by counsel. (*Id.* at p. 674.) Moreover, such misconduct cannot be justified even though the prosecutor's remarks may be in reply to those made by defense counsel. (*People* v. *Perry* (1972) 7 Cal.3d 756, 789 [103 Cal Rptr. 161, 499 P.2d 129]; *People* v. *Bain, supra,* 5 Cal.3d at p. 849; *People* v. *Kirkes, supra,* 39 Cal.2d at p. 725; *People* v. *Kelley, supra,* 75 Cal.App.3d at p. 690; *People* v. *Talle, supra,* 111 Cal.App.2d at p. 677.) However, remarks by defense counsel must be considered in assessing the prejudicial effect of the prosecutorial misconduct. (*People* v. *Perry, supra,* 7 Cal.3d at p. 789.)

For example, at one point during closing argument, Gindes stated:

"Mr. Van Meter told you, look at Carol, spontaneous, you'd ask her a question, she'd answer just like that. None of those long pauses. You know, just told it all how Rick didn't do anything. Really, folks, because a lawyer says something in words, does that make it true? You saw Carol on the witness stand. All long pauses, all these short answers, all of these I don't knows. Her head down. Sad. Troubled. Tormented. Or was she just a happy-go-lucky girl knowing her father had done nothing, out to tell the

---

[28] Evidence Code section 140 provides: " 'Evidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or non-existence of a fact."

world about? How many times did she look at her father? Once, twice, three times, not very many. She sat there miserable.

"You know, there's certain parts of the judicial system that I'm not altogether comfortable with, but we have to accept them as they are because all lawyers are told to respect the law. But Mr. Van Meter called Carol [P.] to the stand, called her as a witness, called her so she could betray herself in court, called her so yet another thing could be chalked up to what that kid will live through in her life. I say that was not one of the high points of the judicial system.

"MR. RUBIN: I'm going to object. This is appealing to sympathy.

"MR. FUSILIER: He's playing on the passions of this jury with his line. He's not talking about evidence now.

"THE COURT: Counsel, it's proper argument. Objection overruled.

"MR. GINDES: He called her, and she miserably did the part. But what did you think about it? What did you think about her testimony? Again, you have to weigh it in the context of those six children."

There was nothing improper about Gindes arguing, based on Carol's demeanor and her manner of testifying, as well as the evidence contrary to her testimony, that her denials of molestations lacked credibility. (See *People* v. *Reyes* (1974) 12 Cal.3d 486, 505 [116 Cal.Rptr. 217, 526 P.2d 225].) Moreover, his comments about the judicial system, if viewed in isolation, were innocuous and certainly not prejudicial. (See *People* v. *Babbitt* (1988) 45 Cal.3d 660, 700 [248 Cal.Rptr. 69, 755 P.2d 253].) However, he went beyond permissible argument when he in essence accused defense counsel of contributing to the ruination of Carol's life. (See *People* v. *Turner, supra*, 145 Cal.App.3d at pp. 673-674.) Moreover, his argument that defense counsel called Carol "so she could betray herself in court" can reasonably be interpreted as a subtle accusation that defense counsel knowingly presented perjured testimony. Such an accusation is clearly misconduct. As the California Supreme Court stated in *People* v. *Thompson* (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37], cert. den. 488 U.S. 960 [102 L.Ed.2d 392, 109 S.Ct. 404]: "A prosecutor may vigorously argue his case, marshalling the facts and arguing inferences to be drawn therefrom. [Citation.] We have held he may not express a personal belief in defendant's guilt, in part because of the danger that jurors may assume there is other evidence at his command on which he bases this conclusion. [Citation.] We have also held it improper for the prosecutor to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the vil-

lain in the case. It is not necessary to find that such implication impinges upon defendant's constitutional right to counsel. [Citation.] Instead it is sufficient to note that defendant's conviction should rest on the evidence, not on derelictions of his counsel. [Citations.] Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." (See also, *People* v. *McLain* (1988) 46 Cal.3d 97, 112-113 [249 Cal.Rptr. 630, 757 P.2d 569], cert. den. 489 U.S. 1072 [103 L.Ed.2d 824, 109 S.Ct. 1356]; *People* v. *Adcox, supra,* 47 Cal.3d at pp. 236-237; *People* v. *Bain, supra,* 5 Cal.3d 839, 847; *People* v. *Talle, supra,* 111 Cal.App.2d at pp. 676-677; *People* v. *Podwys* (1935) 6 Cal.App.2d 71, 72-73 [44 P.2d 377]; contrast *People* v. *Goldberg* (1984) 161 Cal.App.3d 170, 190-191 [207 Cal.Rptr. 431] [permissible to argue that defense counsel was trying to sidetrack jury from the issues and confuse them, and that it was his job].)

Another example occurred during Gindes's argument regarding Dr. Woodling's testimony. Gindes was reciting Woodling's scholastic and professional record when he stated:

". . . He graduated sixth in a class of 72. He graduated through scholarships that he obtained in law school. He became one of ten Mead-Johnson fellows in the entire—

"Mr. Van Meter: Objection, argumentative, facts not in evidence.

"The Court: About the law school—

"Mr. Van Meter: That he obtained a scholarship at law school.

"Mr. Gindes: I'm sorry. Did I say that?

"The Court: Yes.

"Mr. Gindes: Mr. Van Meter scored another point. He was—

"Mr. Van Meter: Your Honor, I will object to that comment by counsel, ask that he be cited.

"The Court: Counsel, we're going forward. Objection is noted.

"Mr. Gindes: I guess he didn't go to law school. Then, he would get a percentage instead of an hourly rate. Anyway, his rank in medical school . . . ."

Gindes also became an unsworn witness as to his own motives and conduct. Thus, he discussed his examination of Lisa:

". . . Lisa [P.], if our evidence is true, is a victim, not a hostile witness, but a victim. And she deserves to be treated decently, kindly and gently. Just like Carol did. Just like Angela did. And I treated them, even though it was my position to attack their credibility, as kindly and as gently and as softly as I could, because again, we have a duty not to traumatize people.

"Mr. Lorenz has no such duty, but he conducted himself in the same manner. Mr. Sims has no such duty. He has a duty to represent his client as vigorously as possible, but he was a gentleman and a gentle person, and I think I tried to be that way myself. Not to 'pressure' somebody.

"Remember when I was examining Lisa, every objection, you know, every question to be [sic] objected to, overruled, objected to for the same reason again, overruled, objected to, overruled, objected to for the same reason again, overruled. Badgering, arguing, going back and forth. It was almost impossible to get an answer out of her. Not because of her necessarily, but because objections were made. So, Mr. Van Meter says to you, he says, 'Lisa [P.] got up there and said none of this happened.'"

The prosecutorial misconduct was not confined to closing argument. Interspersed throughout trial, to an extent this court has never before seen, were comments by one or both prosecutors which disparaged defense counsel; questioned their tactics, competence, and/or ethics; accused them of wasting time; etc. We have reviewed the entire record and have identified instances too numerous to chronicle where misconduct clearly or arguably occurred. Thus, the examples we set forth herein, while necessitating extensive quotes from the record, should not be viewed as isolated conduct, but as representative samples of what occurred. To set forth all of the misconduct would literally take many hundreds of pages.

C. *Comments Disparaging Defense Counsel*

1. "Q [by Mr. Van Meter] Christine, when you heard Bob Fields say that Johnny [M.] had told him that all of these things had happened at the green house and nobody had any clothes on—

"MR. GINDES: Did she just say that Bob Fields had told her that or is Mr. Van Meter making that up to confuse the witness?

"THE COURT: I don't think so. You want to rephrase it."

2. "Q [by Vendrasco] Okay. I want to talk about a different time now and a different day, okay, B.J.? And a different room. Did any of the nasty things happen in the green house in the girls' room?

"A [by Brian] Yes.

"MR. RUBIN: Objection, no proper foundation, irrelevant.

"MR. EYHERABIDE: Join.

"THE COURT: Overruled.

"THE WITNESS: Yes.

"BY MR. VENDRASCO:

"Q Okay. Before—

"MR. EYHERABIDE: Was there an answer? I didn't get the answer.

"THE WITNESS: Yes.

"MR. GINDES: I think Mr. Eyherabide with his comments is having an adverse affect [sic] on the witness. It's hurting his ability to testify.

"MR. EYHERABIDE: Object to those comments.

"MR. GINDES: Bring to the attention of the Court under 288(c) it's traumatizing to the witness the way Mr. Eyherabide is objecting and the way he's—

"MR. RUBIN: Move to have this witness removed and have his testimony stricken if the problem is that he's having trouble answering questions under 288(c).

"MR. EYHERABIDE: I'm just asking—

"MR. VENDRASCO: Witness removed like he's in jail or something.

"THE COURT: We're going to proceed. Objection overruled. Next question, please.

"MR. EYHERABIDE: Could we have the answer to the last question?

"THE COURT: All right.

"MR. VENDRASCO: B.J., maybe you better answer twice.

"MR. SIMS: Objection, his comments aren't necessary.

"THE WITNESS: If I have to say it twice, I will say it out loud. I'll scream it out."

3. "Q [by Eyherabide] OKAY. WELL, BACK TO THE BEER. LET'S TALK ABOUT THE TIME IN RICK AND TUTTI'S ROOM, HOW MUCH BEER, ABOUT, DID YOU DRINK OUT OF THE BOTTLE?

"A [by Brian] ABOUT TWO BOTTLES OF IT.

"Q YOU DRANK TWO BOTTLES YOURSELF?

"A YEAH.

"Q ARE YOU MAKING THAT UP?

"A NO.

"Q THAT REALLY HAPPENED WHILE NASTY THINGS WERE HAPPENING?

"A YES.

"Q YOU SAID YOU'RE GOING TO TELL THE TRUTH HERE.

"A YEAH.

"MR. GINDES: EXCUSE ME, I OBJECT TO COMMENTS LIKE THAT, TRYING TO TRAUMATIZE THE WITNESS INTENTIONALLY, THAT IS IT.

"MR. EYHERABIDE: I'M NOT TRYING TO TRAUMATIZE HIM, I'M ENTITLED TO ASK HIM QUESTIONS TO DETERMINE WHETHER HE IS TELLING THE TRUTH.

"THE COURT: WHAT YOU SAID WASN'T A QUESTION. DO YOU HAVE A QUESTION?

"MR. SIMS: I OBJECT TO MR. GINDES' COMMENTS ON THE RECORD.

"MR. RUBIN: JOIN.

"MR. VAN METER: JOIN.

"THE COURT: LET'S GO, MR. EYHERABIDE."

This must be contrasted with the following:

"Q [by Gindes] Honey, did I ask you if your sister, Carol [P.], told you to come to court and say that nothing happened?

"A [by Lisa] No.

"Q I didn't ask you that question?

"MR. VAN METER: Objection, asked and answered.

"MR. RUBIN: Join.

"THE COURT: Overruled.

"BY MR. GINDES:

"Q Did I ask you that question, honey? You have to tell the truth.

"MR. RUBIN: Objection. That sort of comment, you have to tell the truth is misleading to the jury, totally improper.

"THE COURT: Overruled."

4. "MR. EYHERABIDE: OBJECTION, I'M NOT CHARGED WITH ANY OF THESE ACTS.

"MR. GINDES: COUNSEL, I'M NOT AWARE YOU'RE CHARGED WITH ANY CRIME. WHY DON'T YOU SAY 'MY CLIENT,' LIKE A LAWYER SHOULD AND NOT 'I'M CHARGED.'

"MR. GARDINER: I OBJECT TO THESE STATEMENTS IN FRONT OF THE JURY.

"MR. RUBIN: I MOVE HE BE ADMONISHED.

"THE COURT: LET'S TRY NOT TO BE PERSONAL."

5. "MR. EYHERABIDE: Objection, vague as to time. Are we talking about now, this other time still?

"MR. GINDES: A reasonable person would think that, yeah.

"MR. GARDINER: Your Honor, ask that counsel be admonished for making such statements, and that the jury be requested to disregard it.

"MR. SIMS: Join.

"MR. EYHERABIDE: Join.

"THE COURT: Request denied."

6. "THE COURT: ANYTHING FURTHER OF DEFENSE COUNSEL?

"MR. EYHERABIDE: I WOULD OFFER A STIPULATION—

"MR. GINDES: I THOUGHT I [*sic*] WAS AGAINST THE CANNONS [*sic*] OF ETHICS TO OFFER STIPULATIONS IN FRONT OF THE TRYER [*sic*] OF THE FACTS."

7. "Q [by Van Meter] NOW, HAD YOU BEEN AN AVON LADY PRIOR TO MOVING IN WITH RICK?

". . . . . . . . . . . . . . . .

"MR. VENDRASCO: OBJECT TO THE RELEVANCY.

"THE COURT: WHAT IS THE RELEVANCY OF THE AVON?

"MR. VAN METER: WE ARE GOING TO THE POSSIBILITY OF PEOPLE COMING TO THE HOUSE, YOUR HONOR. THERE HAS BEEN TESTIMONY OF THE ACROSS THE STREET NEIGHBOR THAT HE SAW PEOPLE COMING TO THE HOUSE ON OCCASION.

"MR. VENDRASCO: WHY DOESN'T HE JUST TESTIFY FOR HER.

"MR. VAN METER: WHY DON'T I JUST TESTIFY FOR HER, I DON'T THINK THAT IS JUSTIFIED AT ALL.

"MR. VENDRASCO: I THINK IT IS.

"Mr. Van Meter: I think he should be cited for misconduct.

"Mr. Vendrasco: You have been suggesting answers all along.

"Mr. Fusilier: I would object to the colloquy by the prosecutor.

"The Court: Objection overruled. Let's move forward.

"Mr. Fusilier: This continues, your Honor, I think the damage has been overwhelming.

"Defense Counsel: (Join objection with the exception of Mr. Lorenz.)

"The Court: Let's move ahead, Mr. Van Meter."

8. Although the trial court determined that Forsythe could be impeached with his prior felony convictions, Gindes stated outside the jury's presence that he did not intend to do so on cross-examination; therefore, Gardiner did not need to do so on direct examination. The following subsequently occurred:

"Q [by Gardiner] With regard to your prior convictions—

"Mr. Gindes: Objection, your Honor, irrelevant.

"The Court: Sustained.

"By Mr. Gardiner:

"Q Mr. Forsythe, have you ever been—

"Mr. Gindes: Objection, irrelevant. Your Honor, we have gone into this matter. Is counsel trying to establish Pope 3-D or something like that?

"The Court: I don't know.

"Mr. Gindes: I think the Court made a specific order in this field, and I don't think counsel should ask questions that are going to guarantee a mistrial.

"MR. RUBIN: I totally disagree. There is no order with regard to this.

"THE COURT: What's the relevance? Excuse me. What's the relevance, sir?

"MR. GARDINER: I haven't even asked the question. I don't know how the Court knows what my question is.

"MR. GINDES: If it's a question under 788 of the Penal [*sic*] Code, if he wants to impeach his own witness, that's totally irrelevant for Mr. Gardiner unless he wants to do that. I can't imagine that being part of his case.

"THE COURT: I can't. In all fairness, go ahead with the question. I guess what I was doing was unfairly assuming the question, sir.

"MR. GINDES: I don't think you are, your Honor.

"THE COURT: Go ahead, Mr. Gardiner.

"BY MR. GARDINER:

"Q Mr. Forsythe, have you ever been accused before of child molestation?

"A [by Wayne Forsythe] Never.

"MR. GARDINER: All right. I think that's all the questions I have at this time, your Honor.

"THE COURT: All right.

"Mr. Gindes.

"MR. GINDES: Nothing further.

"THE COURT: Pardon?

"MR. GINDES: Nothing further.

"MR. LORENZ: No questions.

"THE COURT: Mr. Sims.

"MR. SIMS: No questions.

"THE COURT: Mr. Fusilier.

"MR. FUSILIER: No questions.

"THE COURT: Mr. Van Meter.

"MR. VAN METER: No questions.

"THE COURT: Oh, good . . . ."

9. "MR. VAN METER: I'M ASKING HER [Colleen] TO REFER TO HER ENTRIES IN THE DIARY ON THESE SPECIFIC WEEKENDS TO SEE IF THAT REFRESHES HER MEMORY AS TO WHERE SHE WAS AND WHAT SHE WAS DOING.

"THE COURT: WE HAVE ALREADY COVERED WHERE SHE WAS AND WHAT SHE WAS DOING. YOU WANT TO FIND OUT IF SHE WAS AT THE GREEN HOUSE.

"MR. VAN METER: I HAVE ASKED HER TO REFER TO THE ENTRIES IN THE DIARY ON FRIDAY, SATURDAY, SUNDAY ON THESE SPECIFIC WEEKENDS IN ORDER TO ALLOW HER TO REFRESH HER MEMORY SPECIFICALLY AS TO WHAT SHE WAS DOING ON THESE SPECIFIC WEEKENDS SO WE CAN DETERMINE WHETHER OR NOT SHE WAS AT THE GREEN HOUSE.

"MR. GINDES: IT SOUNDS LIKE A MOZART SONATA.

"MR. VAN METER: I WOULD ASK THAT COUNSEL BE CITED FOR THAT REMARK.

"THE COURT: NO, JUST ASK YOUR NEXT QUESTION.

"BY MR. VAN METER:

"Q WOULD YOU REFER TO YOUR DIARY—

"MR. GINDES: HA, HA, HA.

"MR. VAN METER: NOW, MR. GINDES IS LAUGHING OUT LOUD AT THE BEGINNING OF MY QUESTION. I WOULD ASK AGAIN THAT HE BE CITED FOR MISCONDUCT.

"MR. LORENZ: I AM, TOO. IT'S HARD NOT TO LAUGH.

"Mr. Fusilier: This Is a Serious Matter, Your Honor.

"The Court: I Realize That Counsel.

". . . . . . . . . . . . . . . . . .

"Just Ask the Next Question, Mr. Van Meter.

". . . . . . . . . . . . . . . . . .

"By Mr. Van Meter:

"[Q] Ms. Forsythe, Did You Go to the Green House on Friday, the 17th of December?

"Mr. Eyherabide: Objection, Asked and Answered, 352 of the Evidence Code.

"Mr. Vendrasco: I Also Object. the Probative Value Is Outweighed by the Consumption of Time.

"The Court: Overruled. We'll See if You Can Tie It Together, Mr. Van Meter.

"Mr. Vendrasco: Before June of '85.

"Mr. Van Meter: Your Honor, That Is Enough. I Ask He Be Cited for Misconduct for That Remark in Front of the Jury.

"The Court: Counsel, I Would Request—

"Mr. Gindes: Could We Compromise? Perhaps He Can Go Month-by-month and Ask How Many Times.

"The Court: I Suggested That We Go, Why Don't You Go?

"Mr. Van Meter: Your Honor, I'm Interested in the Specific Alternate Weekends. I'm Not Interested in Going Through Every Entry for the Whole Month.

"The Court: I Didn't Suggest You Go Through Every Entry for the Whole Month. Why Don't You Just Say for the Month of December, Did You Go to the Green House on Alternate Weekend Visitation Periods? How Is That?

"MR. VENDRASCO: HE CAN'T DETERMINE ALTERNATE WEEKENDS."

10. "Q [by Vendrasco] DID YOU EVER ASK AN INMATE IN JAIL TO TESTIFY THAT YOU DIDN'T DISCUSS THIS CASE WITH ANYONE IN JAIL?

"MR. EYHERABIDE: I HAVE AN OBJECTION BASED ON U.S. VERSUS HENRY.

"MR. GINDES: CAN COUNSEL MAKE A LEGAL OBJECTION LIKE IT'S IRRELEVANT OR SOMETHING LIKE THAT?

". . . . . . . . . . . . . . . . . . . .

"Q [by Vendrasco] DID YOU EVER OFFER GIFTS TO ANY INMATE IF SHE WOULD TESTIFY ON YOUR BEHALF?

"A [by Grace] NO, I DIDN'T.

"MR. RUBIN: I WILL OBJECT ON 6TH AMENDMENT GROUNDS.

"MR. LORENZ: I WILL MAKE A HEARSAY OBJECTION.

"MR. FUSILIER: I WILL OBJECT, ASSUMING SOMETHING NOT IN EVIDENCE. HE MAY BE MAKING THIS UP FOR ALL WE KNOW.

"MR. GINDES: I THINK AN OFFICER OF THE COURT DOESN'T MAKE THINGS UP, YOUR HONOR. I OBJECT TO MR. FUSILEIR'S [sic] REMARK.

"THE COURT: THIS IS LIMITED TO MS. DILL.

"OVERRULED."

D. *Accusing Defense Counsel of Wasting Time*

1. "Q [by Van Meter]: I BELIEVE YOU TOLD US THAT BOTH RICK AND WAYNE FORSYTHE WERE TAKING PICTURES AT THE SAME TIME?

"MR. GINDES: SHE JUST SAID THAT.

"THE COURT: I THINK WE'RE GOING BACK TO THE RESUMMARIZATION MODE. OBJECTION SUSTAINED.

BY MR. VAN METER:

"Q WERE THEY TAKING PICTURES AT THE SAME TIME?

"MR. GINDES: IS HE GETTING PAID BY THE QUESTION OR SOMETHING? THIS QUESTION HAS BEEN ASKED THREE TIMES.

"MR. VAN METER: I WOULD ASK HE BE CITED FOR MISCONDUCT FOR MAKING A STATEMENT LIKE THAT.

"THE COURT: WHOA. I DON'T THINK HE HAS ASKED THE QUESTION, IF THEY WERE BOTH SIMULTANEOUSLY TAKING PICTURES . . . ."

A motion for mistrial was made outside the jury's presence the following day. Gindes stated that he regretted the remark, but:

"[Van Meter] seemed to be taking very [sic] question and breaking it down into 15 questions and resummarize [sic] the testimony of a witness, and you said this and you said that. It seemed Mr. Van Meter was trying to keep the child on as long as possible. I formed the opinion then, and I do hold it now what we're seeing here is a very sophisticated case of good guy-bad guy defense tactics.

"What I think is happening is Mr. Rubin and Mr. Van Meter and possibly one other attorney, they confer and they have one turn of getting the role of keeping the child on as long as possible and exhausting the child, and the other attorney gets up and makes ingratiating remarks, I'm only going to ask a few questions and she's going to get off the stand. And it's annoying me. I don't like the tactics.

"I think those defense counsel are working together and I think when Mr. Rubin acts like that and has Mr. Van Meter pursue this policy of exhausting the witness by asking question after question after question and it was making me mad. I guess I should not have let that make me mad. I guess you should bet [sic] hardened."

The court denied the mistrial motion, stating:

"Well, I think that the comment was made at the end of a long day. The young girl has been on the stand for, I believe, over a week if you add all the days together, and counsel has apologized for the remark, and I think I just caution both sides to try to bear up under this strain. It's going to be a long trial, and let's see if we can move this as expeditiously as possible. Motion denied."

In *People* v. *McCracken, supra*, 39 Cal.2d at pages 348-349, which counsel cited to the trial court in the instant case, the California Supreme Court held that the prosecutor committed misconduct when he stated in front of the jury, " 'What some people won't do for a fee.' " (Italics omitted.) However, any prejudice was cured because there was an immediate objection and admonition to the jury to disregard the statement.

2. "Q [by Eyherabide] YOU NEVER GOT ANY SHOTS AT THE GREEN HOUSE?

"A [by Windy] NO.

"MR. VENDRASCO: THAT HAS BEEN ASKED BY ANOTHER ATTORNEY. IF WE'RE GOING TO BE ASKING QUESTIONS TWO AND THREE TIMES WE'RE NOT GOING TO FINISH BY THE END OF THE SUMMER. I THINK IT'S BEEN ASKED, SO I OBJECT.

"THE COURT: I THINK IT HAS BEEN ASKED, MR. EYHERABIDE."

3. "Q [by Rubin] Now, Windy, when you were talking with Carol Darling the first time back in June, you knew that Rick and your mom had been arrested, right?

"MR. GINDES: I'm going to object. This is an identical question that has been asked on direct examination, cross-examination two or three times.

"MR. RUBIN: That may be, your Honor. I believe the subject matter has been brought up again. It's been put in issue.

"MR. GINDES: That doesn't give him the right to ask the question and it wastes time.

"MR. RUBIN: It sure does. It would take a lot less time.

"MR. GINDES: Counsel would go on a year if I didn't object . . . ."

4. "Q [by Van Meter] And were all three ropes [on the board] black?

"A [by Brian] Yes.

"Q Okay. None of the ropes were red?

"MR. GINDES: Your Honor, excuse me. Are we going to go on with all the colors of the rainbow? He just told Mr. Van Meter all three ropes were black.

"MR. VAN METER: This is to impeach his prior testimony in which he said the ropes were black and red and yellow.

"MR. GINDES: He just said the ropes were black.

"MR. VAN METER: This is to impeach his prior testimony [in] which he said the ropes were black and red and yellow.

"MR. GINDES: That's not a prior inconsistent statement.

"THE COURT: If he said it was all black—

"MR. VAN METER: I just wanted to get him pinned down on it.

"MR. GINDES: Perhaps we could ask the question 30 times.

"MR. SIMS: Objection, your Honor.

". . . . . . . . . . . . . . . . . . .

"MR. GINDES: Could we stop asking questions that are just, you know, absorbing time and not accomplishing anything. The child has testified they are all black.

"MR. RUBIN: Object to the colloquy.

"THE COURT: Why don't we do this, let's plod on."

5. "Q [by Gardiner] Now, you're saying that there were a lot of them [children] on this first time [at Knotts Street]?

"MR. GINDES: Excuse me. This is the seventh time counsel has done this. She [Idolina Lopez] has told him seven times that she only remembers four children being present on the first occasion.

"THE COURT: But other occasions.

"MR. GINDES: He's asking about the first occasion again. This is the seventh time he has elicited this testimony. It consumes time and it is accomplishing nothing to exonerate his client.

". . . . . . . . . . . . . . . . . . .

"MR. GINDES: He's talking about the first time, and I counted them, now seven occasions she said there were four children on the first time. Why does he want to ask them an eighth time?

"THE COURT: I don't know.

"MR. GINDES: Object to [*sic*] the time consumption outweighs the probative value. Counsel could ask a hundred times and she keeps saying four, and tomorrow he could do the same thing again.

"THE COURT: Let's go on to the next question.

". . . . . . . . . . . . . . . . . . . .

"MR. GINDES: Objection, asked and answered.

"THE COURT: Sustained. Next series of questions.

"MR. GINDES: Your Honor, could counsel ask the next question?

"MR. GARDINER: Your Honor, if I could have a moment.

"THE COURT: All right.

". . . . . . . . . . . . . . . . . . . .

"MR. GINDES: Object to that question as asking her to recall her answers to a preliminary hearing that has lasted two months. Asking her if she can recall an answer after two months of testimony.

"THE COURT: Where are we going with this line of questioning?

"MR. GARDINER: Showing inconsistent statements, your Honor.

"MR. GINDES: If he wants to prove an inconsistent statement, he can do it in a proper and appropriate manner which he is not doing.

"THE COURT: Objection sustained.

". . . . . . . . . . . . . . . . . . . .

"MR. GINDES: Could the record reflect a substantially long pause between the questions Mr. Gardiner is asking and consuming court time?

"THE COURT: He's looking through documents and police reports and transcripts, and I think it's understandable transition."

E. *Comments Regarding Defense Objections*

1. "Q [by Vendrasco] Show us how the kid would touch the lady?

"MR. EYHERABIDE: I will object, asked and answered . . . .

"MR. GINDES: I will object to Mr. Eyherabide interrupting the witness.[29]

"THE COURT: Overruled."

2. "Q [by Vendrasco] And would you sometimes see in Rick and Tutti's room, would you see kids touch women's privates?

"A [by Brian] Yeah.

"MR. EYHERABIDE: Objection, leading and vague as to time.

"MR. RUBIN: Join.

"THE COURT: Overruled.

"MR. GINDES: I think that the Court has ruled by now that the prosecution has established a sufficient foundation to prevent these objections as too vague, as to time. The child has identified the time that he remembers best in Rick and Tutti's room. Therefore, I don't think it's necessary for counsel to completely time after time again repeat that objection when the Court has overruled that objection. It's disrupting the testimony of the child and the trier of fact.

"MR. EYHERABIDE: If the Court will give me a continuing objection.

"MR. GINDES: The Court won't give you a continuing objection. I'd ask Mr. Eyherabide not to make the same objection that has been overruled by the Court continuously.

"[.] . . . . . . . . . . . . . . . .

"MR. FUSILIER: For the record, object to these speaking objections continually happening here.

---

[29] It was not unreasonable for defense counsel to object *before* the answer.

"MR. SIMS: Join with Mr. Fusilier.

"THE COURT: I'm not going to give you a continuing objection. If you feel an objection is in order, please make it as you have been doing."

Many defense objections were necessitated by the court's refusal to grant continuing objections. During the giving of instructions, however, the court did instruct the jury pursuant to defense request as follows:

"It is the duty of the attorney on each side of the case to object when the other side offers testimony or other evidence which the attorney believes is not properly admissible. You must not be prejudiced against either an attorney or any client because the attorney has made objections during the course of the trial.

"By allowing testimony or other evidence to be introduced over the objection of an attorney, the Court does not indicate any opinion as to the weight or effect of such evidence. As stated before, you are the sole judges of the credibility of all witnesses and the weight and effect to be given to all of the evidence."

## F. *Improperly Imparting Information to Jury*

 Defendants complain of the prosecutors' use of speaking objections and other devices to place information before the jury that was not admitted into evidence, or for other improper purposes such as suggesting defense counsel were wasting time. It is settled that "the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." (*Turner v. Louisiana* (1965) 379 U.S. 466, 472-473 [13 L.Ed.2d 424, 429, 85 S.Ct. 546].) It is improper for a prosecutor to present potentially prejudicial "evidence" to a jury in the form of argument. (*People* v. *Perez* (1962) 58 Cal.2d 229, 244 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], disapproved on other grounds in *People* v. *Green, supra*, 27 Cal.3d at pp. 32, 34.)[30] Some examples follow.

1. "Q [by Fusilier] You didn't tell her [Carol Darling] Wayne Dill was there, your uncle, did you at that time?

---

[30] In *People* v. *Poggi, supra*, 45 Cal.3d at pages 335, 336, the California Supreme Court stated that *Perez* was no longer valid. The issue in *Poggi* was the trial court's sua sponte duty to intervene where prosecutorial misconduct occurs. However, portions of *Perez* discussing what constitutes prosecutorial misconduct have been cited with approval in *People* v. *Warren* (1988) 45 Cal.3d 471, 480 [247 Cal.Rptr. 172, 754 P.2d 218], and *People* v. *Carrera* (1989) 49 Cal.3d 291, 318 [261 Cal.Rptr. 348, 777 P.2d 121].

"A [by Christine] No.

"⸴ . . . . . . . . . . . . . . . . . .

"Q Then, in all fairness, let me ask you, was it because he wasn't there or what?

"MR. GINDES: Excuse me. Counsel has a copy of this report and this list and it lists Wayne Dill, and he's asking her questions she didn't say on the list.

"MR. FUSILIER: I object. He's talking to the jury.

"THE COURT: Let's go back, Mr. Fusilier.

"Next question.

"MR. FUSILIER: Just a moment, your Honor. I think something ought to be done about these extemporaneous remarks. He's giving evidence to the jury and it's inadmissible. I don't have that report.

"THE COURT: Next question.

"MR. GINDES: Counsel was given a copy of that report.

"MR. FUSILIER: Have to swear him in and testify, let him testify to that. He's talking in front of the jury.

"THE COURT: Gentlemen, Mr. Fusilier, next question, sir, please.

"MR. RUBIN: Move for a mistrial based on Mr. Gindes' conduct, totally inappropriate.

"THE COURT: Denied, sir.

"NEXT QUESTION.

"⸴ . . . . . . . . . . . . . . . . . .

"MR. FUSILIER: I'd like to join Mr. Rubin's last motion.

"THE COURT: His last motion was—

"MR. FUSILIER: For a mistrial.

"THE COURT: And you're pointing to Mr. Gindes.

"MR. FUSILIER: The same remarks, yes, your Honor.

"THE COURT: Motion.

"MR. GINDES: If counsel wants to make that motion, I have the reports and will give it to the Court and swear that I gave this to all counsel.

"MR. FUSILIER: I renew.

"MR. RUBIN: I join.

"THE COURT: Motion denied."

2. "Q [by Eyherabide] And she [Carol Darling] identified herself as the investigator of the district attorney's office?

"MR. GINDES: First of all, she's not an investigator with the district attorney's office and it's irrelevant.

"MR. EYHERABIDE: I'm just asking the question. I don't need him to testify.

"THE COURT: Rephrase it, Mr. Eyherabide."

3. "Q [by Eyherabide] WHEN MR. GINDES CAME BACK TO CALIFORNIA [FROM OKLAHOMA] WITH YOU, DID HE HAVE THAT [newspaper article concerning this case] IN HIS POSSESSION?

"A [by Sgt. Brad Darling] I DON'T RECALL. MY RECOLLECTION IS THAT THAT WAS FORWARDED TO CALIFORNIA BY SUBPOENA PROCESS.

"Q DO YOU HAVE THAT—

"MR. VENDRASCO: THAT IS RIGHT."

4. "Q [by Rubin] And then after you had told him [the policeman] that Rick had rubbed your—use the term you used, your pee pee once and put his pee pee near your bottom, he asked you whether Rick had done anything else to you, and you said no, is that right?

"MR. GINDES: Object to counsel, when he says I'm going to use the term you used. This report refers to the victim's report of anal intercourse.

Mr. Rubin says you only told him that you [*sic*] put the penis near the bottom, and I'm going to use the term you used, and he's looking at a report that says the child engaged in anal intercourse. That's misstating the report, and I don't think that's a question that should be asked the witness.

"MR. FUSILIER: Object to this testimony by the prosecutor on behalf of Mr. Wayne Dill, Jr.

"THE COURT: He's made an objection, counsel, that he's inaccurately quoting the report.

". . . . . . . . . . . . . . . . . . .

"Why don't you rephrase the question, counsel.

"MR. GINDES: Another thing he said—

"MR. VAN METER: Objection, object to counsel reading from the report. He's trying to get into evidence things that are not possibly admissible.

"MR. GINDES: The basis of my objection is that counsel should not say I'm reading from the report and misread or misconstrue what a witness says in a report and says you say this. That's what my objection is.

"THE COURT: If we're referring to a report, let's accurately—

"MR. GINDES: Legitimate objection.

". . . . . . . . . . . . . . . . . . .

"BY MR. RUBIN:

"Q . . . After you told—we're back to you, Brian, after you told this officer that Rick Pitts had rubbed your pee pee and that Rick Pitts had stepped behind you and placed his penis in the area of your behind, did the officer ask whether Rick Pitts had done anything else?

"MR. GINDES: That's not what the report says.

"MR. RUBIN: Report says anus. I'm sure this witness didn't use that term.

"MR. GINDES: The officer is summarizing, and the witness is talking about putting it in the anus and engaging in anal intercourse. Simply saying that his behind—

"MR. SIMS: Isn't that something for cross-examination?

"MR. FUSILIER: Object for Wayne Dill, Jr. Testimony by the prosecutors. He's testifying. It's not proper. I object.

"THE COURT: Overruled."

The preceding becomes especially interesting in light of the following:

"Q [by Gardiner] . . . Now, in that meeting with Officer Bob Fields, he indicates that he showed you a group of pictures and said he shows you this group of pictures, you looked at it and you picked picture no. 3 and said that was Colleen's boy friend and said his name was Wayne?

"A [by Brian] Yes.

"MR. GINDES: Object and move to strike saying what Bob Fields said. That's hearsay. That report's not in evidence.

"THE COURT: That is correct. I think you can rephrase it, Mr. Gardiner."

Later in the proceedings:

"Q [by Gardiner] . . . In the middle of that paragraph, there is a line or a sentence which says—

"MR. GINDES: Objection to him reading off the report. That's hearsay.

"THE COURT: Sustained."

5. "Q [by Eyherabide] SO THEN YOU TALKED TO [DEPUTY] CONNY ERICSSON ABOUT TERESA COX; IS THAT RIGHT?

"A [by Linda Moten] YES.

"Q NOW, WHAT KIND OF CHARGES IS SHE FACING?

"MR. GINDES: IT'S IRRELEVANT WHAT KIND OF CHARGES TERESA COX IS FACING.

"THE COURT: SUSTAINED.

"BY MR. EYHERABIDE:

"Q DID YOU GIVE—DID YOU TELL CONNY ERICSSON THAT SHE MADE ADMISSIONS CONCERNING SEXUAL ACTIVITY WITH CHILDREN?

"MR. GINDES: I WOULD OBJECT TO THAT. TERESA COX'[S] TESTIMONY AS OPPOSED TO COLLEEN [B.] IS HEARSAY, THEY ARE NOT ADMISSIONS.

"THE COURT: SUSTAINED.

"MR. EYHERABIDE: YOUR HONOR, IT'S NOT COMING IN FOR THE TRUTH, JUST TO SHOW THE PATTERN OF THIS WITNESS.

"MR. VENDRASCO: I'M WILLING TO STIPULATE THAT TERESA COX WAS CONVICTED, IF YOU WANT TO STIPULATE TO THAT."

6. "MR. RUBIN: I'M GOING TO OBJECT TO ANY QUESTIONS IN THIS AREA AS BEING IRRELEVANT AND OUTSIDE THE EVIDENCE PRESENTED AT THE PRELIMINARY HEARING. ANYTHING IN REGARD TO THAT OTHER [CAROL AND LISA'S] ROOM.

"MR. SIMS: JOIN.

"MR. EYHERABIDE: JOIN. ALSO VAGUE AND IRRELEVANT.

"THE COURT: OVERRULED.

."MR. RUBIN: I MIGHT ASK FOR A LIMITING INSTRUCTION WITH REGARD TO MY CLIENT THAT RELATES—

"MR. EYHERABIDE: JOIN.

"THE COURT: THERE IS AIDING AND ABETTING, I THINK, ALLEGED.

"MR. VENDRASCO: IF YOU PROVE EVEN COUNT ONE YOU HAVE PROVED THE REST OF THE COUNTS.

"THE COURT: OVERRULED.

"Mr Rubin: Your Honor, I Would Like to Have the Prosecutor Admonished. That Is a Totally Incorrect Statement in Front of the Jury. I Move for a Mistrial.

"The Court: The Question, Please."

7. "Q [by Fusilier] . . . In fact, the only time, and the first time you ever mentioned Wayne Dill . . . was there was the day before yesterday and today, isn't that true?

"Mr. Gindes: I object to that. Counsel has transcripts where Wayne Dill is mentioned, I think, at least 50 to 60 times in his possession, and he's representing to the Court that's not true.

"Mr. Fusilier: That's not proper. If he has an objection, he should make a proper objection. This is prejudicial and pointing evidence to the jury.

"Mr. Gindes: Counsel has represented to the jury that the first time that this child has ever named Wayne Dill is today.

"Mr. Fusilier: That's not my question.

"Mr. Gindes: May we have the question read back?

"Mr. Fusilier: He shouldn't interrupt and impart testimony without being under oath to this jury. I object.

"The Court: Let's hear the question, counsel.

". . . . . . . . . . . . . . . . .

"Q [by Fusilier] . . . Well, you never said that Wayne Dill was at this house where these nasty things occurred just after the track meet, is that true?

"Mr. Gindes: Could the Court grant—preliminary hearing July 5, 1984 and look at Page 20.

". . . . . . . . . . . . . . . . .

"Mr. Fusilier: I was at a preliminary hearing of my client, Wayne Dill, Jr., and this young man [Johnny] was testifying, and I have read the transcript, and I am in good faith asking him what occurred. I don't know

anything about any other transcripts that he's talking about. My transcript reflects exactly the questions I'm asking.[31]

"MR. VENDRASCO: I move to strike the testimony of Mr. Fusilier, what he read and what he heard. He made a statement 'English wasn't his primary language' I recall.

"THE COURT: That was correct.[32]

"MR. FUSILIER: Meaning what?

"MR. VENDRASCO: I move to strike testimony by the defense attorney what he read. It's not before the Court. It's not proper to consider that.

"THE COURT: Let's cut down on the editorializing.

"MR. VAN METER: Request that counsel be cited for misconduct.

"MR. GINDES: I'm asking the Court to look at those transcripts.

". . . . . . . . . . . . . . . . . . . . . . .

"MR. GINDES: That was the preliminary hearing of Ricky Pitts, et al, and if counsel wants to talk about his own client's preliminary hearing, he can look at the July 25, 1984 transcript at Page 4 which also indicates his client being present there.

"MR. FUSILIER: No, I disagree, your Honor.

"MR. RUBIN: I move we adjourn. We're almost done for the day. Perhaps we should take this out of the presence of the jury.

"THE COURT: I think we can come back after Mr. Fusilier has an opportunity to look at the preliminary hearing transcript and we can see. Get this clarified tomorrow."

---

[31] The July 5, 1984, preliminary hearing involved Rick, Tutti, and Colleen. Dill's preliminary hearing, and that of Gina and Grace, began on July 24, 1984. Forsythe's preliminary hearing began October 31, 1984.

[32] Earlier in the proceedings, Fusilier asked Mr. Silvius for an explanation of dyslexia and noted that English was not his primary language. When Fusilier later was examining Silvius on recross-examination, Vendrasco objected to the unintelligibility of a question, and Silvius asked Fusilier to rephrase it. The trial court joked, "In your primary language now." Fusilier responded, "I've got trouble knowing what primary really means at times." Unlike the instant situation, the context of the initial exchange makes it clear the remarks were humorous.

The next day, the following occurred:

"Q [by Fusilier] You didn't say Wayne Dill, Jr. was there that day, did you?

"MR. GINDES: Excuse me, object to that type of question by counsel. He talked about three incidents at the preliminary hearing, and he put Wayne Dill at each of those three incidents. When counsel asks that question, it's unfair to him.

"MR. FUSILIER: If there's an objection, I'd like to hear it.

"MR. GINDES: That's it.

"BY MR. FUSILIER:

"Q Did you understand my question?

"MR. GINDES: I don't care. He's misrepresenting the record to the witness.

"MR. FUSILIER: No, I'm not. I read the transcript. I was there.

"THE COURT: Didn't you just tell him that he did not testify?

"MR. FUSILIER: Just a minute, your Honor. I'm going to object to Mr. Gindes' interrupting. He's trying to impart information that's unfair and not really true.

"MR. GINDES: I would ask the Court to look at this—

"· · · · · · · · · · · · · · · · ·

"Excuse me a second. I would like the Court to take the volume of July 24, 1984 and we will go through all the volumes where he mentioned incidents and he put Wayne Dill at each incident. So, counsel is misrepresenting to the Court when he says he didn't say Wayne Dill was there.

"MR. FUSILIER: This is an improper—he has a right to cross-examine and produce any kinds of witnesses. I read the transcript of my preliminary hearing, and I defended Wayne Dill.

"MR. GINDES: The only problem is—

"THE COURT: His objection is that you're misstating the evidence.

"MR. FUSILIER: That's his objection, fine.

"THE COURT: Let me look at the transcript then.

"MR. FUSILIER: I will withdraw the question in the interest of time.

"MR. GINDES: Interest of time or interest of accuracy?

"THE COURT: All right, counsel.

"BY MR. FUSILIER:

"Q Johnny, do you get mixed up as to what you said from one preliminary hearing?

"MR. GINDES: Start at Page 23, your Honor.

"THE COURT: All right.

"MR. FUSILIER: Whose prelim was that?

"MR. GINDES: This is yours, counsel, your client's, counsel.

"THE COURT: This is the preliminary hearing transcript, Mr. Fusilier, before the Honorable Judge Scott, Carey Scott on July 24 of '84.

"MR. RUBIN: I'm going to object. There is no question pending.

"MR. FUSILIER: This is highly improper.

"THE COURT: Have you withdrawn that question, counsel?

"MR. FUSILIER: I've withdrawn it.

"MR. SIMS: For time reference, ask to which one this is. Refer the Court to Page 23.

"THE COURT: I am at 23.

"MR. SIMS: Where he talks about this was on a weekend, on a Sunday, and also just before that the instance Mr. Gindes is referring to, it was the

last time that he visited and this isn't the last time that he visited because I brought that out on my cross examination.

"MR. GINDES: Your Honor, [in] the preliminary hearing he talks about three incidents. And he talks about Wayne Dill [being] present at each one. When counsel says you said Wayne Dill wasn't present, he's misrepresenting.

"MR. FUSILIER: There's a place where he says no, he wasn't there also.

"MR. VENDRASCO: Why don't you find that place?

"MR. GINDES: Page 24.

"MR. SIMS: That's the last time.

"THE COURT: Counsel, wait a second. One at a time.

"MR. FUSILIER: I will withdraw.

"THE COURT: Let's stop right here and let me read Page 24.

"MR. EYHERABIDE: I have an objection on hearsay to my client.

"THE COURT: Fine. Let me read Page 24 . . . .

"MR. FUSILIER: You have to read the whole transcript.

"THE COURT: I understand.

"MR. GINDES: Volume 25.

"MR. VENDRASCO: I object to his testimony, what he says.

"MR. GINDES: Page 27.

"MR. RUBIN: I object to what is going on in front of the jury. This is highly prejudicial and incredible waste of time.

"THE COURT: I don't think it's prejudicial. I do think it's a waste of time in view of the fact that counsel has withdrawn the question. However, for the record, I want to point out that Page 24 of that transcript does indicate that the witness does identify Mr. Wayne Dill as being present at a particular incident.

"MR. GINDES: I've got 15 more citations when Wayne Dill was there, if the Court wants it.

"MR. SIMS: Your Honor,—

"THE COURT: I think the point is clear for the record. The question has been withdrawn. Next question, sir.

"MR. RUBIN: I'm going to move to strike the Court's comments as being irrelevant. There is no question pending.

"MR. EYHERABIDE: I will join.

"MR. GARDINER: Join for Wayne Forsythe.

"THE COURT: Request denied. Next question.

"MR. FUSILIER: I will submit there are places where he fails to mention Wayne Dill being there.

"THE COURT: That's fine, sir.

"MR. VENDRASCO: I move to strike.

"MR. SIMS: Ask Mr. Gindes' comments be stricken as prejudicial and inaccurate.

"MR. GINDES: If he thinks they're inaccurate—

"THE COURT: Request denied. Let's proceed."

G. *Improper Questioning of Witnesses*

 Defendants also justifiably contend that prosecutorial misconduct occurred during examination of prosecution and defense witnesses, either because the prosecutor's examination was abusive or because it was used as a means of getting inadmissible evidence and improper innuendo before the jury. In some instances, the prosecutors arguably became their own unsworn witnesses.[33]

---

[33] In many instances, this area overlaps defendants' challenges to various evidentiary rulings. In most cases, the prosecutors' conduct was sanctioned by the trial court's overruling of defense objections. Generally, "[a] prosecutor is not guilty of misconduct when he questions a witness in accordance with the court's ruling." (*People* v. *Rich* (1988) 45 Cal.3d 1036, 1088 [248 Cal.Rptr. 510, 755 P.2d 960].) Many of these instances are properly termed misconduct,

"'The deliberate asking of questions calling for inadmissible and prejudicial answers is misconduct.' [Citation.]" (*People* v. *Bell, supra*, 49 Cal.3d at p. 532.) "The rule is well established that the prosecuting attorney may not interrogate witnesses solely 'for the purpose of getting before the jury the facts inferred therein, together with the insinuations and suggestions they inevitably contained, rather than for the answers which might be given.' [Citations.]" (*People* v. *Wagner* (1975) 13 Cal.3d 612, 619 [119 Cal.Rptr. 457, 532 P.2d 105]; see also, *People* v. *Bonin, supra*, 46 Cal.3d at p. 689 [intentionally eliciting inadmissible testimony]; *People* v. *Warren, supra*, 45 Cal.3d at pp. 480-481 [asking questions suggesting facts harmful to defendant without good faith belief in existence of said facts]; *People* v. *Perez, supra*, 58 Cal.2d at p. 241 [asking questions suggesting facts harmful to defendant without belief facts could be proved and purpose to prove them]; *People* v. *Evans, supra*, 39 Cal.2d at p. 251 [repeated asking of questions relative to objectionable and prejudicial matter involving appeals to passions and prejudices of jury; in § 288 prosecution, crime charged is sufficient to inflame mind of average person so there must be "rigorous insistence" upon observance of rules of admission of evidence and conduct of trial]; *People* v. *Johnson* (1978) 77 Cal.App.3d 866, 873 [143 Cal.Rptr. 852] [improper cross-examination of defendant to place inadmissible prejudicial evidence before jury]; *People* v. *Shipe* (1975) 49 Cal.App.3d 343, 349 [122 Cal.Rptr. 701] [prosecutor "may not, under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony"].)

Nor is the impropriety of such cross-examination cured by the fact that the questions elicit negative answers. "By their very nature the questions suggested to the jurors that the prosecutor had a source of information unknown to them which corroborated the truth of the matters in question . . . . It is reasonable to assume that, in spite of [the] negative responses in the instant case, the jurors were led to believe that, in fact," the insinuations of the questions were true. (*People* v. *Wagner, supra*, 13 Cal.3d at pp. 619-620.) In *Wagner*, it was held that instructions and admonitions did not cure the prejudicial effect of repeated insinuations regarding the defendant's past conduct. (*Id.* at p. 621.)

In *People* v. *Shipe, supra*, 49 Cal.App.3d at pages 349-350, this court held that such conduct violated the defendant's right of confrontation where the witness claimed his Fifth Amendment privilege and refused to answer questions, but through leading and suggestive questions the prosecutor created the almost irrefutable inference that defendant was guilty and the witness

---

however, because the prosecutors' questions were so obviously improper, they cannot have been asked in good faith.

gave true statements to the authorities. Relying on *Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074], we determined that the *Chapman* (*Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]) standard was applicable. (*People* v. *Shipe, supra,* 49 Cal.3d at p. 355.)

1. "Q [by Vendrasco] WERE YOU AWARE OF WHETHER THE GREEN LEAFY SUBSTANCE, MARIJUANA, WAS FOUND WRAPPED UP IN THE WOMAN'S UNDERWEAR [in Rick's house in Boswell]?

"A [by Sgt. Darling] NO.

"MR. RUBIN: OBJECTION, ASSUMES FACTS NOT IN EVIDENCE.

"MR. VENDRASCO: NOT NECESSARILY.

"THE COURT: WHY DON'T YOU REPHRASE THE QUESTION.

"BY MR. VENDRASCO:

"Q YOU WEREN'T PRESENT, THEN, WHEN MARIJUANA WAS SEIZED?

"MR. VAN METER: OBJECTION.

"THE COURT: AREN'T WE TALKING ABOUT GREEN LEAFY SUBSTANCE?

"BY MR. VENDRASCO:

"Q WELL, GREEN LEAFY SUBSTANCE?"[34]

2. Linda Dill testified on Dill's behalf. When Gindes started to cross-examine her about her children, Fusilier objected on relevancy grounds. Gindes stated that he wanted to show dates in relation to events in her life, and he proceeded to question her about when she went to work at a certain place and where and with whom she lived. The following then occurred:

"Q [by Gindes] WAS THERE A PERIOD OF TIME IN THESE DATES BETWEEN AUGUST 25, 1979 AND NOVEMBER 19TH, 1984 WHEN YOUR KIDS WERE PUT IN FOSTER CARE?

---

[34] None of the defendants was charged with possession of marijuana, nor was any evidence introduced to show that the substance was, in fact, contraband.

"A [by Linda Dill] YES.

"MR. FUSILIER: I WILL OBJECT, IRRELEVANT.

"THE WITNESS: YES.

"MR. GINDES: IT'S NOT PREJUDICIAL, IT'S NOT IRRELEVANT. I'M GOING TO TIE IT UP.

". . . . . . . . . . . . . . . . . . . . . .

"BY MR. GINDES:

"Q NOW, I BELIEVE YOU SAID WHEN YOU MARRIED WAYNE DILL YOU HAD TWO KIDS?

"A RIGHT.

"Q YOU DIDN'T HAVE THE THIRD KID UNTIL 1983, RIGHT?

"A '81. I HAVE HAD FOUR IN TOTAL.

"Q OKAY, SO THREE KIDS WENT INTO FOSTER CARE, I'M SORRY, I DIDN'T GET THE DATE.

"A SEPTEMBER 1ST OF '81.

"Q AFTER SEPTEMBER 1ST OF 1981, DID THOSE CHILDREN COME BACK TO LIVE WITH YOU AGAIN?

"A NO.

"Q NOW, WHEN YOU HAD THE CHILD ON AUGUST, IT'S AUGUST OF 1983?

"A UH-HUH.

"Q DID THAT CHILD STAY AND LIVE WITH YOU OR DID THAT CHILD GO OFF TO FOSTER CARE OR SOMEWHERE ELSE?

"MR. FUSILIER: I WILL OBJECT TO THIS. THIS IS ALL IRRELEVANT, PREJUDICIAL UNDER 352. IT SHOULD BE EXCLUDED.

"MR. GINDES: I'M TRYING TO FIND THESE DATES OUT.

"Mr. Fusilier: I think this evidence is not probative of anything. It's more prejudicial then [sic] anything. It should be excluded.

"The Court: I think he indicated he was going to tie it together.

"The Witness: Yes, he did.

"By Mr. Gindes:

"Q That child went into foster care, right?

"A Yes.

"Q Can you tell us the date?

"A A police hold was put on him the 16th of August.

". . . . . . . . . . . . . . . . . .

"A '83.

"Q That is all I want to know about. I'm trying to find out about the dates these things happened because when you were working—

"Mr. Fusilier: I will object to this. Is this a question?

"Mr. Vendrasco: It's got to be.

"The Court: All right.

"By Mr. Gindes:

"Q When you were working at Home Plate Pizza, your kids had already gone into foster care, correct?

"A Yes.

"Q I want to call your attention to the time you were pregnant with the child that you eventually had, all right?

"A WHICH ONE.

"Q THE ONE YOU HAD IN AUGUST OF '83.

"A OKAY.

"MR. FUSILIER: I WILL OBJECT TO THIS AGAIN, ALL OF THIS UNDER 352 IS MORE PREJUDICIAL THAN PROBATIVE. COUNSEL IS ATTEMPTING TO PREJUDICE THE TESTIMONY OF THIS WITNESS BY SUCH TESTIMONY ONLY.

"THE COURT: HE SAYS HE IS TRYING TO GET DATES.

"MR. FUSILIER: THAT IS WHAT HE SAYS, BUT IT'S OBVIOUS HE IS TRYING TO TAINT THIS PERSON'S CHARACTER IS WHAT HE IS TRYING TO DO.

"MR. GINDES: NO, I'M NOT. I'M NOT TRYING TO DO THAT AT ALL.

"THE COURT: AS AN OFFICER OF THE COURT, I ASSUME HE WOULDN'T TRY TO DO THAT. OBJECTION OVERRULED."

Gindes then began questioning about the amount of time Ms. Dill actually spent with Dill, during the period of time in which the molestations were alleged to have occurred. The following ensued:

"Q [by Gindes]: YOUR CHILDREN STAYED WHERE?

". . . . . . . . . . . . . . . . . . .

"RIGHT AFTER THE CHILD YOU SAID YOU HAD WITH WAYNE DILL—

"MR. FUSILIER: I WILL OBJECT, WHERE THE CHILD IS LIVING.

"THE COURT: OVERRULED.

"THE WITNESS [Linda Dill]: WHEN I MOVED IN WITH DELL [a friend of Ms. Dill's], STEVEN HAD YET TO BE BORN.

"BY MR. GINDES:

"Q HE WAS BORN AFTER YOU MOVED IN WITH DELL?

"A YES.

"Q DID HE LIVE WITH YOU AND DELL?

"A NO.

"MR. FUSILIER: I OBJECT, THAT IS IRRELEVANT.

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q WHERE DID HE LIVE?

"A HE WAS PUT IN A FOSTER HOME RIGHT AFTER HE WAS BORN.

"Q LET ME ASK YOU A QUESTION, YOU SAY WAYNE DILL WAS THE FATHER OF THIS CHILD?

"A YES.

"Q DID YOU EVER SEE WAYNE DILL AND HIS CHILD TOGETHER?

"A YES.

"MR. RUBIN: OBJECTION.

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q WHERE DID YOU SEE HIM?

"A AT THE CAR LOT.

"MR. FUSILIER: I'M MAKING AN OBJECTION, I'M MAKING AN OBJECTION UNDER 352, MORE PREJUDICIAL THAN PROBATIVE. FURTHERMORE, IT'S IRRELEVANT.

"THE COURT: OBJECTION OVERRULED.

". . . . . . . . . . . . . . . . . .

"BY MR. GINDES: YOU BROUGHT THE CHILD OVER TO THE CAR LOT TWICE; IS THAT CORRECT?

"A YES.

"Q HOW LONG DID HE STAY AT THE CAR LOT WITH THE CHILD?

"A ABOUT 15, 20 MINUTES.

"Q BESIDES THESE TWO, 15 TO 20 MINUTE STAYS, ARE YOU AWARE OF ANY OTHER TIMES AT ALL THAT WAYNE DILL HAD ANY CONTACT WITH HIS CHILD?

"MR. RUBIN: OBJECTION, IRRELEVANT WHAT SHE KNOWS.

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q ARE YOU PERSONALLY AWARE OF ANY OTHERS?

"A NO.

"Q THIS IS AUGUST OF 1983 UNTIL WHAT, JUNE OF 1984?

"A YES.

"Q MR. DILL NEVER WENT TO SEE HIS OWN CHILD?

"A HE WAS IN A FOSTER HOME.

"MR. FUSILIER: OBJECTION, 352.

"MR. GINDES: YOUR HONOR, SHE SAYS WAYNE DILL FATHERED THE CHILD IN SEPTEMBER OF 1983. I THINK THE FATHER OF THE CHILD AS A NATURAL REASONABLE CONSEQUENCE YOU GO VISIT THE CHILD, SEE THE CHILD. YOU DON'T JUST IGNORE THE CHILD.

"MR. SIMS: HE IS ASSUMING A FACT NOT IN EVIDENCE BECAUSE SHE SAID THE CHILD WASN'T THERE.

"THE COURT: SHE SAID THE CHILD WAS IN A FOSTER HOME.

"BY MR. GINDES:

"Q WHEN DID THE CHILD GO INTO THE FOSTER HOME?

"A RIGHT OUT OF THE HOSPITAL.

"MR. FUSILIER: I WILL OBJECT, THIS IS IRRELEVANT AND INFLAMMATORY.

"MR. RUBIN: IT'S ALSO BEEN ASKED AND ANSWERED. THE DATE'S BEEN GIVEN ALREADY.

"THE COURT: OVERRULED . . . .

". . . . . . . . . . . . . . . . .

"BY MR. GINDES:

"Q THEN AFTER THAT YOU TOOK THE CHILD OVER TO THE CAR LOT?

"A YES.

"Q WHERE DID YOU GET THE CHILD FROM?

"MR. RUBIN: OBJECTION, IRRELEVANT, 352.

"MR. FUSILIER: THIS PERSON ISN'T ON TRIAL, YOUR HONOR. I OBJECT THAT IS IRRELEVANT.

"THE COURT: SUSTAINED. I THINK SHE SAID FROM THE FOSTER HOME.

"BY MR. GINDES:

"Q WAS THERE A DISPUTE BETWEEN YOU AND WAYNE DILL ABOUT WHO THE [sic] FATHERED THAT CHILD?

"MR. FUSILIER: OBJECTION, THAT IS IRRELEVANT.

"THE COURT: WHAT IS THE RELEVANCY OF THAT, COUNSEL?

"MR. GINDES: I THINK IT GOES TO HER TESTIMONY ABOUT SEXUAL RELATIONS WITH WAYNE DILL IN 1982. I THINK SHE IS TRYING TO SHOW A RELATIONSHIP WITH WAYNE DILL AND THE PEOPLE INTEND TO SHOW IT WAS NOT THAT CLOSE.

"THE COURT: OBJECTION OVERRULED."

This was not the end of the evidence adduced about Dill's children. During Gindes's cross-examination of Dill, the following occurred:

"Q SO YOU CLAIM THAT STEVEN IS YOUR CHILD, RIGHT?

"A YES.

"Q DID YOU EVER GO TO SEE STEVEN?

"A NO.

"Q HOW COME?

"A BECAUSE STEVEN WAS TAKEN FROM THE HOSPITAL.

"MR. FUSILIER: THAT IS IRRELEVANT.

"BY MR. GINDES:

"Q DID YOU EVER GO SEE STEVEN?

"MR. RUBIN: I'M GOING TO OBJECT TO THIS QUESTION AS BEING IRRELEVANT AND MORE TIME CONSUMING THAN PROBATIVE.

"THE COURT: WHAT IS THE NEXT QUESTION.

"BY MR. GINDES:

"Q DID YOU EVER GO SEE STEVEN WHERE HE HAD BEEN TAKEN?

"MR. FUSILIER: OBJECTION, IRRELEVANT.

"MR. GINDES: WOULDN'T THE ORDINARY, REASONABLE PARENT, IF THAT IS [W]HAT HE IS, AND HAD A SON, GO AND SEE THE CHILD?

"MR. RUBIN: THAT IS NOT RELEVANT TO THIS CASE. WHAT DOES THAT HAVE TO DO WITH THIS CASE?

"MR. GINDES: WHETHER HE WENT TO SEE THE CHILD.

"MR. RUBIN: I DON'T SEE THE RELEVANCE TO THIS CASE.

"MR. FUSILIER: IT'S IRRELEVANT.

"MR. GINDES: I THINK MOST NORMAL PEOPLE, WHEN THEY FATHER A CHILD, WOULD WANT TO GO SEE THAT CHILD.

"THE COURT: HOW IS THAT RELEVANT TO THIS CASE?

"MR. VENDRASCO: HE SAID HE WAS—SHE SAID SHE WAS WITH WAYNE DILL AND WAS ALIBI[I]NG WAYNE DILL FOR THAT PERIOD OF TIME AND IT GOES TO THAT.

"THE COURT: OBJECTION OVERRULED.

"MR. FUSILIER: I WILL OBJECT AGAIN FOR THE RECORD. THIS IS MORE PREJUDICIAL BY A LONG WAYS THAN PROBATIVE. HE IS CONSTANTLY PREJUDICING THIS CLIENT.

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q IF THIS WAS YOUR CHILD, WHY DIDN'T YOU GO SEE THE CHILD?

"A BECAUSE I DIDN'T KNOW WHERE HE WAS AT.

"Q DID YOU TRY TO FIND OUT?

"MR. RUBIN: IRRELEVANT.

"THE COURT: OVERRULED.

"MR. FUSILIER: COLLATERAL MATTER, IRRELEVANT.

"THE WITNESS: YES.

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q DID YOU FIND OUT?

"MR. RUBIN: OBJECTION, IRRELEVANT.

"THE COURT: OVERRULED.

"THE WITNESS: I TALKED TO SEVERAL CASE WORKERS AND BY THE TIME I GOT TO THE RIGHT CASE WORKER—

"MR. FUSILIER: I WILL OBJECT, IT'S BEEN ASKED AND ANSWERED. MOVE THE LATTER PORTION BE STRICKEN.

"THE COURT: REQUEST DENIED. FINISH YOUR ANSWER, SIR.

"REMEMBER THE QUESTION?

"THE WITNESS: YES. BY THE TIME I GOT TO THE RIGHT CASE WORKER I CALLED HER ONCE, WE HAD ARRANGEMENTS FOR ME TO SEE STEVEN AND THEN LINDA TOLD ME I COULD SEE STEVEN WITHOUT HER.

"BY MR. GINDES:

"Q BEFORE YOU WERE TAKEN INTO CUSTODY ON JUNE THE 29TH, WERE YOU BASICALLY OUT OF CUSTODY FOR EIGHT TO NINE MONTHS WHEN STEVEN WAS LIVING; IS THAT CORRECT?

"A YES.

"Q AND YOU NEVER, IN THOSE EIGHT TO NINE MONTHS, WENT TO SEE STEVEN ONCE; IS THAT CORRECT?

"MR. RUBIN: ASKED AND ANSWERED, IRRELEVANT.

"MR. FUSILIER: OBJECTION, IRRELEVANT.

"THE COURT: SUSTAINED.

"BY MR. GINDES:

"Q THIS GOING TO FIND THE CASE WORKER AND ALL THIS STUFF AND FINDING OUT WHERE STEVEN WAS, IT TOOK NINE MONTHS BEFORE YOU COULD GET THIS INFORMATION AND ATTEMPT TO VISIT STEVEN?

"MR. RUBIN: OBJECTION, IRRELEVANT.

"THE COURT: OVERRULED.

"THE WITNESS: NO.

"BY MR. GINDES:

"Q HOW MANY MONTHS DID IT TAKE YOU?

"MR. RUBIN: OBJECTION, IRRELEVANT.

"THE COURT: OVERRULED.

"THE WITNESS: I DON'T KNOW.

"BY MR. GINDES:

"Q YOU INDICATED THAT WAYNE [D.] AND MARCELLA WAS HER MIDDLE NAME?

"A WAYNETTE.

"Q THEY ARE BOTH ALSO YOUR CHILDREN?

"A YES.

"Q DURING THE PERIOD OF TIME, 1982, THE LAST TWO MONTHS AND 1983, DID YOU VISIT THESE CHILDREN?

"A NO.

"Q EVER?

"A NO.

"MR. FUSILIER: OBJECTION, IRRELEVANT.

"THE COURT: OVERRULED."

 It is difficult to see how this line of questioning was designed to show anything but Dill's shortcomings as a father. Whether we term it prosecutorial misconduct or error on the part of the trial court in admitting it, it should not have come in. "[T]he guilt of a defendant of a particularly charged offense cannot be proved by evidence of general bad character, or, with certain exceptions not here applicable, by evidence of the commission of other crimes not relevant to the one charged." (*People* v. *Alverson, supra*, 60 Cal.2d at p. 810.)

 3. During cross-examination of virtually every defendant who testified, Gindes adopted the technique of rereading the children's testimony. Although we need not determine whether such a technique is improper per se, it was carried to abusive extremes in the instant case. For example:

"Q [by Gindes] . . . MR. DILL, YOU HAVE HEARD A NUMBER OF WITNESSES TESTIFY AGAINST YOU AND MAKE CERTAIN ALLEGATIONS AGAINST YOU; IS THAT CORRECT?

"A [by Wayne Dill] YES.

"Q FOR INSTANCE, YOU REMEMBER ON FEBRUARY 28TH OF 1985, BEING PRESENT HERE WHEN CHRISTINA [H.] TESTIFIED?

"A YES.

"Q AND DID YOU REMEMBER CHRISTINA [H.] TESTIFYING ON THAT DATE THAT SHE SAW YOU TOUCHING CHILDREN WHEN THEY WERE NAKED AT THE GREEN HOUSE?

"A YES.

"Q AND DID YOU ALSO OBSERVE CHRISTINA [H.] POINT YOU OUT AND IDENTIFY YOU AS A PERSON ON THAT DATE WHO HAD BEEN PRESENT AT THE GREEN HOUSE WHEN CHILDREN WERE MOLESTED?

"MR. FUSILIER: I WILL STIPULATE HE WAS PRESENT AND HEARD ALL THAT, YOUR HONOR.

"MR. GINDES: I THINK WE CAN GET INTO SPECIFIC ALLEGATIONS.

"MR. FUSILIER: I THINK THE JURY HEARD IT AND I WILL OBJECT, WASTING TIME.

"MR. EYHERABIDE: I WILL JOIN THE OBJECTION.

"MR. GINDES: I THINK WE CAN ASK HIM ABOUT EACH ALLEGATION MADE.

"THE COURT: OBJECTION OVERRULED. I SHOULD SAY, OBJECTION IS PLURALLY OVERRULED.

"BY MR. GINDES:

"Q Did You Hear Christina [H.] Tell Us That She Had Been With You on Ten Occasions Besides Being at the Green House?

"A Yes.

"Q Is That True or False?

"Mr. Eyherabide: What Is the Relevancy If He Hear[d] It or Not?

"Mr. Gindes: Because I'm Confronting With Allegations.

"The Court: Let Him Phrase His Own Questions, Counsel. Objection Overruled. Let's Proceed.

". . . . . . . . . . . . . . . . . .

"By Mr. Gindes:

"Q Is That True or False?

"Mr. Eyherabide: Argumentative, Your Honor, for the Jury to Determine That.

"The Court: Objection Overruled.

"By Mr. Gindes:

"Q She Indicated That She Had Seen You on Ten Other Occasions Beside Being at the Green House. Was That True or False?

"Mr. Eyherabide: I'm Going to Object, Argumentative, Also Under 352, the Probative Value Is Outweighed by the Waste of Time While He Rehashes the Testimony From Several Months Ago.

"Mr. Gindes: I'm Not Going to Rehash the Testimony.

"The Court: Objections Are Overruled.

"Proceed.

"By Mr. Gindes:

"Q Is That True or False That She Indicated She Had Seen You More Than Ten Times Besides Seeing You at the Green House?

"Mr. Eyherabide: I Will Also Object as Irrelevant.

"Mr. Vendrasco: How Many Times Do They Get to Object.

"The Court: Let's Get All These Objections.

"Mr. Fusilier: My Objection Is, Your Honor, It's Assuming Something Not in Evidence. I Don't Believe She Said That. I Don't Believe She Said That, Not the Way You're Reading It. Slow Down.

"Mr. Van Meter: May the Record Reflect That Mr. Gindes Took Some Offensive Action Toward Mr. Fusilier.

"The Court: Counsel, We Have Got 16 People Giving Their Time to Hear This Case, Attorneys, Clients—

"Mr. Fusilier: He Is Paraphrasing These Things and I Don't Believe He Is Correctly Paraphrasing Them.

"The Court: Fine, Let's Hear the Question.

"Go Ahead, Sir.

"By Mr. Gindes:

"Q You Remember Christine [H.] Testifying When the Court Asked Her Questions, I'm Referring to Page 13, 14 of the Daily Transcript, 'The Court: Christina, Have You Seen Your Uncle, Mr. Wayne Dill, Jr. at Places Other Than the Green House? A Yes. Q'—

"Mr. Fusilier: Objection, If He Is Trying to Impeach This Individual, It's Improper.

"Mr. Gindes: There Is No Point in Even Cross-examining This Witness If He Is Going to Continuously Object.

"The Court: Counsel, I Would Like to Hear a Full Question, Please.

"BY MR. GINDES:

"Q YOU REMEMBER THE COURT ASKING CHRISTINA THESE QUESTIONS: '. . .' DO YOU REMEMBER THAT TESTIMONY?

"A YES.

"MR. EYHERABIDE: OBJECTION, I THINK IT'S ARGUMENTATIVE, IRRELEVANT AND UNDER 352 I WOULD ASK THE COURT TO CURTAIL THESE KIND OF QUESTION[S], BECAUSE THE PROBATIVE VALUE IS OUTWEIGHED BY THE WASTE OF TIME. ALL OF US ALREADY HEARD THAT TESTIMONY AND IT'S TIME TO HEAR NEW TESTIMONY, IF THERE IS ANY.

"THE COURT: I HAVE INDICATED, COUNSEL, I'M OVERRULING THOSE OBJECTIONS.

"MR. EYHERABIDE: I UNDERSTAND, YOUR HONOR.

"BY MR. GINDES:

"Q IS THAT TRUE OR FALSE?

"MR. RUBIN: I'M GOING TO OBJECT, THAT PARTICULAR QUESTION IS VAGUE AND AMBIGUOUS IN THAT I DON'T—

"MR. GINDES: MAYBE I SHOULD HAVE A BREAK, YOUR HONOR. I'M NOT GOING TO BE ALLOWED TO CROSS-EXAMINE THIS WITNESS, THEY'RE GOING TO HARANGUE ME AND FILIBUSTER ME UNTIL THEY GET THEIR WAY.

"THE COURT: YOU'RE GOING TO BE ALLOWED TO CROSS-EXAMINE. YOU DON'T NEED A BREAK RIGHT NOW.

"MR. RUBIN: I DON'T KNOW WHETHER HE MEANS IS IT TRUE OR FALSE THAT HE HEARD THE STATEMENT OR IS IT TRUE OR FALSE. THE PROBLEM IS THAT THE QUESTION IS VAGUE AND AMBIGUOUS.

"THE COURT: I HAVE JUST INDICATED, OBJECTION OVERRULED. THAT IS MY RULING.

". . . . . . . . . . . . . . . . . .

"Q [by Gindes] DID YOU HEAR TOMMY SAY WHEN HE WAS BEING QUESTIONED, WHEN MR. FUSILIER SAID, 'LET'S TALK ABOUT WAYNE DILL, MY CLIENT, NOW, DID YOU SAY THAT YOU SAW HIM DO SOME NASTY THINGS? DID HE DO SOME NASTY THINGS TO YOU, FOR EXAMPLE? A WHO? Q WHO, WAYNE DILL, YOUR UNCLE. A YES. Q WHAT DID HE DO TO YOU? A HE PUT HIS PRIVATES IN MY BUTT.' DID YOU HEAR TOMMY TESTIFY TO THAT?

"A [by Dill] YES.

"Q WAS THAT THE TRUTH OR A LIE?

"A LIE.

"Q DID YOU HEAR HIM TESTIFY THAT YOU DID THIS TO HIM IN CAROL AND LISA'S BEDROOM?

"A YES.

"Q WAS THAT THE TRUTH OR A LIE?

"A LIE.

"MR. FUSILIER: I WILL OBJECT TO THE REPETITIVE QUESTIONS. THEY'RE THE SAME, REPETITIOUS.

"MR. VENDRASCO: THEY'RE REPETITIOUS BECAUSE THERE ARE A LOT OF ACTS THESE PEOPLE TESTIFIED TO.

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q ON MARCH FIVE, 1985, DID YOU HEAR TOMMY TESTIFY AS FOLLOWS TO QUESTIONS BY MR. EYHERABIDE: 'OKAY. ALL RIGHT, REMEMBER I WAS ASKING YOU ABOUT THE GROWN-UP MEN THAT WOULD PUT THEIR PRIVATES EITHER ON OR IN THE VAGINAS OF THE LITTLE GIRLS? A YES. Q DID YOU SEE WAYNE DILL'—

"MR. FUSILIER: LET ME INTERRUPT AND OBJECT. HOW MANY TIMES IS HE GOING TO ASK THE SAME QUESTIONS?

"THE COURT: HE IS NOT ASKING THE SAME QUESTIONS.

"MR. FUSILIER: IT'S A DIFFERENT ATTORNEY IS ALL.

"THE COURT: THE PATTERN IS TO READ TESTIMONY AND ASK HIM IF IT'S TRUE OR FALSE.

"MR. FUSILIER: BUT HE IS GOING DOWN THE LINE WITH EVERY ATTORNEY. IT'S BEEN ASKED AND ANSWERED.

"MR. EYHERABIDE: I WILL JOIN THAT. I THINK IT'S ARGUMENTATIVE IN FORM AND NOT ELICITING ANY NEW TESTIMONY FROM THE WITNESS CONCERNING THINGS THAT WILL HELP THE JURY DECIDE THIS CASE, NOT CALCULATED TO INTRODUCE NEW EVIDENCE WHICH IS THE PURPOSE OF CROSS-EXAMINATION OR DIRECT EXAMINATION.

"MR. FUSILIER: IT'S ONLY GOING TO INFLAME THE JURY, NOTHING ELSE.

"MR. VENDRASCO: I THINK IT'S IMPORTANT FOR THE JURY TO KNOW IF THERE IS [sic] A LOT OF FACTS THAT THESE VICTIMS ALLEGE THIS WAYNE DILL DID DO TO THEM IN THE GREEN HOUSE. THAT GOES TO THEIR CREDIBILITY, WHETHER HE WAS AT THE GREEN HOUSE. I THINK IT'S SOMETHING THE JURY SHOULD HEAR AND ACCESS [sic] FOR THEMSELVES.

"MR. EYHERABIDE: THEY HAVE ALREADY HEARD IT.

"MR. FUSILIER: IT'S THE SAME ACT OVER AND OVER AGAIN WITH DIFFERENT ATTORNEYS.

"THE COURT: OBJECTIONS OVERRULED."

4. "Q [by Gindes] Starting in the middle of October of 1982, did there come a long portion of time when you stopped going to D & D Auto?

"A [by Dill] No.

"Q You kept continuing to work there, is that correct?

"A Yes.

"Q Now, isn't it true that in 1982 starting approximately in October of 1982, you were attempting to evade the police?

"A No.

"Mr. Fusilier: Object to this sort of questioning, 352, besides it's irrelevant.

"The Court: Counsel, you got into the issue that he was in jail several times for not paying [traffic] tickets.

"Mr. Fusilier: What's that have to do with evading the police? It's prejudicial.

"The Court: We don't know yet. Overruled.

"Mr. Fusilier: It's irrelevant. All right.

"By Mr. Gindes:

"Q In October, approximately around October the 18th of 1982, did you get in a dispute with a person . . . by the name of Tom Beierle . . .?

"A Tom Beierle, I don't recall anybody by that name.

"Mr. Fusilier: Object, it's irrelevant. Where, no proper foundation furthermore, your Honor, object on that ground.

"The Court: Overruled.

". . . . . . . . . . . . . . . . . . .

"Q Is he [Marcus Dobbs] your best friend?

"A Yes.

"Q Now, in October of 1982, didn't you and Mr. Dobbs take a transmission out of an automobile of a man by the name of Tom Beierle?

"Mr. Fusilier: This is clearly prejudicial, your Honor.

"The Court: What's the relevance of this?

"Mr. Gindes: The relevance is that there has [sic] been allegations made that he's been showing up publicly in places and being in public places where he can be seen and working at D & D Auto, and I have evidence

exactly to the contrary. For a period of time, he didn't care [*sic*], show his face around there for a long period of time.

"THE COURT: Objection overruled.

"MR. RUBIN: I object, it's irrelevant, especially as to my client.

"MR. FUSILIER: I believe there's a pattern of attempting to get into irrelevant questions under that guise of showing something that doesn't really lend anything or prove anything in this case. 352 should eliminate that.

"THE COURT: Overruled, sir.

"BY MR. GINDES:

"Q Do you remember getting into a dispute with a person about taking a transmission out of a car?

"A No.

". . . . . . . . . . . . . . . . . .

"Q [by Gindes] Do you remember on January 24th of 1983, your friend, Marcus Dobbs, being arrested for his part in this taking of the transmission?

"MR. FUSILIER: Object to that. It's irrelevant. This is an attempt to inflame the jury.

"THE COURT: Sustained concerning Mr. Dobbs.

"BY MR. GINDES:

"Q Okay. Did you receive information from Mr. Dobbs in January of 1983 that the police had arrested him and were looking for you?

"MR. FUSILIER: Object, calling for hearsay.

"MR. GINDES: Goes to state of mind.

"THE COURT: Overruled.

"THE WITNESS: No.

"By Mr. Gindes:

"Q Do you remember the sheriff's department coming out to D & D Auto Parts, D & D at numerous times trying to contact you between October 18th of 1982 and January 24, 1983?

"Mr. Rubin: Objection, assumes a fact not in evidence.

"Mr. Fusilier: The form of the question anyway is improper, your Honor, no proper foundation for that question.

"The Court: Overruled.

". . . . . . . . . . . . . . . . .

"The Witness: No, I do not.

". . . . . . . . . . . . . . . . .

"Q Okay. Did Roy [Fizer] ever give you information that the police had been out to the premises looking for you on a number of occasions?

"Mr. Fusilier: Object, asked and answered.

"The Court: Overruled.

"The Witness: He had told me that his ex-partner that separated and one owned one car lot and another owned another car lot had came by and said that I stole the transmission from him.

". . . . . . . . . . . . . . . . .

"The Witness: And that he—there was nothing ever said about cops being out there.

". . . . . . . . . . . . . . . . .

"Q And you don't remember Mr. Dobbs going to jail approximately on January 24th, 1983?

"Mr. Rubin: Object, irrelevant.

"Mr. Fusilier: Object, irrelevant, should be eliminated under 352.

"THE COURT: Sustained.

"BY MR. GINDES:

"Q Now, during the period of time from October 18, 1982 to January 24, 1983, did anybody tell you the police were out looking for you?

"MR. FUSILIER: Object, that's been asked and answered. Furthermore, irrelevant.

"THE COURT: Overruled.

"MR. RUBIN: And it's hearsay.

"THE COURT: Overruled.

"THE WITNESS: Not that I could recall.

"BY MR. GINDES:

"Q Okay. Besides that in 1982, toward the end of 1982 and 1983, you had a whole bunch of warrants for your arrest, didn't you?

"MR. FUSILIER: Object to the form of that question, prejudicial, your Honor. Move that be stricken. It's a statement, not a question.

"THE COURT: Counsel, you brought up the jailing for traffic tickets, I believe, or fines.

"MR. FUSILIER: Then, I submit this is still calling for hearsay, your Honor.

"THE COURT: Overruled.

". . . . . . . . . . . . ". . . . .

"THE WITNESS: I knew there was warrants out on me for traffic violations.

"BY MR. GINDES: How many warrants?

"MR. RUBIN: I'm going to object to the number as being irrelevant.

"THE COURT: Overruled.

"THE WITNESS: Three that I can recall.

"BY MR. GINDES:

"Q You say they were all traffic warrants?

"A Yes.

" . . . . . . . . . . . . . . . . . . .

"Q Weren't you avoiding being seen in public because of the warrants, and also because of this business with the transmission?

"A No."

The subject of the transmission was brought up again later in cross-examination:

"Q [by Gindes] Do you remember approximately three pages later you told me that someone had called up your employer and said that you stole a transmission from him?

"A [by Dill] Yes.

"Q Do you consider that a dispute?

"MR. VAN METER: Objection, your Honor. Counsel has conveniently omitted about three pages of testimony in which this subject was discussed.

"MR. GINDES: All I see if [sic] three pages in which counsel made repeated objections to me asking that.

"THE COURT: What's the relevance of this discussion about transmissions? I understand it's for impeachment purposes possibly.

"MR. GINDES: To show, your Honor, he was not showing around that auto sales place in 1982 in November. On the contrary, he was hiding out from the police because of warrants, and because they were looking for him because of that transmission stolen [sic].

"MR. FUSILIER: This is not proper to make such a statement in front of the jury. This is a back door he's taken to get, attempt to prejudice that jury against my client. What he is saying now is irrelevant.

"THE COURT: Overruled."

No attempt was made to show that the police were looking for Dill during the time in question, except possibly for the traffic warrants. Gindes subsequently made his point the proper way by calling witnesses on rebuttal who testified that Dill was not at D & D very often during the time in question.

5. A major point of contention between the parties at trial was Gindes's cross-examining Tutti regarding allegations of child abuse made in other states. The issue was raised when Gindes asked Tutti if a group of people she named were the only ones who made false allegations against her about child molestation. Tutti responded that she had never been accused of molesting her children. Argumentative and relevancy objections were overruled. Gindes then offered a stipulation to strike the question and answer, otherwise he was going to cross-examine her on it. Van Meter started to ask a question about the proposed stipulation and the scope of the question, at which point Lorenz stated that the answer was of probative value to his case. The court then announced that the answer stood. Gindes subsequently proceeded to cross-examine Tutti on what she meant by molesting, which elicited the response that she had never abused her children. Gindes asked for Van Meter's opinion on the area, as he wanted to cross-examine Tutti on the volunteered response. A sidebar conference was then held. Gindes completed his cross-examination without asking further questions in the area.

During his cross-examination of Tutti, Lorenz asked her if she had been accused of child abuse in the past. Tutti replied that she had once, in Oklahoma, when one of the boys dropped a spoon on Brian's leg. That was the only occasion; reports from Arkansas concerned the same incident, as an agency in the latter state investigated her after she moved across the border from Oklahoma.

On redirect examination, Van Meter questioned Tutti further about the incident with the spoon. In response to a relevancy objection, the court admonished the jury that the evidence was only to be considered against Tutti. Tutti's explanation was that Tommy was heating the spoon on the heater, then he dropped it onto Brian's leg and it burned his calf. It was not a bad burn. The baby-sitter reported the incident. A social worker began coming out once a month over a period of at least six months, but no police action was taken against Tutti as a result of the incident.

On recross-examination by Gindes, the following occurred:

"Q ARE YOU FAMILIAR WITH A BENTON COUNTY ORGANIZATION IN ARKANSAS CALLED SCAN WHICH STANDS FOR SUSPECTED CHILD ABUSE AND NEGLECT?

"A YES, I AM.

"Q . . . WHEN DID YOU FIRST START LIVING IN ARKANSAS AFTER YOU LEFT JOHNNY [M.]?

"A IN '79.

". . . . . . . . . . . . . . . . . . . . .

"Q WHEN YOU MOVED . . . TO ARKANSAS, DID YOU BECOME THE SUBJECT OF INVESTIGATIONS BY THIS ANTI-CHILD ABUSE AGENCY?

"A YES, THAT IS WHEN TOMMY BURNT BRYAN [sic] WITH THE SPOON.

"Q IN FACT, WEREN'T COMPLAINTS FILED AGAINST YOU FOR COMMITTING ACTS OF PHYSICAL ABUSE AGAINST YOUR CHILDREN?

"A JUST THAT ONE ABOUT THE SPOON.

"MR. RUBIN: OBJECTION, THIS IS IRRELEVANT AS TO EVERYBODY. FURTHER IT'S IMPEACHMENT ON A COLLATERAL MATTER, I ASK THE COURT TO LIMIT THIS UNDER 352 OR TO GRANT SEVERANCE TO MY CLIENT.

"MR. GINDES: IT'S NOT IMPEACHMENT. MR. VAN METER BROUGHT THIS OUT AND INVITED US TO GO INTO THIS AREA.

"THE COURT: OVERRULED.

"MR. FUSILIER: I SUBMIT, YOUR HONOR, MR. VAN METER JUST COVERED WHAT HAD BEEN COVERED ON DIRECT [sic] EXAMINATION.

"MR. GINDES: I DIDN'T ASK ANY QUESTIONS ABOUT THAT ON DIRECT [sic], I REFRAINED FROM ASKING QUESTIONS ABOUT IT ON DIRECT [sic].

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q NOW, WHEN SCAN STARTED INVESTIGATING YOU THERE WERE NUMEROUS COMPLAINTS THAT WERE MADE ABOUT YOU AS FAR AS THE WAY YOU TREATED YOUR CHILDREN; IS THAT CORRECT?

"A No.

"Mr. Rubin: Objection.

"Mr. Gindes: I Would Instruct, Ask the Court to Instruct Mr. Rubin Not to Object, Because This Is Not Being Introduced Against His Client.

"Mr. Rubin: I Don't Have Any Standing? This Is Prejudicial.

"The Court: Overruled.

"Mr. Gindes: Mr. Van Meter Went Into This.

"Mr. Fusilier: It Goes to the Spill Over Theory and I Will Also Object.

"The Court: I'm Not Quite Familiar With That Theory. Overruled. Let's Move On, Counsel.

" . . . . . . . . . . . . . . . . . . .

"Q Were You Told There Was an Accusation Made That You Were Using Cigarettes, Hot Cigarettes and Putting Them on Bryan's [sic] Feet?

"A No. That Spoon Is It.

"Q I'm Not Talking About the Spoon Incident. I'm Talking About Burning Bryan [sic] on His Foot With Cigarettes.

"A No.

"Q Were You Shown the Records of the Allegations That Were Made Against You?

"A I Don't Think I Was. I'm Not Sure, I Don't Remember. But I Never Remember Nothing Like That.

"Q Let Me Show You One, See If It Refreshes Your Recollection. Do You Remember Seeing This Piece of Paper Where It Has Names Whited Out and Allegations Against You Made About Physical Abuse to the Children?

"MR. FUSILIER: I WILL OBJECT, YOUR HONOR, HE HAS TESTIFIED REPEATEDLY. THIS IS NOT PROPER, I OBJECT.

"THE COURT: OVERRULED.

"MR. FUSILIER: ASK THAT HE BE ADMONISHED FOR NOT [sic] DOING SO AGAIN.

"MR. RUBIN: JOIN.

"THE COURT: OVERRULED.

"THE WITNESS: THAT MUST HAVE BEEN THE SAME TIME AS THE SPOON BECAUSE THAT IS THE ONLY TIME.

"BY MR. GINDES:

"Q WASN'T THE ALLEGATION MADE AGAINST YOU THAT YOU WERE USING CIGARETTES ON BRYAN'S [sic] FEET?

"A NO, I DON'T THINK—I NEVER HEARD THAT, NO.

"Q WASN'T AN ALLEGATION MADE AGAINST YOU THAT BRYAN [sic] HAD A BURN ON HIS LEG THAT WAS APPROXIMATELY TWO AND ONE HALF INCHES LONG, LOOKS LIKE THE END OF A BUTCHER KNIFE BURN, A RAW, OPEN SORE WITH DIRTY BANDAID COVERING IT? WASN'T THAT ALLEGATION MADE AGAINST YOU?

"A NO, I DON'T EVER REMEMBER THAT.

"Q DID YOU JUST SEE THAT PIECE OF PAPER I SHOWED YOU?

"A YES, I SEEN IT.

"Q DID YOU READ THAT PIECE OF PAPER?

"A YES, I READ IT.

"Q ISN'T THAT THE ALLEGATION THAT WAS MADE AGAINST YOU?

"A I NEVER HEARD THAT, NO.

"MR. FUSILIER: I OBJECT, PEOPLE DON'T GET TO READ ALLEGATIONS MADE IN LAW ENFORCEMENT, BY LAW ENFORCEMENT OFFICERS. THAT IS IMPROPER.

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q ISN'T THAT AN ACCURATE DESCRIPTION OF THIS LITTLE BURN ON BRYAN [sic], TWO AND A HALF INCHES LONG?

"A NO, IT WASN'T A BIG BURN.

"⸳ . . . . . . . . . . . . . . . . . .

"Q NOW, YOU INDICATED THAT THIS WAS SUCH A MINOR THING THAT BRYAN [sic] WASN'T TAKEN TO A DOCTOR; IS THAT CORRECT?

"A NO, BRYAN [sic] WASN'T TAKEN TO A DOCTOR.

"Q WHAT?

"A HE WASN'T TAKEN TO A DOCTOR.

"Q THAT IS NOT TRUE. HE WAS TAKEN TO A DOCTOR.

"A FOR HIS BURN?

"Q YES.

"MR. FUSILIER: THIS IS ARGUMENTATIVE. I WILL OBJECT, SHE JUST ANSWERED THAT.

"THE COURT: OVERRULED.

"THE WITNESS: NOT FOR HIS BURN.

"MR. RUBIN: IMPEACHMENT ON A COLLATERAL MATTER, YOUR HONOR. I OBJECT UNDER 352, IT'S TIME CONSUMING.

"THE COURT: OVERRULED.

"MR. RUBIN: THEN IT'S IRRELEVANT.

"THE COURT: THAT IS OVERRULED, ALSO.

"BY MR. GINDES:

"Q NOW, YOUR SON, BRYAN [*sic*], WAS TAKEN TO A DOCTOR HUTCHISON; IS THAT CORRECT?

"A I THINK I REMEMBER TAKING HIM IN FOR A PHYSICAL, BUT I DON'T THINK IT WAS JUST FOR THE BURN.

"Q DIDN'T SCAN TAKE YOUR CHILD AND TAKE HIM TO A DOCTOR HUTCHISON?

"A I TOOK HIM, I THINK.

"Q TO DOCTOR HUTCHISON?

"A I'M TRYING TO REMEMBER.

"Q THAT WAS FOR THE BURN, WASN'T IT?

"MR. VAN METER: OBJECTION, HE'S NOT GIVING THE WITNESS AN OPPORTUNITY—

"THE WITNESS: NO, I THINK IT WAS FOR A COMPLETE PHYSICAL.

"THE COURT: OVERRULED.

". . . . . . . . . . . . . . . . . . . . . . .

"BY MR. GINDES:

"Q ISN'T IS TRUE THAT SCAN TOOK BRYAN [*sic*] AND TOOK HIM TO DOCTOR HUTCHISON?

"A I THINK I REMEMBER NOW SOMETHING ABOUT TAKING HIM FOR A COMPLETE PHYSICAL FROM SCAN.

"Q DIDN'T DOCTOR HUTCHISON REPORT THERE IS NO WAY THIS BURN COULD HAVE BEEN CAUSED BY A SPOON?

"MR. VAN METER: OBJECTION, HEARSAY.

"THE COURT: OVERRULED.

"THE WITNESS: NO, I DON'T THINK SO.

"BY MR. GINDES:

"Q DIDN'T THE PEOPLE AT SCAN TELL YOU THAT THE CHILD WAS TAKEN TO A DOCTOR AND THE DOCTOR HAD TOLD YOU THIS WAS NOT CAUSED BY A SPOON?

"A NO.

"MR. RUBIN: HEARSAY.

"MR. VAN METER: DOUBLE HEARSAY.

"THE COURT: OVERRULED.

"THE WITNESS: NO, THEY DIDN'T.

". . . . . . . . . . . . . . . . . .

"Q NOW, WHEN BRYAN [sic] WAS TAKEN TO A DOCTOR, ISN'T IT TRUE THAT THE BURN INCIDENT OCCURRED APPROXIMATELY AROUND NOVEMBER 20TH, OF 1979?

"A SOMEWHERE AROUND THERE.

"Q AND WHEN BRYAN [sic] WAS TAKEN—

"MR. FUSILIER: IN THAT CASE, YOUR HONOR, I WILL SUBMIT IT'S IRRELEVANT IF IT HAPPENED IN 1979.

"THE COURT: MR. VAN METER OPENED THE DOOR. OVERRULED.

"BY MR. GINDES:

"Q WHEN BRYAN [sic] WAS TAKEN TO THE DOCTOR, THAT WASN'T THE ONLY INJURY ON HIM, WAS IT?

"A I DON'T THINK HE HAD ANY OTHER INJURIES.

"Q DIDN'T HE HAVE BLACK AND BLUE MARKS DOWN HIS BACKSIDE, STRAP MARKS?

"A NO.

"Q Are You Saying That Bryan [*sic*] Did Not Have Black and Blue Marks on His Buttocks and o[n] His Upper Back?

"A He May Have Had a Bruise.

"Mr. Van Meter: Objection, Asked and Answered.

"The Court: Overruled.

"The Witness: No.

 "By Mr. Gindes:

"Q Did He Have Black and Blue Marks on His Buttocks and Upper Back?

"A No.

"Mr. Fusilier: It's Been Asked and Answered.

"The Court: I Don't Think It Has. Overruled.

". . . . . . . . . . . . . . . . . . . . .

"Q Did You Ever Explain to Tommy That If You Used a Plastic Spoon It Wouldn't Burn His Hand When He Inflicted a Burn?

"A No.

". . . . . . . . . . . . . . . . . . . . .

"Q Wasn't There Another Time When Bryan [*sic*] Was Referred to SCAN With Burns?

"A No.

"Q You Remember a Time When You Said, Oh, It Was Some Hot Pies That Bryan [*sic*] Pulled Off the Stove and That Burned Him That Time?

"A I Don't Remember.

"Q You Have No Recollection of That?

"A No.

"Q Are You Saying It's Untrue?

"Mr. Rubin: Objection, Question Is Argumentative.

"The Court: Overruled.

"The Witness: I Don't Remember Anything Like That Happening.

"By Mr. Gindes:

"Q Mr. Van Meter Asked You If Any Warrant Was Filed or Any Actions Were Filed Against You in Arkansas. Do You Recall the Arkansas Department of Human Services Closing the Case Against You for the Reason You Moved From the State?

"Mr. Rubin: Objection, Calls for Hearsay, Calls for Speculation.

"Mr. Gindes: She Is Testifying That There Were No Warrants Issued for Her. I Think This Also Goes to the Same Area.

"Mr. Van Meter: Was There a Warrant?

"The Court: What Does That Have to Do With the Issuance of a Warrant Other Than to Say They Dropped It Because She Left the State?

"Mr. Gindes: I Think I'm Entitled to Show the Reason Why This Was Dropped, Not the Reason Mr. Van Meter Implied, That She Was Not Guilty of This Conduct.

"The Court: Overruled.

"Mr. Rubin: You Can't Do It This Way.

"The Court: Overruled.

"By Mr. Gindes:

"Q You Left the State; Is That Correct?

"A The Lady Did Visit Me a Couple Times After I Moved to Oklahoma.

"Q SCAN Would Send People Out to Visit You on Numerous Occasions?

"A Yes, One Lady.

"Q You Kept Moving Time and Time Again When They Were Trying to Fin[d] You to Interview?

"A No, I Always Told Her Where I Lived.

"Mr. Fusilier: This Is Collateral.

"The Court: Overruled.

"By Mr. Gindes:

"Q Did You Also Always Tell Her Where You Moved To?

"A Yes.

"Q Isn't One of the Reasons Why You Left the State of Arkansas Is That You Were Getting Tired of These People From SCAN 'Spying' on You and Your Children All the Time?

"Mr. Fusilier: Argumentative.

"The Witness: No.

"The Court: Overruled.

"The Witness: I Had Nothing to Hide.

"By Mr. Gindes:

"Q In a Period of Six Months, Didn't They Maybe Make 20 or 30 Visits to Your House?

"Mr. Rubin: I'm Going to Object, It's Irrelevant How Many Times They Came Out.

"THE COURT: COUNSEL, MR. VAN METER OPENED THE DOOR.

"MR. RUBIN: I DIDN'T OPEN THE DOOR.

"THE COURT: OVERRULED.

". . . . . . . . . . . . . . . . . . .

"BY MR. GINDES:

"Q DO YOU REMEMBER A TIME ON NOVEMBER THE 21ST OF 1979 BEING IN THE OFFICE OF SCAN?

"A I HAVE PROBABLY BEEN THERE A TIME OR TWO.

"Q DO YOU REMEMBER BEING IN THE OFFICE THAT DAY AND BEING TOLD THAT THE SPOON STORY WAS INCONSISTENT WITH YOUR EXPLANATION.

"A NO.

"MR. RUBIN: OBJECTION, HEARSAY.

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q DO YOU REMEMBER TELLING THE PEOPLE AT SCAN THAT IT WAS 'THE BABY-SITTER THAT MADE THE BLACK AND BLUE MARKS AND IT WASN'T YOU'?

"A NO, I DON'T REMEMBER MAKING THAT STATEMENT.

"Q YOU NEVER ACCUSED THE BABY-SITTER OF DOING ANY OF THIS?

"MR. FUSILIER: ARGUMENTATIVE, OBJECT.

"THE COURT: OVERRULED.

"THE WITNESS: I DON'T REMEMBER.

"MR. FUSILIER: I WOULD LIKE TO INQUIRE IF THIS IS COMING OUT OF MR. GINDES' IMAGINATION OR IS IT A STATEMENT?

"MR. GINDES: DO YOU THINK THAT IS WHERE I'M GETTING IT?

"MR. FUSILIER: YES, THAT IS WHAT I'M BEGINNING TO THINK. I DON'T HAVE ANY SUCH DISCOVERY AS THAT.

"MR. EYHERABIDE: YOUR HONOR, I, FOR THE RECORD, WAS NOT AWARE OF THESE REPORTS MYSELF.

"MR. GINDES: I THINK THE COURT CAN TAKE NOTE OF THE FACT, WE, ON NUMEROUS OCCASIONS TOLD COUNSEL WE HAD THEM AND MADE THEM AVAILABLE FOR INSPECTION. AS A MATTER OF FACT, IF COUNSEL SAYS THEY DIDN'T HAVE THEM, WHEN WE GOT THE REPORTS THERE WAS A SUBPOENA FROM MR. PITTS' LAWYER, IT WAS ON THE TOP OF THE REPORT AND THAT HE HAD GOT THEM.

"MR. EYHERABIDE: I NEVER GO[T] THEM.

"THE COURT: OBJECTION OVERRULED.

"MR. RUBIN: CAN WE HAVE MR. PITTS' PREVIOUS LAWYER?

"MR. GINDES: MR. PITTS' LAWYER?

"MR. RUBIN: I WOULD ASK COMMENTS OF COUNSEL TO BE STRICKEN, THEY'RE MISLEADING. I'M MR. PITTS' LAWYER, I NEVER SUBPOENAED THOSE RECORDS.

"MR. GINDES: I'M NOT GOING TO ARGUE WHAT I TURNED OVER TO THE OTHER LAWYER.

"MR. FUSILIER: I DON'T BELIEVE THERE ARE ANY RECORD[S] FROM THIS STATE OF WHAT PERSONS SAID ABOUT VARIOUS SCAN INVESTIGATIONS.

"THE COURT: SHOW HIM THE DOCUMENTS.

"MR. EYHERABIDE: I WOULD MOVE FOR COPIES OF THE DOCUMENTS.

"MR. LORENZ: I THINK I SAW THEM BEFORE TRIAL, AS A MATTER OF FACT.

"MR. GINDES: THESE WERE OFFERED TO ALL COUNSEL.

"Mr. Eyherabide: They Were Not Ever Offered to Me or Disclosed to Me.

"Mr. Fusilier: Statements About Plastic Spoons or Things Like That, Now [sic] Where Can Those Be Found in Here.

"Mr. Eyherabide: I Think the Court Can Note If They Had Offered Them to Me I Would Have Taken Them.

"Mr. Lorenz: Mr. Vendrasco Made Them Available to Me Before the Trail [sic] Started.

"Mr. Eyherabide: He Never Told Me About Them. He Is Laughing, Your Honor, But I Would Like to See Him Get Under Oath and Have Him Say That He Did.

"Mr. Vendrasco: Are You Running This Court, Mr. Eyherabide?

"Mr. Eyherabide: Mr.—

"The Court: Mr. Eyherabide, That Is It.

". . . . . . . . . . . . . . . . . . . . .

"The Court: Those Will Be Available From the District Attorney's Office . . . .

"By Mr. Gindes:

"Q Didn't You, After You Left Arkansas, Continue to Punish Bryan [sic] When He Disobeyed You by Burning Him?

"A No, I Never Have.

"Mr. Van Meter: Object to the Form of the Question, Continued to Punish Bryan [sic].

"The Court: Overruled.

"Mr. Rubin: Your Honor, Objection, Assumes a Fact Not in Evidence.

"The Court: All Right . . . ."

None of the alleged SCAN reports were ever introduced into evidence. Nor does it appear that Gindes was prepared to do so, assuming they were admissible. Accordingly, most of the allegations were not properly in evidence. Given questions such as the one about whether Tutti continued to punish Brian by burning him, it is impossible to conclude that Gindes was merely cross-examining in this area in order to impeach Tutti's credibility. The only possible purpose for most of the foregoing is to paint Tutti as a bad mother.

Gindes also touched on these elements in his closing argument:

"And going down the line again, Marcella Pitts. Well, the evidence shows pretty much that one [*sic*] one is going to give her the mother of the year award before she started up with Rick Pitts. But again, look at not only Marcella Pitts' relation to Rick Pitts, but two other people. Him, Clifford. Her, Norma . . . .

". . . . . . . . . . . . . . . . . . .

"Those two people and Rick, and I'm not saying, you know, we've heard about this incident that took place in Arkansas about the spoon incident where a child allegedly, where Marcella says what happened, Tommy took a spoon and put it on a flame and heated it up until it was real hot, and accidentally dropped it on the calf of B.J.'s leg. Well, anybody familiar with elementary principles of chemistry or physics, children who have spoons and dropping on legs and producing burns like that.[35] Okay. I'm not trying her for that. Mr. Van Meter brought that up for whatever reason he wanted to. But, that before she got involved with Rick Pitts, there are no allegations of child molestation. There are no allegations of committing these atrocities that took place here. It's only after. I mean, she was being accused of the things that virtually have been, you know, admitted against her. Smoking pot, you know, in front of kids. Not providing for them well. Not clothing them well. Having the older boy cook, stuff like that."[36]

The general rule in this area is stated in *People* v. *Harris* (1981) 28 Cal.3d 935, at page 953 [171 Cal.Rptr. 679, 623 P.2d 240], as follows: " 'Where a defendant takes the stand and makes a general denial of the crime the permissible scope of cross-examination is very wide.' [Citation.]

---

[35] It is unclear if Gindes meant producing burns in that manner, or burns like Brian suffered. If the latter, it must be remembered that the actual evidence never showed the burn to have been anything more than minor. Only Gindes's questions implied that it was a significant injury.

[36] These were all allegations made by John M. during the various custody/visitation hearings. Tutti denied that any were true. John did not testify at trial.

When a defendant voluntarily testifies in his own defense the People may 'fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.' [Citation.] Evidence relevant for these purposes is admissible even though it incidentally involves an unrelated offense. [Citation.]"

Here, however, little actual evidence came in; most was inference and innuendo. Also, the material's relevancy is in question. The alleged incidents happened in 1979, several years before the period at issue in the instant case. Moreover, what Gindes did was not necessary to impeach Tutti's credibility as to her statements that she had never abused, or been accused of molesting, her children.

Nor did Van Meter's alleged "opening the door" excuse what occurred. For example, hearsay is admissible in the absence of an objection, and once in evidence, a witness may be cross-examined on it. (*People* v. *Fatone* (1985) 165 Cal.App.3d 1164, 1171-1172 [211 Cal.Rptr. 288].) "The fact that a topic is raised on direct examination and may therefore appropriately be tested on cross-examination, however, does not amount to a license to introduce irrelevant and prejudicial evidence merely because it can be tied to a phrase uttered on direct examination." (*People* v. *Luparello* (1986) 187 Cal.App.3d 410, 426 [231 Cal.Rptr. 832].)[37] Moreover: " 'An error that is prejudicial is no less so because it results from a lack of knowledge on the part of either counsel or both. Legitimate cross-examination does not extend to matters improperly admitted on direct examination. Failure to object to improper questions on direct examination may not be taken advantage of on cross-examination to elicit immaterial or irrelevant testimony . . . . "Questions designed to elicit testimony which is irrelevant to any issue in the case on trial should be excluded by the judge, even though opposing counsel has been allowed, without objection, to introduce evidence upon the subject." [Citation.]' " (*Dastagir* v. *Dastagir* (1952) 109 Cal.App.2d 809, 815 [241 P.2d 656].)

There is no reporter's transcript of the sidebar conference in which Van Meter apparently invited cross-examination into the spoon burning incident, nor do we know what may have motivated him. Regardless of this

---

[37] Although it ultimately found the misconduct harmless, the *Luparello* court stated, "While the court's sustaining of defense objections and striking of testimony suggested it did not condone such conduct, the flagrancy of the prosecutor's misconduct makes it highly unlikely that even a conscientious jury could completely ignore what it had heard." (*Ibid.*) Here, of course, the trial court's actions suggested it *did* condone Gindes's conduct. .

fact, Gindes should not have been permitted to carry the matter to the extremes he did.

 The matter is further complicated by the trial court's refusal to allow Van Meter to rebut the inferences raised by Gindes's cross-examination. Van Meter was not permitted to call either Johnny or Detective Fields, to testify that Fields asked Johnny if Johnny knew of anything happening to Brian when they lived in Oklahoma. According to Fields's report, Johnny said Tommy burned Brian with a hot spoon, but he was a little kid and did not know what he was doing. When Fields asked if Tutti ever did anything like that, Johnny said not that he knew of. The court ruled:

"ANYTHING THAT HAPPENED BACK THERE, SINCE IT WASN'T BROUGHT UP BY THE PROSECUTION, THAT CERTAINLY IS COLLATERAL, WHAT TOOK PLACE IN ANOTHER STATE. THEY'RE NOT CHARGED WITH THAT. THE DEFENDANTS AREN'T CHARGED WITH THAT, OR YOUR CLIENT, SPECIFICALLY, THAT IS NOT ONE OF THE ALLEGATIONS AGAINST THEM. THAT IS SOMETHING THAT OCCURRED AT A DIFFERENT TIME IN A DIFFERENT STATE . . . ."

6. "Q [by Gindes] AFTER YOU FOUND OUT THAT A DOCTOR HAD EXAMINED THE CHILDREN, YOU TRIED TO GET ANOTHER DOCTOR TO EXAMINE THE CHILDREN; IS THAT CORRECT?

"A [by Norma Pitts] WELL, I HAD HEARD THAT HE [Dr. Woodling] WAS UNRELIABLE, THAT HE WAS WORKING WITH THE COURT.

"Q WHO DID YOU HEAR THAT FROM?

"MR. SIMS: OBJECTION, HEARSAY.

"THE COURT: OVERRULED."

"BY MR. GINDES:

"Q WHO DID YOU HEAR THAT FROM?

"A FROM OTHER PEOPLE WHOSE [sic] BEEN IN THE SAME TYPE CASES.

"Q CONVICTED CHILD MOLESTERS?

"A I WOULD SAY THAT.

"MR. FUSILIER: OBJECTION, HEARSAY.

"BY MR. GINDES:

"Q CONVICTED CHILD MOLESTERS?

"A THEY HAVE BEEN CONVICTED.

"Q BUT THEY ARE, OF COURSE, INNOCENT?

"MR. VAN METER: OBJECTION.

"THE COURT: SUSTAINED.

"MR. VAN METER: I ASK THAT COUNSEL BE CITED FOR THAT REMARK.

"THE COURT: SUSTAINED.

"BY MR. GINDES:

"Q WHO ARE THE PEOPLE YOU HEARD BRING THIS UP?

"A SOME PEOPLE.

"Q WHO?

"A IF YOU WANT TO KNOW—

"Q WHO.

"A FROM MEMBERS OF VOCAL.[38]

"Q WHO? NAME ONE PERSON.

"MR. FUSILIER: OBJECTION, IRRELEVANT.

"MR. RUBIN: JOIN.

"MR. FUSILIER: COLLATERAL MATTER HERE.

---

[38] Although not made totally clear in the record, it appears VOCAL stood for Victims Of Child Abuse Laws and was an organization in which Norma Pitts was active.

"THE COURT: ANSWER THE QUESTION.

". . . . . . . . . . . . . . . . . . . .

"BY MR. GINDES:

"Q I SAID NAME ONE PERSON.

"A THEY TOLD ME IN CONFIDENTIAL [*sic*].

"Q NAME ONE PERSON.

"A I OBJECT—

"MR. FUSILIER: JUST A MOMENT, I OBJECT TO THE FORM OF THAT QUESTION. THIS IS NOT A QUESTION, IT'S ARGUMENTATIVE.

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q ARE YOU A CLERGY MEMBER?

"A NO, I AM NOT.

"Q THEN YOU HAVE TO NAME ONE PERSON.

"A IF YOU MUST KNOW, IT WAS MR. KNIFFEN TOLD ME."

Mr. Kniffen was convicted of numerous counts of child molestation in 1984, in one of Kern County's notorious child molestation ring cases. It was improper for Gindes to link this case with that. (See *People* v. *Adams* (1939) 14 Cal.2d 154, 162 [93 P.2d 146], overruled on other grounds in *People* v. *Burton* (1961) 55 Cal.2d 328, 352 [11 Cal.Rptr. 65, 359 P.2d 433].) If Gindes's purpose was to impeach Norma's opinion of Woodling's abilities, that purpose was achieved once he elicited that she had heard about Woodling from a convicted child molester. Bringing out the Kniffen case by name could only have served to inflame the jury. Nor was this the only time other child molestation cases were mentioned.

7. "Q [by Gindes] NOW, DO YOU KNOW THAT AFTER AMANDA SAW YOU SHE WAS HYSTERICAL FOR ALMOST 45 MINUTES?

"A [by Rick] I REALIZE THAT.

"MR. RUBIN: OBJECTION, ASSUMING A FACT NOT IN EVIDENCE.

"THE COURT: OVERRULED.

"MR. RUBIN: YOUR HONOR, I'M GOING TO MOVE FOR A MISTRIAL AT THIS POINT. THERE IS NO SUCH EVIDENCE OF THAT.

"MR. FUSILIER: HE MENTIONED 45 MINUTES AND I DON'T THINK WE HAVE 45 MINUTES WORTH OF TESTIMONY FROM THAT MORNING.

"THE COURT: THE WITNESS CAN ANSWER.

"BY MR. GINDES:

"Q DO YOU KNOW FOR 45 MINUTE[S] SHE SAT ON MY LAP SCREAMING AND CRYING, 'DON'T LET RICK HURT ME,' AFTER SHE LOOKED YOU IN THE FACE?

"MR. RUBIN: I'M MOVING FOR A MISTRIAL AT THIS POINT.

"ALL DEFENSE COUNSEL: (JOIN.)

"THE COURT: DENIED.

"BY MR. GINDES:

"Q DO YOU KNOW THAT, MR. PITTS?

"A I DON'T KNOW THAT.

"Q MR. PITTS, WHAT DID YOU DO TO HER?

"A I DIDN'T DO NOTHING TO HER. WHAT DID YOU DO TO HER?

"Q YOU THINK I DID SOMETHING TO HER TO MAKE HER DO THAT?

"A I THINK SOMEBODY DID. ONE THING THIS JURY HASN'T HEARD ONE TAPE ON ANY OF THESE KIDS, HOW YOU QUESTIONED THEM OR ANYTHING ELSE.

"Q YOU THINK BY US QUESTIONING HER SHE STARTED GETTING HYSTERICAL?

"A I KNOW THAT KID WOULDN'T HAVE BEGGED AND CRIED FOR AN HOUR AND A HALF BEFORE WE MOVED TO OKLAHOMA. SHE WASN'T SCARED OF ME.[39]

"Q DO YOU HAVE ANY NEUTRAL WITNESSES FROM THE LAST TIME YOU SAW HER?

"A YOU CLAIM EVERYBODY THAT IS BIAS [*sic*] AND WANTS TO GET UP AND LIE.

"Q PEOPLE THAT AREN'T DEFENDANTS IN THIS CASE.

"MR. FUSILIER: THIS IS ARGUMENTATIVE.

"MR. RUBIN: JOIN. MOVE FOR A MISTRIAL.

"THE COURT: DENIED.

". . . . . . . . . . . . . . . . . . . . .

"Q HOW DO YOU THINK WE MADE HER AFRAID OF YOU BY QUESTIONING HER, MR. PITTS?

"A AIN'T MUCH TELLING.

"Q THERE AIN'T MUCH TELLING.

"MR. RUBIN: OBJECTION.

"THE COURT: OVERRULED.

". . . . . . . . . . . . . . . . . . . . .

"BY MR. GINDES:

"Q MR. PITTS, NONE OF THE ATTORNEYS OR THE JUDGE IN THIS ACTION WERE IN THE GREEN HOUSE. WE HEARD THE TESTIMONY OF CHILDREN AND THE TESTIMONY OF YOU, BUT WE ALL SAW WHAT HAPPENED TO AMANDA. CAN YOU EXPLAIN—

"MR. VAN METER: THE QUESTION IS ARGUMENTATIVE. IT'S BEEN ASKED AND ANSWERED.

---

[39] There was testimony that Amanda wanted to move to Oklahoma with Rick and Tutti.

"All Defense Counsel: (Join Objection.)

"By Mr. Gindes:

"Q Can You Explain to Us What Would Cause That Terror of That Child Just Looking You in the Face?

"A I Can Say One Thing, Whatever You Say in Front of This Jury, It Don't Say, Change the Truth. There Is Seven People Over There That Knows the Truth.

"Q That Terror, That Is the Truth. That Is One Thing That Knows the Truth.

"A What I'm Saying Is the Truth.

"All Defense Counsel: (All Objecting and Asking for Mistrial.)

"Mr. Rubin: I Believe the Objections Were Argumentative by All Attorneys.

"The Court: Overruled.

". . . . . . . . . . . . . . . . . . . .

"Q Is That the Reason Why Little Amanda Was So Terrified of You Because You Yanked Her Around?

"A I Heard You Say Before That, Ask Lisa If Rick Was Real, Real Nice to Her. Johnny Comes—How Come Johnny Comes Up With the Other Real, Real Mean to Her? Couldn't Make Your Mind Up?

"Q You Heard Amanda—Johnny Say You Be Nice to Lisa?

"A I Have Heard Lisa, Angela and a Few Others.

"Q We Have Heard Lots of Witnesses, but We Have All Seen That Terror in the Courtroom.

"Mr. Van Meter: Objection, Argumentative.

"Mr. Rubin: Objection, Also Assuming a Fact Not in Evidence.

"The Court: Sustained.

"Mr. Rubin: Move to Strike The—

"The Court: Request to Strike Denied."

8. "Q [by Vendrasco] . . . Approximately Two Months Ago, Did You Take—Did You Attempt to Take Steps to Safeguard Your Children [the M. boys]?

"A [by Janice M.] Yes, We Did.

". . . . . . . . . . . . . . . . . . . . .

"Q Did You Seek to Have Your Kids in a Safe Environment?

"A Yes.

"Mr. Rubin: Objection, Irrelevant.

"Mr. Vendrasco: Very Relevant if They Have Been Threatened, Your Honor."

After defense objections, Vendrasco asked to make an offer of relevancy. The jury and Janice were both excluded. Vendrasco asserted that defense counsel had previously elicited from other witnesses that the boys were in shelter care, and he did not want to leave the jury with the impression that said placement had something to do with the unfitness of Janice's home or similar reasons. He explained that he made the statement about threats in front of the jury, because he was getting a "barrage of objections" and he was merely stating relevancy.

The court suggested that he simply say the children were put in shelter care for their own protection, and leave it at that. Fusilier argued that the harm had already been done, but the court proposed that Janice be asked if the children were put in shelter care for their own protection, without any mention of threats. Eyherabide and Rubin objected; Vendrasco stated the court could tell the jury to disregard anything about threats. A motion for mistrial was denied. The jury was brought back in, after which the following occurred:

"[THE COURT]: LADIES AND GENTLEMEN, YOU WILL DISREGARD ANY COMMENTS AS TO THE REASON FOR TOMMY [M.] GOING INTO SHELTER CARE. HE WAS PUT IN SHELTER CARE FOR HIS OWN PERSONAL SAFETY AND WELL BEING. DISREGARD ALSO ANY COMMENTS REGARDING ANY ALLEGED THREATS THAT MAY HAVE BEEN MADE.

"ALL RIGHT, MR. VENDRASCO?

". . . . . . . . . . . . . . . . . . . .

"BY MR. VENDRASCO:

"Q WERE THE BOYS PUT IN SHELTER CARE FOR THEIR OWN WELL BEING?

"A [by Janice M.] YES, THEY WERE."

This is not the first time that alleged threats were raised in front of the jury. During cross-examination of Carol Darling, defense counsel questioned her regarding her various contacts with Christine. On redirect examination, Gindes asked Ms. Darling whether, while she was in Boswell with Brad Darling, concerns surfaced about Christine's physical safety. Rubin objected that this was an area in which the potential prejudice greatly outweighed any probative value; in the hearing outside the jury's presence, Gindes responded that he had a right to refute the defense's implications that Ms. Darling met often with Christine in order to condition Christine into becoming a prosecution witness. Rubin objected that any threats made in the time frame had to relate to Cliffy and Clovette, since everyone else was already in custody, and Cliffy and Clovette were not on trial. The court suggested Gindes question Ms. Darling about her concern over Christine's care and safety, since that did not connote any threat of kidnapping, and indicated it was also proper for Ms. Darling to have discussed with Christine Cliffy's and Clovette's possible hiding place.

Eyherabide then requested that the court admonish the jury that the evidence about information received by Ms. Darling relative to Clovette or Cliffy, was not being admitted for the truth of such evidence, but only to explain the contact between Ms. Darling and Christine. The court replied, "I think that's patently obviously [sic] as to why it's coming in. Request denied."

When the jury returned, Gindes carefully questioned Ms. Darling about her contacts with Christine during the time Brad Darling and Gindes were

in Oklahoma, whether at the time she decided she had to do something about Christine's care and safety, and whether she contacted Christine for that purpose. After questioning regarding other contacts between Ms. Darling and Christine during the course of the various preliminary examinations, the following occurred:

"Q [by Gindes] NOW, I WANT TO GO BACK A LITTLE BIT BECAUSE I THINK I GOT SLOPPY, AND I DIDN'T COVER THIS BEFORE. BUT DO YOU REMEMBER WHEN YOU FIRST MET CHRISTINE, HAVING A CONTACT WITH HER THAT INVOLVED GOING OUT TO LUNCH WITH HER?

"A [by Carol Darling] YES.

"Q COULD YOU TELL US ABOUT THAT?

"A IT WAS ONE OF MY FIRST CONTACTS WITH HER, BUT I ALREADY KNEW HER, SO IT WAS PROBABLY MY SECOND OR MY THIRD, AND SHE WAS IN MY OFFICE AND IT WAS APPROACHING THE LUNCH HOUR, AND SHE WAS IN FOSTER CARE, AND I ASKED HER IF SHE WAS HUNGRY, IF SHE WANTED TO GO TO LUNCH. WE TALKED ABOUT GOING TO LUNCH TOGETHER. I TOLD HER THAT I WASN'T A BRAVE PERSON AND THAT IF SHE WAS IN ANY DANGER OR KNEW OF ANYONE THAT WANTED TO HURT HER, THEN I COULD TAKE MY HUSBAND AND HE COULD GO WITH US, IF THAT IS WHAT SHE WANTED, OR WE COULD GO BY OURSELVES. SHE SAID, 'I THINK YOU BETTER TAKE YOUR HUSBAND.' SO MY HUSBAND AND MYSELF AND CHRISTINA WENT TO LUNCH.

"MR. RUBIN: YOUR HONOR, I'M GOING TO OBJECT. MOVE TO STRIKE FURTHER, I THINK IT TOTALLY VIOLATES WHAT THE COURT ORDERED.

"MR. GINDES: THIS HAS NOTHING TO DO WITH THAT, THIS IS 356 OF THE EVIDENCE CODE.

"THE COURT: OBJECTION OVERRULED.

"BY MR. GINDES:

"Q SO THAT WAS REALLY WHEN YOU HAD THIS CONVERSATION, THIS WAS WAY BEFORE YOU [sic] WENT TO BOSWELL?

"A SHE WAS STILL IN FOSTER CARE."

As stated in *People* v. *Weiss* (1958) 50 Cal.2d 535, 554 [327 P.2d 527]: " 'Efforts to suppress testimony against himself indicate a consciousness of guilt on the part of a defendant, and evidence thereof is admissible against him. [Citation.] Generally, evidence of the attempt of third persons to suppress testimony is inadmissible against a defendant where the effort did not occur in his presence. [Citation.] However, if the defendant has authorized the attempt of the third person to suppress testimony, evidence of such conduct is admissible against the defendant.' [Citations.] If the attempt is made by a third person, not in the presence of a defendant or shown to have been authorized by him, it should at once be suspect as a mere purporting attempt to suppress evidence and in truth an endeavor to prejudice the defendant before the jury in a way which he cannot possibly rebut satisfactorily because he does not know the true identity of the pretender. The wilful offering of such evidence might well form the basis for declaring a mistrial instanter, or for granting a new trial, or for reversal on appeal . . . ."

In both of the instances cited above, the only reasonable implication is that some of the children were threatened in connection with this case. That leads to the inescapable conclusion that the threats were made by or on behalf of defendants. However, since the prosecutor could not prove that defendants made the threats or authorized third persons to do so, the evidence should not have been admitted and Vendrasco should not have commented that Janice's testimony was relevant if the boys had been threatened.

Instead of curing the harm, the trial court's admonition compounded it by informing the jury as a proven fact that Tommy had been placed in shelter care for safety purposes. Although the court also told the jurors not to consider any alleged threats, what else were they likely to think? If Vendrasco's concern was that the jury not speculate that the boys' home was somehow unfit, then he should simply have asked Janice directly whether unfitness of the home was the reason. Any speculation by the jury that resulted would have been less likely to include the possibility of threats, and thus would have been less prejudicial to defendants. Likewise, the admonition should have simply advised that Tommy was not placed in shelter care due to unfitness of his home. As things stood, the jury was left with the unalterable impression that defendants had a hand in threatening possibly Christine, and certainly Tommy. The prejudice from this impression was not alleviated by the giving of CALJIC No. 1.02 (" . . . You must never assume to be true any insinuation suggested by a question asked a witness . . ."), since the harm flowed not so much from a question's insinuation, but from what the jury was told to accept as fact.

## H. *Misconduct Outside Jury's Presence*

■ A great deal of prosecutorial misconduct occurred outside of the jury's presence. Obviously, such misconduct cannot have prejudiced the jury directly, but given its egregious nature and the one-sidedness of some of the trial court's rulings, it must be discussed because of its possible impact on the court. Additionally, some of it appears to have been calculated to have a chilling effect on attempts to vigorously defend the accused. Representative examples follow.[40]

1. On several occasions, the parties argued about whether the courtroom configuration violated the confrontation clause of the Constitution. These disputes arose, for example, when defense counsel were forced to question from a podium situated so that the witness did not need to look at defendants.[41] At one point, Rubin moved to strike Christine's testimony on confrontation clause grounds. While arguing that the witness could see the defendants if she wanted to but defendants had no right to force her to look at them, Gindes stated:

"I DIDN'T LIKE THE WAY MR. VAN METER POSITIONED IT [the podium] HIMSELF THE WAY HE DID SO IF THIS WITNESS EVER LOOKED AT HIM SHE WOULD HAVE TO LOOK AT RICKY PITTS, A PERSON THAT SHE HAS INDICATED SHE IS TERRIFIED OF. I REALLY TAKE UMBRAGE AT THE FACT AND REALLY AM AGGRAVATED AT THE FACT THAT COUNSEL COULD TAKE SUCH A FINE DOCUMENT AS OUR CONSTITUTION AND TRY TO INTERPRET IT IN SUCH A WAY THAT LETS DEFENSE COUNSEL DO CREEPY THINGS TO INTIMIDATE A WITNESS AND FORCE A WITNESS TO LOOK AT A CLIENT WHO SEXUALLY ABUSED THEM."

2. Gindes frequently sought to explain away his own conduct by arguing misconduct on the part of defense counsel. For instance, the following occurred during argument on one of Rubin's motions for mistrial:

"[THE COURT]: Mr. Gindes, any comment?

"MR. GINDES: Only, your Honor, that I really object to Mr. Rubin's characterization of the way these proceedings have been held. I think it's totally inaccurate. I guess he's shifting his attack from the prosecution now to the Court. Now, everybody is under some basis of attack in his mind, probably excluding himself.

---

[40] All examples in this group occurred wholly outside the jury's presence unless otherwise stated.

[41] At least in the case of Amanda, the youngest witness, the record reflects that at times certain of defense counsel could not even see her while she was testifying.

"I think that, number one, Mr. Van Meter was continuously asking questions about having the witness, and another thing that happens that disturbs me is and I don't know if the Court has been seeing this. Mr. Eyherabide giggles and laughs.

"THE COURT: He has his back to me. I can't see him.

"MR. GINDES: During cross-examination the witness says something Mr. Eyherabide thinks is wrong, he will giggle and laugh about it or Mr. Rubin, and I know other judges, specifically Judge McNutt, has threatened to put Mr. Eyherabide in jail for unprofessional conduct for giggling and laughing at witnesses in court, and I just wish he would keep his demeanor. We have a child here. Maybe Mr. Eyherabide should learn to straighten out his demeanor. As I was talking to the Court he was giggling and smirking and laughing. It throws me off my pace to have him constantly do that.

" . . . . . . . . . . . . . . . . . .

"MR. RUBIN: . . . I object to Mr. Gindes attempting to put factual matters on the record which just aren't there. Things that happened with Mr. Eyherabide in some other trial which aren't proper for this Court to take.

"MR. GINDES: It's proper because of what he's been doing, it's a pattern. It's not an isolated thing.

" . . . . . . . . . . . . . . . . . .

"MR. EYHERABIDE: I don't know why counsel continues to make personal attacks. I don't know if Judge McNutt ever threatened to put me in jail for unprofessional conduct. He never did it in my presence . . . .

"The comment is I would ask the Court to think about this, I don't know why counsel doesn't want to talk about the issues, whenever he doesn't want to talk about the legal issues, some reason we get these personal attacks. Ask the Court to instruct him to just please talk about the legal issues.

"MR. GINDES: They're not personal attacks. Mr. Eyherabide represented to the Court that he did not have a preliminary hearing in front of Judge McNutt when Judge McNutt brought to the attention that he observed Mr. Eyherabide snickering and smirking and laughing at the testimony of a witness and told him not to do it or he was going to get a contempt.

"MR. EYHERABIDE: I don't recall that.

"MR. GINDES: It never happened?

"MR. LORENZ: Let's have a ruling.

"THE COURT: Denied."

3. "MR. RUBIN: Then, I'd like to make a motion to strike the testimony of this witness [Windy] as being without foundation, irrelevant to the charges at hand.

"THE COURT: On what basis?

"MR. RUBIN: The basis is that they're irrelevant. Vague as to time. They don't relate to the charges in the information, and if the prosecution hasn't elected, they don't relate to the charges, the testimony of which has already come in ahead of time from other witnesses.

"THE COURT: All right. Mr. Gindes.

"MR. GINDES: . . . If they want people to testify against them that know dates, they should molest adults instead of children. Maybe adults can do that or accountants who keep diaries. We're dealing with little kids here. I think we're not having a due process right taken away from the defendant by the prosecution, they're denying themselves the right to have specific dates because of their choice of victims, and we have no control over that.

"THE COURT: Well, all right."

4. Out of the jury's presence, Fusilier presented the court with Windy's records from the child guidance clinic, which had been the subject of prior discovery hearings. The following then ensued:

"THE COURT: WHO DID YOU GET THESE RECORDS FROM, SIR?

"MR. FUSILIER: RIGHT HERE, RIGHT HERE AT THE COURTHOUSE.

"THE COURT: OH, ALL RIGHT.

"MR. GINDES: RIGHT HERE AT THE COURTHOUSE WHERE?

"MR. FUSILIER: RIGHT HERE IN THE COURTHOUSE.

"• . . . . . . . . . . . . . . . . . . .

"MR. GINDES: HOW DID THE FILES OF THE HENRIETTA CLINIC GET TO THE COURT TODAY?

"MR. FUSILIER: I ASSURE COUNSEL THEY WERE HERE LEGALLY.

"MR. GINDES: I WANT TO KNOW HOW THE FILE GOT TO THIS COURT.

"• . . . . . . . . . . . . . . . . . . .

"MR. GINDES: YOUR HONOR, I CAN'T UNDERSTAND AND MAYBE I'M MISSING SOMETHING, IS THAT COUNSEL MADE A MOTION TO HAVE THE RECORDS OF THE HENRIETTA WEILL MEMORIAL CHILD GUIDANCE CLINIC PRODUCED BEFORE THE COURT, AND JUDGE WESTRA HEARD THE MOTION AND DENIED THE MOTION.

"MR. FUSILIER: I DIDN'T, YOUR HONOR. I WASN'T THERE.

"THE COURT: I WOULD SUGGEST THAT SOMEBODY, I WOULD IMAGINE THAT OVER THE NOON HOUR, SOMEBODY LAID A SUBPOENA ON THE HENRIETTA WEILL—

"MR. GINDES: WHETHER THEY LAID A SUBPOENA ON THEM OR NOT, IT'S TOTALLY IMPROPER. THOSE RECORDS HAVE BEEN RULED INADMISSIBLE BY JUDGE WESTRA. I THINK HE REVIEWED THEM IN CAMERA, AND FOR SOMEBODY—MAYBE HE GOT THEM FROM HIS CLIENT OR SOMETHING LIKE THAT, BUT FOR THE ORIGINAL RECORDS WHICH ARE CONFIDENTIAL RECORDS BETWEEN A CHILD AND A PSYCHOLOGIST, TO GET TO THE COURT LIKE THIS, THERE MUST BE SOMETHING WRONG. I DON'T KNOW HOW THEY DID IT.

"• . . . . . . . . . . . . . . . . . . .

"THE COURT: . . . WE'LL TAKE THAT UP AT THE END OF THE DAY WHEN WE FIND OUT HOW THE RECORDS ARRIVED.

"DID YOU SUBPOENA THOSE, MR. EYHERABIDE?

"MR. EYHERABIDE: I WOULD PREFER TO TELL THE COURT PRIVATELY. I JUST DON'T THINK IT'S GERMANE.

"MR. GINDES: I DON'T THINK HE HAS A RIGHT TO TELL THE COURT PRIVATELY. I THINK IT'S A MATTER HE SHOULD BRING BEFORE THE COURT.

"THE COURT: WERE THE RECORDS SUBPOENAED?

"MR. EYHERABIDE: YES.

"MR. GINDES: COULD I ASK MR. EYHERABIDE HOW HE SUBPOENAED THEM? HOW ABOUT THE SUBPOENA RECORDS FROM MR. FUSILIER?

"MR. FUSILIER: THIS IS IRRELEVANT. THAT IS A COLLATERAL MATTER. IS HE HIDING EXCULPATORY INFORMATION HERE?

"THE COURT: THE RECORDS WILL REMAIN HERE, GENTLEMEN. LET'S CONTINUE THE CROSS-EXAMINATION.

"MR. GINDES: I JUST MIGHT INFORM THE COURT THAT MR. EYHERABIDE PERSONALLY MADE A MOTION IN FRONT OF JUDGE WESTRA TO HAVE ALL THE RECORDS OF THE HENRIETTA WEILL MEMORIAL CLINIC OF THE CHILDREN VICTIMS PRODUCED BEFORE JUDGE WESTRA. JUDGE WESTRA DENIED THE MOTION AND QUASHED THE SUBPOENA.

"IF MR. EYHERABIDE HAS SOMEHOW GONE BEHIND JUDGE WESTRA'S BACK AND SUBPOENAED RECORDS IN ANY WAY OR HAS GOTTEN THOSE RECORDS, MAYBE I'M MISJUDGING HIM, BUT THAT IS WHAT IT LOOKS LIKE TO ME, WE HAVE GOT A VERY SERIOUS PROBLEM TO DEAL WITH.

"WHEN THE JUDGE SAYS YOU CANNOT HAVE ACCESS TO THIS RECORD AND THE JUDGE SUPPRESSED THE RECORDS UNDER 288(C) OF THE PENAL CODE, AND I'M SURE THAT IS IN THE COURT'S FILE, IF MR. EYHERABIDE WENT IN THERE SOMEHOW AND BY SOME TRICK OR DEVICE, GOT THOSE RECORDS OFF THE CLINIC AFTER THE JUDGE ORDERED THEM, ORDERED THAT THEY WERE NOT DISCOVERABLE, I THINK MR. EYHERABIDE IS GOING TO HAVE A LITTLE BIT OF TROUBLE CONTINUING WITH THIS TRIAL.

"I DON'T KNOW IF HE DID, MAYBE I'M MISUNDERSTANDING SOMETHING.

". . . . . . . . . . . . . . . . . . . . ."

"Mr. Fusilier: I Was Intending to Bring That Up Just Before My Defense Begins, Your Honor, but I Think Whatever This Is Has Nothing to Do With the Merits of Our Motion Now.

"It's Obvious to Me That My Client Is Entitled to Bring That Out, Your Honor. This Little Girl Is Accusing—Not Only Has She Accused Those Three Men Falsely, but There Is an Allen [B.] and Another Person by the Name of Dill, Not Related to My Client—

"The Court: Well, the One Point I'm Not So Sure You Emphasized, but I Believe It Was Her Father or Step Father Who Put Her Up to or Forced Her to Make Those Representations. I Believe That Is What the Records So Indicate . . . .

". . . . . . . . . . . . . . . .

"Mr. Fusilier: May I Have That [the records] Back?

"Mr. Gindes: No.

"The Court: No, This Is Confidential Material, and I Want to Find Out How It Got in Your Presence, Sir, Your Possession.

"Mr. Fusilier: You Just Heard How It Got in My Possession.

"Mr. Gindes: If Mr. Eyherabide Walked Over and Got Those Records in Any Way and Violated Judge Westra's Order—

". . . . . . . . . . . . . . . .

"Mr. Eyherabide: Your Honor, Just in the Interest of Time, I Will Tell the Court How I Got These So I—Because I Don't Want to Spend the Whole Rest of the Afternoon Doing This.

"The Court: Why Don't You Tell Us.

"Mr. Eyherabide: My Client Had Been Treated At the Henrietta Weill Child Guidance Clinic Herself.

"The Court: Yes.

"MR. EYHERABIDE: IN DECEMBER, ACCORDING TO THESE RECORDS HERE, THE INVESTIGATOR SERVED A RELEASE FOR HER OWN RECORDS ON HENRIETTA WEILL, AND APPARENTLY THEY TURNED THOSE RECORDS TO THE INVESTIGATOR WHO BROUGHT THEM TO ME.

"THE COURT: YOU MEAN TURNED THE RECORDS OVER OF HER DAUGHTER?

"MR. EYHERABIDE: YES, WHAT IS IN THERE.

"THE COURT: JUST TO HAVE NO MISTAKE, THESE ARE CASE RECORDS OF WINDY [B.], THEY DON'T HAVE ANYTHING TO DO ABOUT YOUR CLIENT.

"MR. EYHERABIDE: I'M JUST TELLING THE COURT THAT IS WHAT THEY SENT OVER TO ME.

". . . . . . . . . . . . . . . . . .

"MR. GINDES: THIS HAS OBVIOUSLY FOLLOWED THE MOTION WHERE JUDGE WESTRA RULED THAT MR. EYHERABIDE COULD NOT EXAMINE RECORDS OF THE CHILDREN AT CHILD GUIDANCE CLINIC. CHILD GUIDANCE CLINIC COUNSELS CHILDREN, THEY DON'T COUNSEL ADULTS UNLESS THE ADULTS ARE WITH THE CHILDREN, BECAUSE OF THEIR COUNSELING.

"IF AFTER JUDGE WESTRA RULED MR. EYHERABIDE WAS NOT ENTITLED TO DISCOVER THAT AND THESE CAME INTO MR. EYHERABIDE'S HANDS AND HE DID NOT RETURN THEM, WE HAVE A VERY SERIOUS SITUATION, BECAUSE JUDGE WESTRA RULED UNDER SECTION 288(C) THAT MR. EYHERABIDE WAS NOT ENTITLED TO EXAMINE THOSE RECORDS.

"GETTING A RELEASE FOR COLLEEN [B.'S] RECORDS STRIKES ME AS A SUBVERSION OF THE COURT'S RULING SINCE THESE RECORDS OBVIOUSLY ARE RECORDS OF WINDY [B.] AND WHAT HAPPENED WITH HER. THE MINUTE HE SAW THAT FILE WITH THE NAME 'WINDY [B.]', HE SHOULD HAVE RETURNED THAT TO COURT. HE IS IN VIOLATION OF JUDGE WESTRA'S ORDER . . . .

". . . . . . . . . . . . . . . . . .

"MR. EYHERABIDE: THE ONLY THING I WANTED TO PUT ON THE RECORD, I GOT THOSE RECORDS, LOOKED AT THEM, STUCK THEM

BACK IN MY FILE, THEN THIS MORNING THERE WAS SOME QUESTION ABOUT A PRIOR REPORT OR SOMETHING OF WINDY [B.], AND I REMEMBERED THAT I HAD THESE RECORDS. OKAY, I WENT DURING THE LUNCH HOUR AND LOOKED THROUGH THEM. THEN I PAPER CLIPPED THOSE PARTS THAT SAID SOMETHING ABOUT MADE UP OR ENTICED OR FALSELY ACCUSED SOMEBODY OF MOLESTATION, AND I KNOW MR. GINDES HAD TOLD MR. FUSILIER, 'WELL, THERE WAS NO SUBSTANTIATION FOR THAT,' AND THE COURT SAID, 'IF YOU HAVE ANYTHING ON THAT,' YOU KNOW, 'BRING IT FORWARD.' SO THAT IS WHEN I GAVE THE INFORMATION TO MR. FUSILIER.

"I SHOWED HIM THAT THERE WAS SOMETHING IN SOME RECORDS SOMEWHERE ABOUT THAT SO THE COURT DIDN'T THINK HE WAS JUST MAKING THAT UP.

"MR. GINDES: THE WAY I SEE IT, PERHAPS I'M WRONG AND WE'LL CHECK THE COURT'S RECORDS, IS THAT MR. EYHERABIDE MADE A MOTION IN FRONT OF JUDGE WESTRA TO HAVE THE RECORDS OF ALL THESE CHILDREN TURNED OVER TO HIM. JUDGE WESTRA HEARD THIS MOTION FOR HOURS UNDER SECTION 288(C) OF THE PENAL CODE, JUDGE WESTRA RULED THAT MR. EYHERABIDE COULD NOT INSPECT THOSE RECORDS.

"MR. EYHERABIDE HAS NOW ADMITTED THAT ON DECEMBER THE 4TH, 1984 HE CAME INTO POSSESSION OF THOSE RECORDS IN THE PRETEXT OF GETTING COLLEEN['S] RECORDS, WHICH I THINK THE COURT CAN SEE VERY CLEARLY THAT WHEN YOU HAVE A CHILD COUNSELED IN CHILD GUIDANCE, HE IS NOT LOOKING FOR HIS CLIENT'S RECORDS, HE IS LOOKING FOR THE CHILD'S RECORDS. . . .

"NOW, TO MR. EYHERABIDE'S MIND, THAT MIGHT SEEM LIKE LEGAL CONDUCT, BUT IT CERTAINLY STRIKE[S] ME AS CRIMINAL CONDUCT WHEN COUNSEL IS DOING SOMETHING LIKE THAT. IT'S AT LEAST A CONTEMPT, AND IT LOOKS LIKE A COUPLE OF FELONIES ARE INVOLVED IN THERE, TOO.

"THE COURT: THE SITUATION IS, NOW WE HAVE THE RECORDS. THE NEXT QUESTION IS, WHAT DO WE DO WITH THEM.

"MR. GINDES: THE NEXT QUESTION IS, WHETHER MR. EYHERABIDE SHOULD BENEFIT BY HIS OWN MISCONDUCT.

"THE COURT: NOT NECESSARILY . . . .

"Mr. Fusilier: I Think the Court Should Rule These Are Admissible Regardless of This Collateral Situation He Is Bringing Up. We Have the Information, We Have Heard the Testimony. I Think That My Client Is Entitled to Have That Brought Before the Jury, Your Honor, I Think You Ought to Rule in Our Favor on That.

"Mr. Gindes: First of All, Your Honor, I Think We Should Have Mr. Gianquinto Come to Court, and I'm Sure He Is Going to Probably Pursue in Some Legal Remedies Against Mr. Eyherabide."

We need not decide whether the court erred in denying discovery of the guidance clinic records. Assuming Gindes properly objected to their discoverability and admissibility, it served no proper purpose for him to accuse Eyherabide of committing felonies in obtaining the records, especially in light of Eyherabide's explanation as to how he got them.

5. "Mr. Gindes: I want to report to the Court after I asked Mrs. Darling the question Lisa, excuse me, Linda appeared really happy after Lisa had testified, Mr. Van Meter raised his head and looked directly at the jury and said, 'That's because she told the truth in court' and said that to the jury. I don't think the Court heard that.

"The Court: I didn't.

"Mr. Gindes: Mr. Vendrasco heard it. I heard it. Mr. Van Meter said it. I think Mr. Fusilier probably heard it sitting next to Mr. Van Meter. Your Honor, that's misconduct of the grossest sort and combined with Mr. Eyherabide who rampages through the Court's objections when the Court sustains an objection, he simply asks the same question again and argues with the Court in front of the jury, asks the question again. I think it's prejudicial to the prosecution's case when lawyers act that way, and they just get away with that type of thing.

"Mr. Eyherabide, you know, he doesn't conduct himself like anybody that has gone to law school or had any experience. He just rambles in front of the jury and acts like he's some sort of—I've never seen this type of conduct before, where the Court sustains an objection three times and he keeps asking the question again, again and again, and knowing he's not supposed to ask the question, keeps asking them. And I think that something has to be done. Either his name has to be stricken from the list of court appointed attorneys. I don't think unethical attorneys should be appointed.

"THE COURT: I don't think he's going to be doing much court appointments in the next few months.

"MR. GINDES: He's got another one trailing. He's going to tie up another one for seven months and make a living out of these cases. I think he should be held to the conduct of a reasonably intelligent and ethical lawyer in this court or something should be done about him. He's just incredibly, the way he's been talking throughout this entire trial, and Mr. Van Meter with his comment, I don't think, I think the prosecution has a right not to have attorneys act in that type of blatant unethical conduct in front of the jury.

"THE COURT: Well, counsel maybe I'm getting numbed a little bit. It's been a long day, and I didn't see any remark or hear any remark that Mr. Van Meter made, and Mr. Eyherabide, as I have indicated, we all have our own styles, and I think the best thing to do is if it reaches a stage where I feel that something is legally objectionable or counsel is in contempt, then, I will have to act accordingly, but I haven't seen anything today that is unethical . . . ."

6. Defense counsel objected to jailhouse tapes being played to the jury, as they had not had a chance to review the tapes. Apparently, portions of the tapes were made available to defense counsel the day before the prosecution sought their admission into evidence. The argument started in the jury's presence; finally, the jury was sent out and discussion continued over when defense counsel knew about the tapes, whether the prosecutor had a duty to disclose them earlier, and other related issues. The following colloquy then occurred:

"MR. GINDES: . . . AS FAR AS DISCLOSURE IS CONCERNED, I HAVEN'T LISTENED TO PROBABLY 90 PERCENT OF THESE TAPES. MOST OF THESE CONVERSATIONS ARE ABOUT THESE DEFENDANTS BABBLING ABOUT ALL TYPES OF THINGS.

"THE COURT: CIGARETTE MONEY—

"MR. GINDES: OR THE TYPE OF THINGS THAT PEOPLE LIKE THAT TALK ABOUT AND THEY'RE DEPRESSING TO LISTEN TO, THEY'RE FOOLISH TO HEAR AND FRANKLY, IT'S HARD TO LISTEN TO THOSE TYPES OF CONVERSATIONS WHEN THEY TAKE PLACE.

"NOW, WHEN COUNSEL ANNOUNCED CAROL FORSYTHE WAS GOING TO TAKE THE STAND I REALIZED WE DID HAVE SOME JAILHOUSE VISIT TAPES AGAINST HER. I BEGAN LISTENING THE LAST

COUPLE DAYS TO SOME OF THOSE TAPE RECORDINGS THAT WERE MADE AND ACTUALLY SOME OF HER STATEMENTS STRUCK ME AS A BIT UNUSUAL.

"HOWEVER, I DIDN'T KNOW THEY WOULD BE ADMISSIBLE UNTIL I FIGURED OUT WHAT KIND OF TESTIMONY SHE WOULD GIVE . . . .

"YESTERDAY, AS SOON AS THE COURT ORDERED DISCOVERY OF THESE TAPES, I TOOK EVERY TAPE I WAS GOING TO USE, I INSTRUCTED MY SECRETARY TO MAKE COPIES SO ANY ATTORNEY THAT WOULD COME IN COULD GET A COPY LAST NIGHT. BUT NO ONE CAME IN LAST NIGHT.

". . . . . . . . . . . . . . . . . .

"WE WOULD LIKE THE RECORD TO REFLECT THAT MR. EYHERABIDE WAS STANDING UP AND SHOUTING IN FRONT OF THE JURY THAT MR. VENDRASCO WAS A LIAR AND THAT HE WAS LYING AND I THINK IT'S HIGHLY UNPROFESSIONAL CONDUCT BY MR. EYHERABIDE. I HAVE NEVER BEEN IN COURT OR HAD A TRIAL WITH MR. EYHERABIDE BEFORE EXCEPT THE PRELIMINARY HEARING. THAT WAS THE FIRST EXPERIENCE WHERE I HAD AN EXPERIENCE WITH MR. EYHERABIDE WHERE JUDGE LUND WAS THREATENING TO FIND HIM IN CONTEMPT WITH THE CONDUCT HE WAS COMMITTING.

"MR. FUSILIER: THIS IS IRRELEVANT.

"MR. GINDES: I THINK MR. EYHERABIDE FEELS, YOUR HONOR, THAT IF YOU GET AWAY WITH SOMETHING TEMPORARILY THAT THAT SHOWS YOU'RE A BIG SHOT, YOU CAN KEEP DOING WORSE AND WORSE THINGS. I THINK THAT IS WHERE HE IS COMING FROM.

"HE IS BLOWN UP WITH THIS EGOMANIA AND HE IS FOOLISH TO DO IT. HE IS NOW ENGAGING IN ALL TYPES OF CONDUCT HE SHOULD NOT ENGAGE IN. I HAVE HAD REPORTS FROM VARIOUS WITNESSES AND AGENCIES OF THINGS THAT MR. EYHERABIDE IS DOING THAT IS JUST SHOCKING TO ME. AND, YOU KNOW, HE JUST CONTINUES TO DO IT AGAIN AND AGAIN AND CALLING MR. VENDRASCO A LIAR IS THE LATEST CULMINATION OF THIS THING. I REALLY THINK COUNSEL IS ALWAYS OFFERING TO CITE THE DISTRICT ATTORNEY FOR MISCONDUCT—

"MR. FUSILIER: LET ME INTERJECT. I DIDN'T HEAR HIM CALL MR. VENDRASCO A LIAR. HE JUST SAID THAT WASN'T THE TRUTH.

". . . . . . . . . . . . . . . . . . . .

"MR. EYHERABIDE: I WOULD LIKE TO REQUEST A HEARING AT THIS TIME, EVIDENTIARY HEARING, ON WHEN THE PROSECUTION BECAME AWARE OF ALLEGED THREATS MADE TO WITNESSES. I WOULD MAKE A MOTION FOR DISCOVERY OF ANY AND ALL REPORTS OR INFORMATION CONCERNING THREATS MADE TO WITNESSES. I WOULD LIKE TO KNOW WHEN THE PROSECUTION FIRST OBTAINED KNOWLEDGE OF THE PARTICULAR TAPES . . . .

"I THINK THEY HAVE AN AFFIRMATIVE DUTY AHEAD OF TIME TO PROVIDE THIS DISCOVERY OR RELEVANT MATERIAL TO THE DEFENSE OF WITNESSES THAT THEY HAVE TAPE RECORDED AND KNOW WHO MAY BE WITNESSES AT THE TRIAL, INFORMATION THAT WOULD ASSIST THE DEFENSE IN PREPARING THEIR DEFENSE IN A CASE. I THINK THIS IS AN AFFIRMATIVE DUTY ON THEIR PART.

"NOW, I WAS AWARE BECAUSE I WENT TO THE DISTRICT ATTORNEY AND GOT TAPE RECORDINGS AND TRANSCRIPTS AROUND THE FIRST OF THE YEAR FROM MR. VENDRASCO AND THEY PROVIDED ME WITH JAIL TAPES CONCERNING CONVERSATIONS IN JUNE OF 1984. NO ONE TOLD ME THERE IS [sic] ON GOING TAPES IN THE JAIL . . . .

"AT NO TIME UNTIL YESTERDAY DID ANYBODY TELL ME THAT THERE WERE ANY MORE JAIL CONVERSATIONS THAT WERE SOMEHOW RELEVANT TO THE CASE OR ANYTHING LIKE THAT. AND I THINK THEY HAVE AN AFFIRMATIVE DUTY TO DISCLOSE THIS. I THINK THERE IS A COLD, CALCULATED EFFORT HERE TO WITHHOLD DISCOVERY AND I THINK A CLEAR EXAMPLE OF IT WAS THEY WAITED UNTIL MR. FUSILIER CALLED A WITNESS AND THEN DISCLOSED THE MATERIAL BECAUSE THEY INTENDED TO USE IT ON CROSS-EXAMINATION.

"THE COURT: WELL, WHY WOULD THEY—WHAT RELEVANCY WOULD IT HAVE BEEN TO DISCLOSE THAT UNTIL THE LADY TOOK THE STAND AND MADE CERTAIN STATEMENTS? THAT WASN'T ADMISSIBLE ANY OTHER WAY THAN BY WAY OF IMPEACHMENT.

". . . . . . . . . . . . . . . . . . . .

"MR. EYHERABIDE: IT'S A STATEMENT BY HIS CLIENT ON THAT TAPE AND HE WAS SUPPOSE[D] TO HAVE THAT BEFORE TRIAL OR AS SOON AS THEY KNOW ABOUT IT. I KNOW YOU'RE ENTITLED TO STATEMENTS OF YOUR OWN CLIENT WHICH ARE ON THAT TAPE. SINCE

THAT IS COMING IN AGAINST MY CLIENT AS WELL I THINK I'M ENTITLED TO DISCOVERY OF IT."

In the event of a retrial, defense counsel will be free to seek such discovery, including the guidance clinic records and other sealed matters, as may be appropriate. However, the foregoing passage is illustrative of the prosecutors' ability to turn attention from their own possible wrongdoing to defense counsels' conduct. As the California Supreme Court stated in *People* v. *Purvis* (1963) 60 Cal.2d 323, 344 [33 Cal.Rptr. 104, 384 P.2d 424], disapproved on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 639 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], "[T]he facts in reference to this incident illustrate a type of misconduct that permeates the record, that is, the ability of the prosecutor to make his own misconduct appear to be the fault of the defense counsel." It was not misconduct for Gindes to vigorously argue the discovery issue. It was likewise not misconduct for him to note for the record Eyherabide's conduct in front of the jury. However, no proper purpose was served by his references to other proceedings involving Eyherabide, or to Eyherabide's supposed egomania, etc. There was likewise no proper purpose served by the following, which came at the end of the argument:

"MR. GINDES: . . . MR. EYHERABIDE HAD OTHER THINGS TO DO THIS MORNING. HE MIGHT WANT TO TELL YOU ABOUT THE OTHER THINGS. THIS MORNING HE WAS MAKING A SEARCH FOR THE [M.] BOYS EVEN THOUGH THE COURT HAD ORDERED THE [M.] BOYS TO BE SUBJECT TO RECALL. MR. EYHERABIDE SPENT TIME TRYING TO FIND THE [M.] BOYS. I DON'T KNOW WHY HE IS TRYING TO FIND THE [M.] BOYS. THOSE KIDS HAVE BEEN TERRORIZED THROUGHOUT THESE PROCEEDINGS. MR. EYHERABIDE IS DOING THIS WHILE WE'RE HERE WITH RICK PITTS TALKING ABOUT WHERE THEY ARE. AFTER MR. EYHERABIDE HAS TAKEN COUNTY FUNDS AND MADE AN EFFORT TO FIND THESE CHILDREN, THEN THE DEFENDANT[S] WILL KNOW ABOUT IT AND THEIR ASSOCIATES WILL KNOW ABOUT IT.

"I'M TRYING TO TELL THE COURT I DON'T KNOW WHY HE IS DOING THESE THINGS. I WOULD LIKE HIM TO TELL THE COURT WHY HE IS TRYING TO FIND THE [M.] CHILDREN. HIS CONDUCT IS THE MOST INTOLERABLE I HAVE SEEN IN 12 YEARS OF PRACTICE. I THINK IT'S THE RESULT OF FOOLISHNESS. GOD KNOWS WHAT IS MOTIVATING HIS CONDUCT ANY MORE.

"MR. EYHERABIDE: I WOULD BE HAPPY TO TELL THE COURT IN CAMERA.

"THE COURT: MR. EYHERABIDE, I HAVE HEARD ENOUGH."

7. A hearing was held outside the jury's presence regarding the validity of the search warrant executed on Laura Dobbs's residence. During argument on the motion, the following occurred:

"MR. VAN METER: The sentence [in the affidavit] is written, 'He told me that he had requested to talk with a district attorney investigator.' Now, your Honor, that sentence in and of itself was a big clue that something was phoney in this whole thing because in my experience, both as a district attorney and as a defense attorney—

"MR. GINDES: Object to Mr. Van Meter bringing up his experience as a district attorney. He was fired from the district attorney's office for various reasons. I don't think he's an experienced counsel."

## I. *Trial Court Error*

 The prejudicial effect of the prosecutors' misconduct was compounded by the trial court's actions. As is evident from many of the foregoing examples, the court failed or refused to expressly rule on most defense objections to misconduct, or to curb the prosecutors in any way.

 "[I]t is the duty of the judge to 'control all proceedings during the trial, and to limit . . . the argument of counsel to relevant and material matters' [citation] . . . ." (*People* v. *Bell, supra,* 49 Cal.3d at p. 542.) This does not mean the court is "required to identify as misconduct, or correct sua sponte, improper prosecutorial argument." (*Ibid.*; *People* v. *Poggi, supra,* 45 Cal.3d at pp. 335-336.) In the instant case, however, we are not talking about a sua sponte duty to intervene: defense counsel were begging the court to take control of the situation. By failing or refusing to do so, the court "allowed the trial to be conducted at an emotional pitch which is destructive to a fair trial." (*People* v. *Bain, supra,* 5 Cal.3d at p. 849.)

In addition to frequently failing to act, at times the court entered into a rhetorical colloquy with Gindes, which had the effect of belittling defense counsel or their cases. It is reasonably probable that these exchanges, taken together with other remarks by the court which derided defense counsel or ridiculed defense witnesses, implied to the jury that the prosecution's case was more credible than those of the defense, and that the prosecutors and court were on the same side instead of the court being neutral. Added to this was the fact that occasionally the court testified instead of letting a

witness answer. Moreover, many of the court's evidentiary rulings appear to have been one sided.

1. "Q [by Gindes] Did Carol [Darling] ask you [Lisa] if anything bad happened at Rick and Tutti's house?

"MR. EYHERABIDE: Objection, hearsay.

"MR. RUBIN: Join.

"MR. FUSILIER: Join for Wayne Dill, Jr.

"THE COURT: Overruled.

"MR. GINDES: When they make an objection and you overrule it, and they make the identical objection, doesn't that seem to disrupt the proceedings?

"MR. EYHERABIDE: Object to that comment, your Honor.

"MR. FUSILIER: Counsel knows very well we have to make objections each and every time.

"MR. GINDES: The same objection to every identical question?

"THE COURT: Go ahead."

2. Outside of the jury's presence, Sims joined a previous objection by Van Meter to both prosecutors handling things at the same time. The court responded: "The record will indicate so far as I know only one of the two prosecutors at a single instance have asked questions of a witness. Mr. Vendrasco has on occasion, I mean, Mr. Gindes on occasion has made certain responses to certain objections, and in fact, may have objected to some of the objections while Mr. Vendrasco was up here conducting the direct examination. I don't find it offensive. I think that probably ninety-nine percent of the objections are coming from defense counsel. So, I make that notation for the record."

As will be discussed, *post*, we have concluded that it was not improper for the court to permit the People to be represented by two prosecutors, and that, assuming some error occurred, no prejudice has been shown. However, the foregoing passage is indicative of the court's attitude that defense counsel were taking up the bulk of trial time. The court's comments are especially interesting since they occurred during direct examination of the

People's first witness, so it would have been unusual, to say the least, to have *any* objections from the prosecutors at that point.

3. "Q [by Fusilier] [SINCE] LAST THURSDAY, HAVE YOU TALKED TO ANYONE ABOUT THIS CASE, ABOUT YOUR TESTIMONY?

"A [by Christine] NO.

"Q WHAT YOU SAID IN COURT?

"A NO.

"Q WHAT WERE YOU DOING IN THE BACK ROOM THIS MORNING, BACK OF THE COURTHOUSE?

"A GOING TO THE BATHROOM.

"THE COURT: SHE WAS USING THE RESTROOM IN MY CHAMBERS, COUNSEL, WHILE I WAS CONDUCTING A SETTLEMENT CONFERENCE.

"MR. FUSILIER: I HAVEN'T SWORN YOU IN YET, YOUR HONOR, BUT I CAN UNDERSTAND."

4. Tommy testified to getting shots with a needle gun. Eyherabide had him draw a picture of it.

"Q [by Eyherabide] . . . WHAT IS THAT THING?

"A [by Tommy] THE NEEDLE.

"Q THAT IS THE NEEDLE. CAN I WRITE 'NEEDLE' THERE?

"A GO FOR IT.

"Q WHAT DID YOU SAY, 'GO FOR IT'?

"A GO FOR IT.

"Q DO YOU WANT TO ASK THE QUESTIONS?

"NOW—

"THE COURT: IT WOULD BE SHORTER IF HE DID."

5. "Q [by Van Meter] Did You See Deputy Bob Fields Using a Tape Recorder on Either One of the Interviews, Either at Your House or Down at the Sheriff's Office?

"A [by Tommy] Down at the Sheriff's Office.

"Q In the Interview Down at the Sheriff's Office Didn't You Ask Bob Fields a Couple of Times, 'What Did Johnny Tell You' and 'What Did Johnny Say'?

"Mr. Gindes: Objection, Irrelevant, Hearsay.

"The Court: Sustained, Unless You Have an Offer of Proof, Mr. Van Meter.

"Mr. Van Meter: Well, the Offer of Proof Would Be the Tape Recordings Made of the Conversation, Your Honor.

"The Court: Didn't He Just Indicate There Was One?

"Mr. Van Meter: Excuse Me?

"The Court: Didn't He Just Indicate That Officer Fields Tape Recorded One?

"Mr. Van Meter: Yes.

"The Court: Do You Have It?

"Mr. Gindes: The Tape Has Been Made Available to All Counsel.

"Mr. Van Meter: It's Available, Yes, Your Honor.

"The Court: Well, Then, Listen to It."

6. At the end of Amanda's direct testimony, Vendrasco led her off the witness stand and over to the defendants to see whom she could identify. Amanda stated she did not know Gina, then she identified Grace and asked for her mother. The following then occurred:

"Q [by Vendrasco] Wait. What about that guy right there?

"A [by Amanda] What guy?

"Q The guy sitting next to grandma [Grace].

"A No.

"Q Do you recognize him?

"A No. He was the nice guy that—oh, oh, oh, where's Rick?

"MR. FUSILIER: Let the record indicate she's talking about Wayne Dill.

"THE COURT: Ma'am, up here. What's wrong?

"THE WITNESS: Rick.

"THE COURT: Did you see him?

"THE WITNESS: Yes.

"THE COURT: That's all right. Let's take a break. Would you take her back?

"THE WITNESS: By the cop.

"THE COURT: The cop will take you back.

"THE WITNESS: I don't want to go back by him. I want to stay by the judge. Oh, I see him.

"THE COURT: Mr. Fusilier, I don't think it's funny.

"MR. FUSILIER: I don't either.

"THE COURT: Get that smile off your face.

"MR. GINDES: You're laughing.

"MR. LORENZ: Why don't we take a quick recess.

"THE COURT: Let me walk her back."

The following day, outside the jury's presence, Fusilier made a motion for mistrial.

"THE COURT: [W]hen I made that comment to you, sir, it was after the little girl had broke down and was crying and was hysterical and shaking. She was over in the area of the front of the table where Mr. Gindes is seated right now, and she was crying there and screaming. She ran all the way back around in front of the jury, across the witness stand, and literally into my lap crying, and I looked down at her crying, and I was starting to get tears in my eyes, sir, and I looked up and I saw you look at me smiling and it wasn't during a conversation you were having with your client. You may have had that conversation, sir, but I saw everyone else in the courtroom literally having water in their eyes, and I could not understand for the love of money why that smile was on your face, and I apologize to you if it was embarrassing, but it just did not seem proper under those circumstances.

"MR. FUSILIER: I will tell this Court, I did not see—I didn't even know what happened. The first time I saw that little girl was when she was right next to the judge as I was turning around, I asked my client after-wards what happened. I'm not the slowest fellow in the world. I did not realize what was happening, and I don't think that remark in front of the jury is fair to my client.

"Furthermore, Mr. Gindes, 'yes, just stop laughing,' and I said, 'who's laughing.' It doesn't reflect it in the record . . . .

". . . . . . . . . . . . . . . . . . . . . .

"MR. LORENZ: Yesterday when we didn't [*sic*] get into the very heavy emotional scene, and I noticed a couple of the jurors crying also. When that happened I got up and said let's have a short recess, and the Court took a break then. I would suggest perhaps we consider some type of instruction or admonition to the jury. I accept Mr. Fusilier's explanation. Maybe he was paying attention to somebody else, and I know too he does have a problem hearing some of the witnesses in the case.

". . . . . . . . . . . . . . . . . . . . . .

"MR. GINDES: . . . As far as the episode that Mr. Fusilier claims about not hearing what was going on or something like that, I just really can't direct a lot of credence to it. It was a moment of great stress. That little girl was crying at the top of her lungs. She was very close to me, very close to Mr. Fusilier. I can't imagine Mr. Fusilier not hearing that and then she ran right in Mr. Fusilier's point of direct vision when he was not talking to the client, up to the judge. Mr. Fusilier had to see that. And then she was screaming hysterically, and that's when the Court said Mr. Fusilier, some-

thing about a smile, and Mr. Fusilier responded to the Court remarking like laughing at the Court's remark. That's what got me . . . .

"All I can say is, first of all, and I think there's basically three points that we have here is number one, I don't think the defendants can claim advantages or benefits from their own misconduct. If they're going to terrorize young children, then when those children get on the witness stand they're going to act terrorized.

"Number two, I think we should be specifically careful under 288(c) of the Penal Code to not let this happen again, and I think the things that are going to cause this happening again are the witness being directed to look at particular defendants, being forced by attorneys the way they station themselves, they station their bodies to see particular defendants while she's testifying. I think that's going to traumatize her . . . .

"THE COURT: What about a request from the defense counsel to ask the witness to identify a particular defendant?

"MR. GINDES: Well, I suppose they can make those. And I suggest if any request such as that is being made, it be made at the end of her cross-examination, but I think that's going to—if they have to do that because I think that's going to terrorize her again and create a situation of some anxiety on her . . . .

"As far as a request of the admonition of the jury, I think that would be confusing to them . . . .

"Another thing about that is that I frankly feel that it would confuse them because what she did, did have some evidentiary value, as coarse as that may sound, it did demonstrate her tremendous fear for one of these defendants, and it did demonstrate a tremendous power he obviously had over her . . . .

". . . . . . . . . . . . . . . . . . . .

"MR. VAN METER: I'd like the Court to recall that Mr. Vendrasco brought this witness, Amanda [B.], down to the counsel table and was asking the witness to pick out the various defendants.

". . . . . . . . . . . . . . . . . . . .

"THE COURT: If something disturbing comes to my attention, I will mention it, and as I explained to Mr. Fusilier, it was nothing personal. I saw

this child in my arms crying and trembling, and I'm getting water in my eyes, and I'm looking at the jury and they look about the same way, and it's just that, after I looked at her face, I then saw your face, sir, and I probably couldn't reconcil[e] the two.

"MR. FUSILIER: I was just turning around, your Honor, at this time turning to my client. I couldn't figure out why this little girl didn't know her uncle. I was handling my affairs. Then, he had to explain to me what was happening.

"THE COURT: You understand I have to handle my affairs as well, and I'm charged with looking out for the welfare of the child."

The court denied Fusilier's motion for mistrial. It did, however, admonish the jurors as follows:

"I HAVE NOT INTENDED BY ANYTHING I HAVE SAID OR DONE OR BY ANY QUESTIONS THAT I MAY HAVE ASKED OR BY ANY RULING THAT I MAY HAVE MADE TO INTIMATE OR SUGGEST WHAT YOU SHOULD FIND TO BE THE FACTS ON ANY QUESTIONS SUBMITTED TO YOU OR THAT I BELIEVE OR DISBELIEVE ANY WITNESS. IF ANYTHING I HAVE DONE OR SAID HAS SEEMED TO SO INDICATE, YOU WILL DISREGARD IT AND FORM YOUR OWN OPINION."

In certain situations, a trial court's accusing defense counsel of laughing in a situation it does not find funny may constitute judicial misconduct. (See *People* v. *Jackson* (1955) 44 Cal.2d 511, 517-520 [282 P.2d 898].) However, judges are human, and this one instance, standing alone, was probably not prejudicial especially since an admonition was given.[42] Unfortunately, the issue came up again during Gindes's cross-examination of Tutti, in a way that undermined any benefits derived from the admonition:

"MR. FUSILIER: EXCUSE ME, YOUR HONOR, FOR THE RECORD, I DON'T RECALL THE LITTLE GIRL BEING HYSTERICAL.

"THE COURT: THAT IS WHEN YOU WERE SMILING, COUNSEL AND I HAD TO CAUTION YOU ABOUT THAT."

7. "The Court: ANY OBJECTIONS TO RUSTY'S PHOTOGRAPH COMING INTO EVIDENCE?

---

[42] It is arguable that the admonition was not sufficiently tailored to the circumstances so as to adequately cure any harm caused by the trial court's remarks. However, the burden was on defense counsel to request appropriate modifications if they thought it was inadequate. (*People* v. *Martinez* (1989) 207 Cal.App.3d 1204, 1225 [255 Cal.Rptr. 691].)

"MR. GINDES: IT HAS NO REAL PROBATIVE VALUE.

"THE COURT: I DON'T THINK IT DOES EITHER, BUT WE'LL RECEIVE IT."

8. "Q [by Eyherabide] . . . Then have you talked with any other of the defense attorneys that you see here in court?

"MR. GINDES: Objection, irrelevant. How is that relevant to Mr. Eyherabide's case, your Honor?

"THE COURT: I really don't know . . . ."

9. The following occurred after Van Meter concluded his cross-examination of Brian, before Rubin began his:

"THE WITNESS [Brian] Would you read this now?

"THE COURT: What is it?

"For the record, I have just been handed a document from Mr. Brian [M.] He's asked me to read it. To save time, it's rules for Brian [M.] Rule 1, tell the truth.

"MR. VAN METER: I'm going to object.

"MR. RUBIN: Objection.

"THE COURT: Who gave this to you?

"THE WITNESS: Me and Andy did it on his typewriter.

"THE COURT: Anyone want to look at it?

"MR. FUSILIER: I'll join in the objection to read this for Mr. Wayne Dill, Jr.

"THE COURT: All right.

"THE WITNESS: Would you read it?

"THE COURT: There's an objection on reading.

"THE WITNESS: What's that?

"THE COURT: It means that the attorneys have objected to me reading this, but these are rules or instructions you're to follow?

"THE WITNESS: Yeah.

"THE COURT: All right. Ladies and gentlemen, there has been an objection to me reading this particular document that basically it instructs the witness to tell the truth, and if there is any doubt as to what a question means, to say he doesn't understand it or ask the question to be rephrased and reminding him that he is good and that people do love him.

"Is that okay?

"THE WITNESS: Yeah."

10. "Q [by Gindes] DID YOU TELL CAROL DARLING IT WAS TOO EMBARRASSING TO TALK ABOUT YOUR DAD?

"MR. EYHERABIDE: OBJECTION, HEARSAY, ASKED AND ANSWERED YESTERDAY ABOUT THREE TIMES.

"MR. RUBIN: JOIN.

"THE COURT: I THINK IT WAS ASKED AND ANSWERED YESTERDAY, BUT WE'RE STARTING OVER TODAY. OVERRULED."

11. "Q [by Gindes] NOW, YESTERDAY WE TALKED ABOUT WHAT YOU THINK ARE NASTY THINGS, RIGHT?

"A [by Lisa] RIGHT.

"Q REMEMBER WE TALKED ABOUT ME PUTTING THE PENCIL ON THE WOOD AND YOU SAID THAT IS NOT NASTY; RIGHT?

"A RIGHT.

"Q YOU REMEMBER YOU SAID HAVING A KID TOUCH ANOTHER KID'S PRIVATES, THAT WAS NASTY.

"MR. EYHERABIDE: I'M GOING TO OBJECT, YOUR HONOR, TO REHASHING WHAT THE WITNESS SAID ON A PRIOR TIME. IT'S IN THE RECORD WHAT SHE SAID YESTERDAY. IT'S JUST DELAYING, CONSUMING TIME UNNECESSARILY.

"MR. GINDES: IT'S FOUNDATIONAL.

"THE COURT: OVERRULED."

The trial court was within its discretion to permit Gindes a little latitude in this line of questioning. Lisa was barely eight years old at the time she testified, and there was nothing unreasonable about Gindes attempting to refocus her attention after an evening recess. The problem is, the same type of questioning by defense counsel most often resulted in sustained objections.

Similarly, it is not difficult to determine how far defense counsel would have gotten questioning one of the children in the following manner:

"Q [by Gindes] Do you remember me asking you if Carol told you to say Carol [P.] told you to say nothing happened?

"A [by Lisa] Yes.

"MR. EYHERABIDE: Object, leading the witness.

"THE COURT: Overruled.

"BY MR. GINDES:

"Q And didn't you tell me that Carol said to say nothing happened?

"MR. EYHERABIDE: Objection, leading the witness.

"MR. RUBIN: Argumentative.

"MR. FUSILIER: Object, the only term I can think of is badgering, with the Evidence Code, this witness.

"THE COURT: Objection overruled.

"BY MR. GINDES:

"Q Didn't you tell me that Carol told you to say nothing happened? If it's hard to answer the question, tell the judge.

"A No.

"Q Okay. Did I ask you if your mother, Linda, told you to say nothing happened?

"MR. EYHERABIDE: Objection, leading the witness.

"MR. RUBIN: Join.

"MR. FUSILIER: This is traumatizing the witness, object.

"MR. EYHERABIDE: Join.

"MR. FUSILIER: I object to how close he's standing.

"MR. GINDES: I think if anybody is traumatizing, I think it's the conduct of counsel. I think I'm being very gentle.

"THE COURT: Objection overruled.

". . . . . . . . . . . . . . . . . . .

"Q Okay. Honey, didn't you put your head down and tell me that Linda said to tell the people here that nothing happened?

"A Yes.

"Q Did your mother tell you that? Did Linda tell you to say nothing happened?

"A No.

"Q Did you tell me that Linda said that?

"MR. FUSILIER: For the record, have to object, your Honor, continual argument, argumentative.

"THE COURT: Overruled.

". . . . . . . . . . . . . . . . . . .

"Q Did you tell me that Linda told you to say nothing happened? Do you remember the question, honey?

"A No.

"MR. FUSILIER: I can't hear counsel at this time.

"· . . . . . . . . . . . . . . . . . .

"MR. EYHERABIDE: Your Honor, I heard a no in response to that question.

"MR. FUSILIER: I heard a no also.

"MR. GINDES: These adults all bicker with each other. So, let's ignore them.

"Q Did Linda, did you tell me that Linda said to come into court and say that nothing happened when you were with me and Carol? Is it too hard to answer that question?

"A Yes.

"MR. RUBIN: Object. It's hearsay and it's irrelevant.

"THE COURT: Lisa, let me ask you a question, did anyone tell you what to say in court here today?

"THE WITNESS: No.

"THE COURT: No one at all?

"THE WITNESS: No one.

"· . . . . . . . . . . . . . . . . . .

"Q Did Lisa—did your sister, Carol, say to you, 'Tell them nothing happened at the house?'

"MR. RUBIN: Objection, asked and answered.

"MR. VAN METER: Asked and answered.

"MR. EYHERABIDE: Join.

"THE COURT: Sustained.

"· . . . . . . . . . . . . . . . . . .

"Q Did you tell Carol [Darling] that yes, the first time I talked to you I told you nasty things happened? Did you say that to Carol?

"A No.

"Q Honey, are you sure?

"MR. RUBIN: Objection.

"MR. FUSILIER: I didn't hear that.

"MR. RUBIN: The question has been asked and answered now.

"BY MR. GINDES:

"Q Are you sure, honey? Didn't you say that to Carol?

"A I think.

"MR. FUSILIER: Object to that persuasion.

"BY MR. GINDES:

"Q Are you afraid of me, Lisa?

"THE COURT: Let's take a ten minute break.

"MR. GINDES: Let me ask one more question.

"Q Honestly, didn't you tell Carol that you told her nasty things had happened?

"MR. RUBIN: Objection.

"MR. FUSILIER: That's arguing with the witness.

"MR. RUBIN: Join. It's been asked and answered.

"MR. EYHERABIDE: Join.

"MR. GARDINER: Join.

"MR. VAN METER: Join.

"THE COURT: Objection overruled.

"BY MR. GINDES:

"Q Honestly, didn't you tell Carol that nasty things had happened? Didn't you tell her that?

"A I can't—I don't remember.

"Q Honestly, you don't remember if you told her that?

"A No.

"Q Are you sure?

"A Yes.

"MR. GINDES: We're ready for a break, your Honor."

12. Carol Forsythe testified on Dill's behalf. According to her testimony, a typical weekend during 1982 and 1983 involved watching television, cashing a check, washing clothes, getting groceries, and doing things with the kids. No matter what day it was, Ms. Forsythe and Dill would wash clothes all day long the day after she received her check. During Gindes's recross-examination of Ms. Forsythe, the jurors were sent out so that evidentiary matters could be discussed. When they were brought back in, the court stated:

"LADIES AND GENTLEMEN, WE DID RECEIVE JUST A COUPLE MINUTES AGO AND THAT IS ONE OF THE REASONS I HELD UP CALLING YOU RIGHT BACK, FRESHLY PRINTED DRAFTS OR WARRANTS AS THEIR [sic] CALLED, FROM THE COUNTY [for jury service fees]. MR. JACKSON, OUR FRIEND OVER THERE, HAS THEM ALL HERE AND THEY'RE ALL ALPHABETIZED, AND MARGARET WILL PASS THEM OUT. SHE WILL PASS THESE OUT JUST AT THE TIME OF OUR LUNCH, BUT WE'LL BREAK PROBABLY IN ABOUT TEN MINUTES AND YOU HAVE HAVE [sic] A GOOD LUNCH, WASH CLOTHES AND DO OTHER THINGS YOU DO ON PAYDAY."

13. Ms. Forsythe testified about certain conversations she had with Dill while he was in jail. The following occurred during cross-examination:

"[Q] [by Gindes] WHEN YOU CONVERSED WITH MR. WAYNE DILL, JR. ABOUT WEEKENDS THAT YOU CAN REMEMBER BEING TOGETHER, HOW MANY WEEKENDS DID YOU COME UP WITH IN 1982 AND 1983?

".　　.　　.　　.　　.　　.　　.　　.　　.　　.　　.　　.　　.　　.　　.　　.

"THE WITNESS: ABOUT 20 OR SO THAT I CAN REMEMBER.

"BY MR. GINDES:

"Q　20 OR 10. WHEN DID YOU REMEMBER THESE 20 TIMES?

"A　AFTER I HAD GOTTEN A CALENDAR OF THE WEEKENDS OF 1982 AND '83 AND I SAT AND THOUGHT REAL HARD FOR 26 DAYS.

"THE COURT: YOU THOUGHT HARD FOR 26 DAYS?

"BY MR. GINDES:

"Q　JUST STRAIGHT THROUGH LIKE FROM EIGHT TO FIVE FOR 26 DAYS?

"MR. VAN METER: I WILL OBJECT, YOUR HONOR. COUNSEL IS ASKING THESE FACETIOUS QUESTIONS IN THAT TONE OF VOICE. I THINK IT'S VERY OBJECTIONABLE, YOUR HONOR.

"THE COURT: OVERRULED.

"BY MR. GINDES:

"Q　FROM EIGHT TO FIVE FOR 26 DAYS?

"A　NO, I THINK ABOUT WAYNE ALL THE TIME."

The next witness, also called by Dill, was Laura Dobbs. A search warrant was previously executed at her residence, resulting in the seizure of some letters from Forsythe.

"Q　[by Vendrasco] Did you in fact tell Tam Hodgson you had a premonition he was coming?

"A　No, my mother did.

"Q　Oh, your mother did, okay.

"MR. RUBIN: Move to strike that as being hearsay and irrelevant.

"MR. VENDRASCO: It tends to show—

"THE COURT: Well, I think you're trying to lay a foundation, and I'm not too sure where these premonitions are coming in. Go ahead.

"MR. VENDRASCO: I don't know. I had a premonition there was a premonition.

"THE COURT: We've had 26-day thought sessions. I don't know what the premonitions are going for. Go ahead."

There is nothing wrong with a little levity during trial. Here, however, the court's comments went beyond mere humor and belittled the witnesses' testimony. A court's remarks have great potential influence in the eyes of the jury. The cumulative prejudicial effect of remarks interspersed throughout trial, indicating that the prosecutor and his witnesses are more trustworthy than defendants, cannot be negated by admonitions. (*People* v. *Hefner* (1981) 127 Cal.App.3d 88, 95 [179 Cal.Rptr. 336].)

14. During his cross-examination of Dill, Gindes asked about Dill's various jailhouse conversations with Ms. Forsythe. During one of those conversations, the participants said uncomplimentary things about Linda Dill and called her names.

"Q [by Gindes] LET'S GO INTO ANOTHER AREA. YOU INDICATED THAT YOU DID NOT REMEMBER HAVING A CONVERSATION WITH CAROL FORSYTHE ABOUT LINDA DILL BEING A WITNESS AND YOU SAID IF YOU HEARD THAT CONVERSATION THAT MIGHT REFRESH YOUR RECOLLECTION. I FOUND THAT CONVERSATION FOR YOU.

". . . . . . . . . . . . . . . . . . . .

"THE COURT: TURN IT OFF FOR A SECOND. OBJECTION OVERRULED. OBJECTION IS OVERRULED. LET'S PLAY IT BACK.

"MR. VENDRASCO: I WILL START WITH PORKY PIG.

"THE COURT: EVEN BEFORE THE QUEEN OF SHEBA, TOO."

15. "MR. RUBIN: Your Honor, at this point I don't think this has been moved in. I'm going to move this letter be introduced. It's Marcella Pitts F.

"THE COURT: Any objection?

"MR. GINDES: I just don't see the relevance of the letter.

"THE COURT: I don't either.

"MR. RUBIN: It's a document, there's been evidence. It's been testified to, and I think that it's proper to have items like that introduced into evidence and accepted by the Court.

"MR. VENDRASCO: I guess if the water bed frame and T.V. gets in, I guess the letter should get in too.

"THE COURT: They're not in yet.

". . . . . . . . . . . . . . . . . .

"THE COURT: We received that toy which probably isn't relevant. To save some time, we will admit this. It's in.

". . . . . . . . . . . . . . . . . .

"MR. RUBIN: Your Honor, I'm going to object to the Court making these sort of derogatory comments about evidence being introduced.

"MR. GINDES: Could we stop attacking?

"THE COURT: Let's go forward, sir."

16. In the jury's presence, the court asked Eyherabide how long his next witness would be, because the evening recess was going to be taken at a certain time.

"MR. EYHERABIDE: I expect the direct will be about five minutes.

"THE COURT: Where's the witness?

"MR. VENDRASCO: Your Honor, the witness is Mr. [H.] He was a witness for the People. Mr. Eyherabide requested that I contact him and have him here. He came directly from the job. I would prefer we don't have any interruptions with his job, if possible. If not, that's fine.

"THE COURT: I wish you would have told me this before. We would have put him on right away this afternoon.

"MR. GINDES: It's a great inconvenience to him. He managed to accommodate his schedule, and so, we'd like to get him on.

"THE COURT: I understand. You should bring this to our attention, Mr. Eyherabide.

"MR. EYHERABIDE: I had those teachers out there all day.

"THE COURT: It's not my problem you can't schedule them better.

"MR. RUBIN: I'm going to object to the Court making gratuitous comments about counsel's scheduling. It's highly improper.

"MR. SIMS: Join.

"THE COURT: Well, I think there could be a little bit better wan [*sic*] to schedule witnesses.

"MR. RUBIN: The court didn't make those comments when the prosecution had a problem.

"MR. GINDES: Because we didn't do that.

"MR. RUBIN: Well, you did break, for example, for Dr. Woodling.

"MR. EYHERABIDE: Your Honor, I'd like to join that objection. The Court, the other day told me to have my witnesses ready to go. The Court knows I have no way of predicting cross-examination.

"THE COURT: I'm not talking about this. If we have someone that has a problem, bring it to my attention early.

"MR. EYHERABIDE: They told me he'd be available at 4:30 this afternoon today.

"THE COURT: Let's go forward."

Not once was the prosecution chastised for causing delay by not having witnesses ready. Yet Gindes's assertion that they did not do that is patently false. For example, on March 25, 1985, court resumed, following a break, at 10:47 a.m. A few questions were asked of Amanda. When told to call his next witness, Gindes stated that he needed until 1:30. The court said all right. Later, following Dr. Woodling's testimony, the jury was sent home just before 11 a.m., because Gindes expected cross-examination to take all day and so had no other witness available prior to 9:30 the next morning. The court did not indicate any problem with this. When cross-examination of Bobby R. was finished, the court asked if the next witness was available.

Vendrasco said no, that she would be in the next morning. This was at approximately 3:55 p.m. After Gardiner finished his cross-examination of Idolina Lopez on Wednesday, May 1, at approximately 11:40 a.m., the court noted that the next prosecution witness would be available Monday morning. The jury was excused until that time. After Johnny's testimony, Gindes represented that the People might have one more witness, but that person could not be called at that time. Defense counsel did not oppose Gindes's request for a continuance from May 14 to May 16.

This is not to say that defense counsel always had their witnesses properly scheduled so as to minimize any delay. However, it was unfair of the court to criticize Eyherabide in front of the jury, especially when the problem does not appear to have been his fault. Apparently, the prosecutors told him that Bob H. would be available at a certain time, and Eyherabide called him to the stand as close to that time as possible. Regardless of whether the court's comments could ultimately be defended, it was not justified in reprimanding defense counsel before the jury. (*People* v. *Fatone, supra*, 165 Cal.App.3d 1164, 1175.) ■ "When the court embarks on a personal attack on an attorney, it is not the lawyer who pays the price, but the client. And the error, where prejudicial, is reversible." (*Ibid.*)

17. "BY MR. VENDRASCO:

"Q . . . What about your other tattoo, the hearts, was that also a joke?

"A [by Grace] No.

"Q Was that on a dare to[o], the other tattoo?

"A No, that was stupidness.

"Q Stupidness?

"A Yes.

"Q Why was it stupid to put the other tattoo on?

"A It just was.

"MR. FUSILIER: This is argumentative.

"THE COURT: It's stupid to have either one of them put on, but—"

 Regardless of the standard of review employed (compare *Rose* v. *Clark* (1986) 478 U.S. 570, 577 [92 L.Ed.2d 460, 470, 106 S.Ct. 3101] [adjudication by biased judge is federal constitutional error reversible per se] and *People* v. *Hefner, supra*, 127 Cal.App.3d at p. 95 [judicial statements merely tending to show bias do not require reversal where conviction based on overwhelming evidence of guilt]), where disparaging comments and the like permeate the record, especially when the prosecutor rarely received such treatment, they "def[y] a finding of no prejudice." (*People* v. *Fatone, supra*, 165 Cal.App.3d at pp. 1175-1176.) As stated in *Fatone*, "[n]ot every example amounts to misconduct independently, nor does each necessarily involve an erroneous legal ruling. But together they tend to illustrate the demeaning, patronizing attitude displayed by the judge toward [defendant's] attorney before the jury: . . . ." (*Id.* at p. 1176.)

## J. *Conclusion*

The foregoing represents a mere fraction of the misconduct that occurred in the instant case. The record is replete with examples of an overzealous prosecutor who, in his blind quest to convict, forgot or ignored his constitutional and ethical duties as representative of the People of the State of California. Gindes's gross misconduct and the lesser misconduct of Vendrasco were compounded by the actions of the trial judge.

We need not decide whether any of the misconduct is to be reviewed pursuant to the *Chapman* standard, since prejudice exists under the *Watson* (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]) standard. This is not to say that defense counsel were without blame for the emotional level of the proceedings. However, nothing they did warranted the vituperative fervor of the response. A defendant has the right to be fairly tried regardless of the shortcomings of his or her counsel.

 Many of the instances cited above are mild and, if considered singly, would be inconsequential. However, this court must consider their cumulative effect. It is hardly a satisfactory answer to say, as respondent essentially does, that the misconduct was so pervasive on both sides, the jury must have ignored it. As the Court of Appeal appropriately stated some 55 years ago: "The transcript of the proceedings shows continuous criticism of the public defender, representing the defendant, by the district attorney . . . .

"These remarks, and comments made by the district attorney during trial concerning the defendant's witnesses, taken separately, one by one, may not amount to more than what is, unfortunately a too common practice in the trial of cases. Making all due allowances for the fact that the district attor-

ney was engaged in the prosecution of a defendant whom he believed was guilty under the evidence which he was presenting, it must be remembered that a conviction can only be justified by legal means. A prosecutor has no right to inject into the proceedings, by innuendo, such prejudice against the defendant or his counsel as prevents a fair and impartial trial.

"There was no justification for this conduct on the part of the district attorney. As was pointed out in the case of *People* v. *Wells,* 100 Cal. 459, 465 . . . : 'It is too much the habit of prosecuting officers to assume beforehand that a defendant is guilty, and then expect to have the established rules of evidence twisted, and all the features of a fair trial distorted, in order to secure a conviction. If a defendant cannot be fairly convicted, he should not be convicted at all; and to hold otherwise would be to provide ways and means for the conviction of the innocent.' " (*People* v. *Podwys, supra,* 6 Cal.App.2d at pp. 72-73.)

Nor is it an answer to say, as respondent suggests, that this case was "sufficiently strong as to render any misconduct harmless . . . ." Assuming the evidence was sufficient to convict, it did not point unerringly to guilt. Under such circumstances, the type of misconduct involved here could reasonably have tipped the scales. Accordingly, reversal is required. (*People* v. *Kirkes, supra,* 39 Cal.2d at p. 727.) "That the jury was instructed generally to base its verdict exclusively upon the evidence does not prevent the misconduct from being prejudicial and requiring a reversal." (*Ibid.*) "It is idle for us to speculate whether the prosecutor's conduct resulted from ignorance of the law and his official duties, or was a 'dishonest act or an attempt to persuade the court or jury, by use of deceptive or reprehensible methods.' Under either circumstance the *unfair* trial and the resultant conviction and punishment of the accused is an outrage, and the insult to our system of criminal justice, intolerable. [¶] 'Fewer judgments would have to be reversed if the trial courts were more firm in controlling the comparatively few prosecutors who need restraint.' [Citation.]" (*People* v. *Rodgers* (1979) 90 Cal.App.3d 368, 372-373 [153 Cal.Rptr. 382].)

Similarly, we need not decide whether the prosecutor or trial court bears the greater share of the blame. "Things happened in appellant[s'] trial which simply ought not to happen in a fair proceeding. Whether characterized as prosecutorial misconduct, defense counsel misconduct, judicial error, or a combination of all three, the net result was that the trial was turned into something of a circus, complete with sideshows, . . . clowning, and tricks which could only divert the jury's attention from the serious business of determining guilt or innocence in accordance with proper standards." (*In re Rodriguez* (1981) 119 Cal.App.3d 457, 467 [174 Cal.Rptr. 67].)

We recognize that recently, at least, prosecutorial misconduct has usually been deemed harmless. If what occurred in the instant case can be deemed harmless, however, then prosecutorial misconduct will *never* be grounds for reversal, no matter what effect it might have on a defendant's right to a fair trial. That is simply not the law. The misconduct herein was prejudicial under any standard; reversal is required.

## K. *Related Issues*

### *Request to Bar Retrial*

 Forsythe argues the misconduct was so egregious, retrial should be barred since what occurred caused permanent damage to defendants' cases. However, he offers nothing but speculation about the damage caused. He states that witnesses were intimidated, but the record on appeal contains no support for this or related assertions.

Forsythe seeks to analogize the instant case to ones in which mistrials were granted because of prosecutorial misconduct, but he offers no pertinent authority in support of the proposition that retrial should be barred. In fact, the one California case he does cite, *People* v. *Hathcock* (1973) 8 Cal.3d 599 [105 Cal.Rptr. 540, 504 P.2d 476], specifically states that a "defendant's voluntary institution of a mistrial motion is normally a sufficient indicant of the defendant's consent to the discharge of the jury to bar later recourse to a 'once in jeopardy' plea." (*Id.* at p. 613.) The defendant in *Hathcock* argued that his motion for mistrial was compelled by the prosecutor's blatant misconduct, but the Supreme Court rejected the argument. (*Id.* at p. 614.) Although the court recognized that a different situation might exist if a prosecutor deliberately caused the mistrial in order to obtain a fresh start (*id.* at p. 614, fn. 14), such is not the situation in the instant case, nor has Forsythe presented any reason for this court to depart from the *Hathcock* rationale.

Similarly, in *Oregon* v. *Kennedy* (1982) 456 U.S. 667 [72 L.Ed.2d 416, 102 S.Ct. 2083], upon which Forsythe also relies, the United States Supreme Court refused to bar retrial where a mistrial was granted because of prosecutorial misconduct, holding that "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial" could a defendant successfully raise the bar of double jeopardy to a second trial. (*Id.* at p. 676 [72 L.Ed.2d at p. 425].) There is no showing that the prosecutors intended to goad defendants into moving for a mistrial in the instant case.

*Number of Prosecutors*

■ Defendants also complain about two prosecutors being allowed to conduct the People's case. Basically, the argument has two prongs: (1) since two prosecutors argued the case, the trial court should have sua sponte permitted two defense arguments; and (2) since each defendant only had one counsel, the People should only have had one.[43]

The arguments are readily answered. Section 1095 provides: "If the offense charged is punishable with death, two counsel on each side may argue the cause. In any other case the court may, in its discretion, restrict the argument to one counsel on each side."

In *People* v. *Ah Wee* (1874) 48 Cal. 236, the trial court, over objection, permitted three prosecutors to argue the case to the jury. Defendant had only two counsel, each of whom addressed the jury. The California Supreme Court rejected the argument that the trial court erred by allowing more than two arguments on behalf of the People. (*Id.* at p. 238.) It stated: "As we construe [§ 1095], its object was to give both the prosecution and the defense, in a capital case, the right to have the case presented to the jury by at least two counsel; and to distinguish the case in this respect from the inferior grades of crime in which the argument may, in the discretion of the Court, be restricted to one counsel on each side. But it was not intended to limit the power of the Court in any criminal case to allow as many counsel as in its discretion should seem proper, to address the jury, whether upon the part of the people or of the defendant." (*People* v. *Ah Wee, supra*, 48 Cal. at pp. 238-239.)

Defendants offer no reason to depart from this rationale merely because we are concerned with all phases of trial, not just final argument. Forsythe alleges that while one prosecutor was questioning the witness, the other was preparing, researching, and comparing notes on testimony, rendering the proceedings "about as fair as a tag team match with one side limited to one wrestler." However, he offers no proof in the record of this, nor does any defendant establish that prejudice resulted.

Moreover, assuming that error somehow occurred, the defense's opportunity to participate in the adversary process was not significantly limited, and hence there was no infringement of defendants' constitutional right to the assistance of counsel. (*People* v. *Bonin, supra*, 46 Cal.3d at pp. 693-695.) Likewise, assuming section 1095 was violated, which we do not believe has

---

[43] Defendants correctly point out that objections were raised to both prosecutors examining witnesses, objecting, and presenting argument, throughout trial.

been established, the error was harmless under any standard of prejudice. No defense counsel asked for a second argument, nor was the trial court under any duty to sua sponte offer the opportunity for one, this not being a capital case. We have no way of knowing what effect a second defense argument might have had on the jury; however, the lack of defense request indicates either that defense counsel felt such request would be unavailing or that such argument was dispensable. Since the record on appeal sheds no light on this point, the argument is properly rejected. (*Id.* at p. 695.)

### Investigatory Techniques

Finally, defendants contend that the investigatory techniques denied them due process. ▐▌▌▌ As part of this argument, they request that this court take judicial notice of the Attorney General's report on the Kern County child abuse investigation, which report was made pursuant to a request by the Kern County Grand Jury. The request is denied.

Although the record on appeal contains testimony regarding the investigative techniques used, such as repeated interviewing of the children, there is no actual evidence as to whether such techniques were improper or the likely effect on the children's testimony. The Attorney General's report does not concern this particular case. Judicial notice thereof is permissible but not mandatory, pursuant to Evidence Code sections 452 and 459. Given the insufficiency of the appellate record on this issue, this matter is more appropriately left for writ proceedings. (See *People* v. *Stoll* (1989) 49 Cal.3d 1136, 1144, fn. 5 [265 Cal.Rptr. 111, 783 P.2d 698].)

II.

### ADMISSION OF KNOTTS STREET EVIDENCE

#### A. *Procedural Background*

Testimony was admitted at trial regarding Forsythe's alleged involvement in child molestations that occurred in September 1984. Defendants now argue that admission of the evidence, only some of which was limited to Forsythe, constituted reversible error.

The evidence must be examined in light of its procedural background and the justifications offered for its admission.

During trial on April 3, 1985, the People filed a written offer of proof regarding the testimony of their next witness, Idolina Lopez. Idolina was not on the witness list announced by the People at the beginning of trial.

She was interviewed by Sergeant Bobby Fields and another officer on November 16, 1984, and a supplemental report was written by Fields on that date. The prosecutors interviewed her on February 21, 1985. Although Forsythe's attorney, Gardiner, may have had discovery of her statements earlier, other counsel such as Eyherabide did not receive police reports mentioning her until March 25. The materials were apparently provided to defense counsel without any indication, prior to the offer of proof, of Idolina's relevancy to the instant case. Despite this fact, various defense counsel requests for a brief continuance to prepare to respond to the People's offer of proof, which was given to counsel on April 1, were denied.

According to the offer of proof, Idolina's testimony was to be divided into two areas. Area 1 would be admitted against all defendants and would include her observations of cameras, lighting equipment, a television set, light stands and a video camera used by Forsythe to make tapes of child molestation, and her observations of a tape shown by Forsythe of children and adults engaging in sexual acts.[44]

The basis for admitting this evidence was that children had testified to the use of the equipment and Idolina's testimony showed that Forsythe had the equipment used to make the child pornography with which he was charged. The jury could infer that he ended up with the equipment used in the crimes charged, after the arrest of his coconspirators. His possession of the video film would allow the jury to infer it was one of the films resulting from the conspiracy charged in the instant case.

Area 2 evidence, which consisted of the acts of molestation, was to be admitted only against Forsythe. According to the offer of proof, it was admissible on the issue of identity, which was placed in issue by Forsythe's not guilty plea and his failure to indicate that he would not raise the issue as a defense. According to the People, Forsythe's defense was that he was misidentified as a perpetrator and that the children were molested but confused as to who did it. The People argued that it was difficult to find cases involving so many common marks—that the marks were virtually Forsythe's "fingerprint"—and that this also bolstered the credibility of the children's identifications of Forsythe as a perpetrator of the charged offenses. Finally, the People proposed that the jury be given a limiting instruction regarding area 2 evidence.[45]

---

[44] Subsequently, anything regarding observations of sexual acts, in person or on videotape, was moved to area 2.

[45] Just prior to direct examination of Idolina regarding area 2 evidence, the trial court instructed the jury:

"LADIES AND GENTLEMEN OF THE JURY, YOU WILL NOW BE HEARING EVIDENCE THAT IS BEING ADMITTED AGAINST ONLY ONE OF THE DEFENDANTS, WAYNE

In arguing the admissibility of the evidence, Gindes contended that area 1 testimony did not fall within the provisions of Evidence Code section 1101.[46] He argued that the equipment in both instances was the same, and Idolina's testimony showed that one of the conspirators ended up with it. Therefore, it was admissible to corroborate the testimony of the green house

FORSYTHE, AND IS NOT BEING ADMITTED AGAINST ANY OTHER DEFENDANT. YOU ARE INSTRUCTED AND ADMONISHED THAT THIS EVIDENCE MAY ONLY BE CONSIDERED AGAINST WAYNE FORSYTHE AND NOT AGAINST ANY OTHER DEFENDANT. [¶] THE EVIDENCE THAT YOU WILL BE HEARING IS BEING INTRODUCED BY THE PROSECUTION FOR THE PURPOSE OF SHOWING THAT WAYNE FORSYTHE COMMITTED A CRIME OR CRIMES OTHER THAN THAT FOR WHICH HE IS ON TRIAL. SUCH EVIDENCE, IF BELIEVED, IS NOT BEING RECEIVED AND MAY NOT BE CONSIDERED BY YOU TO PROVE HE IS A PERSON OF BAD CHARACTER OR THAT HE HAS A DISPOSITION TO COMMIT CRIMES. [¶] SUCH EVIDENCE IS RECEIVED AND MAY BE CONSIDERED BY YOU ONLY FOR THE LIMITED PURPOSE OF DETERMINING IF IT TENDS TO SHOW THAT THERE IS A CHARACTERISTIC METHOD IN THE COMMISSION OF CRIMINAL ACTS SIMILAR TO THE METHOD USED IN THE COMMISSION OF THE OFFENSE OR OFFENSES IN THIS CASE WHICH WOULD FURTHER TEND TO SHOW THE IDENTITY OF THE PERSON WHO COMMITTED THE CRIME OR CRIMES, IF ANY, OF WHICH WAYNE FORSYTHE IS CHARGED. [¶] FOR THE LIMITED PURPOSE FOR WHICH YOU MAY CONSIDER SUCH EVIDENCE, YOU MUST WEIGH IT IN THE SAME MANNER AS YOU DO ALL OTHER EVIDENCE IN THE CASE. YOU ARE NOT PERMITTED TO CONSIDER SUCH EVIDENCE FOR ANY OTHER PURPOSE."

During the giving of instructions prior to deliberations, the trial court told the jury:

"Evidence has been introduced for the purpose of showing that a defendant committed a crime or crimes other than that for which he is on trial. Such evidence, if believed, was not received and may not be considered by you to proof [*sic*] that he or she is a person of bad character, or that such person has a disposition to commit crimes. Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show the following: As to the evidence that was introduced against Defendant Wayne Forsythe only and which you were instructed to consider, as to no other defendant in any manner, such evidence may be considered if it tends to show a characteristic method, plan or scheme in commission of criminal acts, similar evidence, correction, similar to evidence of the method, plan or scheme used in the commission of the event in this case which would further tend to show the identity of the person who committed the crimes, if any, of which said defendant is charged. [¶] As to evidence that was introduced against all defendants concerning crimes not charged in the information, such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show the existence of a conspiracy. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose."

[46] As of the time of trial, Evidence Code section 1101 read: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Evidence Code section 1101 has since been amended in a manner not pertinent to the instant case.

victims. Gindes also relied on this court's opinion in *People* v. *Willoughby* (1985) 164 Cal.App.3d 1054 [210 Cal.Rptr. 880], and argued that admitting the evidence would save time under Evidence Code section 352[47] since it would prevent the calling of numerous prosecution witnesses in various areas. He also pointed out that the evidence directly contradicted Forsythe's statement to Sergeant Fields that he never had video or photographic equipment, thus showing an attempt by Forsythe to fabricate evidence.

Defense counsel argued that there were glaring dissimilarities among the various descriptions of equipment and that assuming most of what was claimed in the offer of proof were shown, there were no highly distinctive marks of similarity. Counsel also noted the great chance of undue prejudice and time consumption involved in essentially trying a second case. Additionally, counsel argued that there was no way the jury would be able to consider area 2 evidence only as to Forsythe, regardless of the limiting instruction. Various defense counsel also argued that area 1 evidence was irrelevant since Idolina's observations were made more than a year after the alleged molestations at the green house, and that at the very least the trial court should exercise its discretion and refuse to admit the evidence under Evidence Code section 352. Counsel also argued that Forsythe's identity was not actually in issue—that this was not an identity case, but a "no crime was committed" case.

The trial court found that Forsythe placed his identity in issue by claiming that he was misidentified, and that his not guilty plea placed the burden on the People to prove all elements of the charged crimes, including Forsythe's identity as a perpetrator. The court further found that the offer of proof set forth highly distinctive marks of similarity between the charged and uncharged acts, and that the probative value substantially outweighed any prejudice. As to area 1 evidence, the court found that the jury could infer the photographic equipment was used in the green house; therefore, said evidence was admissible against all defendants.

A motion for mistrial, made after conclusion of the Knotts Street testimony, was denied.

B. *Testimony*

*Idolina Lopez*

Idolina Lopez testified that in August or September 1984, she lived in an apartment at 700 Knotts Street. Her son Juan, then age eight, and one

---

[47] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Ignacio Cardona lived with her. Around September 1984, Forsythe moved into the apartment complex with Stephanie Jenkins and her daughters Angela, who was about eight years old, and Alicia, who was about four years old.

After Forsythe and Stephanie moved into the complex, Idolina's son Juan began to play with Angela and Alicia. The second week of September 1984, Idolina missed Juan for a period of time and looked for him, among other places, at Forsythe's apartment. After discussing Juan's whereabouts with Stephanie, Lopez followed Stephanie into the bedroom. Juan was there, as were Alicia, Angela, and Pamela Weatherly's son David. Although Pamela Weatherly was in the kitchen, her husband Melvin was also in the bedroom. Everyone was watching videotapes on television. The movies were of adults having sex with children. Although there was more than one adult involved, Idolina recognized only Forsythe.

While the movies were being shown, Forsythe was lying naked on the bed with Angela. Alicia was also naked. Idolina wanted to take Juan, but Forsythe would not let them leave. After saying they had seen too many things, Forsythe made Idolina remove her clothes. Present at this time were adults Forsythe, Ignacio Cardona, Allen LeCain, Ralph Lopez, and Melvin Weatherly. Also present were children Angela, Alicia, Juan, and David.

Forsythe did not make Idolina do anything else at the time, but he put a knife to Juan's throat and told her she had to come back every time he wanted, to participate in sexual activities, if she wanted to see her son alive. He then let her, Juan, and Ignacio go. After that, she returned to the apartment on numerous occasions when sexual activities occurred.

Idolina was in Forsythe's bedroom on various occasions. There she saw a camera attached to a three-legged stand, and standing about four feet off the ground. The legs were black. The camera had a lens like a square, and the lens could be focused. The camera had one cable attached to it. Idolina saw a video recorder in the apartment, but could not recall if the wire from the camera was attached to it. She saw the camera and recorder in the same room at the same time. The video recording machine was connected to the television.

At a time when Idolina saw the camera on the stand in the bedroom, there were also two lights on stands, with bulbs on top. The stands were alike. The lights were about five feet five inches tall. The bases were round. The stands were silver metal. By each light was a round, silver oval like a bowl, with the light in the middle. The lights were very, very bright. Both lights were the same height and brightness. They were brighter than the

fluorescent lights in the courtroom. There were no wheels on either the legs of the camera stand—or the lights.

On one occasion, Idolina, Forsythe, Melvin Weatherly, Allen LeCain, Ralph Lopez, Kelly LeRoy, Stephanie, Pamela Weatherly, and Ignacio were present. The children there were Stephanie's girls, David W., Juan, Bobby R., Joseph R., Joseph P., Mike M., Christopher L., and Chuko. The children ranged in age from six or seven to twelve.

Forsythe told everyone to disrobe. Idolina then saw him operating the camera. He would tell everyone in what positions to get so that he could take pictures. These were pictures of the adults having sex with the children. Forsythe would tell the adults and children what to do with each other and where. When pictures were being taken, the lights would be turned on and placed directly where the adult and child were having sex. Forsythe would tell the little boys to suck the women's vaginas and the adults would suck the boys' private parts. The little boys would be placed on top of the women and told to penetrate the women. Forsythe would tell the boys to go up and down. Forsythe and Melvin made the boys suck the women's breasts and touch their vaginas with their hands. Forsythe would have the women touch the boys' privates. He also had the adults suck the girls' vaginas, then the girls would touch the men's penises, then the men would penetrate the girls' vaginas and rectums.

At times, Forsythe would stop using the camera and do sexual things himself. He sucked the boys' private parts and penetrated their rectums. He penetrated the girls' vaginas and rectums. He would also have the boys suck his privates. He had tattoos on his legs, arms, chest, back, and penis.

The adults never had sex with each other, just with the children. Forsythe had a knife on more than one occasion. Sometimes he would threaten the children by saying that if they told, they would not see their parents again because Forsythe would kill the children and their parents.

When all the adults were in the room, they would pass around and smoke a long brown cigarette. When one adult was having sex with a child, the others would watch. Sometimes one person would be doing something to one child and another person would be doing something to another child. Once Idolina heard Forsythe telling Stephanie and Melvin that he thought they were going to make good money with the pictures. When the sex acts happened in the bedroom, the same camera and lights were always used.

These events occurred between the second week of September 1984 and October 22, 1984. During that time, the group got together 15 or 20 times.

Photographs were taken the last three times. On the first of those occasions, only one camera was present. It had three black legs. There were two lights. Idolina never saw more than two lights of that kind.

In November 1984, Bobby Fields and another officer spoke with Idolina about the alleged incidents. During the interview, Idolina lied to Fields about knowing the Weatherlys and being involved in sexually molesting the children. She denied ever being in Stephanie's apartment. She did this because she was afraid. Forsythe had told Idolina that if she ever told anyone, even if he was in jail, someone would kill her and her son.

Idolina was eventually granted immunity for testifying in the Knotts Street case.[48] She agreed to testify in the instant case without any promises being made in relation to that case, although at the time she agreed, she knew she was facing a potential sentence of 379 years. At the time of trial, she was still in custody on 98 counts of child molestation, although the district attorney had promised to dismiss the charges.

*Bobby R.*

At the time of trial, Bobby R. was eight years old. He knew Forsythe from the time Forsythe moved into the apartment with Stephanie, Angela, and Alicia in 1984. Bobby lived two houses down.

Bobby initially testified that he did not go into Forsythe's apartment, nor did he remember being in a room with Forsythe. However, he remembered telling Gindes about some cameras Forsythe had. One was a movie camera and the other was one that you press. Bobby saw those cameras at Allen's. (Apparently, Allen LeCain.) He did not see Forsythe with those cameras. Bobby previously told Gindes that Forsythe had three cameras. That was the truth. Bobby saw Forsythe carrying three cameras to Forsythe's apartment. He also saw Forsythe with some lights.

Forsythe had three lights at Allen's apartment. Bobby also saw him with a videotape recorder in Allen's apartment. Bobby also saw Forsythe walking to his apartment with an unusual board. The board, which Bobby said he saw lots of times, was brown, three and one-half to four feet tall and about three feet wide. At one point, Bobby testified that three white ropes were tied around it. There were also sticks and nails on the board. The sticks were attached to the board. So were the nails, which were bent over. At another point, Bobby said that the ropes were tied to the nails and sticks

---

[48] A preliminary hearing involving at least some of the Knotts Street defendants was in progress at the time of trial in the instant matter.

on the board. The sticks were nailed onto the board and the ropes were attached under the sticks. There were six ropes on the board.

One of the cameras had a flash bulb on it. The movie camera had a stand with three legs and a wire coming from it. The camera also had something on it to wind up and a squeeze ball. The other movie camera also had a stand and a squeeze ball. The third camera had a flash. The three lights had stands with three legs and a big round thing to hold the light bulb.

There came a time when Bobby was invited to Forsythe's apartment.[49] Bobby went inside about three times. When he was there, so was Forsythe. There were also times when Bobby went into Allen's apartment, which was in the same complex. Forsythe was there. Bobby had sex in both of the apartments when Forsythe was there. In Forsythe's apartment, it occurred in Forsythe's bedroom. On one occasion, there were 10 adults present: Forsythe, Stephanie Jenkins, David, Melvin Weatherly, Pamela Weatherly, Idolina, Ignacio, Ralph Lopez, Allen, and Allen's girlfriend Kelly. There were also a bunch of children in the room: Michael, John, Alicia, Angela, Bobby, and children whose names Bobby could not recall.

On one occasion, everyone disrobed in Forsythe's bedroom. Forsythe, who was mean, acted like the boss. He and Melvin Weatherly gave orders. Forsythe gave the most orders. He told Kelly, Allen, and Pam to do stuff to the kids. He told the kids to suck on his weenie. He told someone to get on top of the girls. He told the little kids to do it with the other little kids. The men put their weenies in the kids' butts. Forsythe put his penis inside the butts of five of the kids.

There were three bright lights in the room at the time. When a kid was doing something nasty, the lights shone on the kid. After the lights were on for awhile, they made the room hot.

Kids put their mouths on adults' penises. Melvin and Forsythe gave the orders to do this. Forsythe also ordered the children to put their penises in the women's butts. He also ordered them to get on top of the ladies and move up and down. The kids' penises would be lying on the ladies' privates. Forsythe also ordered the children to put their mouths on and lick the women's private places.

Forsythe ordered Bobby to go over to Angela and get on top of her, then told him to go up and down. Allen took a picture. Forsythe also ordered

---

[49] In the same language as the admonition given concerning Idolina's testimony, the jury was instructed that the following evidence could be considered only against Forsythe.

other children to do things with other children. Forsythe was the one who gave the orders as to what boy should do something with what girl. The boys had to lie on top of the girls. The boys also had to put their mouths between the girls' legs. This was photographed. Three of the boys, including Bobby, had to put their mouths on Forsythe's penis. Forsythe also ordered the boys to suck the women's breasts.

Forsythe has tattoos on his arm and his back. He also has a tattoo on his butt. One of the tattoos looks like a snake. One looks like a hawk.

The board was used at both Allen's and Forsythe's houses. Three children would be tied to the board at the same time. Forsythe tied them. They were sitting down. There were times when Bobby saw only one child tied to the board. That child would be lying down and was tied with two ropes. The ropes went around the child's arms. Then the women would get on top of the child while someone took pictures.

All of the children were made to sniff white powder through a straw from a dish in the kitchen. It made Bobby feel drowsy. It made his nose feel funny, like he always had to wiggle it.

When Forsythe had to go to the rest room, he would "pee" in a cup. He made Bobby and other kids drink it while someone took pictures. This happened one time. When the kids had to pee, Forsythe made them pee on the floor. No one took pictures of this. Forsythe also made Bobby drink whiskey and beer. "They" made him smoke "weed." It made Bobby feel sleepy. This all happened on the same day.

The nasty things started about 1 p.m. and ended about 3 p.m. They happened at Forsythe's apartment on three different days. There were two doors in the apartment; on two of the occasions, Bobby saw a big person standing at the front door. Once there was also a big person at the back door.

Allen lived next door to Forsythe. The fourth time nasty things happened was at Allen's apartment. Nasty things happened more than four times, although Bobby could not recall how many altogether. They all ended before school started. Forsythe showed movies on television at Allen's. These were of children doing nasty things to each other. Bobby recognized Forsythe and some of the children doing nasty things in the movies, but he did not see himself. Forsythe threatened to kill the children's parents if the children told.

Bobby saw some of the people, whose names he did not know, drive up in cars. He saw a car that was really unusual in his neighborhood. It was a red

Porsche. Bobby saw one of the people in Forsythe's room get out of the Porsche. This person was in Forsythe's room while the nasty things were happening.

Bobby saw the stranger drive up to the apartments in a red Porsche more than once, but only on days when the nasty things happened. The stranger would arrive shortly before the nasty things started happening in the apartment, and he would be present. The man stayed in the apartment while the nasty things were happening, but he did not take his clothes off or do any of the things. He was not the man at either of the doors. He was in the living room while everyone else was in the bedroom. He did not take any pictures.

*Toby Tyler*

Richard P. "Toby" Tyler, a San Bernardino County sheriff's sergeant, was qualified by the People as an expert in child pornography. The lowest price Tyler encountered in the United States in 1982 and 1983 for a single videotape of child pornography was $100. An individual possessing such a tape could make unlimited copies thereof and sell each for that price. Still photographs of children involved in sexual activity in 1982 and 1983 went for $15 to $25 per picture, rarely less. Child pornography made to order commands higher prices. Tyler has encountered cases in which child pornography is traded for narcotics.

In making child pornography, a video camera is generally used. A VCR may be used. A low quality video has little or no auxiliary lighting. The higher quality semiprofessional one involves a minimum of two lights mounted on tripods. They are usually quartz lights which give off a substantial amount of light and heat. There is often a light mounted on the camera itself, in addition to the other two lights mounted on stands. The quartz lights are so bright that a momentary touching of the bulb itself would produce a third degree burn. People closer than six feet to the lights would be made uncomfortable by the heat. Within two feet, sustained exposure would cause a second degree burn.

A video camera will always have a wire. A movie camera may or may not have a wire. Very frequently, more than one camera is used at the same time. Multiple cameras produce a larger quantity of material. There may be voice-overs on videotape, because child pornography collectors form a special preference for certain children and like to be able to identify those children when future orders are placed. Any kind of camera can be used in child pornography. There are a number of cameras that fit the description of an individual with a black hood over himself taking pictures.

Generally speaking, videotapes depict virtually any act that is possible between two humans or a human and an animal, or animals, or humans and animals. This includes sexual intercourse, fondling, oral intercourse, oral copulation of the anus, sexual acting out with animals, sodomy, and sadistic/masochistic (S & M) behavior. There are also "golden showers," i.e., the child drinking urine, and "brown logging," i.e., the consumption of human excrement. It is fairly common to have pictures of adults having sex with a child. It is also very common to have pictures of sexual acts between children. There is a movie called Kinder Orgy, which depicts an orgy scene showing an adult having access to many children. Tyler has seen depictions of children all lined up and an adult going from one child to the next.

There is a market for S & M child pornography, which depicts the infliction of pain upon others and the arousal by experiencing pain. It may include bondage, such as tying people up or handcuffing them. The child may be handcuffed, then molested, and this is shown on film. There are cases where children are filmed urinating on the floor. This is suggestive of golden showers, which may range from urinating on another person to urinating in another's mouth and having that person consume the urine. There are cases in which objects such as screwdrivers have been inserted into body openings of a child. Tyler has not heard golden showers applied to drinking urine from a cup. He has never seen depictions of a child drinking urine from some type of receptacle, nor has he seen depictions of a gun barrel placed into the anal opening of a child.

Kiddie porn films show basically the same acts as adult films, except that in kiddie porn, there is usually not penile penetration of prepubescent females' vaginas. Such penetration would cause tremendous pain and potentially life-threatening injuries. A child may be numbed by Novocain, or by having cocaine applied to the genitals.

It is fairly common for videotapes of children engaged in sexual acts to be shown to those children at a later time. One purpose is to get the child to have significant guilt over the fact that he or she is now a participant in a "dirty movie." Another is to get the child interested in participating again, so they can once again become a movie star. A third purpose is to entice or seduce other children into participating in like activity.

C. *Admission of Evidence Against Forsythe*

The general rule is that evidence of crimes other than those charged in the information is inadmissible when offered solely to prove the criminal disposition or propensity of the accused. (Evid. Code, § 1101, subd. (a).) ▮ This is because the probative value of such evidence is out-

weighed by its prejudicial effect. (*People* v. *Haston* (1968) 69 Cal.2d 233, 244 [70 Cal.Rptr. 419, 444 P.2d 91].) However, except when it merely shows criminal disposition, sufficiently relevant evidence may be admissible although it includes evidence of the commission of another crime. (*Ibid.*)

Evidence of other crimes must be examined with care and " '[a] closely reasoned analysis' of the pertinent factors must be undertaken before a determination can be made of its admissibility." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 314, fn. omitted [165 Cal.Rptr. 289, 611 P.2d 883].) Such evidence should be received " 'with "extreme caution," and if its connection with the crime charged is not clearly perceived, the doubt should be resolved in favor of the accused.' [Citations.]" (*People* v. *Haston, supra,* 69 Cal.2d at pp. 244-245.)

■ " 'Before permitting the jury to hear evidence of other offenses the court must ascertain that the evidence (a) "tends logically, naturally and by reasonable inference" to prove the issue upon which it is offered; (b) is offered upon an issue which will ultimately prove to be material to the People's case; and (c) is not merely cumulative with respect to other evidence which the People may use to prove the same issue.' [Citation.]" (*People* v. *Perry, supra,* 7 Cal.3d at p. 780.) In other words, the admissibility of an uncharged offense depends on "three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence. [Citations.]" (*People* v. *Thompson, supra,* 27 Cal.3d at p. 315.)

■ To satisfy the materiality requirement, the fact sought to be proved may be either an ultimate fact in the proceeding or an intermediate fact from which an ultimate fact may be presumed or inferred. (*People* v. *Thompson, supra,* 27 Cal.3d at p. 315.) The perpetrator's identity and elements of the charged crimes are ultimate facts, as are elements of certain defenses. (*Id.* at p. 315, fn. 13.) Motive, opportunity, plan, scheme, design, and modus operandi are intermediate facts. (*Id.* at p. 315, fn. 14.) "Evidence of an uncharged offense offered to prove an intermediate fact is not necessarily material. The materiality requirement is satisfied *only* if the intermediate fact tends logically and reasonably to prove an ultimate fact which is in dispute . . . ." (*Ibid.*)

Moreover, the ultimate fact to be proved "must be 'actually in dispute.' [Citation.] If an accused has not 'actually placed that [ultimate fact] in issue,' evidence of uncharged offenses may not be admitted to prove it. [Citations.] The fact that an accused has pleaded not guilty is not sufficient

to place the elements of the crimes charged against him 'in issue.' [Citation.]" (*People* v. *Thompson, supra,* 27 Cal.3d at p. 315, fn. omitted.)

■ Evidence Code section 1101, subdivision (a) does not permit balancing of probative value against prejudicial effect. "The inference of a criminal disposition may not be used to establish any link in the chain of logic connecting the uncharged offense with a material fact. If no theory of relevance can be established without this pitfall, the evidence of the uncharged offense is simply inadmissible." (*People* v. *Thompson, supra,* 27 Cal.3d at p. 317, fn. omitted.) Similarly, evidence of other crimes is not automatically admissible under Evidence Code section 1101, subdivision (b) when offered to prove an intermediate fact other than disposition: it must still satisfy the rules of admissibility codified in Evidence Code sections 210, 350, and 352. (*People* v. *Thompson, supra,* at p. 317, fn. 17.) This is because " '[w]e have . . . reached the conclusion that the risk of convicting the innocent . . . is sufficiently imminent for us to forego the slight marginal gain in punishing the guilty.' [Citation.]" (*Id.* at p. 317, fn. omitted.)

If evidence of other offenses is " 'merely cumulative with respect to other evidence which the People may use to prove the same issue,' it is excluded under a rule of necessity. [Citations.]" (*People* v. *Thompson, supra,* 27 Cal.3d at p. 318.) ■ Moreover, for such evidence to be admissible, under Evidence Code section 352 its probative value must outweigh its prejudicial effect. Since a substantial prejudicial effect is inherent in such evidence, it is admissible only if it has *substantial* probative value. If there is any doubt, the evidence should be excluded. (*People* v. *Thompson, supra,* at p. 318; see also, *People* v. *Tassell* (1984) 36 Cal.3d 77, 88 [201 Cal.Rptr. 567, 679 P.2d 1].)[50]

■ Finally, the admission of other crimes evidence cannot be justified merely by asserting an admissible purpose. Rather, its relevancy must be determined: is the evidence of other offenses *here* offered logically relevant

---

[50]Evidence Code section 1101, subdivision (b) was amended by Statutes 1986, chapter 1432, section 1 to read as follows: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

Section 2 of Statutes 1986, chapter 1432, provides: "It is the intent of the Legislature in enacting this act to clarify the holding in *People* v. *Tassell,* 36 Cal.3d 77, to the extent an inference can be drawn from that holding that evidence of another act is ipso facto inadmissible or irrelevant to the issue of a defendant's reasonable and good faith belief that the victim consented, by rejecting that inference and making it clear that that evidence can be relevant on that issue in a particular case, depending upon the circumstances there present." This clarification of *Tassell* does not affect that case's application to the instant case.

to prove something other than disposition *in this case*? (*People* v. *Thompson, supra*, 27 Cal.3d at p. 319 and fn. 22.)

██ In the instant case, the People offered the Knotts Street evidence to prove Forsythe's identity as a perpetrator of the charged offenses. Since identity of a perpetrator is an ultimate fact, the Knotts Street evidence was offered to prove something other than Forsythe's criminal disposition, and hence was not made automatically inadmissible by Evidence Code section 1101, subdivision (a).

The question, however, is whether Forsythe's identity was actually in issue. If there was no issue of identity, it is immaterial whether the modus operandi of the green house offenses was similar to that of the Knotts Street crimes. Under such circumstances, the "common plan or scheme" rationale for admissibility was merely a euphemism for "disposition" and the other crimes evidence was inadmissible. (*People* v. *Tassell, supra*, 36 Cal.3d at p. 89.)

In his opening statement, Gardiner asserted:

"The evidence will establish that Mr. Wayne Forsythe became acquainted with Colleen Dill Bennett Forsythe in the summer of 1982, and that Mr. Forsythe and his present wife, Colleen Forsythe were married later that year and lived in the southern California area.

"The evidence will establish that Wayne Forsythe had very little contact with these children, notably, Johnny [M.] who will be the principal witness against him, and in fact, probably saw the children no more than a couple of times. Because he did not spend any extensive period of time at this so-called green house. About his major involvement, the evidence will establish, is that he assisted Rick Pitts and his wife when they were packing up and moving back to the middle west. He saw the children on occasion in the yard in the house, of the house in which they were living.

"The evidence will establish that Mr. Wayne Forsythe was not part of any conspiracy, that he was not involved in a child molestation ring, and that the charges against him are unfounded, that is they are based upon untrue testimony.

"One glaring thing that you will notice in the evidence that's produced here in the testimony that you hear is this, if the activities that Johnny [M.] testifies to actually took place, Johnny [M.] would be able to describe certain features about Mr. Forsythe which he, the evidence will show,

cannot describe. The evidence will show when this case is over that Wayne Forsythe is not guilty of the charges that have been brought against him."

As previously noted, Gindes characterized Forsythe's defense as being one of misidentification. Defense counsel characterized it as being that no crimes occurred.

When the defense is that the victim mistook the defendant for another person, identity is clearly placed in issue. Where, however, the defendant claims that the crime did not occur, it has been held that identity is *not* actually in dispute. (See *People* v. *Gordon* (1985) 165 Cal.App.3d 839, 846-848, 860 [212 Cal.Rptr. 174].) The import of Gardiner's opening statement is that Forsythe's defense was that the molestations did not occur.

This court has previously stated that where a defendant does not indicate he will *not* raise a misidentification issue, the prosecution may produce other crimes evidence in its case-in-chief because it has the burden of proving all elements of the charged offense, including the identity of the perpetrator thereof. (*People* v. *Willoughby, supra*, 164 Cal.App.3d at pp. 1064-1065.)

We first note that this statement was in the form of an advisory opinion for the guidance of the trial court in the event of retrial following remand, and, as such, was not necessary to the decision and merely dictum. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 783, pp. 753-755.) Secondly, in *People* v. *Willoughby, supra*, 164 Cal.App.3d at page 1064, this court also stated in the course of the advisory portion of the opinion: "Appellant's not guilty plea places the burden on the prosecution to prove his guilt of the charged crime beyond a reasonable doubt. This obviously includes proof of appellant's identity as the perpetrator of the charged crime." In the instant case, quite understandably, both Gindes and the trial court interpreted this as meaning that when a defendant pleads not guilty, he places his identity in dispute. Given the California Supreme Court's reasoning in *People* v. *Thompson, supra*, 27 Cal.3d at page 315 ["The fact that an accused has pleaded not guilty is not sufficient to place the elements of the crimes charged against him 'in issue'"], this is an overly broad reading of *Willoughby*. If a defendant's identity were always "actually in dispute" because of a not guilty plea, other crimes evidence would always be admissible at least under Evidence Code section 1101, subdivision (b), assuming there were sufficiently distinctive marks of similarity between the charged and uncharged offenses. The exception would essentially swallow the rule. However, as we noted in *Willoughby*: "We recognize there are sex cases which hold that a defendant's identity is not 'in issue' in the prosecution's case-in-chief where the victim is personally acquainted with the defendant, such as

where the accused is the victim's parent or teacher. [Citations.] However, in these cases, unlike the present case, 'the focus . . . of [the] case is likely to be on whether the alleged crime was ever committed' [citation] rather than on the question whether the defendant did it. In the present case, because the evidence is uncontradicted that [K.] had been repeatedly molested, the only real issue for the jury to decide was whether appellant was the one who did it." (*People* v. *Willoughby, supra,* 164 Cal.App.3d at p. 1065, fn. 3.)

In *Willoughby,* there was uncontradicted testimony by physicians of physical findings establishing that the child victim "had been repeatedly sodomized and had been subjected to repeated vaginal intercourse." (*People* v. *Willoughby, supra,* 164 Cal.App.3d at p. 1060.)

In the instant case, Forsythe was acquainted with all of the alleged victims and in fact lived with two of them (Windy and Amanda) off and on. Although Dr. Woodling testified that Carol and Lisa had been molested, this evidence was not uncontradicted since those children themselves testified otherwise. Nor was there uncontradicted evidence that any of the other alleged victims had been molested. When Gardiner's opening statement is considered in conjunction with these circumstances, it is clear that Forsythe's "identity" was not actually in dispute. The real issue was not whether Forsythe was, in fact, one of the persons identified by the children as perpetrators of the acts of molestation, but whether the acts of molestation as described by the children ever happened. No claim of misidentification was raised by Gardiner's opening statement on behalf of Forsythe, nor later by Forsythe's testimony. Stated another way, if the jurors believed the testimony of the children and found that the acts of molestation as described by them actually happened, there was no reasonable basis under the evidence for the jury to find that defendant Wayne Forsythe was not the Wayne Forsythe identified by the children as being one of the perpetrators.

Since Forsythe's identity as one of the perpetrators was not actually in dispute, the Knotts Street evidence was inadmissible (see *People* v. *Thompson, supra,* 27 Cal.3d at p. 315; *People* v. *Tassell, supra,* 36 Cal.3d at pp. 88-89); moreover, because of its overwhelming prejudicial nature, reversal is required.

Having concluded that Forsythe's identity was not actually in dispute, we need not address the question of whether the Knotts Street evidence was admissible pursuant to Evidence Code section 1101, subdivision (b), as showing a modus operandi from which identity could reasonably be inferred.

### D. *Admission of Evidence Against Other Defendants*

 Although a prior act need not be a crime to be admissible under Evidence Code section 1101 (*People* v. *Wills-Watkins* (1979) 99 Cal.App.3d 451, 456, fn. 1 [160 Cal Rptr. 289]), such evidence is not admissible solely to corroborate or bolster a witness's credibility (*People* v. *Key* (1984) 153 Cal.App.3d 888, 894 [203 Cal.Rptr. 144]; see *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1207, fn. 7) [249 Cal.Rptr. 71, 756 P.2d 795].

 Gindes argued that the area 1 evidence did not depend on Evidence Code section 1101 for admissibility, but instead was relevant to show that one of the conspirators ended up with the equipment used in the commission of the charged offenses. Assuming this argument would be valid in some situations, it is not valid here nor was the area 1 evidence otherwise independently admissible: the equipment used in the Knotts Street acts was simply not sufficiently shown to be the equipment used in the green house.

The green house children gave enormously varied descriptions of the equipment involved. According to Christine, there was a movie camera on a stand and more than one bright light. There was or was not (depending on which version of her testimony is considered) a wire or cord touching the camera. There was also a smaller camera that pictures came out of. The larger camera was on a stand when not in use. There was no camera which involved the placement of a hood over the operator's head. The lights each had one bulb with a round thing like a salad bowl. Each was on a pole, and neither had wheels.

Tommy testified to big, round lights on two little stands. They were bright. There was also a video camera with wires coming out of it. It was on a stand. There was also a camera that pictures came out of. One camera had a black thing that went over the operator's head. The operator would have a little squeezer in his hand. There were wheels on the camera's legs. On one occasion, the camera with wires was not present, but one without wires was.

According to Amanda, the camera was big. There were three lights which were not on stands.

Windy testified that on one occasion, there were three cameras present. One had a strap on it that could go around the user's neck. Another had a stand. The third had a strap that could go around the user's hand. The camera with the neck strap ejected a picture when a button was pushed. The camera on the stand had wires around it. The third camera was small. There were also three bright lights on tables. The camera stand had four

legs and wires going up to the camera and back down. There was nothing covering its operator, like a hood.

Brian testified to a big camera and a small one. According to one portion of his testimony, there were two lights on the big camera. They were not on anything else. They were bright. This camera was on a stand with three legs and stood about four feet high. There were wires on the camera which hooked onto the light. The light was big and long, and the camera was not taken off of its legs during use. According to a different portion of testimony, the bright lights were on their own stand, which consisted of a long pole with a square bottom. The pole was round. Pictures came out of the small camera right away. One light was on the big camera and one was on the little camera. On one occasion, Brian saw a camera with a black hood. The operator would have his face under the hood while taking pictures.

Johnny described a camera that was on a stand. The operator could look through it, aim it at people, and film them. The stand had four wheels on the bottom, was about as big as a refrigerator, and had three floors. It was square. The camera could be set on it and pushed around, or the camera could be held. The camera had cords coming out of it that were connected to a box in the same room as the camera. There was also a smaller camera that took snapshots and was not on a stand. Johnny never saw pictures come out of the small camera. There were also two or three lights which were different from ordinary lights. Each was on a stand and had a handle where they could be pushed around. The stands were the same as for the camera and had wheels. The lights did not change the room's temperature, although all three were on at the same time.

Some of these descriptions fit Idolina's and/or Bobby's descriptions, and some did not. In any event, all of the witnesses described standard photographic equipment. None of the equipment was distinctive enough to permit a reasonable inference that the same equipment was used in both instances, especially given the fact that all of the defendants except Forsythe were in jail at the time of the alleged Knotts Street occurrences, and over a year had elapsed between those occurrences and what went on at the green house.

Even the descriptions of the board, the most unique piece of equipment used, diverged wildly. As noted, Bobby described a brown board with sticks and nails and three or six white ropes. Christine never saw the board used, but saw a rope on it. The handcuffs were on a nail in the wall, not on the board itself. Tommy described the board as being long with black straps connected to it. According to Amanda, there were handcuffs on the board and children were hung up. The handcuffs were nailed to the board. The

board had one piece of rope on it and one strap, which was white. Brian said the board and ropes were black, red, and yellow. The board was approximately three feet by three feet. The children would be tied to it with one rope on their arms, one on the middle of their bodies, and one on their legs. At one point, Brian testified that all three of the ropes were black, and at least one was tied to the board as opposed to being nailed to it. There were no straps on the board. Johnny described the board as being brown and about six feet long by three feet wide. There were straps attached to it and little metal handles to hold the straps down. There were about five straps, which Johnny thought were red. Later in his testimony, Johnny described the straps as being made of cloth. Some were all red and some were all blue. They were tied to the board, not nailed.

Under these circumstances, the area 1 evidence was irrelevant as to all defendants, including Forsythe.

There remains the question of prejudice, which is analyzed under the standard of *People* v. *Watson, supra*, 46 Cal.2d at page 836. The area 1 evidence, considered alone, was prejudicial because it permitted the jury to infer conspiracy, and bolstered the credibility of the green house children, although the evidence was inadmissible for those purposes.

More importantly, the jury also heard the area 2 evidence. Granted, the jury was admonished that said evidence was only to be considered as to Forsythe. ▆▆ Where the jury is instructed that evidence is admitted only as to certain counts or defendants, it is ordinarily presumed the jury followed that instruction. However, that is not always the case. (*People* v. *Foote* (1957) 48 Cal.2d 20, 23-24 [306 P.2d 803].) ▆▆ The reality of the overwhelming prejudicial effect of the evidence as to each defendant in the instant case is that, assuming the jury accepted the testimony of Idolina Lopez and Bobby R., they would conclude that Forsythe committed the Knotts Street molestations; if Forsythe committed the Knotts Street molestations, he was also guilty of the green house molestations; if he was guilty of the green house molestations, the green house children were telling the truth regarding Forsythe; if they were telling the truth regarding Forsythe, it follows they were telling the truth regarding everyone else. Under such circumstances, the limiting instruction was inherently insufficient, and there was no way the jury could, in actuality, consider the area 2 evidence only as to Forsythe. This precise argument was made to the trial court prior to admission of Idolina's testimony. Inexplicably, the court found it "premature."

The problems with the limiting instruction were compounded by Vendrasco's opening argument. At one point, Vendrasco was pointing out evi-

dence that corroborated the victims. Point 14 on his list was the testimony of Idolina Lopez. Although he reiterated that the evidence could only be used against Forsythe, Vendrasco described the acts to which Idolina testified and argued that they were very similar to what the green house children said: "The orgies were also committed in a very small room as Idol[i]na described the size of the room similar to Rick and Tutti's room. Very similar to our case. And the people that weren't engaged in molesting were watching this same sort of thing that all the kids said happened in our case . . . ."

Later, Vendrasco showed the jury a chart which referred to the informations filed against all defendants but Forsythe. The chart contained the reporters' transcript page numbers for testimony regarding each count and showed the People's election as to each. Count 14 was a child pornography charge. According to Vendrasco, proof of count 14 was made by Johnny's testimony the acts were filmed and photographed, his testimony regarding the tape having a voice-over, Tyler's testimony, Linda Moten's testimony regarding statements made by Colleen, and Idolina's testimony that Forsythe told Stephanie and Melvin they were going to make good money with the pictures. Although Idolina's testimony about the statements was in evidence, it was area 2 evidence that was only to be considered against Forsythe. Yet Vendrasco argued it as proof of a charge made against all other defendants.

As to count 23, another child pornography charge against all defendants but Forsythe, Vendrasco again argued Forsythe's statements as proof. When Rubin objected, Vendrasco asserted that Idolina's testimony was limited to Forsythe, but objections to her answers regarding the statements were overruled at the time she testified. Gindes noted that her testimony was in fact limited to Forsythe, to which the trial court responded, "That's my understanding. Overruled." Vendrasco then stated, "This information deals with all the defendants but Wayne Forsythe, but Wayne Forsythe was charged with a lot of these same offenses that I'm not going to repeat in his chart. So, it actually deals with him too, a lot of these same charges." The trial court answered, "All right." The jurors had to have been hopelessly confused as to what evidence they could consider against whom. Later standard instructions about evidence admitted for a limited purpose could not have cured the harm.

Accordingly, reversal is required on this issue as to all defendants.

For guidance of the trial court in case of a retrial, we express no opinion as to whether the Knotts Street evidence will be admissible against Forsythe, since we do not know if his identity will actually be placed in dispute.

We likewise express no opinion as to whether the Knotts Street and green house incidents share sufficient marks of similarity so as to render the Knotts Street evidence admissible under Evidence Code section 1101, subdivision (b) as modus operandi evidence from which identity could reasonably be inferred (see, e.g., *People* v. *Bean* (1988) 46 Cal.3d 919, 937 [251 Cal.Rptr. 467, 760 P.2d 996], cert. den. ___ U.S. ___ [108 L.Ed.2d 634, 110 S.Ct. 1499]), assuming identity is actually placed in dispute. If the Knotts Street evidence is determined to be admissible against Forsythe, serious consideration should be given to ordering a separate trial for him.

## III.

### ADMISSION OF JAIL STATEMENTS

Defendants object on various grounds to the admission at trial of statements allegedly made by some of the defendants while they were in jail.

A. *Testimony of Laurancia Lopez* (hereinafter referred to as Laurancia, in order to distinguish her from Idolina Lopez)

 Except as otherwise noted, Laurancia's testimony was admitted against all defendants over timely defense objection. Defendants contend the trial court erred in admitting this testimony because Laurancia was a police agent and hence defendants' Sixth Amendment right to counsel was violated.

Beginning in October 1984, Laurancia was housed in a protective custody cell in the Kern County jail with a number of women charged with child molestation. Laurancia was housed in protective custody because she had previously informed in a murder case; she was not charged with child molestation. Grace, Colleen, and Tutti were housed in the same cell. Laurancia was released from custody on about December 18, 1984, but was again housed with them on various occasions during February, March, April, and May 1985.

During the end of October or beginning of November, Laurancia overheard an argument between Tutti and Colleen. Tutti told Colleen that if it had not been for Colleen's "stupid old man," meaning Forsythe, they would not be there. Colleen said Rick was just as guilty. Colleen told Tutti that if Rick had not been threatening the kids, none of this would have happened. Tutti said that it was not like Forsythe never threatened the kids, too. After that, Colleen and Tutti did not talk to each other for a few days. Apparently during this same conversation, Colleen told Tutti that Rick was going to kill the kids if they said anything. They mentioned that the kids were both boys

and girls. On another occasion, Tutti said that if it was not for Wayne, they would not be there. Colleen answered that it was Rick's fault for leaving the state. Colleen said something about Tutti and the kids going with Rick.

At one point, Grace told Colleen that they—the authorities—did not have any evidence because when they got to the house, all they took was an old camera. Grace said they did not have any evidence because they had gotten rid of everything already. She said that the camera that was seized was not good because it did not take good pictures. Colleen said nothing in reply. Tutti was present at the time, although she may have been asleep.

At trial, Colleen used her diaries to refresh her memory as to her activities and whereabouts during the time in question. Laurancia heard Colleen say there was nothing in the diary that could say she was molesting the kids, because she was not stupid enough to do that. This testimony was admitted only against Colleen.

Another time, Laurancia walked into the cell and heard Grace tell Colleen that Forsythe had a small dick. Colleen started laughing and said it was just right for her. It is unclear whether this testimony was admitted, as the following colloquy occurred:

"Mr. Rubin: I'm Going to Move to Strike as Being Hearsay. It's Not Inconsistent With Anything That Was Said Here. I Don't Remember Any Questions—

"Mr. Gindes: If Grace Dill Wasn't Observing These Things at the Green House, How Would She Know the Size of Wayne Forsythe's Penis?

"The Court: Well, There Have Been Photographs Here.

"Mr. Rubin: That Is True. There Have Been Photographs Here.

"The Court: Objection Sustained.

"By Mr. Gindes:

"Q How Long Ago Did This Conversation Take Place?

"Mr. Sims: Move to Strike. You Sustained the Objection.

"By Mr. Gindes:

"Q How Long Ago Did This Talk About the Photographs Take Place? How Long Ago, About, Did This Talk About the Size of Wayne Forsythe's Penis Take Place? When Did This Talk Happen?

"A It's Been Quite a Few Months Back. In February.

"Mr. Gindes: I Think That Pretty Much Preceeds [sic] When the Photographs Were Shown.

"Mr. Fusilier: I Didn't Get That. Was It the 7th of February?

"The Court: Sometime in February. It Doesn't Make Any Difference Anyway."

At some point, Laurancia heard Grace talking about Linda Moten in an unfriendly fashion. (Linda Moten was a former cellmate who testified against defendants at trial.) Laurancia's testimony on this point was admitted only against Grace. Grace and "everyone" were calling Moten names because she testified against them. At this time, Grace approached Laurancia and said that if Laurancia could have her bail lowered, they could have it arranged where they could get Laurancia out and they would buy her clothes if she would come to court and be a witness on their behalf. Grace said Laurancia could say she had been there during certain times and had never heard them talk about their case in front of anybody. Grace said she would try to have someone bail Laurancia out of jail.

The following testimony of Laurancia was admitted against Colleen only. Referring to her children, Colleen would always say, "Them little bitches," and call them whores. Colleen referred to her children as bitches quite a few times; Laurancia never heard her say anything good about them. Grace would tell Colleen to be quiet. Colleen also talked about her tattoos. She showed Laurancia one by her private parts and said she had tried to burn it off.

Deputy Patricia McCatheron testified outside the jury's presence on a motion to dismiss or, alternatively, to strike Laurancia's testimony. From October through December 1984, Deputy McCatheron worked on C deck of the Kern County jail. During that time, she came into contact with Laurancia. McCatheron knew Laurancia had testified in a murder trial some five years earlier and that she had given information to narcotics officers on a couple of occasions. The two women were on friendly terms

and talked from time to time outside the cell. McCatheron considered Laurancia as being "kind of like an informant."

At some point, Laurancia told McCatheron she was not happy being celled in the molestation tank, because she was not accused of being a molester and it bothered her when the other inmates talked about their cases. (According to Laurancia, McCatheron came up and asked if she had heard anything.) McCatheron asked if a person in the cell named Teresa Cox had mentioned anything about her case, and Laurancia answered that she had heard Teresa talking to her husband or somebody down below about it. The inmates apparently had an ingenious method of communicating among the different levels of the jail by using the toilets. McCatheron asked if Cox mentioned anything about her child, who McCatheron knew was missing. Authorities were trying to find him because he was supposed to have been a victim of child molestation. Laurancia said no; McCatheron told her to go back to the cell and just keep her ears open. Laurancia said okay and asked if she should ask the inmates questions. McCatheron told her not to, just to keep her ears open and let McCatheron know if anything was said about the child. McCatheron told Laurancia there were some pretty heavy molestation cases in the cell. McCatheron did not indicate to Laurancia that the police would do anything for her if she got the information. Laurancia initially spoke with McCatheron before the argument between Tutti and Colleen and before Grace talked to her about the case.

After Laurancia agreed to keep her ears open, McCatheron did not make any attempt to have her celled elsewhere. It was McCatheron's belief that the people in the cell would talk about their cases. McCatheron did not offer Laurancia money for information or deals on any charges. McCatheron was concerned for the Cox baby's safety and simply told Laurancia to keep her ears open for information regarding him. She did not ask Laurancia to spy on any of the defendants housed in that cell, nor did she ask Laurancia to get information from anyone specifically. All she asked was that Laurancia let her know if she heard anything about the baby. She did not mention the "heavy molestation defendants" in order to convey the message that she was interested in information about them.

Laurancia was removed from the cell in question on June 2, 1985, and placed in a single cell. Only at that time did she contact law enforcement with information regarding the instant case. On June 7, she wrote a letter which was delivered to one of the investigators. On June 12, she accepted a deal whereby she would plead guilty to one charge in return for dismissal of charges involving failure to appear and violation of probation for possession of controlled substances. Part of the agreement was that she would receive

no more than two years in prison, as opposed to the maximum term of three years. There was no agreement that she would testify in any other case.

As of the date of her testimony in the instant case, Laurancia was in custody awaiting sentencing following her guilty plea to grand theft of a firearm. She was also on probation on the narcotics charge, summary probation having been reinstated at the time she entered her guilty plea. She was due to be sentenced the following week. She had not been promised, nor did she expect, help with her case or leniency in return for her testimony. She contacted the district attorney's office and offered to testify "for the kids."

We conclude that the appellants have not shown a violation of their Sixth Amendment rights.[51]

In *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], Massiah and one Colson were charged with narcotics offenses and released on bail. Massiah had retained counsel. Unbeknown to him, Colson decided to cooperate with the authorities. Colson conducted a conversation with Massiah which was monitored by federal agents; Massiah's incriminating statements were introduced against him at trial.

In reversing the conviction, the United States Supreme Court held that an accused's Sixth Amendment right to counsel is violated by the use of incriminating statements, deliberately elicited by federal agents after indictment and in absence of counsel. (*Massiah* v. *United States, supra,* 377 U.S. at p. 206 [12 L.Ed.2d at p. 250].)

In *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183], Henry was arrested and indicted for robbery. After his incarceration, a federal agent working on the case contacted inmate Nichols, who had been a paid informant for some time. The agent told Nichols to be alert to any statements made by federal prisoners, but not to initiate conversations with or question Henry regarding the robbery. After Nichols was released

---

[51] The Sixth Amendment to the United States Constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . , and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

Article I, section 15 of the California Constitution provides in part: "The defendant in a criminal cause has the right to a speedy public trial, to compel attendance of witnesses in the defendant's behalf, to have the assistance of counsel for the defendant's defense, to be personally present with counsel, and to be confronted with the witnesses against the defendant . . . ."

from jail, the agent recontacted him and Nichols reported incriminating statements made by Henry. Nichols was paid for the information.

The Supreme Court rejected the government's argument that Henry's statements were voluntary and not the result of affirmative conduct on the agent's part to elicit evidence. It noted that the *Massiah* holding rests squarely on interference with an accused's right to counsel, and that the question before it was whether a government agent deliberately elicited statements from the defendant within the meaning of *Massiah*. (*United States* v. *Henry, supra,* 447 U.S. at p. 270 [65 L.Ed.2d at p. 122].) Three factors were important: (1) Nichols was acting under instructions as a paid informant; (2) Nichols ostensibly was nothing more than Henry's fellow inmate; and (3) Henry was in custody and under indictment at the time he was engaged in conversation by Nichols. (*Ibid.*)

The court found that Nichols used his position to secure incriminating information from Henry when counsel was not present. Moreover, his conduct was attributable to the government: he was a paid informant; the agent was aware he had access to Henry and could engage him in conversation; and Nichols was paid only if he produced useful information. "Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." (*United States* v. *Henry, supra,* 447 U.S. at p. 271 [65 L.Ed.2d at p. 122].) Additionally, in discussions with Nichols, the agent singled Henry out as the inmate in whom he had a special interest. He only instructed Nichols not to question Henry or initiate conversations regarding the robbery; Nichols remained free, under these instructions, "to discharge his task of eliciting the statements in myriad less direct ways." (*Id.* at p. 271, fn. 8 [65 L.Ed.2d at p. 122].) Finally, according to Nichols's own testimony, he was not merely a passive listener. (*Id.* at p. 271 [65 L.Ed.2d at pp. 122-123].) "By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." (*Id.* at p. 274 [65 L.Ed.2d at p. 125], fn. omitted.)

*Henry* did not determine whether the Sixth Amendment is violated where an informant is placed in close proximity to an accused, but makes no effort to stimulate conversations about the crime charged. (*United States* v. *Henry, supra,* 447 U.S. at p. 271, fn. 9 [65 L.Ed.2d at p. 123].) This question was answered in *Kuhlmann* v. *Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 106 S.Ct. 2616], wherein no Sixth Amendment violation was found.

Kuhlmann was arrested on charges of robbery and murder. Lee, who had agreed to listen to Kuhlmann's conversations and report his remarks to a

federal agent, was placed in the cell with him. Lee, who was so housed in order to determine the identities of Kuhlmann's confederates, was instructed not to ask questions, but to "keep his ears open" for the names of other perpetrators. Kuhlmann initiated conversations with Lee in which he made incriminating statements. The trial court held a hearing, following which it expressly found that Lee followed instructions and only listened, and that Kuhlmann's statements were spontaneous and unsolicited. (*Kuhlmann* v. *Wilson, supra,* 477 U.S. at pp. 438-440 [91 L.Ed.2d at pp. 371-372].)

The Supreme Court held that the Sixth Amendment does not forbid admission of an accused's statements made to an informant placed in close proximity but who makes no effort to stimulate conversations regarding the crime charged. (*Kuhlmann* v. *Wilson, supra,* 477 U.S. at p. 456 [91 L.Ed.2d at pp. 382-383].) It distinguished *Henry* on the ground that, in that case, although the informant did not question defendant, he stimulated conversations in order to elicit incriminating information. (*Kuhlmann, supra,* at p. 458 [91 L.Ed.2d at p. 384].) It also distinguished *Maine* v. *Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477], in which the defendant's accomplice agreed to cooperate with authorities and to wear a listening device. In *Moulton,* because of the relationship between the defendant and the informant, the informant's engaging the defendant in active conversation about their upcoming trial was certain to elicit incriminating statements. Accordingly, the informant's participation was the functional equivalent of interrogation. (*Kuhlmann, supra,* at pp. 458-459 [91 L.Ed.2d at pp. 383-384].) The *Kuhlmann* court concluded: "[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since 'the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached,' [citations], a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Id.* at p. 459 [91 L.Ed.2d at p. 384].) Chief Justice Burger, the author of *Henry,* concurred: "There is a vast difference between placing an 'ear' in the suspect's cell and placing a voice in the cell to encourage conversation for the 'ear' to record." (*Id.* at p. 461 [91 L.Ed.2d at p. 386] [conc. opn. of Burger, C. J.].)

Recent California cases are in accord. In *People* v. *Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161], an agent asked deLoach, whom he was transporting to California on an extradition warrant, to contact him if he heard anything regarding any homicides. The agent was unaware that

deLoach had previously been a paid informant. Whitt was housed with deLoach, based on available space in the jail. The two had known each other previously, and Whitt talked about the case. DeLoach reported the conversations to the agent, who told him not to solicit any more information, but that it was okay if he heard more. DeLoach subsequently made further reports, after which agents contacted the district attorney on his behalf. DeLoach never received any promises of leniency and testified at a suppression hearing that Whitt volunteered all statements. (*Id.* at pp. 737-739.)

Although the California Supreme Court found this a close case, it held that the record supported the conclusion the state did not deliberately elicit Whitt's statements to deLoach. (*People* v. *Whitt, supra,* 36 Cal.3d at p. 740.) In so doing, it focused on the state's conduct as a whole, rather than that of the informant. (*Id.* at p. 741.)

"In sum, the critical inquiry is whether the state has created a situation likely to provide it with incriminating statements from an accused. If it has, it may not disclaim responsibility for this information by the simple device of telling an informant to 'listen but don't ask.'" (*People* v. *Whitt, supra,* 36 Cal.3d at p. 742.) The court found it irrelevant to a *Henry* analysis that the informant followed instructions regarding not asking questions and that Whitt's statements were voluntary. (*Ibid.*) It noted that if the police had prior arrangements with deLoach of this sort, their acceptance of the information and agreement to speak to the district attorney might be enough to attribute his activities, after their first meeting with him, to the state. "Under those circumstances, the inference that deLoach expected a quid pro quo and that the police encouraged this expectation would be compelling." (*Id.* at p. 744.) Absent a prior relationship, however, their acceptance of information and agreement to speak to the prosecutor was not enough to establish a Sixth Amendment violation. There was no indication more information would help influence the prosecutor, and the police gave no incentive to obtain information to such an extent that deLoach's conduct was attributable to the state. (*Ibid.*)

In *People* v. *Hovey* (1988) 44 Cal.3d 543 [244 Cal.Rptr. 121, 749 P.2d 776] (cert. den. 488 U.S. 871 [102 L.Ed.2d 157, 109 S.Ct. 188]), Hovey was the prime suspect in a murder case, although he had not been charged with that crime. Hovey was incarcerated and represented by counsel on charges unrelated to the murder. After his arrest, he invoked his right to remain silent. An officer met with Lee, his cellmate. The officer hoped Lee would pass on information but did not instruct him to do so. The officer told Lee he could not direct him to attempt to obtain information, but that if anything important came up, Lee should decide whether or not to report it. Lee

was promised no reward or consideration, although Lee knew informants frequently received protection from assaults by other inmates. Lee informed the officer of statements made by Hovey, and later testified his sole motivation for doing so was "to relieve my mind [of] what I heard." (*Id.* at pp. 557-558.)

In affirming Hovey's conviction, the California Supreme Court found that although Lee was asked to listen and report, he was not directed to initiate conversations. Merely being asked to listen and report did not make him a police agent whose activities violated Hovey's right to counsel and privilege against self-incrimination. (*People* v. *Hovey, supra*, 44 Cal.3d at p. 559.) Unlike Lee, the informant in *Henry* was not a mere passive listener or listening post. (*Hovey, supra*, at p. 559.) Moreover, Lee obtained information regarding an offense for which Hovey had not been charged. *Massiah* and *Henry* apply only to attempts to gather information regarding formal charges, since a defendant has a present right to counsel only as to those charges. Under *Kuhlmann*, in any event, Hovey's volunteered statements were admissible because Lee asked no questions. The statements were not deliberately elicited by a police agent. (*Hovey, supra*, at p. 561; see *People* v. *Williams* (1988) 44 Cal.3d 1127, 1141 [245 Cal.Rptr. 635, 751 P.2d 901], cert. den. 488 U.S. 975 [102 L.Ed.2d 549, 109 S.Ct. 514] ["[A] general policy of encouraging inmates to provide useful information does not transform them into government agents; some specific action 'designed deliberately to elicit incriminating remarks' is required." A mere governmental "listening post" does not violate the Sixth Amendment under *Kuhlmann*].)

In the instant case, McCatheron knew that Laurancia had provided information in the past, but not on this type of case. (See *People* v. *Dominick* (1986) 182 Cal.App.3d 1174 [227 Cal.Rptr. 849].)[52] As far as the evidence showed, Laurancia was housed with defendants according to normal housing procedures. Significantly, McCatheron only directed Laurancia to "keep her ears open" regarding a case that had nothing to do with defendants. (See *People* v. *Talamantez* (1985) 169 Cal.App.3d 443 [215 Cal.Rptr.

---

[52] In *Dominick*, Copeland, a jail trusty, had been a narcotics informant in the past. Dominick was placed in his unit, apparently according to normal housing procedures, and a deputy asked Copeland to explain basic jail procedures to Dominick. Approximately one month earlier, Copeland had contacted a district attorney's investigator, who had no connection with defendant's case, and asked about receiving consideration on his sentence if he came across anything. The investigator told him to stay in touch, but did not tell him to seek out information or pay him to act as a listening post in jail. Ultimately, Dominick confessed to Copeland, who offered the information to authorities if certain conditions were met. Eventually, he received money and time off of his sentence. Dominick's conviction was affirmed, there being no evidence Copeland was acting on instructions to deliberately elicit information. Defendant's confession was spontaneous and voluntary. (*People* v. *Dominick, supra*, 182 Cal.App.3d at pp. 1198-1199.)

542].)[53] Also of significance is the fact that Laurancia did not question defendants but merely overheard them talking. In fact, it does not appear she was even part of the incriminating conversations, except insofar as Grace allegedly solicited her as a witness. In ruling Laurancia's testimony to be admissible, the trial court impliedly found that Laurancia was not promised anything in return for her testimony, nor did she expect anyone to ask for leniency in terms of her sentence. Her stated motivation for testifying was her concern about children. Although the truth of her testimony regarding her motives and expectations might be subject to question, the record simply does not show that she deliberately elicited incriminating remarks from defendants, or that the state created a situation likely to provide it with incriminating statements from these defendants. Accordingly, defendants' constitutional rights were not violated by admission of Laurancia's testimony.

## B. *Adoptive Admissions*

Colleen contends the trial court erred by admitting into evidence, as adoptive admissions, several postarrest jail conversations. The first occurred on June 16, 1984, when Grace visited Colleen in jail; it was admitted only against Grace and Colleen. The transcript of the relevant portion of the tape-recorded conversation reads:

"COLLEEN: He could if we get our shit together and quit fightin' all the time.

"GRACE: And Allen [B.] is something else.

"COLLEEN: Why?

"GRACE: He is just trying to cause trouble.

"COLLEEN: For . . . about what?

---

[53] In *Talamantez*, an officer intercepted a letter from inmate Daniels to another inmate regarding a heroin smuggling operation run in jail by defendant. Daniels agreed to provide information and was instructed to obtain information from defendant only regarding the drug operation. As a result of said information, defendant's conversation with a visitor was monitored. During that conversation, defendant made incriminating statements regarding a murder, the details of which he subsequently also told Daniels. His statements to Daniels were not in response to any questions. Daniels received an early release after supplying narcotics information. In holding there was no interference with the relationship between client and counsel, the court noted Daniels did not engage defendant in surreptitious interrogation, informed on a different crime from that for which defendant was in custody, and obtained information from defendant which was not in response to any questions by Daniels. The court noted it was not Daniels's role to act as an informant in the murder case. (*People* v. *Talamantez, supra,* 169 Cal.App.3d at pp. 463-464.)

"GRACE: Telling everybody well there's pictures here and there's pictures there. He's seen 'em. He is really trying to make trouble, Hon, I left word all around. I says, 'Tell him he better keep his mouth shut before he's up there with them. But you know . . . .

"COLLEEN: I wonder why he's trying to start shit like that. He knows better than that.

"GRACE: I know he does, just looking for attention, I think is what it is.

"COLLEEN: Well, you better tell him that uh—

"GRACE: I—

"COLLEEN: He was living with me when all this shit was suppossed [sic] to have taken place. If he don't want his ass drug right up here with us he better shut his goddamn mouth. Cause I'll tell 'em who in the fuck I was living with."

The next conversation, which was admitted only against Forsythe and Colleen, occurred June 25, 1984, when Forsythe visited Colleen in jail. (Colleen states she has no objection to this evidence, since her statements are not adoptive admissions or incriminating.) The transcript of the relevant portion of the tape reads:

"COLLEEN: Hi.

"WAYNE FORSYTHE: Hello[.]

"COLLEEN: I never thought I'd see this day.

"WAYNE FORSYTHE: Oh really. I told you I'd be here.

"COLLEEN: I never thought I'd see the day that we'd be sitting like this though. If anything, I figured you on this side and me on that side."

Colleen also challenges admission of another segment of the same conversation, again admitted only against Forsythe and herself. The transcript of the relevant portion of the tape reads:

"COLLEEN: . . . stay, stay out here till they release me cause they're [—] Pray they gotta drop these charges.

"WAYNE FORSYTHE: They will[.]

"COLLEEN: The fifth. My lawyer said it might go to jury trial though.

"WAYNE FORSYTHE: It might but, they don't have enough evidence to carry it to a jury trial. Cause if they had enough evidence they'd have me too. They'd have everybidy [*sic*]. They arrested three people and that was it. I—

"COLLEEN: Well at first there wasn't, the only thing they had on me is just uh—they said I was just there."

Finally, Colleen challenges admission of Laurancia's testimony that Grace told Colleen there was no evidence because they had gotten rid of everything, to which Colleen did not respond. Since these conversations all occurred after Colleen's arrest and administration of *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) warnings, the argument runs, use of her silence violated her privilege against self-incrimination.

Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." ▉ As stated in *People* v. *Preston* (1973) 9 Cal.3d 308, 313-314 [107 Cal.Rptr. 300, 508 P.2d 300]: "If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt. [Citations.]" ▉ And as further explained recently in *People* v. *Edelbacher* (1989) 47 Cal.3d 983 at page 1011 [254 Cal.Rptr. 586, 766 P.2d 1]: "To warrant admissibility [under Evid. Code, § 1221], it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide. [Citation.]"

▉ In the case at bench, the challenged evidence was admissible under the above authorities. The circumstances do not lend themselves to an inference Colleen was relying on her Fifth Amendment privilege of silence in not responding to the accusatory statements. These were jailhouse

conversations, occurring between fellow inmates or inmate and visitors; they were ostensibly private—members of law enforcement were not immediately present and visibly listening to the conversations; they were not immediately preceded by *Miranda* warnings; they did not occur in an inherently accusatory or interrogative setting; and the record reveals no indication Colleen or anyone else involved suspected they were being tape-recorded or that Laurancia would inform on them.

Here, the jurors were instructed in the language of CALJIC No. 2.71.5 (4th ed. 1979 bound vol.) (adoptive admission—silence, false or evasive reply to accusation). They could reasonably have concluded the challenged testimony constituted adoptive admissions.

Colleen contends, however, that *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] and its progeny place a blanket prohibition on the use of postarrest silence.[54] In Doyle, the use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, was held to violate due process. (*Doyle, supra,* at p. 619 [49 L.Ed.2d at p. 98].) The United States Supreme Court observed: "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." (*Id.* at p. 617 [49 L.Ed.2d at p. 97], fn. omitted.)

In *United States* v. *Hale* (1975) 422 U.S. 171 [45 L.Ed.2d 99, 95 S.Ct. 2133], the Supreme Court found an accused's silence during police interrogation lacked significant probative value, since an arrestee is under no duty to speak and refute an accusation. (*Id.* at pp. 176, 180 [45 L.Ed.2d at pp. 104-105, 106-107].)

"At the time of arrest and during custodial interrogation, innocent and guilty alike—perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision . . . [T]he inherent pressures of in-custody interrogation . . . compound the difficulty of identifying the reason for silence." (*Id.* at p. 177 [45 L.Ed.2d at p. 105], fn. omitted.)

In *People* v. *Free* (1982) 131 Cal.App.3d 155 [182 Cal.Rptr. 259], this court dealt with a situation in which defendant testified at trial that he killed the victim in self-defense. The prosecution then cross-examined him about his flight after the shooting and his failure to contact the authorities. In determining the cross-examination was proper, we noted that the basis of

---

[54] *People* v. *Preston, supra,* 9 Cal.3d 308 concerned prearrest conduct.

*Doyle* was the fundamental unfairness of giving an accused *Miranda* warnings, then commenting on his exercise of the right to remain silent. "By informing [the accused] of his right against self-incrimination, there is an implicit assurance that a decision to remain silent cannot be used against the accused." (*People* v. *Free, supra*, at p. 162.) From an examination of various state and federal cases, we distilled the California rule: "[P]ostarrest silence may not be commented upon if it follows a *Miranda* warning. The same rule may apply if there is no *Miranda* warning in order to foreclose inducement of police to dispense with a *Miranda* advisement . . . . Prearrest silence may be commented upon unless the court finds the silence was an invocation of Fifth Amendment rights. Prearrest silence in circumstances in which there is no inference of a reliance on the right to silence may be used to impeach by way of cross-examination." (*Id.* at p. 165.)

Taken by itself, broad language in the foregoing cases supports Colleen's assertion. However, the factual context cannot be ignored. In both *Doyle* and *Hale*, the defendant was cross-examined regarding his silence, following the receipt of *Miranda* warnings, at the time of his arrest. Similarly, the cases examined in *Free* concern either silence at the time of arrest, or prior to arrest but in the face of an accusation made by a police officer. Likewise, *People* v. *Cockrell* (1965) 63 Cal.2d 659, 669-670 [47 Cal.Rptr. 788, 408 P.2d 116] (cert. den. 389 U.S. 1006 [19 L.Ed.2d 604, 88 S.Ct. 568]), which prohibited drawing an adverse inference from defendant's silence although defendant made no statement indicating he was invoking his privilege against self-incrimination, concerned a situation in which a coconspirator made an accusatory statement in defendant's presence at the police station. Similarly, *People* v. *Gaines* (1980) 103 Cal.App.3d 89 [162 Cal.Rptr. 827], disapproved on other grounds in *People* v. *Nelums* (1982) 31 Cal.3d 355, 360 [182 Cal.Rptr. 515, 644 P.2d 201], found constitutional error where the prosecutor cross-examined defendant about his silence upon arrest. Although it was assumed *Miranda* warnings had not yet been given, the improper questioning concerned whether defendant told his story to the arresting officers. (*People* v. *Gaines, supra*, at pp. 91-92.) Under those circumstances, the court found no authority that the evidentiary use of postarrest silent was constitutionally permissible, nor could it say the circumstances did not lend themselves to an inference that defendant was relying on his Fifth Amendment right of silence. (*Id.* at p. 96.)

A criminal defendant's silence in the face of a police officer's accusation is distinguishable from such silence in the face of a nonpolice officer's hearsay accusation. The former is more reasonably due to exercise of the privilege against self-incrimination than belief in the truth of the accusation. (*People* v. *Pic'l* (1981) 114 Cal.App.3d 824, 859, fn. 8 [171 Cal.Rptr. 106]; reversed on other grounds in *People* v. *Pic'l* (1982) 31 Cal.3d 731 [183 Cal.Rptr. 685,

646 P.2d 847]; disapproved on other grounds in *People* v. *Kimble* (1988) 44 Cal.3d 480, 498 [244 Cal.Rptr. 148, 749 P.2d 803].) Thus, " '[a] typical example of an adoptive admission is the accusatory statement to a criminal defendant made by a person *other* than a police officer, and defendant's conduct of silence, or his words or equivocal and evasive replies in response. With knowledge of the accusation, the defendant's conduct of silence or his words in the nature of evasive or equivocal replies lead reasonably to the inference that he believes the accusatory statement to be true.' [Citation.]" (*People* v. *Silva* (1988) 45 Cal.3d 604, 623-624 [247 Cal.Rptr. 573, 754 P.2d 1070], cert. den. 488 U.S. 1019 [102 L.Ed.2d 809, 109 S.Ct. 820].)

Accordingly, we conclude that neither *Doyle* nor the other cases relied upon by Colleen constitute authority for excluding adoptive admissions under the circumstances present here.

### C. *Aranda*

 Defendants contend certain testimony should have been ruled inadmissible, or severance motions granted, pursuant to *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. For the most part, their claims center around the testimony of Linda Moten, although they also challenge admission of certain jail conversations and part of Laurancia's testimony. Respondent addresses the issue only in passing.

Linda Moten was arrested on January 14, 1985, and charged with various sex offenses.[55] She was placed in protective custody, where two or three days later she came into contact with Colleen. Moten testified she heard Colleen say she would do anything to get out of jail and would lie or have anybody lie for her. Colleen admitted selling cocaine and marijuana in front of her kids. She further stated it was her business what "they" did to her kids, not the police's. Colleen said she had some evidence she had to get rid of before the cops or anybody could get hold of it. Colleen said it was pictures, which she had to burn. She threatened to kill Moten if Moten ever told anybody what she said. Colleen also threatened another lady who had some charges pending and was set to testify against defendants. According to Moten, "They said they would kill her and they would have to get rid of her."

Moten testified that Colleen also talked about putting cocaine in the little girls' vaginas and on the little boys' penises. This was done to her sister's kids, "then they sucked it off." Colleen said she did it "when they had sex acts." She said when she had sex acts with her children, "they" took pic-

---

[55] The trial court took judicial notice of the information in case No. 18706, People v. Linda Moten, and informed the jury that she was charged with 12 counts of child molestation.

tures and sold them to a guy in Los Angeles for drugs and stuff. The pictures were of children and sex acts and orgies. Colleen was saying this to Teresa Cox.[56]

Outside the jury's presence, prior to Moten's testimony, Vendrasco announced the evidence was only relevant to Colleen.[57] The following colloquy occurred:

"MR. LORENZ: I'M GOING TO MOVE THAT THE COURT GIVE SOME SPECIAL ADMONITION THAT THIS EVIDENCE IS ONLY INTRODUCED AGAINST COLLEEN BENNETT. AND I ALSO GATHER THE WITNESS IS NOT GOING TO BE TESTIFYING THAT COLLEEN BENNETT TOLD ME THAT SHE CONSPIRED WITH RICK AND TUTTI AND X NUMBER OF OTHER DEFENDANTS.

"THE COURT: IS THAT CORRECT, MR. VENDRASCO?

"MR. VENDRASCO: THAT IS CORRECT. I'M NOT GOING TO ELICIT ANY ARANDA TYPE STATEMENTS WHERE SHE IS SAYING WHAT ANOTHER PERSON SAID, THAT SHE AND SOMEBODY ELSE DID."

Rubin contended that the evidence would be highly prejudicial to Rick, while not being probative. He also argued that an admonition would be insufficient. Accordingly, he moved for severance. All defense counsel joined except Eyherabide. The motion was denied.

Laurancia's testimony is set forth, *ante*. Prior to calling her in rebuttal, Gindes requested and was granted permission to recall Tutti for further cross-examination regarding admissions allegedly made by her to, or in the presence of, Laurancia. He asserted that by having the declarant defendants testify and deny making the alleged admissions, the other defendants could cross-examine and thus no *Aranda* error would occur. Accordingly, no rights would be violated by admission of Laurancia's testimony against all defendants.[58] Rubin argued this procedure would not cure *Aranda* problems. Subsequently, during Laurancia's testimony, Gindes argued that to limit her testimony to any defendant(s) would violate *Aranda* since limiting

---

[56]Moten acknowledged testifying against Cox in another case. Colleen made the alleged statements about putting cocaine on the children's genitals after a trusty had advised Cox that Moten was giving information to the police. Moten also told the police about statements she allegedly heard Stephanie Jenkins make.

[57]The jury was later admonished that Moten's testimony was only being offered against Colleen, and that it was not to be considered in respect to the other defendants.

[58]During the time in which the alleged admissions were made, Grace, Tutti, and Colleen were housed together. The three male defendants were housed elsewhere in the jail, and Gina was out of custody on bail.

instructions would be insufficient. Everything should be admitted against everyone, he contended, under the exception to the hearsay rule for prior inconsistent statements. The trial court first sustained defense hearsay objections, then reversed its ruling and admitted Laurancia's testimony against everyone. Rubin's motion for severance, which was joined by all defense counsel, was denied.

In *People* v. *Aranda, supra,* 63 Cal.2d 518, codefendant Martinez confessed, implicating Aranda in a robbery. Martinez testified and denied making the confession. The jury was instructed it could only consider Martinez's confession against Martinez. (*Id.* at pp. 522-524.) In reversing Aranda's conviction, the California Supreme Court adopted rules that are not constitutionally compelled but which are "judicially declared rules of practice to implement section 1098." (*Id.* at p. 530, fn. omitted.) It stated: "When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible." (*Id.* at pp. 530-531, fn. omitted.)

In *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], a witness testified to codefendant Evans's confession that he and defendant committed a robbery. Evans did not testify. The jury was instructed it could only consider the confession against Evans. Because of the substantial risk the jury, despite instructions, considered Evans's confession against defendant, the Supreme Court held that admission of said confession at a joint trial violated defendant's Sixth Amendment right of cross-examination. (*Id.* at p. 126 [20 L.Ed.2d at p. 479].) The introduction of Evans's confession added substantial weight to the government's case in a form not subject to cross-examination, since Evans did not take the stand. Therefore, defendant was denied his right of confrontation. (*Id.* at pp. 127-128 [20 L.Ed.2d at pp. 480-481].)

In *Nelson* v. *O'Neil* (1971) 402 U.S. 622 [29 L.Ed.2d 222, 91 S.Ct. 1723], a case arising out of California, defendant and codefendant Runnels offered

the same alibi defense at their joint trial. A police officer testified that Runnels confessed and implicated defendant. Runnels took the stand and denied making the statement or that it was true. The trial court instructed the jury it could only consider the confession against Runnels.

In holding there was no constitutional violation, the Supreme Court noted that Runnels's confession was properly found to be hearsay as to defendant and hence inadmissible under California evidentiary law. (*Nelson* v. *O'Neil, supra*, 402 U.S. at p. 626 [29 L.Ed.2d at pp. 226-227].) It determined that under *Bruton*, a cautionary instruction provides inadequate protection for a defendant where the declarant codefendant does not take the stand, because through the confession, the codefendant becomes a witness against defendant. Defendant must constitutionally have the opportunity to confront such a witness, which he or she cannot do if the codefendant refuses to take the stand. (*Nelson, supra*, at p. 626 [29 L.Ed.2d at p. 626].)

However, where the declarant is present to testify and submit to cross-examination, no confrontation problem exists, despite defendant's absence at the time the codefendant allegedly made the out-of-court statement. (*Nelson* v. *O'Neil, supra*, 402 U.S. at pp. 626-627 [29 L.Ed.2d at pp. 226-227].) "The Constitution as construed in *Bruton*, in other words, is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination." (*Id.* at p. 627 [29 L.Ed.2d at p. 227.) A witness can be cross-examined regarding a statement not affirmed by him. (*Ibid.*) "[W]here a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments." (*Id.* at pp. 629-630 [29 L.Ed.2d at p. 228].)

In *People* v. *Brown* (1978) 79 Cal.App.3d 649 [145 Cal.Rptr. 130], the court recognized that some *Aranda* error is based on constitutional principles, while other is not. It stated: "The People urge that no *Aranda* error is involved in the case at bench since codefendant Rollins became a witness and testified, thus precluding defendant Brown from urging any violation of constitutional due-process or witness-confrontation rights. This view lacks merit as *Aranda* specifically sets forth that the principles adopted 'are to be regarded, not as constitutionally compelled, but as judicially declared rules of practice to implement [Pen. Code] section 1098.' [Citation.]

". . . . . . . . . . . . . . . . . .

"Although, by taking the stand, Rollins precluded the *Aranda* error from constituting a denial to defendant Brown of any constitutional rights protected by the Sixth and Fourteenth Amendments to the United States Constitution, his action did not eliminate the error. Rollins' taking the stand simply changed the standard for determining whether the *Aranda* error is reversible or not. ▆▆ ▆▆▆▆ ▆▆▆▆ In place of the prejudicial-per-se error (*Bruton* v. *United States* [*supra*]), the error must be gauged under the standard of whether it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. [Citations.]" (*People* v. *Brown, supra,* 79 Cal.App.3d at pp. 656-657; see also *People* v. *Atkins* (1975) 53 Cal.App.3d 348, 356-357 [125 Cal.Rptr. 855].)[59]

▆▆▆ In the case at bench, the trial court did not follow the requirements of *Aranda*. However, defendants' constitutional rights were not violated by admission of the various statements, since the declarants subjected themselves to cross-examination. In the case of Moten's testimony, moreover, as in *Nelson* v. *O'Neil, supra,* 402 U.S. 622, the jury was admonished it could only consider the evidence against Colleen.

In the event of retrial, defendants will be free to seek severance or the exclusion of certain testimony on *Aranda* grounds. The People will be at liberty to argue in response that *Aranda* failed to survive Proposition 8 except to the extent it is constitutionally based. (See *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1010 [248 Cal.Rptr. 568, 755 P.2d 1017], cert. den. 488 U.S. 1050 [102 L.Ed.2d 1006, 109 S.Ct. 883]; *People* v. *Jacobs* (1987) 195 Cal.App.3d 1636, 1649-1650 [241 Cal.Rptr. 550].) Assuming the trial court determines *Aranda* does not *compel* severance or the exclusion of evidence, it should still consider the severance question in light of the factors set forth in *People* v. *Massie* (1967) 66 Cal.2d 899, 916-917 [59 Cal.Rptr. 733, 428 P.2d 869].

▆▆▆ A separate but related question remains regarding which defendants Laurancia's testimony was admissible against, aside from *Aranda* concerns. Gindes relied heavily on *Nelson* v. *O'Neil, supra,* 402 U.S. 622 in arguing for admissibility against all defendants. However, *O'Neil* does not expressly support a blanket policy of admissibility. As noted, in *O'Neil* the trial court properly gave a limiting instruction and did *not* admit Runnels's confession against the nondeclarant defendant, it being hearsay as to him.

---

[59] *Aranda-Bruton* error is now judged under the "harmless beyond a reasonable doubt" standard of *Chapman* v. *California, supra,* 386 U.S. at page 24 [17 L.Ed.2d at p. 711]. Such error is harmless where properly admitted evidence is overwhelming and the evidence proved by the incriminating extrajudicial statement is cumulative of other direct evidence presented through eyewitness testimony or defendant's own mouth. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1128-1129 [240 Cal.Rptr. 585, 742 P.2d 1306].)

In *O'Neil,* the confession fell within none of the recognized hearsay objections with regard to defendant. In the case at bench, however, Laurancia took the stand and testified *after* Colleen, Grace, and Tutti had all denied participating in molestations or making various incriminating statements. As to them, Laurancia's testimony was properly admitted as prior inconsistent statements pursuant to Evidence Code section 1235.[60]

Pursuant to *People* v. *Becerra* (1987) 188 Cal.App.3d 772, 777 [233 Cal.Rptr. 679], Laurancia's testimony was also properly admitted against the nondeclarant defendants. In *Becerra,* codefendant Gutierrez made a postarrest statement which implicated defendant. Citing *Nelson* v. *O'Neil, supra,* 402 U.S. at pages 629-630 [29 L.Ed.2d at p. 228]; *People* v. *Steger* (1976) 16 Cal.3d 539, 551 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; and *In re Rosoto* (1974) 10 Cal.3d 939, 952 [112 Cal.Rptr. 641, 519 P.2d 1065, 69 A.L.R.3d 980] (cert. den. 419 U.S. 897 [42 L.Ed.2d 141, 95 S.Ct. 177]), the court stated: "Since Gutierrez testified favorably to Becerra at trial, denied making the incriminating out-of-court statement, and was available for cross-examination, Gutierrez's postarrest statement was fully admissible as a prior inconsistent statement, against Becerra as well as against Gutierrez."

We therefore conclude that Laurancia's testimony was properly admitted against everyone. In *People* v. *Jenkins* (1973) 34 Cal.App.3d 893, 896 [110 Cal.Rptr. 465], convictions were affirmed where Jenkins, Mayer, and Givens were all originally codefendants in a robbery prosecution. Givens was subsequently allowed to plead guilty with the understanding that he would testify against Jenkins and Mayer. Mayer's pretrial severance motion was denied. At trial, Givens denied having knowledge of, or making statements about, the robbery. Law enforcement witnesses were then permitted to testify that Givens told them he, Jenkins, and Mayer had committed the robbery. The jury was instructed it could consider the prior inconsistent statements for the truth of the matter asserted.

*Jenkins* permitted use of prior inconsistent statements against nondeclarants. The same situation exists in the case at bench. Since all defendants got the benefit of the denials made by Grace, Tutti, and Colleen, any out-of-

---

[60] Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:

"(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or

"(b) The witness has not been excused from giving further testimony in the action."

court statements made by those three which were inconsistent with their denials should also be considered as to the nondeclarant defendants. Under *O'Neil*, there is no constitutional bar to the procedure, because the declarant defendants testified and were subject to cross-examination by the nondeclarant defendants.

## IV.

### ADMISSION OF DR. WOODLING'S TESTIMONY

▮ On March 7, 1985, Dr. Bruce Woodling examined Lisa, then almost eight, and Carol, then twelve. Rick, Colleen, Grace, Dill, Tutti, and Forsythe now contend that the trial court erred by admitting Woodling's testimony, in that use of a colposcope to establish sexual abuse does not meet the *Kelly-Frye*[61] standard of admissibility.

▮ Respondent contends that only Rick and Colleen preserved the *Kelly-Frye* issue for appeal by making proper objections at trial. (See *People* v. *Stanley* (1984) 36 Cal.3d 253, 260-261 [203 Cal.Rptr. 461, 681 P.2d 302].) However, analysis of the issue as to all defendants promotes judicial economy and precludes a subsequent claim that trial counsel was ineffective for failing to object. For the same reasons we consider the issue as to Grace, even though she did not join therein until her reply brief, and points raised for the first time in an appellant's reply brief generally are not considered on appeal. (*People* v. *Jackson* (1981) 121 Cal.App.3d 862, 873 [176 Cal.Rptr. 166].)

Dr. Woodling has examined several hundred children between the ages of five and twelve for sexual abuse who were referred to him by law enforcement agencies, the district attorney's office, or child protective services. He also has a family practice, in which he has examined children with no history of sexual abuse.

To determine whether a female child has been sexually abused, Dr. Woodling first talks to the child and takes a history. Sometimes he employs anatomically correct dolls. He then does a general wellness assessment. Following this, he looks around the outer and inner lips of the vagina, without penetrating the area, to the hymenal area, and carefully inspects the hymen and the posterior fourchette, the zone of tissue that occurs between the end of the vagina and the beginning of the anus. After completing the evaluation, he observes the area around the anus, and in selected cases he

---

[61] (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C.Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145].)

makes an internal examination and looks at the rectum. He also uses a magnifying system called a colposcope, which has a five- to thirty-power magnification capability. He uses the system to again check the external aspect of the female genitals as well as the area around the anus, and sometimes takes photos through the colposcope.

Colposcopy, the use of a colposcope, is basically a way for a physician to get a magnified view of areas of the child's body. Colposcopy has been used in Europe since the early 1960's and has been regularly used in gynecology in the United States since the mid-1960's. Dr. Woodling used colposcopy in medical school and incorporated it into his family practice in 1975, but only began using it for the evaluation of sexual abuse a little over two years before trial. He did so following a publication in Medical Science Law describing a series of 500 patients who were examined in Brazil and the resulting findings.

Colposcopy has been used primarily to study abnormal pap smears and changes that occur in a woman's cervix. Its use in determining whether someone has been sexually traumatized first became accepted in South America and Italy. The technique was developed to observe microtraumas that are not visible to the naked eye. At the time of trial, Dr. Woodling had written an article that would appear in September 1985 in the International Journal of Child Abuse and Neglect, titled *Colposcopy as a New Modality for Evaluating Child Sex Abuse.*

Where someone is forcibly sodomized in a single episode, with no lubricants used, and the person is not regularly sodomized, Dr. Woodling would expect a great deal of local trauma, including abrasions, fissures, and swelling. The anal sphincter might spasm, and internally there might be petechiae (tiny bruises) and evulsions (lacerations) of the mucus membrane. In the person not regularly sodomized, when a penis or other object is directed at the anus, the normal response is for the anal sphincter to tighten and create tremendous resistance. This is not a voluntary reaction.

If a child were sodomized every other weekend over a long period of time, and lubrication were used, the child's normal body responses would change. A series of more than 10 sodomies would lead to an accommodation of the normal reflexive response of tightening the anal sphincter, so that when the entrance of the sphincter is stimulated, the sphincter relaxes sufficiently so that there is an easier introduction of the penis into the anus. Sodomy is thus more easily achieved and there is less trauma, if any. Assuming the use of lubrication and the learning of the relaxation response, the child can then be sodomized without feeling pain or suffering further physical trauma. It is very common in chronic sodomy for a child not to

experience pain after the adaptive mechanism has been in effect. It would not be unusual for a child not to bleed, because of the use of lubricants and the specific attempt on the part of the person doing the sodomy not to cause injury.

In 50 to 70 percent of the cases, a rectal examination of a chronically sodomized child will not reveal evidence of any injury one week after the last sodomy. An examination of a child who has been the victim of chronic sodomy may reveal signs of sodomy; however, the absence of such signs does not indicate that the child has not been sodomized. A child examined a year after the last sodomy could still show signs, such as scarring, at the time of the examination. However, if the only injury were a small bruise or local swelling, evidence of that would not be visible a year later. Even scar tissue may diminish with the passage of time if there is no further sodomy.

In an examination to determine if a child has been chronically sodomized, there are ways to determine if the child has the relaxation reflex, i.e., the ability to relax the anus, upon external stimulation. One is to place a gloved finger on the anus and apply gentle pressure. Another is to stroke the tissue next to the anus with a cotton swab (the wink response). The third is to pull the cheeks of the buttocks apart (the lateral traction test). In each test, if the response is present, there will be a relaxation. If the stimulus, i.e., the sodomy, ceases, the reflex will initially persist unchanged. However, after six to eighteen months, it will no longer be present. Woodling felt that the presence of relaxation reflexes were not 100 percent diagnostic as of the time of trial, because a controlled research study had yet to be done.

If a child is chronically sodomized over a long period of time, then is put in a safe environment for approximately a year and then examined, a normal anus and no wink response would not be inconsistent with a history of chronic sodomy. Fifty to seventy percent of all cases in which force was not involved would result in no findings. However, sometimes children who are exposed to sodomy at a very early age will receive injuries resulting in scars, even with very gentle sodomy. In such cases, there will be small scars and sometimes areas of hypopigmentation. In some cases, where there has been local bleeding into the tissue, there will initially be a swollen mass, then following healing there will develop a tag of tissue, which is referred to as an external tag and is similar to an external hemorrhoid. Such tags are commonly seen in adults but are very uncommon in children.

The most frequent location for a tag of tissue and related scar or fissure in a child who has been regularly sodomized will be in the 6 o'clock position with the child prone. Other injuries can occur anywhere about the anus, because until the child learns the relaxation reflex, a substantial amount of

force is needed for the penis to pass the sphincter muscle. The use of lubricants diminishes the likelihood of injury, and in such cases there may be no findings unless an examination is performed shortly after the sodomy. The other likely point for scarring is the 12 o'clock position. The signs of sodomy are identical for girls and boys.

The most common form of vaginal abuse of girls involving a penis is vulvar coitus. The penis is put into the vaginal area and usually there is an intercourse-like motion on the part of the male, but the penis merely stays within the lips of the labia and does not go all the way into the vagina. A photograph of an act of vulvar coitus would look exactly like one of penetration into the vagina. Vulvar coitus is usually performed because the size of an erect male penis vis-à-vis that of a child's vaginal opening makes penetration without injury very difficult. In addition, a child does not know how to relax the pubococcygeus muscle, which is the muscle that supports the vagina and urethra. It can require a great deal of force to achieve penetration when a pubococcygeal muscle is contracted, even in an adult female.

If lubricants are used, vulvar coitus can be achieved without signs of injury. Subtle signs may be found, however, in many cases, especially when lubricants are not used. There are minor visual injuries in the tissue, which leave scars called synechiae when healed. There may be a minor tearing or micro-transection of the hymen externally without penetration internally, although the act often does not transect or separate the hymen. When lubricants are used, it is common for there to be swelling and redness which persist for two to seven days.

If a child is raped by forcible penetration of the vagina, there is a lot of mutilation of the vagina. However, significant pain is rare in vulvar coitus. Some children will have pain or cuts and transections, especially at the 6 o'clock position in the posterior fourchette. Sixty percent of the time, healing will occur leaving only a small scar. Commonly, a child with an extensive history of chronic molestation involving vulvar coitus will manifest nothing abnormal.

When a penis is put into a young girl, there is a tremendous rush of immediate feeling. Children have the capacity to interpret the intense feeling at the entrance, but not to determine the depth of penetration. Many children who state that they have been penetrated have only experienced vulvar coitus. Many children think they have been vaginally penetrated when in fact entry was through the anus into the rectum.

Injuries in the posterior fourchette are very indicative of sexual abuse. Also significant is a child's transhymenal diameter. In an eight-year-old

child, a seven-millimeter transhymenal diameter would be at the extreme upper limits of normal and could possibly be an abnormal finding. In a child of 12, 12 millimeters is the upper limit of the normal range. A transhymenal diameter over 12 millimeters would be a significantly abnormal finding.

During the examinations of Carol and Lisa, Dr. Woodling spent about an hour separately with each child and pursued his normal methodology in examining them, including the use of colposcopy. First, he attempted to obtain histories from them. Lisa emphatically told Dr. Woodling that nothing had happened to her. On two occasions she spontaneously said, "I can't say anything." Lisa also declined to have her mother present during the examination. Most children Lisa's age request to have their mothers with them. Whereas Lisa had periods of pause and retraction and not giving much of a history other than denial, Carol was very controlled and very precise in what she said. Carol also emphatically denied being sexually molested.

Carol had a large tag at the 12 o'clock (supine) or 6 o'clock (prone) position of her anus, which is the most common spot for rectal penetration injuries. There was also an area of focal scarring. Carol requested that Dr. Woodling not examine her inside the vagina, and he honored this request. The transhymenal diameter was 15 millimeters. Carol could possibly accept full penetration of a normal adult penis without any tearing or injury.

Carol's hymen was rounded and thickened, which is not inconsistent with whole hymenal trauma. There were, however, no transections or cuts through the hymen. The only transections were on the posterior fourchette. Hymenal rounding in a girl Carol's age is abnormal, and occurs when the area has had repeated episodes of injury with swelling in the deposition of connective or scarring tissue beneath the normal outer layers. Carol's hymen lacked the thin, filmy character usually found in children's hymens. Hymens commonly become toughened and rounded by repeated penile pressure around the hymen.

Taking into account the rounded hymen, enlarged transhymenal diameter, and the injury at 6 o'clock, it was Dr. Woodling's impression that there was penile-type injury to the posterior fourchette due to some degree of penile penetration into the vagina. He could not say that it was full depth penetration because the hymen appeared intact without signs of scarring either by visual or colposcopic observation. This is the type of finding Dr. Woodling would see with vulvar coitus and partial vaginal penetration. It would not be inconsistent with full penetration depending on the hymen's degree of elasticity. In Woodling's opinion, a single episode of molestation would not cause this degree of rounding of the hymen or the large

transhymenal diameter. Dr. Woodling also found a teardrop-shaped area of hypopigmentation in the prone 12 o'clock area of Carol's anus, which is consistent with sodomy. The physical findings observed in Carol were inconsistent with her stated history of no trauma to the genital area.

During Dr. Woodling's examination of Lisa, he observed injuries at both the 6 and 12 o'clock positions around her anus that represented themselves as old scars. Anything that was pushed into the anus could have caused the injury. Her transhymenal diameter was seven millimeters. Although Lisa's hymen was not rounded, Dr. Woodling's findings were inconsistent with Lisa's stated history.

Neither Lisa's nor Carol's injuries were recent enough for Dr. Woodling to form an opinion as to when they occurred. However, his findings with regard to Carol were consistent with, and corroborated, a history of her being sodomized or having penises stuck in the area of her vagina approximately every other weekend until about the end of March 1983. His findings regarding Lisa were consistent with anal penetration causing injury during the same time period on every other weekend and could be consistent with noninjurious perivaginal contact. His findings would not be inconsistent with vulvar coitus if lubricants were used.

 "The *Kelly-Frye* test conditions the admissibility of evidence based on a new scientific method of proof on a showing that the technique has been generally accepted as reliable in the scientific community in which it developed. [Citation.] The proponent must establish reliability of method and proper qualifications of the testifying witness. [Citation.] A single witness is insufficient to represent the views of an entire scientific community regarding reliability of the technique. [Citation.] Those techniques are not necessarily limited to manipulation of physical evidence but also include new scientific processes operating on purely psychological evidence. The purpose of the standard is to prevent the jury from being misled by unproven and ultimately unsound scientific methods. [Citations.]" (*People v. Jeff* (1988) 204 Cal.App.3d 309, 330 [251 Cal.Rptr. 135], fn. omitted; see *People v. Kelly, supra,* 17 Cal.3d at p. 30; *People v. Shirley* (1982) 31 Cal.3d 18, 54, fn. 32 [181 Cal.Rptr. 243, 723 P.2d 1354], cert. den. 459 U.S. 860 [74 L.Ed.2d 114, 103 S.Ct. 133].)

 Defendants contend that the trial court erred in summarily overruling the *Kelly-Frye* objection without requiring the prosecutor to establish the admissibility of Dr. Woodling's testimony. Defendants further contend that the testimony was inadmissible since use of a colposcope to establish sexual abuse has not gained general acceptance in the relevant scientific community. (See *People v. Kelly, supra,* 17 Cal.3d at p. 30.)

We reject both contentions. This court recently held that a colposcopic examination was not a new scientific technique subject to the *Kelly-Frye* requirements. (*People* v. *Luna* (1988) 204 Cal.App.3d 726, 734 [250 Cal.Rptr. 878], disapproved on other grounds in *People* v. *Jones* (1990) 51 Cal.3d 34, 60 [270 Cal.Rptr. 611, 792 P.2d 643].) A colposcope is an instrument which allows the doctor to magnify and photograph the area to be examined. (*Luna, supra,* at p. 729, fn. 1.) Microscopes have long been accepted as scientifically reliable, and opinions given by a witness at trial based on his visual examination and observations made with the aid of a colposcope, in addition to the witness's own medical knowledge and observations, are admissible. (*Id.* at p. 733.)

Defendants seek to distinguish *Luna* on the ground that there, the defendant only objected to the use of the colposcope, not to the witness's opinion as to the significance of the perceived injuries. However, our holding in *Luna* was based squarely on the analysis and decision in *People* v. *Mendibles* (1988) 199 Cal.App.3d 1277 [245 Cal.Rptr. 553]. (*People* v. *Luna, supra,* 204 Cal.App.3d at p. 733.)

In *Mendibles,* the defendant challenged the admission of a doctor's opinion that the findings of her physical examination of the victims were consistent with sexual abuse. In forming her opinion, the doctor relied primarily on patterns of scarring, deformities, and other abnormal changes in the victims' hymens. For part of the examination, she used a colposcope. The defendant invoked the *Kelly-Frye* rule and claimed that "all of the foregoing" constituted use of a new scientific technique. (*People* v. *Mendibles, supra,* 199 Cal.App.3d at p. 1292.) The defendant was challenging not only the use of the colposcope, but the doctor's opinions based on the observations made during her examination.

The *Mendibles* court noted that there is a difference between development of a new scientific technique—a novel method of proof—and development of a body of medical knowledge and expertise. (*People* v. *Mendibles, supra,* 199 Cal.App.3d at pp. 1292-1293.) The expression of an expert medical opinion as to the cause of a wound or injury falls outside of the realm of what is subject to the *Kelly-Frye* rule. An expert medical witness is qualified to give an opinion on the cause of a particular injury based on his or her deduction from the appearance of the injury itself. (*Id.* at p. 1293; see also, *People* v. *Bledsoe* (1984) 36 Cal.3d 236, 249 [203 Cal.Rptr. 450, 681 P.2d 291]; *People* v. *McDonald* (1984) 37 Cal.3d 351, 372-373 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]; *In re Amber B.* (1987) 191 Cal.App.3d 682, 686 [236 Cal.Rptr. 623]; accord *Onwan* v. *Commonwealth* (Ky.App. 1987) 728 S.W.2d 536.)

Relying on matters outside the record in this case, defendants contend that these principles are not applicable here because the microphenomena described by Dr. Woodling are not "injuries," but in fact appear in a number of nonabused children. Accordingly, the argument runs, Dr. Woodling did not present a medical opinion on the cause of an injury, but merely gave a novel interpretation of microscopic markings, for which he presented no real foundation. To the extent defendants' argument is founded on matters outside the appellate record, it must be rejected. To the extent that defendants are subtly attacking Dr. Woodling's qualifications to testify as an expert or the trial court's permitting him to testify as such, the argument is meritless.

■ "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates. Whether a person qualifies as an expert in a particular case, however, depends upon the facts of the case and the witness's qualifications. [Citation.] The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion i[s] shown. [Citations.]" (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 357 [233 Cal.Rptr. 368, 729 P.2d 802].)

Defendants have failed to show an abuse of discretion here.

## V.

### EXCLUSION OF POLYGRAPH EVIDENCE

Prior to trial, Tutti, Rick, Colleen, and Grace took and passed polygraph tests. All four subsequently moved for admission into evidence of the results of said examinations as well as the test graphs and expert opinion of the polygrapher. Tutti, Rick, and Colleen further offered to stipulate to take another test, to be administered by a qualified polygrapher chosen by the prosecutor after consultation with defense counsel. They agreed that the graphs, test results, and expert opinion of the polygrapher could be admitted into evidence at trial upon motion of either side, regardless of the test results. Grace offered to submit to a polygraph test as administered by any qualified expert requested by the prosecution. All four defendants contended that polygraph evidence was admissible under the truth-in-evidence section of Proposition 8,[62] and that Evidence Code section 351.1 was unconstitutional.[63] Dill and Forsythe orally joined the motion.

---

[62] Effective June 9, 1982, Proposition 8, an initiative measure approved by the voters, added section 28(d) to article I of the California Constitution. Known as the truth-in-evidence sec-

The prosecution moved to preclude any mention of polygraph tests. It refused to enter into the proposed stipulations, either with regard to admission of the results of the tests already taken, or with regard to further tests, because it believed (1) polygraph examination results are unreliable when the test is taken by a defendant who knows that the results will not be used if they are unfavorable to him; (2) once a defendant has been polygraphed and told he has passed the test, the results of a second test are worthless because the defendant's ability to respond has been affected by the first test; (3) the polygraph lacks substantial scientific validity; (4) there is a great potential for confusing the trier of fact; and (5) the examiner used by defendants was not competent.

The trial court denied defendants' motion to admit the polygraph results, based on Evidence Code section 351.1 and the prosecution's refusal to stipulate. It also granted the People's motion to preclude any mention of polygraph tests or results during trial.

■ On appeal, defendants contend the trial court erred by excluding evidence of the polygraph examinations and results. They argue that Evidence Code section 351.1 unconstitutionally violates ex post facto, compulsory process, due process, separation of powers, and equal protection principles.

In *People* v. *Harris, supra,* 47 Cal.3d 1047, the defendant was tried in 1984 for offenses which occurred in December of 1982. The offenses were thus committed during the "window" period between *Witherspoon* v. *Superior Court* (1982) 133 Cal.App.3d 24 [183 Cal.Rptr. 615], which held that a defendant could seek to establish the admissibility of polygraph results, and the effective date of Evidence Code section 351.1, which was intended by

tion, section 28(d) states: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." Proposition 8 applies to prosecutions for crimes committed on or after its effective date. (*People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].)

[63] Evidence Code section 351.1, which became effective as an urgency measure on July 12, 1983, provides: "(a) Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results. [¶] (b) Nothing in this section is intended to exclude from evidence statements made during a polygraph examination which are otherwise admissible."

the Legislature to overrule *Witherspoon* and create an exception to the truth-in-evidence section of Proposition 8. (Cf. *People* v. *Kegler* (1987) 197 Cal.App.3d 72, 84 [242 Cal.Rptr. 897].)

In *Harris*, the California Supreme Court upheld denial of the defendant's motion to admit into evidence results of his polygraph examination. The court stated:

"[O]n a proper showing defendants must from time to time be permitted to demonstrate that advancement in a scientific technique has enhanced its reliability and acceptance in the scientific community, and to establish that the advances warrant admission of a previously excluded category of scientific evidence. Defendant here made no such preliminary showing, however. The applicable rule in this state, one unaffected by either *Witherspoon* or the adoption of section 28(d), is that the admissibility of evidence based on a new scientific technique is determined under the principles of *Frye* v. *United States* [*supra,*] 293 Fed. 1013, 1014 [citations]. (*People* v. *Kelly, supra*, 17 Cal.3d 24, 30.) Defendant offered only to call the polygraph examiner to establish the manner in which the test was conducted, an offer that was not sufficient to establish the admissibility of the results of the test or the examiner's opinion regarding defendant's veracity. Absent an offer of proof that the polygraph is now accepted in the scientific community as a reliable technique, the evidence was presumptively unreliable and inadmissible. The trial court neither erred in refusing to admit the evidence, nor denied defendant due process by excluding relevant evidence." (*People* v. *Harris, supra*, 47 Cal.3d at pp. 1094-1095, fn. omitted.) In light of this conclusion, the Supreme Court expressly did not consider whether Evidence Code section 351.1 applied to the defendant's trial. (*Id.* at p. 1095, fn. 26.)

In the instant case, defense counsel did not make the requisite offer of proof. Van Meter argued that *McMorris* v. *Israel* (7th Cir. 1981) 643 F.2d 458 (cert. den. 455 U.S. 967 [71 L.Ed.2d 684, 102 S.Ct. 1479]) contained a documented discussion of the scientific validity of the polygraph, and urged the trial court to read the case. He responded to Gindes's concerns about the reliability of defendants' polygraph examiner by implying that a lack of competence had not been shown in other situations in which said examiner was used. Eyherabide commented that he felt polygraph examinations were reliable since large corporations and the Federal Bureau of Investigation used them. Sims stated that Grace passed the test and, if given the opportunity, he believed he could show it was reliable. Rubin expressly stated that defendants were not asking for an evidentiary hearing because of Evidence Code section 351.1.

None of the foregoing constitutes a sufficient offer of proof under *Harris*, nor does the record suggest the trial court precluded the making of such an

offer. The trial court never denied a defense request for an evidentiary hearing; defendants chose not to make such a request. Under these circumstances, the trial court properly excluded any evidence of or reference to polygraph results, and we need not address the constitutionality of Evidence Code section 351.1.

## VI.

### APPOINTMENT OF COUNSEL FOR CHILD VICTIMS

At the end of the first preliminary hearing, Gindes and Ms. Darling were concerned about Christine being traumatized if she had to talk about the case. They decided that Christine needed an attorney to represent her and protect her rights. J. J. Gianquinto was appointed. Judge Bowles subsequently appointed him in superior court to represent Johnny, Tommy, Brian, Amanda, Windy, Carol, Lisa, and Christine. Judge Bowles further ordered that all pleadings, notices, and motions be served on Gianquinto. Insofar as the record shows, the order was obtained ex parte by Gindes based on his own declaration, which stated in part that the children had been identified as victims of violations of section 288, subdivision (b), and that Judge Lund had appointed Gianquinto at the preliminary hearing. The declaration concluded, "Defense counsel have made motions to require the child victims to submit to interviews and physical examinations. [¶] Because of the above, all of said children need counsel to represent them."

The court appointed counsel pursuant to former subdivision (c) of section 288, now subdivision (d) (hereinafter referred to as section 288, subdivision (d)). At all times pertinent, it provided:

"In any arrest or prosecution under this section the peace officer, the district attorney, and the court shall consider the needs of the child victim and shall do whatever is necessary and constitutionally permissible to prevent psychological harm to the child victim." (Minor amendments have since been made which do not affect the case at bench.)

■■■ Defendants contend that appointment of counsel for the minors unconstitutionally interfered with their (defendants') rights to effective assistance of counsel, to prepare a defense, and to compulsory process. They argue that appointment of counsel was beyond the trial court's power, and that in any event, counsel impermissibly blocked access to the children. We conclude that appointment of counsel for minor victims is constitutionally and statutorily permissible, but that proper procedures were not followed in the instant case.

In *Hochheiser* v. *Superior Court* (1984) 161 Cal.App.3d 777 [208 Cal.Rptr. 273], the prosecution sought an order whereby alleged child molestation victims would be permitted to testify via closed-circuit television. Based on testimony by the children's parents regarding behavioral problems exhibited by the children after they testified at the preliminary hearing, the trial court granted the order, relying on its inherent power to control the courtroom and develop new procedures. (*Id.* at pp. 780-783.) The Court of Appeal issued a writ of prohibition. In noting the need for judicial restraint, it found such a far-reaching innovation more appropriately left to the Legislature. (*Id.* at p. 783.)

Defendants rely on *Hochheiser* as supporting their proposition that the trial court in the instant case was without the inherent power to appoint counsel for the minors. However, the *Hochheiser* court was faced with a somewhat different problem. As it noted, a court is " 'not the proper body to create procedural rules that tend to impinge on the traditional and arguably constitutional rights of a criminal defendant' . . . [citation]." (*Hochheiser* v. *Superior Court, supra*, 161 Cal.App.3d at pp. 784-785.) "The closed-circuit television order herein raises significant and complex federal and state constitutional issues, potentially affecting petitioner's fundamental rights to a public trial, confrontation of witnesses against him and due process. [Citations.]" (*Id.* at pp. 785-786, fn. omitted.) As will be discussed, appointment of counsel per se does not present such constitutional questions.

Defendants also rely on the *Hochheiser* court's analysis of section 288, subdivision (d). ■■■ Based on the settled rule that "legislative enactments should not be construed to overthrow long-established principles of law unless such an intention is clearly shown by express declaration or necessary implication" (*Hochheiser* v. *Superior Court, supra*, 161 Cal.App.3d at pp. 791-792), the court examined the legislative history of section 288, subdivision (d) and found no indication that testimony via closed-circuit television was even considered (*id.* at pp. 790-791 and fn. 9). The court concluded: "[T]he Summary of 1981 Crime Legislation Report compiled by the Joint Committee for Revision of the Penal Code merely states that 'S.B. 586 mandates that in any prosecution for child molestation the needs of the child to be protected from further psychological harm during arrest and prosecution be placed on an equal priority with the successful prosecution of the offender.' [Citation.] We construe this language to mandate a philosophical change focusing on the minor's needs. But we cannot read into this statute a legislative mandate for a closed-circuit television procedure or, indeed, any other specific procedure, which so drastically affects the rights of a defendant." (*Id.* at p. 791.)

From the foregoing, defendants reason that appointment of counsel for the minors is not expressly authorized by the terms of the statute; therefore, it is not permitted. Again, however, the *Hochheiser* court was clearly facing a problem of constitutional dimensions. Unlike testimony by closed-circuit television, appointment of counsel for minor victims does not drastically affect the rights of a defendant, unless counsel is permitted to interfere with preparation or presentation of the defense. Accordingly, we conclude that, upon a proper showing and with proper limitations, a trial court may permissibly appoint counsel for alleged child victims pursuant to section 288, subdivision (d).

The procedures used in the instant case were not proper, however. First, there was no showing as to why the motion for appointment of counsel had to proceed ex parte instead of by way of noticed motion. As a policy matter, it would appear prudent to require a noticed hearing. Effective January 1, 1985, California Rules of Court, rule 227.5 provides:

"(a) Unless otherwise ordered or specifically provided by law, all pretrial motions, accompanied by points and authorities, shall be served and filed at least 10 calendar days, all papers opposing the motion at least five calendar days, and all reply papers at least two court days before the time appointed for hearing. Proof of service of the moving papers shall be filed no later than five calendar days before the time appointed for hearing.

"(b) The court may consider the failure without good cause of the moving party to serve and file points and authorities within the time permitted as an admission that the motion is without merit."

California Rules of Court, rule 379 provides that in civil cases: "An application for an order shall not be made ex parte unless it appears by affidavit or declaration (1) that within a reasonable time before the application the party informed the opposing party or the opposing party's attorney when and where the application would be made; or (2) that the party in good faith attempted to inform the opposing party and the opposing party's attorney but was unable to do so, specifying the efforts made to inform them; or (3) that for reasons specified the party should not be required to inform the opposing party or the opposing party's attorney."

Although there is no corresponding provision in the criminal law and motion rules, we can conceive of no good reason why the same requirements should not prevail in criminal cases as well. Defense concerns about access to the children, etc., could be addressed and ground rules for counsel worked out.

More importantly, the showing made here was utterly insufficient. By its own terms, section 288, subdivision (d) requires the trial court to do what is

(1) necessary and (2) constitutionally permissible to (3) prevent psychological harm to the child victim. Gindes's declaration did not show appointment of counsel for the minors to be necessary or even beneficial to prevent psychological harm, or to be constitutionally permissible. "[T]he burden of proof on the issue of invocation of [the procedure] rests with the proponent of the procedure and the showing must be made by competent evidence." (*Hochheiser* v. *Superior Court, supra,* 161 Cal.App.3d at p. 793.) Since each case must be determined on its own facts (*ibid.*), we need not determine what type of showing would be adequate. Presumably, however, it would involve more than the mere fact that defense counsel had filed some motions.

Defendants also complain that appointment of counsel in the instant case was merely a ruse whereby the prosecution was able to block defense access to the children, something it could not do directly. Since this case is being reversed on other grounds, we need not determine the truth of this assertion.[64] However, for the guidance of the trial court and the parties on remand, we note some pertinent legal principles.

A victim is not a party to a criminal action, which "is prosecuted in the name of the people of the State of California, as a party, against the person charged with the offense." (§ 684; *People* v. *Parriera* (1965) 237 Cal.App.2d 275, 282 [46 Cal.Rptr. 835].) Accordingly, counsel appointed for minor victims cannot have the same status, vis-à-vis his ability to control the proceedings, as the prosecutor or defense counsel.

Moreover, "[w]itnesses and potential witnesses belong to neither side to an adversary proceeding. Within constitutional limitations, access to potential witnesses should remain open to all parties in a legal controversy." (*People* v. *Hannon* (1977) 19 Cal.3d 588, 601 [138 Cal.Rptr. 885, 564 P.2d 1203].) Thus, a prosecutor has no right to instruct witnesses not to talk with a defendant or defense counsel. (*Clark* v. *Superior Court* (1961) 190 Cal.App.2d 739, 743 [12 Cal.Rptr. 191].) A defendant, having the right to compulsory process for obtaining witnesses to testify in his behalf, also has the right either personally or by attorney, subject in certain instances to the proper exercise of judicial supervision, to ascertain what their testimony will be. (*Walker* v. *Superior Court* (1957) 155 Cal.App.2d 134, 140 [317 P.2d 130].) This does not mean, of course, that a court has the authority to

---

[64] The record discloses that not a single defense counsel had been permitted to speak to any of the alleged child victims as of the time the child took the witness stand at trial, with the exception that Johnny had been cross-examined at the various preliminary hearings. In addition, although Gindes obtained "consent" to have Lisa and Carol physically examined, he did so without notice to defense counsel and without defense counsel being able to obtain consent from anyone involved for the examination of any of the children.

*compel* a witness to submit to an interview where the witness objects. (*Ibid.*) It simply means a defendant is free to interview a witness where the witness is willing. (*People* v. *Mersino* (1965) 237 Cal.App.2d 265, 269 [46 Cal.Rptr. 821].) Where the witness informs one party of his or her knowledge of a case and refuses to speak to the other party's representative, the remedy is impeachment of the witness's testimony on the basis of bias. (*People* v. *Hannon, supra*, 19 Cal.3d at p. 601.)

 Section 288, subdivision (d) cannot properly be interpreted so as to override a defendant's right to a fair trial or to fully present his or her case. Since the trial court is only empowered by the statute to do what is *constitutionally* necessary to prevent psychological harm, it stands to reason it cannot appoint counsel for the minors who will in essence act as the prosecution's agent, interfering arbitrarily with defense access to those children. While counsel will have ethical obligations toward the children as clients, counsel's role under the statute will be more advisory in nature: for example, he or she may coordinate prosecution and defense contact with the children; advise the children and their guardians on whether they are *required* to submit to physical examinations, interviews, etc., and the consequences at trial (such as impeachment) that are likely to occur if they do not; transmit their wishes to the court in appropriate circumstances—for example, in determining whether to order the children to submit to physical examinations, the trial court may properly consider the potential for psychological harm to the victim (*People* v. *Nokes* (1986) 183 Cal.App.3d 468, 479 [228 Cal.Rptr. 119]); and be present, upon the children's/guardians' request, during any interviews of the children to ensure that neither party becomes abusive or overbearing toward the children. The attorney could also have input in fashioning any of the court's orders, regarding discovery and other such matters, so as to minimize harm to the children. Depending on the circumstances of the case, counsel might also properly be involved in other aspects. He or she could not, however, have the power to veto defense access to the children, requests for discovery, or the like, except as that power is vested in the children/their guardians and conveyed to the court through the attorney.

We recognize the inherent tension between counsel's role under the statute and his or her ethical obligations to clients. Therefore, if a trial court appoints counsel for a child victim pursuant to section 288, subdivision (d), the attorney's role should be carefully spelled out following a full hearing, at which time the prosecution, defense, and proposed counsel should be allowed to participate and provide input. Should there be a situation in which ex parte appointment of counsel is necessary under the statute, a full hearing should follow within a reasonable time.

## VII.

### INSTRUCTIONAL ERROR

Defendants complain that various prejudicial instructional errors occurred. We conclude that although error occurred, in light of the reversal on other grounds, an analysis of prejudice need not be undertaken.

### A. *The Children Touching Children Counts*

This contention affects counts 13, 15, 16, 17, 20, 27, 44, 51, 52, and 53 as to everyone but Forsythe; 57 as to Grace, Dill, and Gina; and 7, 9, 29, and 31 as to Forsythe.

 Defendants contend that reversal is required of the children touching children counts, because there was no evidence to support conviction on an aiding and abetting theory, and special instruction A-19A did not adequately inform the jury of the intent it had to find in order to convict. Respondent counters that the instructions as a whole adequately informed the jury as to intent, and that in any event the instructions provided for conspiracy as an alternate theory of liability. In her reply brief, Colleen states that "the question presented is not one of sufficiency of evidence, but an instructional one." She concedes the evidence was sufficient to convict appellants on these counts under a theory of constructive touching, but argues the jury was not instructed on that theory of guilt.

At the People's request, the trial court gave special instruction A-19A, which stated: "In certain counts of the Information, it is alleged that a violation of Section 288(b) of the Penal Code as I have defined such has been committed, and a specific act is identified wherein the crime is set forth as one in which a child is alleged to have participated in a lewd and lascivious act with another child.

"In order to find a defendant guilty under such circumstances, it must be proved that, one, such defendant aided and abetted the commission of such act. I have previously instructed you on the definition of aiding and abetting. Or, two, a defendant was a member of a conspiracy wherein the lewd and lascivious act was the purpose of said conspiracy, and said act was done in furtherance of said conspiracy, and all of the other requirements that I have previously set forth exist as to the liability of a co-conspirator."

This instruction is at worst wrong, and at best incomplete. In order to be liable under an aiding and abetting theory, a defendant must "act with knowledge of the criminal purpose of the perpetrator *and* with an

intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) For example, if, during one of the orgies described in the instant case, defendant "A" makes Christine touch Johnny's penis, the other defendants can be convicted of violating section 288 on the ground that they aided and abetted "A," and the jury should be so instructed. "A," however, is *not* an aider and abettor (hence he or she cannot be convicted of violating section 288 on an aiding and abetting theory) *unless* one of the children has the requisite specific intent under section 288, i.e., unless one of the children is violating section 288. (See *In re Billie Y.* (1990) 220 Cal.App.3d 127, 130-133 [269 Cal.Rptr. 212].) If one of the children is not violating section 288, there is nothing for "A" to aid and abet. "A's" liability is direct, not vicarious.

 Where, as here, there is no evidence, and the prosecution does not proceed on the theory, that the children had the requisite lewd intent, the jury must be instructed that "A's" liability is as a principal, predicated on the theory of constructive touching (see *People* v. *Meacham* (1984) 152 Cal.App.3d 142 [199 Cal.Rptr. 586]) or use of the child as the innocent agent (instrumentality) by which "A" committed the offense (see *People* v. *Austin* (1980) 111 Cal.App.3d 110 [168 Cal.Rptr. 401]).

*People* v. *Roberts* (1972) 26 Cal.App.3d 385 [103 Cal.Rptr. 25], which was cited as the source of special instruction A-19A, does not hold to the contrary. In *Roberts*, the defendant was charged with aiding and abetting violations of section 288, in that he instructed and encouraged the five alleged victims to engage in sexual activities with each other. On the People's appeal from an order granting a section 995 motion to set aside two counts of the information, the Court of Appeal held that an aider and abettor need not have actual physical contact with the victim. (*Roberts, supra,* at p. 388.)

The court rejected Roberts's contention that since the children were incapable of committing a crime pursuant to section 26,[65] he could not be guilty as a principal "in any crime so committed" under section 31. The court found it "reasonable to assume that the Legislature intended by section 26 to merely relieve the persons listed therein from responsibility for criminal conduct and by section 31 to hold the aider and abettor liable as a principal 'in any crime so committed.'" (*People* v. *Roberts, supra,* 26 Cal.App.3d at p. 388.) The issue of the children's intent under section 288,

---

[65] Section 26 provides in relevant portion: "All persons are capable of committing crimes except those belonging to the following classes:

"One—Children under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness."

or lack thereof, is not addressed, although the concept of relieving one from responsibility for criminal conduct appears to assume one committed a crime in the first place. Moreover, the cases relied on by the *Roberts* court all involve rape or statutory rape, which are general intent crimes. (*People* v. *Griffin* (1988) 46 Cal.3d 1011, 1030 [251 Cal.Rptr. 643, 761 P.2d 103]; *People* v. *Hernandez* (1964) 61 Cal.2d 529 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092].) Under these circumstances, *Roberts* does not stand for the proposition that a defendant can be convicted of aiding and abetting a violation of section 288, regardless of whether one or more of the actors (children touching children) themselves have the knowledge and specific intent required for a violation of that statute.

Respondent contends that, assuming the aiding and abetting theory was incorrect, the jury was properly instructed that it could find defendants liable on a conspiracy theory. This ignores the problem of determining upon which theory the jury based its verdicts. In any event, since the case is being reversed on other grounds, we need not determine whether the error was harmless beyond a reasonable doubt. (Cf. *People* v. *Lee* (1987) 43 Cal.3d 666, 674-675 and fn. 1 [238 Cal.Rptr. 406, 738 P.2d 752]; *People* v. *Macedo* (1989) 213 Cal.App.3d 554, 561-562 [261 Cal.Rptr. 754]; *People* v. *Leffel* (1988) 203 Cal.App.3d 575, 585 [249 Cal.Rptr. 906].) Suffice it to say that, in the event of retrial on the counts involving children touching children, the jury should be instructed on the "innocent agent/instrumentality" and/or "constructive touching" theories of liability, but not on aiding and abetting insofar as the principal is concerned.

### B. *Flight Instruction*

 Defendants contend the trial court erred in instructing the jury in the language of CALJIC No. 2.52 (1979 rev.)(4th ed. bound vol.)[66] (flight after crime), without making various modifications. The jury was instructed: "The flight of a person immediately after he is accused of a crime is not sufficient in itself to establish his guilt, but it's a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.

"In giving this instruction, you must draw no inference that in fact this Court has determined that the flight of a defendant has or has not occurred. Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to such a circumstance, are matters for your determination."

---

[66] All references to CALJIC are to the fourth edition 1979 bound volume except as otherwise indicated.

Specifically, Dill argues that by refusing to expressly limit the instruction's applicability to Forsythe, the trial court erroneously permitted the jury to consider Dill's moving to a different residence as consciousness of guilt. Forsythe, on the other hand, contends the instruction should not have been given regarding him because his identity was in dispute (for this issue, but not for purposes of admission of the Knotts Street evidence), and that in any event the unmodified version wrongfully permitted the jury to consider Cliffy's and Clovette's flight to infer consciousness of guilt on the part of all defendants.

 Flight is relevant because it may demonstrate consciousness of guilt. Evidence of flight has no other probative value. (*People* v. *Hill* (1967) 67 Cal.2d 105, 120 [60 Cal.Rptr. 234, 429 P.2d 586], cert. den. 389 U.S. 1009 [19 L.Ed.2d 607, 88 S.Ct. 572].) "An instruction on flight is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt, and flight requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." (*People* v. *Crandell* (1988) 46 Cal.3d 833, 869 [251 Cal Rptr. 227, 760 P.2d 423], cert. den. 490 U.S. 1037 [104 L.Ed.2d 408, 109 S.Ct. 1936].) A flight instruction should not be given where, for example, the evidence merely shows the defendant was arrested some time after the crime and miles away from the scene, since such evidence, standing alone, does not support an inference of guilt. (*People* v. *Watson* (1977) 75 Cal.App.3d 384, 403 [142 Cal.Rptr. 134].) Moreover, where there is sufficient evidence of flight by some defendants but not others, the flight instruction should be limited accordingly. (*People* v. *Mora* (1956) 139 Cal.App.2d 266, 274 [293 P.2d 522].)

In the case at bench, Gindes cross-examined Dill about where he was living when he learned that Rick and Tutti had been arrested and whether he moved shortly thereafter. Dill admitted that he and Carol Forsythe and her children moved into Carla Joyce's one-bedroom residence around the time of the arrests, but contended he did not recall whether it was before or after he learned of the arrests, and that he did not know he was wanted at the time. He continued to work at D & D Auto Sales.[67]

---

[67]The following colloquy occurred in the jury's presence:
"Q [by Gindes] ISN'T IT TRUE THAT YOU DIDN'T MOVE TO MONTEREY AS CAROL FORSYTHE HAS TESTIFIED UNTIL AFTER YOU FOUND OUT THAT RICK AND TUTTI WERE ARRESTED?
"MR. FUSILIER: I WILL OBJECT. THAT IS IRRELEVANT.
"MR. GINDES: FLIGHT IS AN INDICATION OF GUILT.
"THE COURT: OVERRULED.
"MR. FUSILIER: THERE IS NO FLIGHT HERE.
"THE WITNESS: NO.
"BY MR. GINDES:

In *People* v. *Mora, supra*, 139 Cal.App.2d at page 274, sufficient evidence to support the flight instruction was found as to two defendants who, the day after the offense, failed to return home and spent the night elsewhere after learning the police were asking questions about them. In the instant case, however, leaving aside the implications of Gindes's questions, the only evidence was that Dill changed residences at a certain time and continued to work at his normal place of employment. Under these circumstances, there was no evidence to support the flight instruction as to Dill.

Gindes implicitly admitted as much when, during the instruction conference, he stated there was evidence of flight as to one person, that being Wayne Forsythe. Counsel for Dill requested the flight instruction be modified to indicate its application to Forsythe, but Gardiner objected and the trial court refused the modification.

The trial court found that such a modification might indicate to the jury that the court thought there was evidence of flight on Forsythe's part. However, pursuant to *People* v. *Mora, supra*, 139 Cal.App.2d at page 274, the instruction should have been modified to tell the jury that the mere changing of residences, standing alone, did not constitute evidence of flight.

As far as Cliffy and Clovette are concerned, Ron Darling testified to efforts to coordinate their arrests in Boswell, Oklahoma, with the arrests of Gina, Grace, and Dill. He also testified about a search of their Boswell residence, which turned up an article about this case from a Bakersfield newspaper. In the jury's presence, Vendrasco sought to have the article admitted into evidence on the ground it was relevant to the knowledge of the people at the Boswell residence. Various defense counsel interposed relevancy objections, to which Vendrasco responded that flight of a coconspirator was relevant as to whether there was an admission of guilt. The article was eventually received into evidence. Outside the jury's presence, Gindes subsequently argued that evidence of Oklahoma and the flight of Cliffy and Clovette was not introduced to show a consciousness of guilt, but to show that at least two defendants were involved in preventing the prose-

---

"Q You Moved to Monterey—

"Mr. Fusilier: Just a Moment. A Mere Moving Is Not Flight.

". . . . . . . . . . . . . . . . . . . . .

"Mr. Gindes: If You're a Member of a Conspiracy and Co-conspirators Have Been Arrested and Suddenly You Abandon Your Premises and Move in With Another Person, I Think That the Reasonable Inference Is That That Is Flight.

"Mr. Rubin: The Problem With That Is It Assumes He Is Guilty and He Is Innocent Until Proven Guilty.

"Mr. Gindes: Isn't Flight an Indication of Guilt?

"The Court: Yes. The Objection Is Overruled."

cution from gaining access to Brandy and Bobo, i.e., a suppression of evidence, and also to show why Brandy and Bobo were not witnesses.

Assuming the evidence was properly admitted for those purposes, the jury was never so informed. Under the circumstances, especially given Vendrasco's statements in the jury's presence, the jury could have inferred from the unmodified flight instruction that it could consider Cliffy's and Clovette's conduct as evidencing a consciousness of guilt on the part of all defendants. Accordingly, the instruction should have been modified to exclude consideration of Cliffy's and Clovette's conduct in this regard.

Forsythe is incorrect in his assertion that the instruction should not have been given as to him at all. According to his testimony, he was arrested on October 11, 1984, but had heard rumors about a warrant as early as August. He would not have visited Colleen in jail if he was hiding out, and he stayed in Tehachapi because of a job. However, Fields testified that after his arrest, Forsythe stated he had been lying low.

We have previously held that Forsythe's identity was not in issue[68] and there was substantial evidence of his flight apart from his identification as a perpetrator. (See, e.g., *People* v. *Batey* (1989) 213 Cal.App.3d 582, 585-588 [261 Cal.Rptr. 674]; *People* v. *Rhodes* (1989) 209 Cal.App.3d 1471, 1475-1477 [258 Cal.Rptr. 71].) The existence of alternative explanations for the conduct in question did not affect the propriety of the instruction, but merely went to the weight of the evidence. (*Ibid.*)

## C. *Note-taking Instruction*

Defendants contend the trial court erred in refusing to give Forsythe's requested special instruction "Y," a cautionary instruction regarding note taking: "You have been provided with note pads and pencils so that you may take notes during the course of this trial. [¶] These notes are merely to assist you in the performance of your duties as jurors. You will be allowed to take them with you when you deliberate, but you must remember that the true and accurate record of the evidence has been kept by the stenographic reporter. [¶] If any dispute arises concerning the evidence, you may always request that the reporter read back to you the record of such evidence."

Regardless of whether the court would have had a sua sponte duty to give such an instruction, it erred in failing to give the instruction upon request.

---

[68] At trial, defense counsel contended it was in issue because of the trial court's earlier ruling in admitting the Knotts Street evidence.

(See *People* v. *Harris, supra,* 47 Cal.3d at p. 1096; *People* v. *Ghent, supra,* 43 Cal.3d at p. 758, cert. den. 485 U.S. 929; *People* v. *Leach* (1985) 41 Cal.3d 92, 107 [221 Cal.Rptr. 826, 710 P.2d 893].)

## D. *Defense Instructions*

Defendants contend the trial court erred by refusing to give certain instructions requested by the defense.

### (a) *Assessing Testimony of Children and Defendants*

Defendants requested, and the trial court refused, several instructions regarding the evaluation of children's testimony. CALJIC No. 2.20 (1980 rev.) (4th ed. pocket pt.) (credibility of witnesses) adequately covered most of the requested subjects, although not specifically with a view toward children's testimony. In any event, upon retrial the children will be considerably older than they were at the time of the original trial. Thus, we deem it neither necessary nor fitting to determine what, if any, instructions would be appropriate regarding their testimony. Nor are we faced with the question of what instructions should be given if, for some reason, the children's original trial testimony is admitted into evidence upon retrial.[69]

 The trial court also refused to give several requested instructions regarding the testimony of defendants. However, defendants have failed to show that the instructions given, taken as a whole, failed to adequately inform the jury of how to properly view their testimony.

### (b) *Informers, Drug Addicts, and Immunized Witnesses*

 Defendants requested several instructions aimed at witnesses Idolina Lopez, Linda Moten, and Laurancia Lopez. These instructions generally provided that the testimony of drug addicts, immunized witnesses, informers, and witnesses who agreed to testify in exchange for lenient treatment, was to be examined with greater caution than testimony of a normal witness. Additionally, some defendants requested a modified version of CALJIC No. 17.42 (jury must not consider penalty—noncapital case), which would have instructed the jury not to consider punishment as to defendants, but that it could be considered with regard to any witness who had charges pending at the time he or she testified, or who was on probation. The trial court refused all of these requested instructions.

---

[69] Section 1127f (added by Stats. 1986, ch. 1051, § 3) and CALJIC No. 2.20.1 now cover situations where children under the age of 10 testify.

Although the trial court was under no sua sponte duty to give cautionary instructions regarding the testimony of informers, drug addicts, or immunized witnesses, appropriate instructions should have been given upon request. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 27 [252 Cal.Rptr. 525, 762 P.2d 1249], cert. den. 490 U.S. 1095 [104 L.Ed.2d 998, 109 S.Ct. 2442] [informant]; *People* v. *Leach, supra,* 41 Cal.3d at p. 106 [immunized witnesses]; *People* v. *Harvey* (1984) 163 Cal.App.3d 90, 112 [208 Cal.Rptr. 910] [immunized witnesses].) Defendants have failed to show prejudice, since the testimony in issue was not the sole basis for the convictions (*People* v. *Hovey, supra,* 44 Cal.3d at p. 565, cert. den. 488 U.S. 871 [102 L.Ed.2d 157, 109 S.Ct. 188]; *People* v. *Castro* (1979) 99 Cal.App.3d 191 [160 Cal.Rptr. 156]) and much of the information was covered in CALJIC No. 2.20 (1980 rev.) (4th ed. pocket pt.) (credibility of witnesses). We can assume the error will not be repeated in the event of a retrial. (See § 1127a, added by Stats. 1989, ch. 901, § 1.)

(c) *Reasonable Doubt*

■ Defendants contend the trial court erred in refusing requested instructions on the relationship of certain evidence to reasonable doubt. Grace's special instruction 16 provided:

"If, after examining all of the evidence, you find that you have a reasonable doubt that the acts alleged to have been committed by the defendants could have taken place in the location described by the witness(es), that reasonable doubt may be considered by you as one of the factors relating to the credibility of the witness(es) who testified to the acts occurring at such a location." Grace's special instruction 17 stated: "If, after examining all of the evidence, you find that you have a reasonable doubt that the acts alleged to have been committed by the defendants could have taken place in the location described by the witness(es), that reasonable doubt may form the basis for a verdict of not guilty." Other defendants requested similar instructions. The jury was instructed in the language of CALJIC No. 2.90 (1979 rev.) embodying the language of section 1096. Pursuant to section 1096a, "no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given." Nevertheless, a defendant has the right, upon request, to an instruction "that directs attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered." (*People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847].)

Where the defendant's proposed instruction is repetitious of instructions already given, however, the trial court may properly refuse it. (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1134 [248 Cal.Rptr. 600, 755 P.2d 1049].)

The trial court may also properly refuse to give argumentative instructions, i.e., ones which "invite the jury to draw inferences favorable to the defendant from specified items of evidence on a disputed question of fact . . . ." (*Id.* at p. 1135.) Such inferences belong in counsel's argument to the jury, not in instructions. A proper instruction does not select " 'certain material facts, or those which are deemed to be material, and endeavor[] to force the court to indicate an opinion favorable to the defendant as to the effect of such facts, by incorporating them into instructions containing a correct principle of law.' " (*Ibid.*) In a proper instruction, " '[w]hat is pinpointed is not specific evidence as such, but the *theory* of the defendant's case.' [Citation.]" (*Id.* at p. 1137, italics in original.)

Here, the proposed instructions pinpointed specific evidence, i.e., the number of people allegedly in the room during the molestations, as well as the theory of defendants' cases. By requesting the court to emphasize, albeit subtly, the number of people versus the size of the rooms, defendants in essence attempted to obtain from the court an indication of opinion favorable to them with regard to that fact. The court's refusal of the instructions was proper.

(d) *Failure to Specify Applicability of Instructions*

■ Defendants challenge the trial court's failure to specify to which defendants the jury was to apply CALJIC No. 2.23 (credibility of witness— conviction of a felony), People's special instruction A-6 (attempt to suppress evidence by offer of compensation to witness), People's special instruction A-7 (effort to suppress evidence by third person for defendant's benefit), CALJIC No. 2.52 (1979 rev.) (flight after crime), and CALJIC No. 2.71.5 (adoptive admission—silence, false or evasive reply to accusation). This constituted prejudicial error, the argument runs, because the jury was instructed pursuant to CALJIC No. 1.11 that "[t]he word 'defendant' as used in these instructions, applies equally to each defendant in this case except as you may be otherwise instructed." Therefore, they could have considered evidence of limited admissibility as to all defendants.

The flight instruction has been previously discussed. Had it been properly modified, it would have clearly applied only to Forsythe without prejudicing him by indicating whether he fled. Similarly, the instruction dealing with felony convictions could have only been interpreted as applying to Forsythe, as among the defendants.

With regard to the other challenged instructions, the jury was also instructed to consider the instructions as a whole (CALJIC No. 1.01 (1979 rev.)), and was instructed in the language of CALJIC No. 2.09 (evidence

limited as to purpose), CALJIC No. 2.07 (1979 rev.) (evidence limited to one defendant only), and CALJIC No. 2.08 modified (plaintiff's special instruction A-4; evidence of postarrest statement limited to defendant making statement). These instructions adequately reminded the jury of the limiting admonitions given them when certain evidence was admitted. To the extent limiting admonitions were not timely given, or the prosecutors argued evidence of limited admissibility for a purpose for which, or against a defendant against whom it was not admitted, we may assume the error will not be repeated in the event of a retrial.

### E. *Instructions on Lesser Included Offenses*

■■■ Defendants contend the trial court prejudicially erred by failing to instruct on nonforcible lewd acts (§ 288, subd. (a)) as a lesser included offense of forcible lewd acts (§ 288, subd. (b)). They are incorrect.

■■■ " ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]' (*People v. Sedeno* (1974) 10 Cal.3d 703, 715-716 [citations].)" (*People v. Wickersham* (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d 311].)

■■■ Instructions on lesser included offenses need only be given "if the accused proffers evidence sufficient to 'deserve consideration by the jury, i.e., "evidence from which a jury composed of reasonable men could have concluded" ' that the particular facts underlying the instruction did exist. [Citations.]" (*People v. Wickersham, supra*, 32 Cal.3d at p. 324.) "The trial court is not obligated to instruct *sua sponte* on necessarily included offenses unless the evidence would justify a conviction of such offenses." (*Id.* at p. 325; *People v. Leach, supra*, 41 Cal.3d at p. 106.)

In the instant case, the court and counsel discussed whether the court had a sua sponte duty, under the evidence presented, to instruct on section 288, subdivision (a) as a lesser included offense of section 288, subdivision (b). No defense counsel requested such an instruction, and the court accurately observed that none of them relied on a defense involving the commission of a violation of subdivision (a) as opposed to subdivision (b). Accord-

ingly, the trial court found itself under no sua sponte duty to give the instruction.

The court's ruling was correct, and the failure to give instructions on section 288, subdivision (a) was not error. All defendants denied taking part in any molestations. According to them, either they were misidentified or the crimes never actually occurred. If the People's evidence were believed, they were guilty as charged. If the defendants' evidence were believed, they were not guilty of anything. Under no view of the evidence was any of them guilty of nonforcible molestation pursuant to section 288, subdivision (a). (See *People* v. *Leach, supra*, 41 Cal.3d at p. 106; *People* v. *Lema* (1987) 188 Cal.App.3d 1541, 1545 [234 Cal.Rptr. 173].)

## VIII.

### SUFFICIENCY OF THE EVIDENCE

Defendants contend the evidence is insufficient to support their convictions on various counts. They do not all challenge the same counts. For the sake of fairness and convenience, however, we will treat each as joining in the others' arguments. This approach will not disadvantage either respondent or any individual defendant.

It is settled that the test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*Ibid.*) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) It must not reweigh the evidence (*People* v. *Culver* (1973) 10 Cal.3d 542, 548 [111 Cal.Rptr. 183, 516 P.2d 887]), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367 [157 Cal.Rptr. 769], cert. den. 446 U.S. 934 [64 L.Ed.2d 787, 100 S.Ct. 2150]). Furthermore, an appellate court can only reject evidence accepted by the trier of fact when the evidence is inherently improbable and impossible of belief. (*People* v. *Maxwell* (1979) 94 Cal.App.3d 562, 577 [156 Cal.Rptr. 630].)

## A. *The Child Pornography Counts*

This contention affects counts 14 (Johnny) and 23 (Tommy) as to everyone but Forsythe, and counts 8 (Johnny), 16 (Tommy), 32 (Amanda), 33 (Brandy), 34 (Bobo), and 35 (Windy) as to Forsythe.

 Forsythe contends the evidence was insufficient to sustain convictions for violating section 311.4, subdivision (c), because the "commercial purposes" requirement was shown only by evidence that was wrongfully admitted.

At the time the alleged offenses were committed, section 311.4, subdivision (c) read: "Every person who, with knowledge that a person is a minor under the age of 14 years, or who, while in possession of any facts on the basis of which he or she should reasonably know that the person is a minor under the age of 14 years, knowingly promotes, employs, uses, persuades, induces, or coerces a minor under the age of 14 years, or any parent or guardian of a minor under the age of 14 years under his or her control who knowingly permits the minor, to engage in or assist others to engage in either posing or modeling alone or with others for purposes of preparing a film, photograph, negative, slide, or live performance involving sexual conduct by a minor under the age of 14 years alone or with other persons or animals, for commercial purposes, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."[70]

We conclude that a commercial purpose was sufficiently shown, even leaving aside any evidence of questionable admissibility.

Laurancia Lopez, who was housed with Grace, Colleen, and Tutti, testified to overhearing Grace say they had gotten rid of everything, and the camera that was seized was not good because it did not take good pictures.

Linda Moten, Colleen's cellmate at another time, testified to hearing Colleen say she had burned some pictures that were evidence. According to Moten, Colleen also said they took pictures of children and sex acts and orgies and sold them to a guy in Los Angeles for drugs and stuff. Moten's testimony was admitted only against Colleen.

Toby Tyler testified in detail to equipment commonly used in the production of, and acts commonly seen in, commercial child pornography. His testimony raised the reasonable inference that the pornography allegedly

---

[70] The "commercial purposes" requirement of subdivision (c) was eliminated by Statutes 1984, chapter 1489, section 2, pages 5215-5216.

produced in the instant case was produced at least in part for commercial purposes. The fact that it may have also been produced, and the acts committed, for the personal gratification of the adults involved does not preclude a conviction for violating section 311.4, subdivision (c). Since the children testified that all of the defendants were involved on occasions when filming occurred, the evidence was sufficient as to all defendants.

Furthermore, the evidence was sufficient even without Tyler's testimony. Johnny testified to a voice on the videotape that named the children and said what they were doing. The jurors could reasonably infer that it was unlikely someone making such a film solely for personal use would need to identify the participants, all of whom were either family members or acquaintances. Additionally, the equipment used as testified to by the children, especially the lighting, is fairly sophisticated when compared to that used for ordinary home videos. The amount of material being produced must also be considered, as well as the fact that none of it was found. Evidence was presented that tapes of virtually the same acts and participants were allegedly made every other weekend for approximately 18 months. It could be inferred that rather than being stockpiled for personal use the material was being sold as quickly as it was produced. There was no evidence that anyone involved possessed the equipment needed to copy this material; under such circumstances, it could reasonably be inferred that defendants did not keep master tapes but instead produced new material on a regular basis. Given the foregoing, the jury could have reasonably concluded that the pornography was filmed for commercial purposes. ■■■ "An appellate court must . . . uphold the trial court's disposition if, on the basis of the evidence presented, the jury's determination is reasonable." (*People* v. *Garrison* (1989) 47 Cal.3d 746, 774 [254 Cal.Rptr. 257, 765 P.2d 419].)

### B. *The Urine Drinking Counts*

This contention affects counts 19 (Tommy), 46 (Johnny), and 47 (Brian) as to everyone but Forsythe, and count 12 (Tommy) as to Forsythe.

■■■ Defendants contend that section 288 does not contemplate the drinking of urine; therefore there was insufficient evidence to sustain their convictions for violating section 288, subdivision (b) based on such acts. The argument is two-pronged: urine drinking does not constitute a lewd act, and it does not involve a touching.

At the time of the alleged offenses, section 288 provided in relevant part: "(a) Any person who shall willfully and lewdly commit any lewd or lascivious act including any of the acts constituting other crimes provided for in

Part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such child, shall be guilty of a felony and shall be imprisoned in the state prison for a term of three, six, or eight years.

"(b) Any person who commits an act described in subdivision (a) by use of force, violence, duress, menace, or threat of great bodily harm, shall be guilty of a felony and shall be imprisoned in the state prison for a term of three, six or eight years."

We conclude that under the circumstances of the instant case, sufficient evidence supports the jury's conclusion that forcing the children to drink urine constituted a lewd act within the meaning of the statute.

Webster's Third New International Dictionary (1986) partially defines "lewd" as: "2 a : sexually unchaste or licentious : DISSOLUTE, LASCIVIOUS b : suggestive of or tending to moral looseness : inciting to sensual desire or imagination : INDECENT, OBSCENE, SALACIOUS . . . ."

"Lascivious" is defined as "1 : inclined to lechery : LEWD, LUSTFUL . . . 2 : tending to arouse sexual desire : LIBIDINOUS, SALACIOUS . . . ."

Virtually any act can fit this description, depending upon the intent with which it is done. As stated in *People* v. *Hobbs* (1952) 109 Cal.App.2d 189, 192 [240 P.2d 411]: "Section 288 of the Penal Code was enacted to protect children from the lustful advances and tamperings of callous and unscrupulous persons as well as from the assaults of depraved unfortunates. In all cases arising under this statute the purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done. In *People* v. *Owen*, 68 Cal.App.2d 617, 620 [citation], it is said that 'It is not the accomplishment but the intent of the party that is the basis of the commission of the acts condemned in Penal Code section 288.' If intent of the act, although it may have the outward appearance of innocence, is to arouse, or appeal to, or gratify the lust, the passion or the sexual desire of the *perpetrator* it stands condemned by the statute, or, if it is intended to arouse feelings of passion or sexual desire in the *child*, it likewise stands condemned."

Certainly it cannot be said that forcing a child to drink urine has the outward appearance of innocence.

The question of intent is one of fact, to be determined by the jury " 'except in a case where the facts proven afford no reasonable ground for

an inference as to intent.' " (*People* v. *Pineda* (1940) 41 Cal.App.2d 100, 105 [106 P.2d 25].) Intent is rarely susceptible of direct proof and must usually be inferred from a consideration of all the facts and circumstances shown by the evidence. (*People* v. *Lyles* (1957) 156 Cal.App.2d 482, 486 [319 P.2d 745].) A jury can conclude that defendant had the requisite intent from the circumstances surrounding the incident in question. (*People* v. *Dontanville* (1970) 10 Cal.App.3d 783, 795-796 [89 Cal.Rptr. 172].) "[I]f the evidence is sufficient to justify a reasonable inference that the requisite intent existed, the finding of its presence in a particular case, may not be disturbed on appeal [citations]." (*People* v. *Lyles, supra*, 156 Cal.App.2d at p. 486.)

In the instant case, the prosecution, during Vendrasco's opening argument, elected certain testimony as providing the basis for the counts in question. According to Tommy's testimony, Rick urinated in a bottle. At the time, Tutti was on the bed. Rick stuck the bottle up her vagina, then made Tommy, Johnny and Brian put the bottle in their mouths and drink some of the urine. Forsythe told Tommy he had to do this. All of the adults were in the room when the boys did this. Tommy further testified that all of the adults had their clothes off at the time and were watching the boys and laughing. Forsythe took pictures of this.

Brian testified that he saw Rick urinate in a cup, after which Brian had to drink the urine. Rick said to do it, or he would beat Brian to death. This happened in Rick and Tutti's room; Johnny, Tommy, and Bobo also had to do it. Brian saw both Rick and Tutti urinate in the cup. All the children and adults were present. No one took a picture of Brian doing this; his clothes were on at the time.

Johnny testified that Rick urinated into a bottle and made Johnny drink it. This was on an occasion when Rick forced Johnny to orally copulate him. The group of people were all around watching; Cliffy was taking pictures. Bobo, Windy, Brandy, Tommy, and Brian also had to drink urine on this occasion.

Given the circumstances surrounding the urine drinking, as testified to by the boys, there was sufficient evidence to support the jury's conclusion that the acts were done with a lewd intent. Tommy and Johnny both testified to being forced to commit the act during a period of numerous molestations. Consideration of all the circumstances shows that, while the acts may have been performed to an extent for pornographic purposes, the jury could reasonably conclude they were also performed to arouse, appeal to, or gratify the lust, passions, or sexual desires of the adults, who were standing around watching. Although Brian's testimony is less clear, since

according to him the act was not filmed and he was clothed, the presence of the orgy participants and the indisputable implication that molestations also occurred on this occasion, also indicate the existence of a lewd act. Given the absence of filming, the inference is even stronger that this act was intended to appeal sexually to the adults, as opposed to being merely for purposes of pornography.

A closer question is whether these acts constituted "touchings." "[A] touching is required to commit a felonious section 288 lewd act." (*People* v. *Austin, supra*, 111 Cal.App.3d at p. 113.) Defendants argue that here there was no physical touching between the bodies of themselves and the victims, nor was there a physical touching of the victim's body by the victim. Since the only contact shown was between the victim's mouth and a drinking vessel, the argument runs, there was insufficient evidence to show a violation of section 288. Respondent counters that a touching occurred because the bodily fluid of a coconspirator touched the lips, mouths, and digestive systems of the victims.

It is settled that the private parts of the victim's body need not be touched in order to sustain a section 288 conviction. (See, e.g., *People* v. *Dontanville, supra*, 10 Cal.App.3d at p. 796.) Moreover, where, as here, a defendant is charged as an aider and abettor, he or she need not have physical contact with the victim in order to be guilty of a section 288 charge. (*People* v. *Roberts, supra*, 26 Cal.App.3d at p. 388.)

In *People* v. *Austin, supra*, 111 Cal.App.3d 110, this court upheld a section 288 conviction where the defendant did not touch the victim but had her pull down her own panties. While noting the need for a touching, we observed that the act of removing panties was such that the hands of the one doing the removing came in contact with the body of the child. (*People* v. *Austin, supra*, at pp. 113-114.) In *Austin*, the defendant caused the victim to physically touch her own person, and his intent was inferable from his conduct. (*Id.* at pp. 114-115.) We held that the touching necessary for a section 288 violation may be done by the child victim on his or her own person provided it is done at the instigation of a person who had the required specific intent. (*Austin, supra*, at p. 114.) We noted that at common law, one who caused a crime to be committed by an innocent agent was deemed guilty of the crime as a principal, which rule is contained in section 31.[71] (*Austin, supra*, at p. 114.)

---

[71] Section 31 provides: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, and all persons counseling, advising, or encouraging children under the age of fourteen years, lunatics or idiots, to commit any crime, or who, by fraud, contrivance, or force,

In *People* v. *Meacham, supra*, 152 Cal.App.3d 142, a jury instruction based on *Austin* was approved. Although adopting the holding of *Austin*— that the touching requirement could be satisfied by the child's touching his or her own person at the instigation of one having the requisite specific intent—the Second Appellate District took a different route. Instead of reasoning that the child victim was the innocent agent of the perpetrator, the *Meacham* court found that a child's touching of its own genitalia at defendant's instigation constituted a "constructive touching" by defendant himself. (*People* v. *Meacham, supra*, at pp. 152-153.) The defendant instructed or posed the children in such a manner that their hands were caused to be placed on their own genitalia; these acts were imputable to defendant as if they had actually been done by defendant's own hands. (*Id.* at p. 154.)

 Under these authorities we conclude that compelling a child to drink urine from a cup or bottle is a sufficient "touching" to constitute a violation of section 288. Under the facts at hand, these were lewd acts committed "upon or with" at least the mouths of the children. If a defendant lewdly touched a child with an object rather than with some part of that defendant's body, it would in our view be no less a violation of section 288. Since the requisite touching can be done by the child himself, the presence or absence of an object (here, the cup or bottle) seems to us to be immaterial.

## C. *Conspiracy*

 Grace, with Dill and Gina specifically joining, contends that the conspiracy allegation was improperly pleaded and there was insufficient evidence to support a conviction therefor.

 " 'A conspiracy is an agreement between two or more persons with the specific intent to agree to commit a public offense . . . , and with the further specific intent to commit such offense, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement.' [Citations.]" (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 156, p. 173.)

"Conspiracy is a specific intent crime, with the intent divided into two elements: '(a) the intent to agree or conspire, and (b) the intent to commit the offense which is the object of the conspiracy . . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must

occasion the drunkenness of another for the purpose of causing him to commit any crime, or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed."

show not only that the conspirators intended to agree but also that they intended to commit the elements of the offense.' [Citation.]" (*People* v. *Backus* (1979) 23 Cal.3d 360, 390 [152 Cal.Rptr. 710, 590 P.2d 837].)

 The first portion of defendants' contention has to do with the manner in which the overt acts were pleaded in the information. Basically, the argument turns on whether a period was erroneously inserted instead of a comma, so that the jury was not informed that the overt acts alleged had to be committed in furtherance of the conspiracy. Defendants argue the problem was compounded by the vague and ambiguous language of the overt acts.

Assuming defects existed in the wording, however, they appeared on the face of the information and hence any objection was waived by defendants' failure to demur on this ground. (§ 1012; *People* v. *White* (1987) 188 Cal.App.3d 1128, 1137, fn. 7 [233 Cal.Rptr. 772]; *People* v. *Williams* (1979) 97 Cal.App.3d 382, 387-388 [158 Cal.Rptr. 778].) Additionally, the jury was instructed that the overt acts had to be committed for the purpose of accomplishing the object of the agreement. Absent strong and specific reason to think otherwise, we are required to assume the jury properly understood and applied the trial court's instructions. (See, e.g., *Zuckerman* v. *Underwriters at Lloyd's* (1954) 42 Cal.2d 460, 478-479 [267 P.2d 777].)

 With reference to the claim of insufficiency of the evidence, the totality of the circumstances supports the jury's finding that all defendants knowingly participated in a conspiracy to violate sections 288 and 311.4, subdivision (c).

"To establish agreement, the People need show no more than a tacit, mutual understanding between coconspirators to accomplish an unlawful act." (*People* v. *Lauria* (1967) 251 Cal.App.2d 471, 475 [59 Cal.Rptr. 628].)

"[I]t is not necessary to prove that the parties met and actually agreed to perform the unlawful act or that they had previously arranged a detailed plan for its execution. Rather significantly, the agreement may be inferred from the conduct of the defendants mutually carrying out a common purpose in violation of a penal statute [citations]." (*People* v. *Lipinski* (1976) 65 Cal.App.3d 566, 575-576 [135 Cal.Rptr. 451], italics omitted.)

Taken in the light most favorable to the judgment below, the evidence shows that all defendants met numerous times for the purpose of molesting children and filming these acts. Johnny, for one, identified all defendants, including Grace, Dill, and Gina, as being present a lot of the times the "nasty things" occurred. Their agreement can be reasonably inferred from

the number of times this went on and the nature of the acts that occurred, as can their dual purpose and intent.

### D. *Aiding and Abetting*

Defendants also contend their convictions cannot be sustained on an aiding and abetting theory.

*People* v. *Beeman, supra*, 35 Cal.3d 547 sets forth the requirements for imposition of liability upon a theory of aiding and abetting:

"[T]he weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]

 "When the definition of the offense includes the intent to do some act or achieve some consequences beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator. By 'share' we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. [Citation.] Rather, an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (*People* v. *Beeman, supra*, 35 Cal.3d at p. 560.)

In *People* v. *Croy* (1985) 41 Cal.3d 1, 12, footnote 5 [221 Cal.Rptr. 592, 710 P.2d 392], the Supreme Court elaborated on *Beeman* and noted that the liability of an aider and abettor is vicarious. If that person's acts are undertaken with the intent that the actual perpetrator's purpose be facilitated thereby, the aider and abettor is guilty of the offense that he intended to facilitate and encourage, and also of any reasonably foreseeable offense that is committed by the person he aids and abets. Whether a person aided and abetted a crime is a question of fact (*People* v. *Mitchell* (1986) 183 Cal.App.3d 325, 329 [228 Cal.Rptr. 286]), as is the question whether an offense is the natural and probable consequence of the act knowingly aided or encouraged (*People* v. *Croy, supra*, at p. 12, fn. 5).

 Evidence of intent is usually not direct. (*People* v. *Beeman, supra*, 35 Cal.3d at p. 558.) An act which has the effect of giving aid and encouragement and which is done with the knowledge of the criminal purpose of the person aided may indicate intent. (*Id.* at p. 559.) Proof of

intent may be made by way of inferences from a defendant's volitional acts which are done with knowledge of the probable consequences, and presence at the scene of the crime, while insufficient of itself to make one an aider and abettor, is one factor which tends to show intent. Other factors which may be considered include the defendant's failure to take steps to prevent the commission of the crime, companionship, and conduct before and after the crime. (*People* v. *Jones* (1980) 108 Cal.App.3d 9, 15 [166 Cal.Rptr. 131].)

 Considering the evidence adduced at trial in light of the foregoing principles, it is clear substantial evidence supports defendants' convictions on the aiding and abetting theory.

Grace argues that assuming she allowed a child to make oral contact with her breast, it does not necessarily follow she would condone the sodomizing of a small child. However, assuming she only intended to commit the first act, she nevertheless knowingly participated in a situation such that other, varied acts of molestation were the natural and probable consequences thereof. Moreover, despite Grace's argument that it is unlikely she was present during all of the charged acts, she has failed to demonstrate that she was *not* present, or that, assuming she was not present, she still was not vicariously liable for the offenses.

Defendants' various claims of insufficiency of the evidence are rejected.

## IX.

### LATE ELECTION/COUNTS NOT SHOWN AT PRELIMINARY HEARING

Defendants contend they were prejudiced by the trial court's refusal to require the prosecution to elect the act upon which it relied to support each count. They also contend they were improperly convicted of numerous counts which were not shown by evidence adduced at their respective preliminary hearings. Respondent concedes defendants preserved both issues for appeal.

Three separate preliminary hearings were held. The Rick/Tutti/Colleen hearing was held July 5-July 12, 1984. The Grace/Dill/Gina hearing was held July 24-August 8, 1984. The Forsythe hearing was held October 31-November 1, 1984. The only witness called by the prosecution to testify as to the charged offenses at each preliminary hearing was alleged child victim Johnny M.

Information No. 27641 was filed against Rick, Tutti, and Colleen on July 25, 1984. Information No. 27774 was filed against Grace, Dill, and Gina on

August 16, 1984. For the most part, both informations were the same and alleged offenses occurring between January 1, 1982, and December 30, 1983. The charges all involve violations of the Penal Code. Force was alleged in all of the section 288 counts; in some the defendant allegedly forcing the child victim was specified; in most of the counts, it was expressly alleged that other defendants aided and abetted. For the present purposes, it is sufficient to merely identify the time frame, principal participants, and act alleged, as follows:

| Count | Penal Code Section | Summary of Charge |
|---|---|---|
| 1) | 182 | Conspiracy to violate sections 288 and 311.4(c). |
| 2) | 288(b) | Rick forced Johnny to lick white powder off Rick's penis. |
| 3) | 288(b) | Rick touched his penis to Johnny's behind. |
| 4) | 288(b) | Rick put his penis in Johnny's mouth. |
| 5) | 288(b) | Johnny licked white powder from Tutti's vagina. |
| 6) | 288(b) | Tutti forced Johnny to suck on her breast. |
| 7) | 288(b) | Rick put his penis in Bobo's mouth. |
| 8) | 288(b) | Rick put his penis in Tommy's mouth. |
| 9) | 288(b) | Rick put his penis in Brian's mouth. |
| 10) | 288(b) | Rick put his penis in Christine's mouth. |
| 11) | 288(b) | Unspecified act involving Windy. |
| 12) | 288(b) | Bobo committed a lewd act on the body of another child. |
| 13) | 288(b) | Johnny committed a lewd act on the body of another child, separate from count 12. |
| 14) | 311.4(c) | Use of Johnny for commercial pornography. |
| 15) | 288(b) | Johnny committed a lewd act with another child, separate from counts 12 and 13. |
| 16) | 288(b) | Johnny put his penis in contact with another child's genitals. |
| 17) | 288(b) | Johnny touched his penis to Clovette's genitals. |
| 18)[72] | 288(b) | Tommy licked Tutti's vagina. |
| 19) | 288(b) | Tommy licked urine from a bottle. |
| 20) | 288(b) | Tommy committed a lewd act on another child. |
| 21) | 288(b) | Tommy lay on Tutti. |
| 22) | 288(b) | Tommy put his mouth to Rick's penis. |
| 23) | 311.4(c) | Use of Tommy for commercial pornography. |

---

[72] Counts 18-22 and 24-27 alleged offenses occurring between January 1, 1982, and December 30, 1983, but "upon a different date than that alleged in counts two through seventeen, inclusive."

| Count | Penal Code Section | Summary of Charge |
|---|---|---|
| 24) | 288(b) | Tommy put his penis in contact with Tutti's vagina. |
| 25) | 288(b) | Tommy orally copulated Rick. |
| 26) | 288(b) | Rick sodomized Tommy. |
| 27) | 288(b) | Tommy licked white powder off Rick's penis. |
| 28) | 273a(1) | Felony child endangerment of Johnny. |
| 29)[73] | 288(b) | Tutti touched her genitals to Brian's. |
| 30) | 288(b) | Unspecified act involving Brian. |
| 31) | 288(b) | Tutti lay on Brian. |
| 32) | 288(b) | Brian orally copulated Rick. |
| 33) | 288(b) | Brian orally copulated Tutti. |
| 34) | 273a(1) | Felony child endangerment of Brian. |
| 35) | 288(b) | Rick's penis made contact with Brian's behind. |
| 36) | 273a(2) | Misdemeanor child endangerment of Tommy. |
| 37) | 288(b) | Unspecified act involving Windy. |
| 38) | 288(b) | Unspecified act involving Bobo. |
| 39) | 288(b) | Unspecified act involving Christine. |
| 40) | 245(a)(1) | Assault with knife on Johnny. |
| 41) | 245(a)(2) | Assault with firearm on Johnny. |
| 42) | 288(b) | Johnny sucked Colleen's breast. |
| 43) | 288(b) | Johnny put his penis in Colleen's vagina. |
| 44) | 288(b) | Unspecified act involving Windy. |
| 45) | 288(b) | Tommy orally copulated Colleen. |
| 46) | 288(b) | Johnny drank Rick's urine. |
| 47) | 288(b) | Brian drank Rick's urine. |
| 48) | 288(b) | Rick sodomized Brian. |
| 49) | 288(b) | Brian sucked Colleen's breasts. |
| 50) | 288(b) | Brian orally copulated Colleen. |
| 51) | 288(b) | Unspecified act involving Amanda. |
| 52) | 288(b) | Unspecified act involving Amanda. |
| 53) | 288(b) | Unspecified act involving Amanda. |
| 54)[74] | 288(b) | Unspecified act involving Johnny. |
| 55) | 288(b) | Unspecified act involving Brian. |
| 56) | 288(b) | Unspecified act involving Tommy. |
| 57) | 288(b) | Unspecified act involving Bobo. |
| 58) | 288(b) | Unspecified act involving Brian. |

[73] Counts 29-33 and count 35 alleged offenses committed between January 1, 1982, and December 30, 1983, "but upon a date different than alleged in counts to [sic] through twenty-four, inclusive."

[74] Counts 54-58 were charged against Grace, Dill, and Gina only.

The original information against Forsythe, information No. 28244, was filed November 13, 1984, and charged the following offenses committed between January 1, 1982, and December 30, 1983:

| Count | Penal Code Section | Summary of Charge |
|---|---|---|
| 1) | 182 | Conspiracy to violate sections 288 and 311.4(c). |
| 2) | 288(b) | Rick forced Johnny to lick white powder off Rick's penis. |
| 3) | 288(b) | Rick touched his penis to Johnny's behind. |
| 4) | 288(b) | Rick put his penis in Johnny's mouth. |
| 5) | 288(b) | Johnny licked white powder from Tutti's vagina. |
| 6) | 288(b) | Tutti made Johnny suck her breast. |
| 7) | 288(b) | Johnny touched his private to Carol's body. |
| 8) | 311.4(c) | Use of Johnny for commercial pornography. |
| 9) | 288(b) | Johnny put his penis in contact with Lisa's genitals. |
| 10) | 288(b) | Johnny touched his penis to Clovette's genitals. |
| 11) | 288(b) | Tommy licked Tutti's vagina. |
| 12) | 288(b) | Tommy licked urine from a bottle. |
| 13) | 288(b) | Rick put his tongue in Tommy's mouth. |
| 14) | 288(b) | Tommy lay on Tutti. |
| 15) | 288(b) | Tommy put his mouth to Rick's penis. |
| 16) | 311.4(c) | Use of Tommy for commercial pornography. |
| 17) | 288(b) | Tommy put his penis in contact with Tutti's vagina. |
| 18) | 288(b) | Tommy orally copulated Rick. |
| 19) | 288(b) | Rick put his penis on Tommy's behind. |
| 20) | 288(b) | Tommy licked white powder off Rick's penis. |
| 21) | 273a(1) | Felony child endangerment of Johnny. |
| 22) | 288(b) | Tutti touched her genitals to Brian's. |
| 23) | 288(b) | Tutti touched Brian's penis. |
| 24) | 288(b) | Tutti lay on Brian. |
| 25) | 288(b) | Tutti orally copulated Brian. |
| 26) | 273a(1) | Felony child endangerment of Brian. |
| 27) | 288(b) | Rick's penis made contact with Brian's behind. |
| 28) | 288(b) | Unspecified act involving Windy. |
| 29) | 288(b) | Unspecified act involving Brandy. |
| 30) | 288(b) | Unspecified act involving Bobo. |
| 31) | 288(b) | Unspecified act involving Amanda. |
| 32) | 311.4(c) | Use of Amanda for commercial pornography. |
| 33) | 311.4(c) | Use of Brandy for commercial pornography. |
| 34) | 311.4(c) | Use of Bobo for commercial pornography. |

| | *Penal Code* | |
|---|---|---|
| *Count* | *Section* | *Summary of Charge* |
| 35) | 311.4(c) | Use of Windy for commercial pornography. |
| 36) | 288(b) | Forsythe put his penis in Johnny's mouth. |
| 37) | 288(b) | Forsythe put his penis in Johnny's mouth. |
| 38) | 288(b) | Forsythe put his penis in Johnny's mouth. |
| 39) | 288(b) | Forsythe put his penis on Johnny's behind. |
| 40) | 288(b) | Forsythe put his penis on Johnny's behind. |
| 41) | 288(b) | Forsythe put his penis on Johnny's behind. |
| 42) | 288(b) | Forsythe put his penis in Amanda's mouth. |
| 43) | 288(b) | Forsythe put his penis on Amanda's behind. |
| 44) | 273a(2) | Misdemeanor child endangerment of Tommy. |

Colleen's and Rick's motions to dismiss the informations, pursuant to section 995, were granted as to counts 17, 20, and 27. On December 17, 1984, a few days after the start of trial, the People were granted permission to file amended informations as to all defendants except Forsythe. Colleen's motion to require an election of the acts relied on in counts 17, 20, and 27 was denied.

The amended informations made the following changes:

| | *Penal Code* | |
|---|---|---|
| *Count* | *Section* | *Summary of Charge* |
| 12) | 288(b) | Bobo put his mouth between Colleen's legs. (Changed in Rick/Tutti/Colleen information only.) |
| 17) | 288(b) | Johnny put his penis in contact with another child. |
| 20) | 288(b) | Unspecified act involving Christine. |
| 21) | 288(b) | Tommy lay on Tutti; omitted allegation that offense occurred on different date than counts 2-17. (Changed in Grace/Dill/Gina information only.) |
| 22) | 288(b) | Tommy put his mouth to Rick's penis; omitted allegation that offense occurred on different date than counts 2-17. (Changed in Grace/Dill/Gina information only.) |
| 27) | 288(b) | Unspecified act involving Christine. |
| 31) | 288(b) | Tutti lay on Brian; unchanged in Rick/Tutti/Colleen information; deleted from Grace/Dill/Gina information. |

| Count | Penal Code Section | Summary of Charge |
|-------|--------------------|--------------------|
| 32) | 288(b) | Brian orally copulated Rick; omitted allegation that offense occurred on different date than counts 2-24. (Changed in Grace/Dill/Gina information only.) |
| 33) | 288(b) | Brian orally copulated Tutti; omitted allegation that offense occurred on different date than counts 2-24. (Changed in Grace/Dill/Gina information only.) |
| 48) | 288(b) | Rick put his penis on Brian's behind. |

Colleen's demurrer, in which other defendants joined, was overruled. Additionally, her motion to dismiss (§ 995) counts 17, 20, and 27 was denied, as were Forsythe's and Dill's motions pursuant to section 995. Also denied was a defense motion regarding proof of uncharged acts. Defendants' motion for election of acts as to all counts was likewise denied.

At trial, the children testified to many more offenses than were charged in the informations. Further defense requests for election were denied, as were motions to strike testimony. Objections that the offenses testified to were not shown by evidence at the preliminary hearing were routinely overruled.

On May 20, 1985, following presentation of the People's evidence and just prior to resting their case, the prosecution orally moved to be allowed to "make some minor amendments on the information to conform to proof and state elections." Defense objections were overruled. In the jury's presence, the following amendments were stated as to Forsythe's information:[75]

| Count | Summary of Charge |
|-------|--------------------|
| 12) | Changed Tommy licked urine from a bottle to Tommy drank urine from a bottle. |
| 18) | Changed Tommy orally copulated Rick to Tommy put his mouth on Rick's penis. |
| 24) | Changed Tutti lay on Brian to Brian lay on Tutti. |
| 25) | Changed Tutti orally copulated Brian to Brian put his mouth on Tutti's vagina. |
| 28) | Changed from unspecified act involving Windy to Rick put his penis on Windy's behind. |
| 29) | Changed from unspecified act involving Brandy to Brian lay on Brandy. |

[75] Amendments to children's names, such as changing a last name, were also made. They are insignificant and so are not shown. Defendants do not contend they were prejudiced by such changes.

| Count | Summary of Charge |
|-------|-------------------|
| 44) | Changed misdemeanor child endangerment (§ 273a, subd. (2)) to felony child endangerment (§ 273a, subd. (1)). |

The following changes were made in the amended informations involving the remaining defendants:

| Count | Summary of Charge |
|-------|-------------------|
| 11) | Changed from unspecified act involving Windy to Rick put his penis on Windy's behind. |
| 13) | Changed from unspecified act involving Johnny and another child to Johnny touched Windy's genitals. |
| 15) | Changed from unspecified act involving Johnny and another child to Johnny lay on top of Carol. |
| 16) | Changed from Johnny put his penis in contact with another child's genitals, to Christine's genitals. |
| 17) | Changed from Johnny put his penis in contact with another child, to Lisa. |
| 19) | Changed Tommy licked urine from a bottle to Tommy drank urine from a bottle. |
| 20) | Changed from unspecified act involving Christine to Tommy lay on top of Christine. |
| 25) | Changed Tommy orally copulated Rick to Tommy put his mouth in Rick's penis. |
| 26) | Changed Rick sodomized Tommy to Rick put his penis on Tommy's behind. |
| 27) | Changed from unspecified act involving Christine to Christine touched Johnny's penis. |
| 30) | Changed from unspecified act involving Brian to Brian put his mouth on Tutti's breast. |
| 31) | Changed from Tutti lay on Brian to Brian lay on Tutti. (Charged in Rick/Tutti/Colleen information only.) |
| 32) | Changed from Brian orally copulated Rick to put his mouth on Rick's penis. |
| 33) | Changed from Brian orally copulated Tutti to put his mouth on Tutti's vagina. |
| 36) | Changed misdemeanor child endangerment (§ 273a, subd. (2)). of Tommy to felony child endangerment (§ 273a, subd. (1)). |
| 37) | Changed from unspecified act involving Windy to Forsythe touched Windy's privates. |
| 38) | Changed from unspecified act involving Bobo to Bobo put his mouth on Tutti's breast. |

| Count | Summary of Charge |
|-------|-------------------|
| 39) | Changed from unspecified act involving Christine to Rick touched Christine's genitals. |
| 43) | Changed from Johnny put his penis in Colleen's vagina to on her vagina. |
| 44) | Changed from unspecified act involving Windy to Windy touched Johnny's penis. |
| 45) | Changed from Tommy orally copulated Colleen to put his mouth on her vagina. |
| 46) | Changed from Johnny drank Rick's urine to Johnny drank urine. |
| 47) | Changed from Brian drank Rick's urine to Brian drank urine. |
| 50) | Changed from Brian orally copulated Colleen to put his mouth on her vagina. |
| 51) | Changed from unspecified act involving Amanda to Brian lay on top of Amanda. |
| 52) | Changed from unspecified act involving Amanda to Brian touched Amanda's genitals. |
| 53) | Changed from unspecified act involving Amanda to Amanda touched Brian's privates. |

Counts 54 through 58 were still only charged in the Grace/Dill/Gina information. They were amended as follows:

| Count | Summary of Charge |
|-------|-------------------|
| 54) | Changed from unspecified act involving Johnny to Johnny put his mouth on Dill's penis. |
| 55) | Changed from unspecified act involving Brian to Brian put his mouth on Forsythe's penis. |
| 56) | Changed from unspecified act involving Tommy to Tommy put his mouth on Dill's penis. |
| 57) | Changed from unspecified act involving Bobo to Windy touched Bobo's privates. |
| 58) | Changed from unspecified act involving Brian to Forsythe put his penis in contact with Brian's behind. |

In response to the oral amendments, various defense counsel filed motions to dismiss (§ 995), motions opposing election, motions alleging some offenses were not shown by evidence adduced at the preliminary hearing, demurrers, and for a continuance. The motions were denied and the demurrers overruled.

On May 20, the day the amendments were stated in open court, the trial court "requested" the prosecution to file an amended information "the next day or so." On June 4, following objections from defense counsel that nothing had been filed, the court ordered the prosecution to file an amended information by June 10, pursuant to amendments made in open court to conform to proof. On June 10, second amended informations were filed as to Rick/Tutti/Colleen and Grace/Dill/Gina, and a first amended information was filed as to Forsythe. Despite such a change not having been announced beforehand or approved by the court, these informations deleted any allegations of a time frame other than that of January 1, 1982, through December 30, 1983. Thus, there were no longer allegations that certain acts occurred on a date different from certain other acts within the same time frame.

During the first of the prosecution's closing arguments, Vendrasco elected the testimony on which the People relied to prove the various allegations. Reference was made to pages of the reporters' transcripts, and Vendrasco read portions thereof. Prior to this election, the jury was instructed, pursuant to special instruction A-1: "Ladies and Gentlemen of the jury, I have given you a general explanation of the nature and purpose of the arguments that will be given by the attorneys. There is, however, one additional purpose of the opening argument by the prosecution. It's required by law that the People make specific elections as to which specific acts constitute each crime alleged in the information.

"You will be informed as to the elected acts by the People in the following manner: First, a copy of the information, that's the complaint filed against each defendant will be available to you in your deliberations. Second, it's my understanding that the People will in their opening argument make specific references to the acts that they have elected for each alleged crime charged in the information. You should, therefore, take note of these acts that the prosecution has elected for each crime alleged in the information."

The jury was later instructed, pursuant to special instruction A-17: "It is the responsibility of the prosecution to identify to the jury which specific act is alleged to constitute each crime alleged in the Information. The jury is bound by the identification of said act by the prosecutor. The prosecutor has identified said specific acts by pleading certain language in the Informations, and by referring to the acts identified in his opening argument to the jury."

Special instruction A-18 was also read to the jury: "You will be provided with a copy of the Informations filed by the People in these consolidated cases.

"As you have previously been told, the Information is a pleading which alleges what offenses the defendants are charged with. The Information consists of the formal charges against the defendants and is not evidence and must in no degree be considered as such. The Information is not provided to you to define or set forth the elements of any crime. The sole purpose of allowing you to use the Informations in your deliberations is to assist you in identifying the crimes and any overt acts which are alleged in such.

"The definition of each crime and the elements required to be proved, correction, and the elements required to prove each crime are included in the instructions that I am giving to you. The Information may not be used or considered for any other purpose."

## A. *Failure to Compel Timely Election*

Defendants contend they were prejudiced by the trial court's refusal to require, prior to trial or at least early in the proceedings, the prosecution to elect the specific act upon which it was relying to prove each count. Respondent counters that any error was harmless and defendants' due process rights were not violated, as a unanimity instruction was given.

Recently, in *People* v. *Jones, supra*, 51 Cal.3d 34, our Supreme Court discussed the election doctrine and evidentiary and due process requirements in cases where the victim's testimony is "generic," i.e., unparticularized as to details of the alleged offenses. In the instant case, however, the convictions were supported by evidence sufficiently specific as to time, place or circumstance. Moreover, *Jones* did not address the due process issue that exists where, as here, many of the specific offenses of which defendants were convicted were not shown by evidence adduced at the preliminary hearings. Thus, the problem is not merely one of election or jury unanimity, but whether defendants received adequate notice of the acts against which they might be called upon to defend. The prosecution could have elected at the outset of trial and the court could have given any number of unanimity instructions, but if defendants were ultimately forced to defend against offenses not shown at the preliminary hearing, there still existed a due process violation such that reversal is required.

Because the convictions are being reversed on other grounds, we need not determine whether any of the counts would have to be reversed solely because of the election problem, or whether the giving of the unanimity instruction would have cured the failure of election absent the preliminary hearing problem. The preliminary hearing problem must be addressed, however, because counts reversed on this ground could not merely be re-

tried. Instead, the People would have to recharge them so there could be a preliminary examination thereon. This would leave defendants free to move for dismissal on whatever grounds might be appropriate, including statute of limitations, etc.

## B. *Offenses Not Shown at Preliminary Hearing*

Section 739 provides in part: "When a defendant has been examined and committed, . . . it shall be the duty of the district attorney of the county in which the offense is triable to file in the superior court of that county . . . an information against the defendant which may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed . . . ."

■■■ "[A]n information which charges the commission of an offense not named in the commitment order will not be upheld unless (1) the evidence before the magistrate shows that such offense was committed [citation], and (2) that the offense 'arose out of the transaction which was the basis for the commitment' on a related offense. [Citations.]" (*Jones* v. *Superior Court* (1971) 4 Cal.3d 660, 664-665 [94 Cal.Rptr. 289, 483 P.2d 1241].)

A trial court has no jurisdiction to proceed on an information which runs afoul of this rule; such an information is defective and on motion must be set aside. (*People* v. *Firestine* (1968) 268 Cal.App.2d 533, 536-537, fn. 3 [74 Cal.Rptr. 168].)

The same general rule holds where an amendment is concerned. Section 1009 provides in relevant portion: "An . . . information may be amended by the district attorney, . . . without leave of court at any time before the defendant pleads or a demurrer to the original pleading is sustained. The court in which an action is pending may order or permit an amendment of an . . . information, . . . for any defect or insufficiency, at any stage of the proceedings, . . . An indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination . . . ."

■■■ Within the limitations expressed in *Jones* v. *Superior Court, supra*, 4 Cal.3d at pages 664-665, section 1009 gives the trial court discretion to permit an amendment of the information to charge any offense shown by evidence taken at the preliminary examination, at any time during trial, provided the defendant's substantial rights are not prejudiced thereby. (*People* v. *Hernandez* (1961) 197 Cal.App.2d 25, 31 [17 Cal.Rptr. 20].) Section 1009 preserves a defendant's substantial right to trial on a charge of

which he had due notice. (*People* v. *Flowers* (1971) 14 Cal.App.3d 1017, 1020-1021 [92 Cal.Rptr. 647].) In other words, section 1009 protects a defendant's right to due process.

This court has previously stated in an election context: "Notice of the specific charge is a constitutional right of the accused. [Citation.] An information which charges a criminal defendant with multiple counts of the same offense does not violate due process so long as (1) the information informs defendant of the nature of the conduct with which he is accused and (2) the evidence presented at the preliminary hearing informs him of the particulars of the offenses which the prosecution may prove at trial. [Citations.] The information plays a limited but important role—it tells a defendant what kinds of offenses he is charged with and states the number of offenses that can result in prosecution. However, the time, place, and circumstances of charged offenses are left to the preliminary hearing transcript. This is the touchstone of due process notice to a defendant. [Citation.] So long as the evidence presented at the preliminary hearing supports the number of offenses charged against defendant and covers the timeframe(s) charged in the information, a defendant has all the notice the Constitution requires. The defendant may demur if he or she believes the lack of greater specificity hampers the ability to defend against the charges. [Citation.]" (*People* v. *Jeff, supra*, 204 Cal.App.3d at pp. 341-342; see *People* v. *Jones, supra*, 51 Cal.3d at p. 51.)

■■■ Respondent seizes on the last portion of the foregoing and argues that, although certain counts were not supported by evidence of the specific acts averred in the charges, defendants suffered no lack of notice or prejudice from the disparity. Respondent argues: "[E]ach Section 288 count *identified a victim* who was *lewdly touched*, and there were ample numbers of occasions testified to in the preliminary hearings showing these touchings with the specified victims. As appellants were bound over and charged as co-conspirators in each Section 288 charge, it was permissible to amend to conform to proof under Section 1009, to change the *actor* in each count where a lewd touching is charged against a certain victim. Under this reasoning, it would be permissible to amend the information to charge the victim was touched in the same way by another child, acting as an agent of one of the co-conspirators, or another adult . . . .

"Additionally, it could be argued that the informations simply were amended to conform to proof at trial on matters which were not essential elements of the crime. [Citation.] Each charge was stated against appellants that 'on or about' the time frame in issue, they 'willfully, unlawfully and lewdly committed a lewd and lascivious act upon and with the body of' a specified victim, and only then described the manner in which the act

occurred. Under this reasoning, as long as the preliminary hearing provides evidence of a certain number of lewd acts upon the specified victim 'on or about' the time frame in issue, it should be immaterial in what manner the act is described in the charge. [Citations.]

"Under this approach, appellants are on notice to defend themselves against any touchings 'upon and with the body of' the victim within the time frame alleged in the information and at the green house. Consequently, . . . appellants suffered no harm, surprise or inability to defend themselves from the charge merely from the absence in the preliminary hearing transcript of the specific act with those players identified in the charge where it read 'in the following manner.' In *People* v. *Britton* (1936) 6 Cal.2d 1, 4, it was noted that 'the particular mode or means employed in the commission of an offense' need not be alleged. '[P]articulars as to manner, means, place or circumstances need not in general be added to the statutory [*sic*] definition. [Citations.] The . . . information need only charge the essential elements of the statutory offense. It then fairly apprises the defendant of what he is to meet at the trial.' [Citation.]" (Fn. omitted.)

This argument ignores the differences in function between an information and the transcript of the preliminary hearing. ▮▮▮ It is true that an information need *not* notify a defendant of all the particulars of the crime charged. *That role is left to the preliminary hearing transcript.* ▮▮▮ Where, as here, the particulars are *not* shown by the preliminary hearing transcript, the defendant is *not* on notice in such a way that he has the opportunity to prepare a meaningful defense. Thus, in *People* v. *Diaz* (1987) 195 Cal.App.3d 1375 [241 Cal.Rptr. 366], this court stated: "As long as a criminal defendant has the meaningful opportunity to prepare a defense to *specific acts*, . . . no meaningful purpose would have been served in forcing this prosecutor to make an election at the beginning of the trial. The prosecution in the instant action never wavered from the evidence presented at the preliminary hearing. It is clear that the defendant in the *Williams* [*People* v. *Williams* (1901) 133 Cal. 165 (65 P. 323)] case did not have the benefit of a preliminary hearing or a pretrial election by the prosecution to give him the *opportunity to focus upon specific acts* so that he could tender a meaningful defense. That is not the situation in the instant action." (*Id.* at p. 1383, italics added.) It is, however, the situation here.

A hypothetical is in order. Suppose the evidence at a preliminary hearing revealed the commission of four distinct violations of section 288, say two oral copulations and two lewd touchings, involving victim X and occurring over a four-month period in defendant's bedroom. X, being a child, could not pinpoint the times of the offenses except to say that one set occurred near Christmas and the other following a school athletic event. Suppose

further that the information charged in statutory language only two violations occurring within the four-month time frame. Further assume that the evidence at trial revealed the same acts occurring within the same time frame inside defendant's home.

Absent unusual circumstances, an amendment at trial to charge the remaining two violations would not violate due process, because the defendant was on notice from the preliminary hearing as to what charges he might potentially have to be prepared to defend against at trial. In such a situation, the defendant would not be prejudiced by a variance in time or place, so long as the evidence showed the offenses were committed within the original four-month period and somewhere in the house. The evidence adduced at the preliminary hearing placed the defendant on notice as to all possible charges; under normal circumstances, his opportunity to prepare an effective defense would not be affected merely because the evidence at trial showed the offenses occurred at a different time (within the time frame alleged in the original information) or a different room of the house. **(90)** Even in alibi cases, neither the time (*People* v. *Wrigley* (1968) 69 Cal.2d 149, 155 [70 Cal.Rptr. 116, 443 P.2d 580]) nor the place at which an offense is committed (*People* v. *Thompson* (1934) 3 Cal.App.2d 359, 362-363 [39 P.2d 425]; § 956) is material, and an immaterial variance will be disregarded (*People* v. *LaMarr* (1942) 20 Cal.2d 705, 711 [128 P.2d 345].)

 If the defendant is misled in making his defense, however, the variance *is* material. (*People* v. *LaMarr, supra,* 20 Cal.2d at p. 711.) Suppose, in the foregoing hypothetical, the evidence at trial showed two acts of sodomy and two of sexual intercourse and the information was amended accordingly. In such a situation, the preliminary hearing transcript would *not* afford the defendant adequate notice of the specific acts against which he might have to defend. Moreover, in such a situation the opportunity to prepare a meaningful defense would obviously be adversely affected, since the change in alleged acts would affect medical testimony, cross-examination of the alleged victim(s), etc. If the amendments were not specified until the close of the People's case and the defendant were given no continuance to meet them, the problem would be even greater.

To say that due process would not be violated in the second situation because the defendant knew to defend against four violations of section 288 within a certain time frame is to ignore the reality of the situation. In the case at bench, the prosecution's attitude to the whole problem is revealed by a statement made by Gindes, outside the jury's presence, during argument over a motion to strike Windy's testimony as being without foundation and irrelevant to the charges at hand. As noted in our discussion of misconduct, he said:

"If they want people to testify against them that know dates, they should molest adults instead of children. Maybe adults can do that or accountants who keep diaries. We're dealing with little kids here. I think we're not having a due process right taken away from the defendant by the prosecution, they're denying themselves the right to have specific dates because of their choice of victims, and we have no control over that."

This concept, which goes hand-in-hand with the idea that defendants already know the times, acts, and places involved, "assumes the guilt of the accused, or its practical equivalent . . . . Such a concept of presumed guilt is foreign to our system of criminal justice." (*Sallas* v. *Municipal Court* (1978) 86 Cal.App.3d 737, 743 [150 Cal.Rptr. 543].) Criminal trials, regardless of the nature thereof, must be conducted in a manner consistent with the defendants' constitutional rights.

This is not to say that all particulars of an offense are material. Under the circumstances of the instant case, it does not appear due process was violated where the evidence at the preliminary hearing showed a specific act occurring on one occasion (for instance, the "last time"), whereas the evidence at trial placed the act on another occasion (for example, the "time after the track meet time"). Nor is it material that evidence at the preliminary hearings placed all molestations in Rick and Tutti's room, whereas some were shown at trial to have occurred in Carol and Lisa's room. Although defendants attempted to show that Rick and Tutti's room was too small to house an orgy of the size testified to by the children, it would not have been difficult for them to obtain the dimensions of the girls' room in order to attempt to show it was equally as unlikely a location. In fact, there was some testimony as to the size of the girls' room.

In some counts as charged in the second amended informations (first amended as to Forsythe), however, the specific act and/or actors changed from previous amendments, and/or the specific act involving specific actors was not shown by evidence adduced at a particular preliminary hearing. Respondent essentially argues defendants were on notice to defend against any and all lewd acts involving any child shown by preliminary hearing evidence to have been present during the molestations.[76] To hold such variances are immaterial, however, would be to hold that due process is satisfied as long as the preliminary hearing evidence shows five violations of a statute and the evidence at trial shows the same number of violations of the same statute, regardless of the particulars. Such a holding would basically do away with use of the preliminary hearing transcript as a means for

[76] Respondent concedes that counts 11, 13, 16, 20, 27, 31 (Rick/Tutti/Colleen only); 37, 39, 43, 44, 51, 52, and 53 (everyone but Forsythe); count 57 (Grace/Dill/Gina only); and counts 23, 24, 28, and 29 (Forsythe) must be reversed if we do not agree with this argument.

giving fair notice. This is not the law; a preliminary hearing transcript affording notice of the time, place and circumstances of charged offenses " 'is the touchstone of due process notice to a defendant.' " (*People* v. *Jeff, supra,* 204 Cal.App.3d at p. 342.)[77]

Accordingly, under the circumstances of the instant case, we reject respondent's argument that the convictions based upon the second amended informations (first amended, for Forsythe) were valid merely because the evidence at the preliminary hearings may have supported the same number of violations in the same time frame or because conspiracy was charged.[78] We hold that convictions on the following counts must be reversed as to the individual defendants indicated because evidence supporting the offense charged in each of said counts was not adduced at defendants' respective preliminary hearings.

### SECOND AMENDED INFORMATION NO. 27641
### (RICK, TUTTI AND COLLEEN)

*Count 11,* charge: Rick put his penis in Windy's behind. The only evidence of such an act was adduced at Forsythe's preliminary hearing. Respondent offers no authority for using evidence from one defendant's preliminary hearing to supply evidence missing from another defendant's hearing, merely because the defendants subsequently have their cases consolidated for trial.

*Count 13,* charge: Johnny touched Windy's genitals. No evidence of such conduct was adduced at the Rick/Tutti/Colleen preliminary hearing.

*Count 16,* charge: Johnny put his penis in contact with Christine's genitals. Respondent concedes there was no evidence of such an act adduced at the Rick/Tutti/Colleen preliminary hearing.

*Count 20,* charge: Tommy lay on top of Christine. There was no testimony about such an act at the Rick/Tutti/Colleen preliminary hearing. The

---

[77] This conclusion is not changed by section 956, which states: "When an offense involves the commission of, or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured, or intended to be injured, or of the place where the offense was committed, or of the property involved in its commission, is not material." Section 956 states a rule of pleading; the errors described therein are not fatal because the accused receives notice of the particulars of the offense from the preliminary hearing transcript. (See *People* v. *Gordon* (1945) 71 Cal.App.2d 606, 610-611 [163 P.2d 110].)

[78] In *People* v. *Jones, supra,* 51 Cal.3d 34, the Supreme Court did not address or reverse the holding of the Court of Appeal that, as to certain counts, reversal was required because amending the time frame alleged in the information changed the offense to one not shown by evidence at the preliminary hearing and the change violated the defendant's fundamental right to be apprised as to when the events occurred.

fact that Christine was mentioned as being involved in other acts did not adequately notify defendants of the need to defend against this particular act.

*Count 24*, charge: Tommy put his penis in contact with Tutti's vagina. Johnny did not testify to any such act during the Rick/Tutti/Colleen preliminary hearing, aside from Tommy lying on Tutti, which supports count 21. Since Johnny did not testify to any other such acts occurring between Tommy and Tutti, count 24 cannot stand.

*Count 27*, charge: Christine touched Johnny's penis. Respondent concedes no evidence of such an act was adduced at the Rick/Tutti/Colleen preliminary hearing.

*Count 29*, charge: Tutti touched her genitals to Brian's. Johnny did not testify to any act involving a touching between Tutti's and Brian's genitals, during the Rick/Tutti/Colleen preliminary hearing. Accordingly, count 29 cannot stand as to them.

*Count 31*, charge: Brian lay on top of Tutti. No evidence was presented as to such an act at the Rick/Tutti/Colleen preliminary hearing.

*Count 37*, charge: Forsythe touched Windy's privates. No evidence of such an act was adduced at the Rick/Tutti/Colleen preliminary hearing.

*Count 39*, charge: Rick touched Christine's genitals. Respondent concedes no such act was shown by evidence adduced at the Rick/Tutti/Colleen preliminary hearing. Although there was evidence at that hearing that Rick sodomized Christine, the elected trial testimony consisted of Rick touching her genitals with his hand.

*Count 44*, charge: Windy touched Johnny's penis. During the Rick/Tutti/Colleen preliminary hearing, Johnny did not testify to performing any act with Windy.

*Counts 51, 52 and 53*, charges: Brian lay on top of Amanda, Brian touched Amanda's genitals, and Amanda touched Brian's privates. Respondent concedes no evidence of any such acts was adduced at the Rick/Tutti/Colleen preliminary hearing.

SECOND AMENDED INFORMATION NO. 27774
(GRACE, DILL AND GINA)

*Count 4*, charge: Rick put his penis in Johnny's mouth. At the Rick/Tutti/Colleen preliminary hearing, Johnny testified to sucking white

powder from Rick's penis on three separate occasions. One of these occasions is used to support count 2. This means that one occasion is available to support count 4. Although as elected Johnny's testimony at trial made no reference to white powder, the presence or absence of powder is an immaterial detail insofar as due process is concerned. The basic act is oral copulation of Rick by Johnny; that act is supported as to Rick, Tutti, and Colleen. However, in the Grace/Dill/Gina preliminary hearing, Johnny testified to one act of sucking white powder from Rick's penis, and no other acts of oral copulation of Rick by him at the green house. This being the case, count 4 cannot stand as to Grace, Dill, or Gina.

*Count 11*, charge: Rick put his penis on Windy's behind. The only evidence of such an act was adduced at Forsythe's preliminary hearing. Respondent argues that since the evidence showed that Rick put his penis in Windy's vagina (such evidence was adduced at the Grace/Dill/Gina preliminary hearing only—it was not shown by testimony at the Rick/Tutti/Colleen hearing), defendants received adequate notice of the acts against which they might be required to defend. However, defendants were placed on notice to defend against a certain type of act (intercourse) involving Rick and Windy, and were not placed on notice regarding a different type of act (sodomy).

*Count 12*, charge: Bobo put his mouth between Colleen's legs. At the Rick/Tutti/Colleen preliminary examination, Johnny testified that during the last time, Bobo and other children put their mouths on Colleen's breasts and between her legs. At the Grace/Dill/Gina hearing, there was no testimony about an act involving Bobo and Colleen.

*Count 13*, charge: Johnny touched Windy's genitals. At the Grace/Dill/Gina preliminary hearing, Johnny testified that during the last time, he had to stick his penis in the vaginas of Windy and "Rick's girls." He also testified to putting his mouth between Windy's legs more than once. While either of these acts could technically support count 13, the prosecution elected testimony wherein Windy essentially stated that she and Johnny were forced to touch each other's genitals with their hands. Johnny did not testify to such contact between Windy and himself at the Grace/Dill/Gina preliminary hearing.

*Count 16*, charge: Johnny put his penis in contact with Christine's genitals. Respondent concedes there was no evidence of such an act adduced at the Grace/Dill/Gina preliminary hearing.

*Count 19*, charge: Tommy drank urine. At the Rick/Tutti/Colleen preliminary hearing, Johnny testified that besides himself, Tommy, Brian, and

Bobo had to drink Rick's urine on different occasions. At the Grace/Dill/Gina hearing, however, Johnny only testified to drinking urine himself.

*Count 20,* charge: Tommy lay on top of Christine. There was no testimony about such an act at the Grace/Dill/Gina preliminary hearing. (See discussion of count 20 regarding Rick, Tutti, and Colleen, *ante.*)

*Count 22,* charge: Rick put his penis in Tommy's mouth. At the Rick/Tutti/Colleen hearing, Johnny testified that during the track meet time, Tommy sucked white powder from Rick's penis and also orally copulated Rick on other occasions. At the Grace/Dill/Gina preliminary examination, Johnny testified to Tommy and other children sucking Rick's penis the last time. However, this act is used to support count 8. Since at the Grace/Dill/Gina hearing Johnny only testified to one act of Tommy orally copulating Rick, count 22 cannot stand as to those three defendants.

*Count 24,* charge: Tommy put his penis in contact with Tutti's vagina. During the Grace/Dill/Gina preliminary hearing, Johnny testified to Tommy and others sucking Tutti's breasts and putting their penises in her vagina during the last time. That testimony supports count 21. Since Johnny did not testify to any other such acts occurring between Tommy and Tutti, count 24 cannot stand.

*Count 25,* charge: Rick put his penis in Tommy's mouth. At the Rick/Tutti/Colleen preliminary hearing, Johnny testified to various occasions when Tommy orally copulated Rick. One occurred the last time; it supports count 8. Another occurred the track meet time; it supports count 22 as to Rick, Tutti, and Colleen. Count 25 is supported as to Rick, Tutti, and Colleen, by Johnny's testimony that Tommy also put his mouth on Rick's penis the time after the last time, when Johnny was in fourth grade. At the Grace/Dill/Gina hearing, however, Johnny only testified to one such act, which supports count 8. Accordingly, count 25 cannot stand as to Grace, Dill, or Gina.

*Count 27,* charge: Christine touched Johnny's penis. Respondent concedes no evidence of such an act was adduced at the Grace/Dill/Gina preliminary hearing.

*Count 37,* charge: Forsythe touched Windy's privates. No evidence of such an act was adduced at the Grace/Dill/Gina preliminary hearing.

*Count 39,* charge: Rick touched Christine's genitals. Respondent concedes no such act was shown by evidence adduced at the Grace/Dill/Gina preliminary hearing.

*Counts 42 and 43*, charges: Johnny sucked Colleen's breasts and put his penis on Colleen's vagina. At the Rick/Tutti/Colleen preliminary examination, Johnny testified to sucking Colleen's breasts and putting his penis in her vagina during the last time. At the Grace/Dill/Gina hearing, he did not testify to performing any act with Colleen. Accordingly, counts 42 and 43 cannot stand as to those three defendants.

*Count 44*, charge: Windy touched Johnny's penis. At the Grace/Dill/Gina preliminary examination, Johnny testified to putting his penis in Windy's vagina. Technically, this could support count 44 as to those defendants; however, the trial testimony elected in support of count 44 involved Windy "playing" with the penises of Johnny and other boys. There was no testimony at the Grace/Dill/Gina hearing about Windy touching Johnny's penis with her hand or "playing" with his penis.

*Count 45*, charge: Tommy put his mouth to Colleen's vagina. At the Grace/Dill/Gina preliminary hearing, Johnny did not testify to any act involving Tommy and Colleen. Accordingly, count 45 cannot stand as to those three defendants.

*Count 47*, charge: Brian drank urine. At the Rick/Tutti/Colleen hearing, Johnny testified that Tommy, Brian, and Bobo had to drink pee on different occasions. Although not tied to any specific time frame within the overall dates alleged (e.g., the last time, track meet time, etc.), the act of drinking urine is specific enough so that Rick, Tutti, and Colleen were on notice to defend against it, and also to permit them to formulate a meaningful defense thereto. At the Grace/Dill/Gina preliminary examination, however, the only testimony about urine was that Johnny was made to drink it. Accordingly, count 47 cannot stand as to those three defendants.

*Counts 49 and 50*, charges: Brian sucked Colleen's breast and put his mouth on her vagina. At the Rick/Tutti/Colleen preliminary hearing, Johnny testified that on the last time, Brian and other children put their mouths on Colleen's breasts and between her legs. Brian also performed the acts on another occasion. However, at the Grace/Dill/Gina hearing, Johnny did not testify to any activity between Brian and Colleen. Accordingly, counts 49 and 50 cannot be sustained as to them.

*Counts 51, 52 and 53*, charges: Brian lay on top of Amanda, Brian touched Amanda's genitals, and Amanda touched Brian's privates. Respondent concedes no evidence of any such acts was adduced at the Grace/Dill/Gina preliminary hearing.

*Count 55*, charge: Brian put his mouth on Forsythe's penis. Although such an act was shown by evidence adduced at Forsythe's preliminary

hearing, no such act was testified to at the Grace/Dill/Gina hearing. Accordingly, count 55 cannot stand as to those three defendants.

*Count 57*, charge: Windy touched Bobo's privates. Respondent concedes the evidence adduced at the preliminary hearing does not show this specific act.

*Count 58*, charge: Forsythe put his penis in contact with Brian's behind. Although such an act was shown by evidence adduced at Forsythe's preliminary hearing, it was not shown at the Grace/Dill/Gina hearing. Accordingly, the count cannot stand.

## AMENDED INFORMATION NO. 28244 (FORSYTHE)

*Count 4*, charge: Rick put his penis in Johnny's mouth. At Forsythe's preliminary hearing, Johnny testified to one act of sucking white powder from Rick's penis. That testimony supports count 2. Since Johnny did not testify to any other acts of oral copulation of Rick by him at the green house, count 4 is not supported as to Forsythe. (See discussion of count 4 regarding Grace, Dill, and Gina, *ante*.)

*Count 10*, charge: Johnny put his penis to Clovette's genitals. Respondent contends this count is supported by Johnny's testimony that on more than one occasion, he had to put his mouth on Clovette's breast and vagina, and stick his penis in her vagina. However, that testimony was adduced at the Grace/Dill/Gina preliminary hearing. At Forsythe's preliminary examination, Johnny testified to Clovette's presence. However, the only specific act testified to involving Clovette was when Tommy stuck his penis in Clovette's vagina.

*Count 18*, charge: Tommy put his mouth on Rick's penis. At Forsythe's preliminary examination, Johnny testified to Tommy and other children putting their mouths on Rick's penis during the last time. However, since count 15 alleges the same act and Johnny only testified to one such act in Forsythe's preliminary hearing, counts 15 and 18 cannot both be sustained.

*Count 20*, charge: Tommy licked white powder from Rick's penis. Although Johnny testified at Forsythe's preliminary examination to Tommy and other children putting their mouths on Rick's penis, said act only supports count 15. (See discussion of count 18 regarding Forsythe, *ante*.)

*Count 24*, charge: Brian lay on Tutti. Although Johnny never specifically testified to Brian lying on Tutti, this count could arguably be supported by his testimony that Brian put his penis in Tutti's vagina. However, because

of the limited number of such acts specifically shown by Johnny's testimony (two), if counts 22 and 23 stand, count 24 cannot. Respondent concedes this count, assuming we do not accept the argument that Forsythe was on notice to defend against any and all lewd acts involving Brian.

*Count 29*, charge: Brian lay on Brandy. Respondent concedes there was no evidence of this act adduced at Forsythe's preliminary hearing.

*Count 31*, charge: Amanda touched Brian's privates. Johnny did not testify to such an act at Forsythe's preliminary hearing.

Recapitulation—under the foregoing analysis, the following counts must be reversed:

*As to Rick, Tutti, and Colleen*: SECOND AMENDED INFORMATION No. 27641, counts 11, 13, 16, 20, 24, 27, 29, 31, 37, 39, 44, 51, 52, and 53.

*As to Grace, Dill, and Gina*: SECOND AMENDED INFORMATION No. 27774, counts 4, 11, 12, 13, 16, 19, 20, 22, 24, 25, 27, 37, 39, 42, 43, 44, 45, 47, 49, 50, 51, 52, 53, 55, 57, and 58.

*As to Forsythe*: AMENDED INFORMATION No. 28244, counts 4, 10, 18, 20, 24, 29, and 31.

■ Respondent asserts that retrial of the foregoing counts is not barred by double jeopardy principles. We agree. "[J]eopardy attaches to a defendant when he is placed on trial before a court of competent jurisdiction *upon a valid indictment or information* before a jury duly impaneled and charged with his deliverance." (*Jackson* v. *Superior Court* (1937) 10 Cal.2d 350, 352 [74 P.2d 243, 113 A.L.R. 1422], italics added.) Since an information cannot validly charge, or be amended to charge, an offense not shown by evidence adduced at the preliminary hearing, the first amended (Forsythe) and second amended (remaining defendants) informations were invalid as to the foregoing counts. Accordingly, jeopardy never attached as to those counts, and retrial thereon is not barred by double jeopardy principles. (See *People* v. *Tong* (1909) 155 Cal. 579, 581-584 [102 P. 263] [where information improperly charges count, verdict on said count is a nullity and double jeopardy does not bar retrial thereon].)

This does not mean, however, that retrial is automatically permissible. Since defendants were never validly charged with said counts, the People

would be required to file new charges with reference to those offenses. Such action might be barred by the statute of limitations. This court need not determine this issue; if the prosecution elects to proceed on the counts in question, defendants can bring appropriate motions in the trial court.

## X.

### JURY SELECTION ISSUES

Defendants complain of alleged prejudicial errors occurring in the formation of the venire and during the selection of the trial jurors. Since we reverse on other grounds, we deem it unnecessary to address these complaints other than to note that the People concede that automatic exclusion from the venire of prospective jurors residing outside a 75-mile radius from the City of Bakersfield "was unauthorized by any legislation, rule or regulation, as the superior court district included the entire county."

## XI.

### PENDING MOTIONS

All motions pending before this court not ruled upon in this opinion or not previously ruled upon are denied.

### DISPOSITION

The judgments are reversed.

The trial court is directed to enter its order dismissing the following counts:

Counts 11, 13, 16, 20, 24, 27, 29, 31, 37, 39, 44, 51, 52, and 53 of SECOND AMENDED INFORMATION No. 27641;

Counts 4, 11, 12, 13, 16, 19, 20, 22, 24, 25, 27, 37, 39, 42, 43, 44, 45, 47, 49, 50, 51, 52, 53, 55, 57, and 58 of SECOND AMENDED INFORMATION No. 27774;

Counts 4, 10, 18, 20, 24, 29, and 31 of AMENDED INFORMATION No. 28244.

Martin, Acting P. J., and Vartabedian, J., concurred.